UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


DOCKET NO. 16-842-SDD-RLB


EARL PETERS, ET AL.

VERSUS

RAMAN SINGH, ET AL.

Deposition of DR. RAMAN SINGH, taken at the
Law Offices of Keogh, Cox & Wilson, Ltd., 701 Main
Street, Baton Rouge, Louisiana, on Sunday, November
4, 2018, commencing at 12:38 p.m.

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4          Law Office of William Most

5          (By: William B. Most, Esquire)

6          201 St. Charles Avenue, Suite 114, #101

7          New Orleans, Louisiana 70170

8

9

10   FOR THE DEFENDANT, DR. RAMAN SINGH:

11         Keogh, Cox & Wilson, Ltd

12         (By: Andrew Blanchfield, Esquire)

13         701 Main Street

14         Baton Rouge, Louisiana 70802

15

16

17

18

19

20

21

22

23   Reported By:

24         DESIREE DELATTE
           Certified Court Reporter
25         Registered Professional Reporter

Dr. Raman Singh

```
1                      I N D E X

2                                                  Page

3       Agreement of Counsel                          5

4

5       Examination By

6             MR. MOST                                 6

7

8

9       Exhibits

10      A - Meeting Minutes                           49

11      B - 12/4/2013 E-mail                          59

12      C - Offender Surgical Procedure Request       68

13      D - 3/31/2014 E-mail                          77

14      E - Guidelines For Offender Care              82

15      F - 6/19/2014 E-mail                          91

16      G - LSP Hernia Repair List                    96

17      H - 3/23/2015 E-mail                         112

18      I - 11/7/2013 E-mail                         117

19      J - 10/6/2015 E-mail                         120

20      K - Referral Guidelines                      125

21      L - 6/5/2012 E-mail                          131

22      M - 3/30/2016 Letter                         136

23      N - LSP Hernia Process For Lallie Kemp OR    149

24      O - Letter From Williams Most to Dr. Singh   152

25           *Exhibit O not provided to court reporter
```

Dr. Raman Singh

1           I N D E X

2

3    P - Inmate Consult Form              162

4    Q - Medical Records Form            166

5    R - Medical Record                  170

6    S - Health Care Request Form        170

7    T - Eceptionist Form                171

8    U - Health Care Request Form        182

9    V - June 28, 2016, Letter           188

10        (Exhibit Withdrawn)

11   W - 7/19/2016 E-mail                196

12   X - 11/30/2016 E-mail               206

13   Y - 11/9/2016 Letter                207

14   Z - 1/23/2015 E-mail                222

15   AA - 3/16/2012 E-mail               229

16

17   Witness' Certificate                240

18   Reporter's Page                     241

19   Reporter's Certificate              242

20

21

22

23

24

25

1              S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between counsel for the parties hereto that the

5    deposition of the aforementioned witness is hereby

6    being taken in accordance with the Federal Rules of

7    Civil Procedure, for all purposes allowed, in

8    accordance with law, pursuant to notice;

9              That the formalities of reading and

10   signing are specifically not waived; that the

11   formalities of sealing, certification and filing

12   are specifically waived;

13             That all objections, save those as to the

14   form of the question and the responsiveness of the

15   answer, are hereby reserved until such time as this

16   deposition, or any part thereof, may be used or

17   sought to be used in evidence.

18                    * * * * *

19             DESIREE DELATTE, Certified Court Reporter

20   in and for the State of Louisiana, officiated in

21   administering the oath to the witness.

22                    * * * * *

23

24

25

1                    DR. RAMAN SINGH,

2   after having been first duly sworn by the

3   above-mentioned Court Reporter did testify as

4   follows:

5                    EXAMINATION

6   BY MR. MOST:

7        Q.  Dr. Singh, just so we start off, could you

8   give us your name and title, please?

9        A.  Good morning -- good afternoon.  My name

10   is Raman, R-A-M-A-N, and last name is Singh,

11   S-I-N-G-H.

12        Q.  And I believe you've given a number of

13   depositions before; is that correct?

14        A.  Yes, sir.

15        Q.  And so you realize you're under oath

16   today?

17        A.  Yes, sir.

18        Q.  And that your answers here still have the

19   same force as if we were in a courtroom with a

20   judge and jury?

21        A.  Yes, sir.

22        Q.  Is there anything that will prevent you

23   today from giving your full attention or truthful

24   answers?

25        A.  I don't think so.

1    Q.  Are you taking any medications or

2    suffering from any illness that would prevent you

3    from understanding my questions or answering them

4    fully and truthfully?

5    A.  Not that I know of.

6    Q.  And if you need to take a break at any

7    time, just let me know and we'll take breaks as you

8    need them.  And we've had depositions before, so I

9    know you're good at this, but I will try and wait

10   until you finish answering the question before I

11   ask the next one.  And if you'll wait until I'm

12   done with the question before answering, that way

13   we can create a clean transcript.  Is that all

14   right with you?

15   A.  That's wonderful.  Thank you.

16   Q.  Great.  Dr. Singh, when were you informed

17   that you'd be doing this deposition?

18   A.  I have to check my e-mail.  I'm not really

19   good with dates, but this has been going back and

20   forth, scheduling a date convenient to all.  But I

21   think I had good notice for this.  I can't tell you

22   the exact dates, but I can go look at my e-mails

23   and see.

24   Q.  Okay.  When did you begin preparing for

25   this deposition?  Approximately is fine.

**Dr. Raman Singh**

1           MR. BLANCHFIELD:

2                   Object to the form.

3           THE WITNESS:

4                   I would love to answer your

5               question if you would help me understand

6               "prepare."  What do you mean by

7               preparation?

8       BY MR. MOST:

9           Q.  Sure.  Have you, Dr. Singh, read anything

10      to prepare for this deposition?

11          A.  No.

12          Q.  Have you talked to anyone to prepare for

13      this deposition?

14          A.  Not that I can think of.  I don't have

15      access to any DOC records anymore.  I'm sure you

16      know it's almost more than one year since I stopped

17      working for Louisiana Department of Corrections,

18      and I have no access to any records.

19          Q.  Have you looked at any documents related

20      to this case to prepare for this deposition?

21          A.  I don't have access to any documents, but

22      I had -- I was involved very closely with this case

23      and working with you, so I'm going to use my memory

24      to answer your questions.

25          Q.  So if I can sum it up, you haven't looked

1   at or done anything to prepare for this deposition,

2   aside from recall things from your memory; is that

3   correct?

4       A.  That's correct.  Because I don't have

5   access to any of those records.

6       Q.  Okay.  Do you know what case you're here

7   for today, Dr. Singh?

8       A.  That's right.  Mr. Earl Peters.  That's

9   the name of the case -- plaintiff.

10      Q.  When did you first learn about this case?

11      A.  A few years ago.

12      Q.  How did you first learn about this case?

13      A.  To go into details, I was notified through

14  the legal department in DOC, and I think I had

15  reviewed all the records.  I have answered letters

16  from you.  There are many cases combined together

17  about the hernia and the catheter issue, so I had

18  prepared a response.  That's how I had first

19  learned about it, if my memory serves me correctly.

20      Q.  When you first learned about this case,

21  did you contact a lawyer?

22      A.  I was contacted by the DOC's attorney, so

23  I was working with that legal team.

24      Q.  And who was the DOC's lawyer that

25  contacted you?

1      A.  I can't recall.  I have to go back, but I

2   don't have access to my e-mail, but usually it's

3   Susan Griffin, Billy Kline, Jonathan Vining.  They

4   have, like, three or four of the attorneys.

5      Q.  Did you receive a copy of the complaint,

6   the initial document of the lawsuit for this case?

7      A.  As I recall, I did.

8      Q.  What did you do with that complaint?  Did

9   you give it to anyone, send it to anyone?

10     A.  Yes.  So we had a process.  So once I get

11  a complaint, I have to go back and look in the

12  medical records to find out what's going on, what

13  is the complaint, what -- what -- you know, what

14  was done.  And I had a team of nurses working with

15  me at that time, and I used to work with them.

16  They used to go and get the records and review --

17  and I used to review the records.  Because for

18  inmates who are housed at Angola, Angola keeps the

19  medical records.

20          At that time, Louisiana DOC did not have

21  electronic health records, so that means that it's

22  all paper-based.  And the headquarters did not keep

23  the paper records, so we had to get the copies

24  made.  I would review.  Maybe I would have

25  follow-up questions or they would get more records

1    for me.  And I did talk to Angola's medical record

2    leadership about this case and other cases, and I

3    used to take my notes, and we used to have files

4    for each co-worker so once I had more

5    questionnaires from the attorneys, possibly

6    defense, possibly plaintiff, and I would go and

7    find out.  So it's a long process, Mr. Most.  And

8    I'm sure you know.  So I used to a keep file in

9    each of these cases.

10        Q.   All right.  Is that a physical file, or is

11   that an electronic file?

12        A.   Well, mostly physical file, but there are

13   many e-mails back and forth too, some of those

14   e-mails where there is new information.  Either you

15   like to print them out and put in the file because

16   it's one place, but some of the e-mails are, like,

17   redundant in -- of the chain of e-mails going back

18   and forth.  So I did not, but there was a physical

19   file.

20        Q.   Where is that physical file?

21        A.   If should be in my old office.  That's

22   where it used to be.  I don't know.  I'm not in

23   contact with anyone for the last one year, so I

24   don't have no idea.

25        Q.   So when you left the Department of

1    Corrections, there was a physical file related to

2    this case in your office?

3        A.   As I recall.

4        Q.   Was it in a cabinet?

5        A.   So my office was my office, and then there

6    was my assistant's office, and we had so many

7    files.  There was a filing section.  It's hard for

8    me to tell because I used to just tell my chief

9    nursing officer.  But, you know, they knew what was

10   on my calendar.  And if I had to review the

11   documents, or, you know, spend some time figuring

12   out things, then I used to add those things to my

13   calendar.

14       Q.   Uh-huh.

15       A.   So that was my day's agenda.  That --

16   like, reviewing Earl Peter's medical records.  So

17   they would pull all of the medical records and be

18   ready for me to review.  So really, I'm not the

19   best person to answer it exactly where those files

20   were.

21       Q.   Okay.

22       A.   But I used to have access to those files.

23       Q.   So it was a physical file somewhere in the

24   office of the Director of Medical for the

25   Department of Corrections; is that right?

1      A.   That's the way it used to be.

2      Q.   Do you recall how it was labeled?

3      A.   It used to be called -- like, you know,

4  with the legal name.

5      Q.   Okay.

6      A.   But it was easy to pull the files.

7      Q.   Sure.  So at some point, you got a copy of

8  the complaint for this case.  Did you submit it or

9  send it to the attorney general's office?

10     A.   What exactly did I submit to the attorney

11  general's office?

12     Q.   I'm asking about the complaint, the

13  initial document in this lawsuit for Peters v.

14  Singh.  Did you submit that complaint or send it to

15  the attorney general's office?

16     A.   I don't recall me sending, because it was

17  more like a team work.  You know, the legal -- they

18  get all the legal notices and they work with AG's

19  office on all those issues, and then they also

20  notify me.  And at that point, we started to work

21  together.  But any time I had communication overall

22  with AG's office, it was always with our legal

23  department being in there.

24     Q.   Did you ask for representation from the

25  attorney general's office?

```
 1        A.  I don't recall asking, but I presume that
 2   they are supposed to defend State employees.
 3        Q.  Okay.  Is your lawyer for this case
 4   Mr. Andrew Blanchfield?
 5        A.  As I understand.
 6        Q.  And what do you mean, "as you understand"?
 7        A.  That he's assigned to defend me in this
 8   lawsuit.
 9        Q.  Okay.  Have you met with Mr. Blanchfield
10   about this case before today?
11        A.  There are many cases.  And I'm trying to
12   be honest in my answers.  And please know that I'm
13   completely out of touch for one year.
14             So I met with Mr. Blanchfield on many of
15   the cases over the last I would say six or seven
16   years, so it will be helpful if I had access to my
17   files so I can answer truthfully.  So honestly, I
18   cannot tell you whether I met with him on this
19   case.  Probably, yes.  But if you ask me about the
20   details, then I would like to go back and look at
21   the file.
22        Q.  Sure.  Dr. Singh, what's your current
23   employment?
24        A.  Current employment, I'm working with an
25   occupational medicine clinic.
```

Dr. Raman Singh

```
 1        Q.   Okay.  What's the name of that clinic?

 2        A.   It's Concentra.

 3        Q.   What do you do there?

 4        A.   I see patients.

 5        Q.   Okay.  What kind of doctor are you?

 6        A.   I'm an internal medicine physician.

 7        Q.   And how long have you held that job?

 8        A.   A few months.  It's very recent.

 9        Q.   What was your job prior to working at

10   Concentra?

11        A.   Well, working at the medical mental health

12   director for Louisiana DOC.

13        Q.   Okay.  And that brings up something I

14   meant to mention.  I'll say today, sometimes the

15   DOC.  And what I mean by that is the Louisiana

16   Department of Public Safety and Corrections.  Would

17   you understand that shorthand, if I use it in that

18   way?

19        A.   Yes, sir.  And I will do the same thing.

20        Q.   Great.  So what was the beginning and end

21   of your time working at the Department of

22   Corrections?

23        A.   Well, October 2002, I started working at

24   Angola as a staff physician.  And end would be

25   somewhere around November 2017.
```

```
1        Q.   And did you leave the Department of
2   Corrections voluntarily?
3        A.   No.
4        Q.   Are you currently engaged in a lawsuit
5   against the Department of Corrections?
6        A.   Yes, absolutely.   I'm fully engaged.
7        Q.   And the nature of that lawsuit is related
8   to your termination; is that correct?
9        A.   Absolutely.
10       Q.   Okay.   So you worked at the Department of
11  Corrections from 2002 to 2017; is that right?
12       A.   Yes.
13       Q.   My understanding is that from a big
14  picture perspective, there were essentially two
15  different periods within that time in terms of
16  kinds of provision of medical care.
17            Prior to 2013, the DOC had a sort of an
18  all you can eat policy, where Louisiana State
19  University was paid a lump sum to provide medical
20  care for inmates.   And then after that, after 2013,
21  there was a redesign and a somewhat different
22  system of care; is that right?
23       A.   Kind of.   But, you know, I'm sure that's
24  like a very generalized statement about the very
25  complex system.   And that holds true if you are
```

```
 1    talking about what I started calling onsite care.
 2    So onsite care did change, but, you know, the
 3    structure and essence, it did not change.  We made
 4    it more efficient after 2013.
 5            But I think what you are referring to is
 6    off-site care.  Means when patients are taken to an
 7    emergency room or require inpatient
 8    hospitalization.  Then, yes, you are correct.
 9        Q.  So in 2013, there was a redesign of
10    offsite care; is that correct?
11        A.  Yes.  Like the timeframe maybe, you know,
12    when it started once -- I have to go back to the
13    files, but around that time.
14        Q.  Okay.  My understanding is that before the
15    2013, redesign, LSU provided off site medical care.
16    And after the 2013 redesign, the Department of
17    Corrections had individual contracts with medical
18    care systems to provide off site care; is that
19    accurate?
20        A.  Yes and no.  Yes, LSU, they provide care.
21    So the health care is a complex, you know,
22    arrangement.  Even after '13, the majority of care
23    was being provided by LSU.  However, the business
24    model had changed.  Before 2013, legislature used
25    to appropriate funding for health care for offsite
```

1   to any prisoner, DOC or non-DOC directly to LSU.

2   And what criminal justice system was required to do

3   was to bring their patients to LSU, and after that,

4   it was LSU who was provided for, and they would do

5   everything.

6       After 2013, LSU is paid as the major

7   health care provider.  But the way the funding

8   flows and the -- who is in the control of system

9   and the monitoring, those things were changed

10  drastically, if that makes sense to you.

11      Q.  Yeah.

12      A.  So for the patient, after all is said and

13  done, after dust settled down, there was not much

14  difference except that Earl K. Long was closed.

15  Let me -- you know, if you're talking -- LSU is a

16  big umbrella organization, so a heart patient in

17  Angola used to go to New Orleans to see a

18  cardiologist.  With LSU, even yesterday, he would

19  have gone to New Orleans -- I mean a Friday to see

20  the same LSU cardiologist.  But the way all the

21  system works behind the scene was drastically

22  changed due to the necessity of that time.

23      Q.  The way I describe this to people is that

24  prior to 2013, there was an all-you-can-eat policy

25  where the legislature appropriated a chunk of money

1   to LSU to take care of most offsite inmate medical

2   care, and after 2013, redesign it was an a la carte

3   system where procedures were paid for individually.

4   Is that a fair summary of it?

5           MR. BLANCHFIELD:

6               Object to the form of your

7               question, but you can answer.

8           THE WITNESS:

9               I think from where you sit, it's

10              like asking Coach O about yesterday's

11              football game.  You know, it's hard to

12              summarize in one sentence.  But then

13              working closely with LSU, the way LSU

14              system worked, it was way more

15              complicated.  They are funding work

16              based on what they showed to the

17              legislature how much they spent and they

18              used to go there.

19              A la carte is we are following the

20              Medicaid and what the private health

21              insurance industry does because, you

22              know, we have to pay based on the

23              services and we have to provide the

24              documents that these services are

25              performed.

1           LSU did not keep up really well

2      with the documentation because they had

3      no incentive.  You know, they're not --

4      you're not billing, so why are you going

5      to spend seven percent of our funding

6      towards the billing purposes when you

7      are not getting any extra money?  So if

8      I'm a physician and I saw you and I'm

9      going to bill your Blue Cross Blue

10     Shield, Blue Cross Blue Shield, would

11     like to see what exactly I did, they

12     would like to see the documentation.

13     Without that Blue Cross, it is not going

14     to pay me even though you can tell Blue

15     Cross, yes, I went and was Dr. Singh.

16     So that was the scenario before 2013.

17           After 2013, we kind of became the

18     payer.  Before that, we were not the

19     direct payers.  That was the biggest

20     difference.  Then we started to follow

21     the same private health care insurance

22     industry model.  So if you did

23     something, then you had to show what the

24     documents that has to match with the

25     level of service and then we're going to

1          pay you.

2    BY MR. MOST:

3        Q.   Okay.

4        A.   So the services -- the a la carte means

5    you are choosing your services.  So I see where

6    you're going based on what you're saying, but that

7    would not be the very exact description.  Because

8    services were not affected.

9          The way things were affected is the

10   business between patient and provider had not

11   changed.  But the back side, the business side and

12   how the funding flows had drastically changed.

13   Because now we were requiring documentation from

14   LSU and every contractor to send the claim to the

15   billing company.  And every claim was being audited

16   for the appropriateness for the level of service

17   and documentation.

18       Q.   So are you saying from a patient

19   perspective, they would've seen no interruption our

20   change in care before and after that 2013 redesign?

21       A.   That's not what I'm saying.  Because this

22   was a sizzling -- this was a huge change.  Our

23   world was rocked by the changes in LSU.  These were

24   external forces way beyond our control.  With the

25   hindsight, if I was the guy doing it, I wouldn't

1    have done it, means -- you know, de-privatizing LSU

2    or what.  So corrections had to respond to this

3    crisis.  It was not our call -- not DOC's call to

4    shut down Earl K. Long.  It was not DOC's call to

5    privatize LSU in New Orleans.  But that's where our

6    patients went.  So we had to respond to this

7    crisis.  And this crisis was like Katrina hitting

8    correctional health care; not only DOC local jails,

9    Office of Juvenile, it's goes to everybody.  So how

10   do you respond to Katrina?  Was there no upheaval

11   in New Orleans?  There was no unrest?  People got

12   turned upside-down.

13          There was a big shock to us, and it came

14   at us at such a fast speed.  And you have to create

15   all those businesses I'm talking about because

16   everyone works for money.  No doctor is going to

17   see patients unless you provide a system to make --

18   give them payment, money.  These things don't

19   happen overnight.  So this correctional health care

20   was truly, truly rocked at that time.

21          So if you answer your question is, there

22   was no difference in patient and physician

23   relationship?  Yes, there was.  There was a big

24   shock and it took time for us to come back to the

25   way we -- you know, were before this privatization.

1          And I hope I'm bringing -- you know,

2     showing you some light on this complex issue.

3          Q.   So the closure of Earl K. Long and changes

4     in LSU system led to a 2013 redesign of the

5     Department of Corrections inmate medical care

6     system; is that correct?

7          A.   Absolutely.   Absolutely.

8          Q.   Okay.   Do you recall if that redesign

9     occurred in the spring, summer, fall, or winter of

10    2013?

11         A.   I still remember.   Once again, you know,

12    October.   I don't know which year.   First, we came

13    to know about it.   And I can't be more honest than,

14    you know, with the way I'm going to describe the

15    situation and the newspaper that there was a plan

16    to shut down Earl K. Long, and Earl K. Long right

17    here in Baton Rouge was the nerve center for

18    offender health care.   They had an inpatient

19    prisoner ward.   Angola, which is our -- used to be

20    our biggest health care prison, is only 50 minutes

21    from Earl K. Long.   It's two and a half hours from

22    New Orleans Dixon Correctional Institute where we

23    house our offenders.   And you can't presume how

24    sick they are.   You know, if someone who is on

25    dialysis, at that time, almost 95 offenders is 35

1   minutes.  So all DOC's health care delivery model

2   was all based on that Earl K. Long being in close

3   proximity so everything was done.  And just for one

4   night the floor gave away under our feet, Earl K.

5   long.  So we read in the newspaper -- and I

6   remember going to my bosses and saying, where are

7   we going to go?  How are we going to do it?

8           And they had no idea.  We went to the

9   Governor's office and looked like the biggest

10  scheme of things, offender health care was somehow,

11  you know, not there on the list.  So we started

12  working.  And I still remember getting a letter --

13  to answer your question -- in October from

14  Christie Nichols, who was at that time

15  commissioner, she had appointed a team.  They

16  needed a coordinator to figure it out how we can

17  issue continuity of care for criminal justice

18  involved people in Louisiana.

19          And she had put LSU on that team.  She had

20  put folks from health and hospital on that team.

21  She had put folks on Medicaid on that team.  And we

22  were also working with Office of Group Benefits to

23  learn from the insurance how this billing system is

24  going to work.

25          So that letter came in October.  Once

```
 1   again, the timeline is hazy, but that file -- so
 2   LSU redesign is a huge folder in my old office,
 3   which should have a copy of that letter from
 4   Commissioner Nichols.
 5        Q.  Okay.  Do you recall that you and I had
 6   a -- sat down for a deposition in this room in May
 7   of 2016?
 8        A.  Yes.
 9        Q.  You testified at that deposition that
10   after the redesign, DOC is completely responsible,
11   end quote; is that accurate?
12            MR. BLANCHFIELD:
13                 I mean, look, if you're going to
14             quote from the deposition, I need you to
15             say what page and line number.
16            MR. MOST:
17                 Okay.
18            MR. BLANCHFIELD:
19                 In fairness to him, that was a bit
20             of a time ago.
21            MR. MOST:
22                 Sure.  Okay.
23            THE WITNESS:
24                 In fairness to me.
25            MR. MOST:
```

```
 1                    Yeah.  May I -- I can just ask him
 2              things and see if it's accurate, but it
 3              will be helpful for the record.
 4   BY MR. MOST:
 5       Q.  So on page 147 of -- well, let me just
 6   start over.
 7              On Page 147 of the May 4, 2016, deposition
 8   of Dr. Singh, you testified, quote, "After the
 9   redesign, DOC is completely responsible," end
10   quote.  Is that a truthful statement?
11       A.  That sounds right to me.
12       Q.  Okay.
13       A.  That was my thinking at that time, and
14   it's still the same thinking.
15       Q.  On page 68 of that deposition, I asked
16   you, "Is it the Department of Correction's
17   obligation to provide medically necessary health
18   care to offenders?"  And you said, "Yes."  Is that
19   truthful?
20       A.  Oh, absolutely.
21       Q.  On page 67 of that deposition, I asked you
22   "If a doctor recommends surgery for an inmate, that
23   would be medically necessary?"  And you answered,
24   "Yes."  Is that truthful?
25       A.  I have to go back and see because the
```

1   "yes" is about right, but there's a more to this

2   question.   Because this question you're asking is a

3   very heavy question.

4           Medical necessity is not as simple as

5   people believe -- you know, presume.   And it varies

6   based on the patient's need what the patient

7   thinks, what an attorney thinks, what the physician

8   thinks, what the policies are and what court

9   thinks.   So there are many, many answers to what is

10  medically necessary.

11          So I have to see the contract, but to

12  answer the question, if a physician recommends

13  something, that is the first -- definitely sounds

14  like.   But, you know, you and I had this

15  conversation about medical necessity, what is

16  medically necessary, what is elective surgery.   You

17  and I had this long conversation on those issues.

18      Q.   Okay.   On page 31 of that deposition, you

19  testified that, quote, "DOC headquarters does not

20  approve or deny surgery, and that is a fact."

21  That's the fact."   End quote.   Is that truthful?

22      A.   Yes.   That was our policy.   You know, if I

23  have not seen a patient, then, you know, approving

24  or denying surgery was not -- the job that our

25  policies -- did our practices -- the DOC

1    headquarters job was more like monitoring with the

2    compliance that, you know, there are clinical

3    standards where the care being delivered meets the

4    clinical standards or not.  You know, some -- so

5    that was more like the supervisory goal, the way I

6    saw that.

7        Q.  On page 72 of that deposition, you

8    testified that, "The Department of Corrections

9    headquarters does not delay surgery."  Is that

10   truthful?

11       A.  So kind of.  And here's why.  I'm not

12   saying that surgeries are never delayed.  Let me

13   put it this way, because that would be a wrong

14   statement to say.  And I'm also not saying that the

15   needed surgeries are never delayed.  Surgeries, you

16   know, sometimes get delayed.  But if you look at

17   all the pieces in this puzzle, Department of

18   Corrections headquarters is the one piece, like one

19   step.  And that was actually the least important

20   step affecting the outcome, like getting surgery

21   done at a certain date.  The surgery requires

22   surgeon who is recommending surgery to fill out the

23   paperwork.  Let me take a step back.  Can I?  So

24   that you have a better idea.

25            When we had to redesign the system, you

**Dr. Raman Singh**

1   cannot redesign or read in one the medical time.

2   Our goal -- my goal was not to reinvent how to

3   define hernia, how to diagnose hernia, how to treat

4   hernia.  That's way beyond me.  You know, they've

5   got the medical schools and professors, that's

6   their job.

7        We were simply trying to create a health

8   care delivery model which -- and shows continuity

9   of care which provides care in a timely manner

10  with, like, huge patient data because it is a lot

11  of patients.  So how do we prioritize efficiently?

12  How the information is going to flow back and forth

13  seamlessly and how we're going to do the billing,

14  so that, Oh, I just can't get the money and there

15  is no delay.  Because LSU, before 2013, if I'm LSU

16  surgeon and I saw the patient, I didn't even need

17  billing because my salary was fixed, unless he was

18  getting money.  But after 2013, if LSU doesn't get

19  money from DOC, they weren't paying their services.

20       So to answer your question, delay caused

21  by DOC Correction Headquarters, sometimes it may

22  have, yes.  But in the bigger scheme of things, DOC

23  Headquarters was not designed, if that makes sense,

24  in the bigger scheme of things, the way it was

25  supposed to work, DOC Headquarters was not designed

1   to cause any delay.

2        Q.   I hear you saying DOC Headquarters was not

3   designed to cause delay.  Did the DOC Headquarters,

4   during your tenure, cause delay of surgery for

5   inmates?

6        A.   It may have sometimes, but that shouldn't

7   have been the norm.  So every employee works

8   perfectly all the time, no.  So I cannot vouch.  My

9   answer -- truthful answer is I cannot vouch that

10  DOC Headquarters never caused any delay.  They may

11  have.

12       Q.   Okay.  So when I asked you on May 4, 2016,

13  the question, quote, "I understand your same view,

14  DOC Headquarters does not approve or deny surgery,

15  does the DOC Headquarters, ever delay surgery"?

16  End quote.  And your answer was, quote, "No, we do

17  not."  End quote.  You're saying that's not

18  completely truthful?

19       A.   What I'm saying, what I was talking about,

20  it's philosophy and principle.  The way this new

21  system was designed, everyone had their role.  So,

22  in essence, I'm not supposed to kill my patients,

23  you know, make a mistake which can kill him.  So in

24  principle, the DOC headquarters was not be causing

25  any delay in getting any patient any surgery.

1   Because the patient is being seen by a surgeon

2   somewhere else, not at DOC Headquarters, patient is

3   not going to DOC headquarters for surgery.  He's

4   going to LSU or somebody else for surgery.  The

5   patient is not going to DOC Headquarters for

6   pre-surgical checkup, all those things.  So DOC

7   Headquarters should not be causing any delay.

8        Q.  Okay.  Should you personally, in your role

9   at the DOC, have been causing delay of surgery?

10            MR. BLANCHFIELD:

11                 Object to the form of your

12            question.

13            THE WITNESS:

14                 I don't think so.

15   BY MR. MOST:

16        Q.  Okay.

17        A.  But, you know, people can look at it

18   differently, but I don't think so.

19        Q.  In your role at the DOC, did you cause any

20   delay of surgery?

21            MR. BLANCHFIELD:

22                 Object to the form.

23            THE WITNESS:

24                 I don't recall any incident where

25            I had caused medical delay in a

```
 1                medically necessary surgery.
 2    BY MR. MOST:
 3        Q.  Did you cause any delay in medically
 4    unnecessary surgery?
 5            MR. BLANCHFIELD:
 6                Object to the form.
 7            THE WITNESS:
 8                I may have created systems where
 9                medically unnecessary surgeries were
10                either not done or required further
11                review if there was no threat to the
12                patient's life or limb or quality of
13                life.  Because I did not -- all the
14                surgeries, there are state laws in the
15                place.  Like, take for example, cosmetic
16                surgery.  And I can't really quote you
17                the exact state law which clearly states
18                that no backstairs money should be used
19                to allow for the cosmetic surgery,
20                unless, blah, blah, blah and blah.
21                So if I get a recommendation and
22                an inmate wants their tattoos to get
23                removed and the physician there does
24                recommend and, you know, he has a
25                dermatologist that he does need tattoo
```

1                   removed, it may require further review,

2                   I would have to work with law department

3                   to see what can be done, what not can be

4                   done.  So for medically necessary, the

5                   focus of the DOC was to get them done as

6                   the provider wanted with the timeline

7                   the provider had in his mind.

8      BY MR. MOST:

9           Q.  Did you ever create a blanket rule that

10     said surgery was not appropriate for a specific

11     condition, cosmetic surgery aside?

12          A.  Can you please restate your question so

13     that I get it right?

14          Q.  Sure.  Aside from cosmetic surgery,

15     setting cosmetic surgery aside, did you ever create

16     a blanket rule that said surgery for inmates was

17     not appropriate for a specific kind of condition?

18          A.  That's like a very broad question.  Let me

19     see if you can hone in and provide more detail what

20     kind of condition you're talking about.

21              Like, I have been medical director for ten

22     years, you know, so we are talking about 3,650

23     days, thousands and thousands of cases, hundreds of

24     -- not rules.  I never made a rule.  More likely a

25     guidance from the headquarters.  Medical mental

```
1   health director was never in command telling people
2   it was more like a guiding role the way I think.
3   When I look back, I think about it.  So if you tell
4   me what exactly you're talking about with any more
5   specificity, I can provide you a better answer.
6        Q.  Well, you can just answer the question.
7   Do you recall ever creating a blanket rule, aside
8   from cosmetic surgery, that surgery was not
9   appropriate for a particular kind of condition?
10       A.  To be honest, Mr. Most, I find your
11  question to be very, very broad.  Do I have ever
12  any rule about any kind of surgeries, so --
13       Q.  If you don't recall, you can say that or
14  you can say, if you did create a blanket rule or is
15  that you never created a blanket rule.
16       MR. BLANCHFIELD:
17            I think the witness has told you
18            now twice that your question is so broad
19            that he has difficulty answering it.
20       MR. MOST:
21            Well, he can still answer it.
22       MR. BLANCHFIELD:
23            He just did.  But you don't need
24            it twice.  That was his answer and you
25            don't -- you don't have to like it, but
```

1              that's his answer.

2    BY MR. MOST:

3        Q.   Did you ever direct that certain kinds of

4    conditions would be managed non-operatively?

5        A.   What kind of conditions?

6        Q.   Did you ever direct that certain kinds of

7    conditions would be managed non-operatively.

8        A.   Yeah.  Of course.  Non-operative

9    conditions should be managed non-operatively.

10       Q.   Okay.

11       A.   But I don't recall, like, sending e-mail,

12   because, you know, you expect physicians who have

13   been through the medical school to know the medical

14   finds.  So that's why I'm asking you for help in

15   giving me more specifics.  I shouldn't be telling

16   you if the patient that has high blood pressure,

17   but you manage high blood pressure with anti-high

18   blood pressure medication.  But sending an e-mail

19   saying that non-operative conditions should be

20   managed non-operatively, have I ever done it?  It's

21   hard for me to say or like, you know.

22       Q.   Okay.  I'll be more specific.  In the

23   deposition that I referenced earlier at Page 151, I

24   asked you about a document that said, quote, "Hold

25   all surgeries if hernia is reducible per medical

1    director effective October of 31, '13."  End quote.

2    And you told me that that was a reference to the

3    redesign transition time.  Is that true?

4            MR. BLANCHFIELD:

5                    Hold it.  Let me -- if you're

6              going to continue this, I need to get a

7              copy of the deposition.  Because

8              you're -- you know, I have no reason to

9              think that you're misquoting.

10        MR. MOST:

11                Sure.

12       MR. BLANCHFIELD:

13                But I need to follow along.

14       MR. MOST:

15                Sure.

16       MR. BLANCHFIELD:

17                I can go grab a copy, I think.

18       MR. MOST:

19                Yeah.  If you want.  Or you can

20            sort of look along at this one.

21       MR. BLANCHFIELD:

22                Are you going to be doing this

23            more?  I mean --

24       MR. MOST:

25                Let's go off the record for a

```
 1            second.
 2                   (Off the record.)
 3      MR. MOST:
 4                   And for note keeping purposes, we
 5            started this deposition at 12:38, and we
 6            just took a five-minute break.
 7      MR. BLANCHFIELD:
 8                   You say that you anticipate going
 9            seven hours with this witness after 300
10            pages of testimony.
11      MR. MOST:
12                   I really hope not.  But --
13      MR. BLANCHFIELD:
14                   I would hope not, too.  I've got a
15            leukemia walk tonight for a friend of
16            mine who's got leukemia.  And if you
17            really spend seven hours on this, I
18            can't believe that that would happen,
19            William.
20      MR. MOST:
21                   We scheduled this deposition --
22      MR. BLANCHFIELD:
23                   Look, son, you do what you want
24            to.  You know, take your deposition, but
25            I'm telling you that's on the record.
```

```
 1              You've deposed this fellow for a day, a
 2              full day, already seven hours on the
 3              same issues that bring us here today.
 4    MR. MOST:
 5              True.  We scheduled this
 6              deposition at noon on a Sunday at your
 7              request.
 8    MR. BLANCHFIELD:
 9              Not at my request.  At the
10              doctor's necessity because he works out
11              of town, and we're doing A last-minute
12              accommodation to you, who've done
13              nothing in this case for a year and a
14              half.
15    MR. MOST:
16              What's your last-minute
17              accommodation to me?
18    MR. BLANCHFIELD:
19              This is an accommodation to you.
20              All these depositions that we're jamming
21              in to get done by November 15th, that is
22              demanded by the Court.
23    MR. MOST:
24              You see a deposition of a
25              defendant as an accommodation to me?
```

```
 1            MR. BLANCHFIELD:

 2                 Look -- yeah, I do.

 3            MR. MOST:

 4                 Okay.

 5            MR. BLANCHFIELD:

 6                 Let's go.

 7    BY MR. MOST:

 8        Q.  Dr. Singh, in the May 4, 2016, deposition,

 9    I showed you a document that said, quote, "Hold all

10    surgeries if hernia is reducible per medical

11    director effective October 31, 2013."  On Page 151.

12    And you told me that was a reference to the

13    transition time; is that true?

14        A.  I have no reason to not believe you.  That

15    sounds right, but I'm going to veer away a moment.

16    We all are so busy.  In my job, new job, I barely

17    got a job.  I have nothing to do with DOC.  I want

18    this to go on the record that I'm doing the

19    deposition for the plaintiffs who have filed a

20    lawsuit.  I'm sure in their hearts they believe

21    they have a case.  So Sunday is my time to spend

22    with my family.  I work my butt off.  But I'm going

23    to do for those plaintiffs.

24            So how much -- how many hours you need to

25    serve the justice?  I'm willing to give my time for
```

1    that.

2         Q.   Thank you, Dr. Singh.

3         A.   Okay.  So to answer your question, yes,

4    that sounds about right to me.

5         Q.   On Page 123 of that deposition, we were

6    talking about -- let me back up.

7              When you say, "transition," do you mean

8    the 2013 redesign of inmate medical care?

9         A.   I presume so, yes.

10        Q.   On Page 123, we were talking about the

11   transition of inmate medical care and I asked you

12   the question, "How long would you estimate the

13   delay in non-urgent care was?"  And you answered,

14   "Well, I would saw a few months."  Is that

15   accurate?

16        A.   You are reading the document.  If you're

17   saying I told you so, then I'm sure I told you so.

18        Q.   Was it about a few months of delay of

19   non-urgent care resulting from the 2013 redesign?

20        A.   Give or take.  Or maybe some cases, it was

21   more than that.  Some cases, it was less.  But that

22   would be an average.

23        Q.   Okay.  Great.  I'm just going -- I have to

24   do some basics about hernias and you can tell me if

25   it's accurate or not accurate.

```
 1          A hernia occurs when there's a small
 2     opening in the lining of the abdominal wall and a
 3     loop of intestine pokes through the hole; is that
 4     accurate?
 5          MR. BLANCHFIELD:
 6               Object to the form.
 7          THE WITNESS:
 8               More or less, yes.  It depends
 9          where the hernia is, so.
10     BY MR. MOST:
11        Q.  A hernia is reducible if the loop of
12     intestine can be pushed back through the hole into
13     the body; is that accurate?
14        A.  That's a definition of reducing a hernia.
15        Q.  If the hernia cannot be reduced, it's
16     termed "incarcerated."  That is, a loop of
17     intestine becomes trapped outside the abdomen; is
18     that correct?
19        A.  Say that again?
20        Q.  Sure.  If a hernia cannot be reduced, it
21     is termed "incarcerated."  That is, the loop of
22     intestine becomes trapped outside the body; is that
23     accurate?
24        A.  Yes.
25        Q.  An incarcerated hernia may progress to
```

1  become a strangulated hernia, which is when the

2  trapped loop of intestine becomes twisted in such a

3  that the blood supply is interrupted; is that

4  accurate?

5       MR. BLANCHFIELD:

6            Object to the form.

7            You can answer.

8       THE WITNESS:

9            Pretty close.  You know, it

10           doesn't have to twist, but that is what

11           a strangulation is, when the neck is

12           constricting the blood circulation is

13           being cut off.  So, you know, it can

14           straight not being twisted, but that's

15           immaterial at that point.

16  BY MR. MOST:

17      Q.  I see.  A strangulated hernia often

18  results in tissue death and gangrene of the bowels

19  within a few hours; is that accurate?

20      A.  Within a few hours?  Possibly, yes.

21      Q.  Strangulation of a hernia is a very

22  serious condition.  It's a catastrophic event that

23  causes illness with pain in the hernia, abdominal

24  pain, nausea, vomiting and sepsis; is that

25  accurate?

```
 1        A.  Yes, sir.
 2        Q.  A patient may not know immediately when
 3   their hernia becomes strangulated; is that
 4   accurate?
 5        A.  It is possible.
 6        Q.  Often, a patient will only discover a
 7   strangulated hernia when they began to experience
 8   secondary symptoms associated with the tissue
 9   dying, such as nausea, vomiting, fever, sudden
10   pain, rapid heart rate; is that accurate?
11             MR. BLANCHFIELD:
12                   Object to the form.
13   BY MR. MOST:
14        Q.  Is that accurate?
15        A.  Your statement is pretty accurate.  I'm
16   not sure about the "often" word you used, Because
17   that sounds to me that's a major way to manifest.
18   So that may not be the case, but you know, hey, but
19   you are right on the money.  Sometimes it's
20   different from often, but, yes.
21        Q.  Okay.  Without swift emergency treatment,
22   a strangulated hernia can kill the patient?
23        A.  Can.  May.  Yes, absolutely.  That's a
24   known complication.  But can is like absolute if
25   every strangulated patient will die.  But hopefully
```

```
 1   not.  But if left untreated, chances of it, very

 2   high.

 3       Q.  Every day that goes by for a person with a

 4   hernia that is not corrected by surgery carries a

 5   risk that the hernia will become incarcerated and

 6   strangulated; is that accurate?

 7           MR. BLANCHFIELD:

 8               Object to the form.

 9           THE WITNESS:

10               Yes and no.  So once again, you

11           know, if you are checking my medical, I

12           just passed internal medicine board

13           again, so it's not black and white.  So

14           your statement is "every day a hernia"

15           and I'm presuming you're talking about

16           the non strangulated because you just

17           showed me that you know so much about

18           the strangulation.  It's progressing

19           towards strangulation.  That may not be

20           the case and that may be the case.  It

21           depends on the size of the gap, it

22           depends on other co-morbid conditions,

23           it depends on the work atmosphere.  Is

24           patient is heavy weightlifter or the

25           sedentary office worker, there are other
```

1              factors.  Intraabdominal pressure, which

2              is pushing the contents down.  And I'm

3              presuming we are talking about abdominal

4              hernia.

5                   So hernia is a very different

6              field.  No one has a magic wand to tell,

7              unlike diabetes, where you know it's

8              going to start getting worse, because

9              the pancreas is being damaged every day,

10             unlike in ongoing kidney dysfunction,

11             kidneys are going down every day.  That

12             may or may not be the case with the

13             hernia.  And that's why the experts

14             recommend red flags and guidelines how

15             to manage hernia.

16    BY MR. MOST:

17         Q.  Okay.

18         A.  I hope I'm making sense.  So if you're

19    asking me to vouch, hernia is not like high blood

20    pressure.  It's not -- hernia is not -- there's no

21    guarantee that a hernia can deteriorate every time,

22    if you don't treat it.  Because there's no --

23    really, honestly, there's no medical treatment for

24    a hernia unless there's a medical reason.  So like

25    if you have a patient who is a smoker who has COPD,

1   he coughs a lot, and he is starting to get hernia,

2   so we know that treating cough will help because

3   cough creates greater intra-abdominal pressure.  It

4   pushes the contents down.  Patient with end stage

5   liver cirrhosis, which is very common in offender

6   population, tend to accumulate a lot of fluid in

7   their abdomen, nephritis.  And when nephritis is

8   getting worse because the liver, it completely

9   shut, that will continue to raise intra-abdominal

10  pressure.  So that patient has a tiny hernia.  Then

11  you do expect this hernia will continue to get

12  worse because the root cause is the rise in

13  intra-abdominal pressure from liver issue.

14          We can go on different examples.  So --

15  but more or less, I hope you're talking about the

16  patient with no other medical condition

17  contributing to this hernia.  It's a pure and

18  simple hernia.  There's no medical treatment.  So

19  the only way to fix a hernia is surgery.  Let me

20  put it this way:  The debate is ongoing experts

21  guidelines are there, when you do the surgery and

22  what is the timing part of surgery.

23          So to summarize, if someone had a

24  strangulation, that's a medical emergency.  You

25  know, there's no if and buts, there's no doubt the

```
 1   patient should go to ER.  You need to save his life

 2   because the gangrene of the stink can really kill

 3   your patient if it's too late.

 4          So outside of that, when you operate a

 5   hernia, there are expert guidelines.  And you know,

 6   there's no contests, if that's when you're going

 7   to.  And I don't mean to jump the gun, but --

 8      Q.  Repeated reduction of a hernia can lead to

 9   bowel trauma and a lot of the hernia to grow

10   larger; is that true?

11          MR. BLANCHFIELD:

12              Object to the form.

13          THE WITNESS:

14              I'm an internal medicine

15              physician.  If you have to ask my

16              opinion about the very intricate

17              surgical subject, I would suggest that

18              you go and talk to a surgeon, to be

19              honest with you, Mr. Most.  I don't want

20              to give you the false information.

21   BY MR. MOST:

22      Q.  Okay.

23      A.  I'm not an expert in bowel trauma and, you

24   know, what hernia reduction does.

25      Q.  Inmates with hernias at Angola are
```

1    particularly at risk because Angola does not have

2    emergency surgical facilities and is a fair drive

3    from the nearest emergency room; is that true?

4            MR. BLANCHFIELD:

5                    Object to the form.

6            THE WITNESS:

7                    I don't think so.  There are --

8                    forget about inmates.  There are free

9                    people living outside Angola, so they

10                   have the same risk, but emergency

11                   doesn't mean that, you know, you have

12                   to -- unlike an anaphylactic shock,

13                   like, you know, you have patients have

14                   peanut allergy, but if you don't give

15                   timely intervention right then and

16                   there, your patient can die.

17                   So we are taking different

18                   scenarios and just creating one

19                   emergency that may not be the case.

20                   Even if you take -- if I have a

21                   strangulated hernia, and you take me to

22                   the lake, it's not that as soon as you

23                   arrive at the lake, someone is ready

24                   with a scalpel and cut open my hernia.

25                   I have to go through pre-surgical

1              checkup making sure they have my blood

2              types available, surgeon is going to

3              come there.  So that distance create an

4              issue, yes, of course.

5    BY MR. MOST:

6        Q.  Okay.  We're going to look at some

7    documents.

8        A.  Sure.  And know that I'm trying to answer

9    your questions truthfully with the complete picture

10   based what I know.  Am I the person who knows the

11   most about hernia?  Possibly not.  I know more

12   about the process and procedures and the systems

13   and internal medicine.

14            MR. MOST:

15                Uh-huh.  So this is a document

16            which I'll label Exhibit A after you

17            look at it.

18                (Whereupon Exhibit A was marked

19            for identification.)

20   BY MR. MOST:

21       Q.  Do you recognize this document, Dr. Singh?

22       A.  I do, kind of.

23       Q.  It appears to be minutes of a meeting

24   regarding hernia, cataracts and sleep studies from

25   November 13, 2013; is that right?

1        A.  Yes, it does sound right.

2        Q.  Were you present at this meeting,

3   Dr. Singh?

4        A.  I should have been, yes.

5        Q.  Under hernia discussion, it says, "We need

6   to start implementing guidelines and have all units

7   to review hernia cases.  If they do not meet

8   criteria, do not send a surgeon.  Reducible hernias

9   will be managed non-operatively by PCP at prison."

10  Do you see that?

11       A.  I do see that.

12       Q.  PCP, that stands for primary care

13  physician; is that right?

14       A.  Primary care provider.

15       Q.  Primary care provider.  Do you recall this

16  topic being discussed at this meeting?

17       A.  Oh, absolutely.  This meeting was about

18  these topics, and this is giving the redesign.  And

19  one goal during the redesign with the new system

20  was to have consistent implementation of the known

21  medical standard after arriving to a consensus.

22            So take, for example, high blood pressure

23  and how to treat.  Every doctor may choose to

24  follow a different medication regimen.  So the goal

25  was to go and talk to the experts, create a

1    consensus and then make sure that every prison

2    provider is following what we all had agreed upon

3    So that there had be a consistency because

4    offenders were being transferred from one place to

5    another.  And this variation in the daily review of

6    health care was not something, you know, I was very

7    fond of.

8            So I think this meeting is about a lot of

9    medical directors and we had created a work group

10   which was chaired by, I think -- and I maybe

11   wrong -- Dr. Casey McVea.  At that time, he was at

12   Rayburn (spelled phonetically), and he was

13   instructed and all of the medical records to

14   consult with LSU surgical department.  Because I

15   remember getting in touch with LSU -- head of LSU

16   surgery, that how did you all do?  What did you all

17   use?  Because I have seen back in my days at

18   Angola, not all hernias were getting operated.  So

19   I wanted to know, but I did not know how LSU

20   approached what criteria did they use.  So now

21   it's -- it was on DOC.  So I wanted to follow the

22   same thing LSU had done to ensure, you know, smooth

23   transition.  So I had told that committee to get in

24   touch with LSU surgery head, I think, Dr. Batson

25   and all those people and they were working back and

1    forth with LSU experts.  And I still remember doing

2    research.  There were so many lawsuits and the

3    Court's judgment about hernia, what is considered

4    medically necessary, what is the urgent.  And I

5    wanted to make sure that whatever consensus this

6    work group comes up with meets the legal standard.

7    So --

8         Q.  So was this the consensus that reducible

9    hernias will be managed non-operatively?

10        A.  It sounds like -- because at that meeting

11   it wasn't like a physician, you know.  All other --

12   if they're like all physicians, a physician is not

13   going tell another physician how to see the

14   patient.  But we can definitely talk about it and

15   come to a consensus.  So this wasn't like a memo, a

16   direction from the medical directors office that,

17   no, you will stop doing it.  This was more like the

18   meeting minutes that all the physicians were

19   talking about a medical subject.

20        Q.  Was this "reducible hernias will be

21   managed non-operatively" supposed to be a temporary

22   thing in reaction to the redesign, or was that

23   going to be the permanent plan going forward?

24        A.  So I can give you the history.  At that

25   time, DOC was really struggling with LSU redesign.

1   And I still remember calling LSU head of surgery

2   and their CEO because they were losing staff, so

3   can we put it -- we put hernia aside.  We still had

4   major life-threatening cases where patients were

5   not getting surgery.  We used to send patients who

6   had date for the surgery, you know, they had to

7   fast, get the pre-surgical checkup done, and they

8   would go and not get surgery and come right back.

9   And I would get really mad what was going on.  And

10  I would used to pick up phone and call, and they

11  said, Well, we just don't have enough

12  anesthesiologists.  We just don't have enough

13  surgeons.  So surgeon on this part went through all

14  the cases and that said, well, these cases cannot

15  be done today.

16          So at that time, our big focus was on

17  efficient prioritization based on -- because there

18  were not enough slots with LSU.  They didn't have

19  that many -- they had -- were struggling with OR

20  rooms.  And New Orleans was having -- so once you

21  take Earl K. Long out from the picture, that

22  creates a huge hole in our health care delivery

23  model.  LSU New Orleans was busy -- to big in this.

24  Now you are putting extra load on LSU New Orleans.

25          They were being privatized on their own.

1   It's not that they were based on working at their

2   own normal.  LSU was being privatized from the

3   government-owned operation to a private operation,

4   and many employees were leaving, so they were

5   struggling to stay open.

6         So at this time, we all worked with LSU.

7   And they said, if you have a reducible hernia, even

8   if you want their surgery to happen, we just cannot

9   do it.  So our point was let's not get lost in this

10  picture.  Let's focus on where we see an immediate

11  threat, immediate action is needed.  So based on

12  all this team work and consensus, so comes the

13  medical science, comes the operation side, comes

14  the LSU side, you know, their own capacity issue,

15  so the consensus was there's no way the reducible

16  hernia could be operated upon at LSU at that time.

17  And they said, We never operated on reducible

18  hernia, even before 2013, to begin with.

19      Q.  So --

20      A.  In a nutshell, that was the consensus at

21  that time.

22      Q.  So this was a prioritization decision in

23  reaction to the redesign that reducible hernias

24  would be managed non-operatively?

25      A.  And in reaction to the reality at the

1    time.  That's right.

2        Q.  Was that supposed to be a temporary

3    measure?

4        A.  You can say, yes and no.  Because

5    eventually my hope was that eventually operations

6    will be back.  And if there's a patient who is seen

7    by a surgeon -- a surgeon, you know, who is the

8    subject matter expert in hernia -- let me be

9    honest -- he thinks that surgery needs to be done,

10   then the system's job is make sure surgery is done.

11       And we also created a process where the

12   surgeon is going to tell how the surgery needs to

13   be done.  So if surgeon says that this surgery

14   should be done in two weeks, then system's job, as

15   I see it, to make sure that all the pieces are in

16   place to make the surgery happen in the next two

17   weeks.

18       Because unlike free people where I can go

19   to the ER any time I want to, inmates don't have

20   that luxury.  They depend way more than non-inmates

21   on the system to get necessary health care

22   delivered in a time, you know, the way it is

23   supposed to work.

24       Q.  But this issue specifically, reducible

25   hernias will be managed non-operatively, was that

1    to be a temporary measure or a permanent measure?

2         MR. BLANCHFIELD:

3              Asked and answered.

4         THE WITNESS:

5              Once again, reducible and -- at

6         that time, I would -- you know, really,

7         we didn't think about that case as

8         temporary or long-term.

9    BY MR. MOST:

10    Q.   Okay.

11    A.   Eventually you go -- you know, we wanted

12    to get the hernias which were life-threatening to

13    be operated upon.  LSU and all LSU thought there

14    was no question.  You know, funding; no funding.

15    System; no system.  If there's a patient with a

16    strangulated hernia, he needs to get out, go to an

17    ER, and get the surgery done.  That was the goal --

18    number one goal.

19         Number two goal, keep a handle on the

20    situation.  And this may got transitioned where

21    patients may not be getting care as they used to

22    get the care due the forces, external forces, the

23    big forces.  We should not get lost -- you know, to

24    lost track of all other patients needing care, so

25    we need to have a -- more like a record trail, like

1    one system opens up, a line opens up, and we can

2    just start following them back into the system so

3    that no one gets lost.  These were two main focuses

4    at that time.

5            So to answer your question, this was

6    temporary or permanent, at that time, that was a

7    thing, and we always went back to review based on

8    the resources available, based on the need, based

9    on the prioritization.

10    Q.  Was cost a consideration in coming up with

11    this reducible hernias will be managed

12    non-operatively?

13    A.  You know, that's a -- the answer would

14    surprise most of the people actually in this one,

15    because it's a lot of people think it's we were

16    trying to save money.  In a hernia cases, you would

17    be surprised to know that to operate a hernia is

18    much cheaper than to fight the lawsuits and to

19    spend your time.

20            In this case, cost was a concern overall,

21    but when it comes to hernia, it was cheapest for

22    DOC to get the hernia surgery done, but we had to

23    follow the medical standards.  You would not even

24    believe how much Medicaid, which was our rate pay

25    for hernia surgery, you would be shocked to know

1  that this cost is -- was not a factor at all in

2  hernia.

3         The factor was hernia was not the only

4  medical disease we were struggling with.  We had

5  patients with cancer diagnosis.  And in all the

6  transitions, you know, to get them care because

7  there was no more cancer care for us.  You know,

8  where would I take my patients for chemotherapy?

9  For cancer surgery?

10        There were patients having heart attacks.

11  Where would I take them for bypass surgery to save

12  their life?  Things like -- so hernia, just because

13  the way hernia was, except unless when it's

14  strangulated, when it's incarcerated, really wasn't

15  rising to the top of our attention at that time.

16  Because we had too much focus on dialysis, cancer,

17  heart attacks, you know, strokes, life-saving

18  surgeries, at that time because LSU had very few

19  slots for surgery for anybody, not only offenders.

20     Q.  So in short, your answer is, no, cost was

21  not a consideration in coming to the consensus

22  reducible hernias will be managed non-operatively?

23     A.  Yeah.  I can say for sure, for hernia,

24  yes.  Absolutely, cost was not -- it was never on

25  anyone's mind I know of.

1    Q.  Cost was not on anyone's mind?

2    A.  For hernia.

3    Q.  Okay.  The next line says, "Approximate

4  cost per hernia is 1,600 times 200 pending equals

5  $320,000"?

6    A.  Yeah.  50 million, can you say.  I was

7  trying to make a point and that point that hernia

8  cost was not a huge deal, in fact.

9    Q.  Okay.

10   A.  I don't know.  I don't know why it is

11  there, but that's the way it is.  Because it is

12  their decision because that is the commonest thing

13  people think, that you are cutting the corners

14  because you're trying to save money.

15   Q.  Okay.

16   A.  But I really don't recall clearly why this

17  statement is there.  I -- maybe because it was like

18  three, four-hour long meeting.  But in a nutshell,

19  I'm very confident that when it comes to hernia,

20  I'm not talking about the big picture.  Cost was

21  not on anyone's mind, as far as I know.

22       MR. MOST:

23            Okay.  Next document, which we're

24            going to label Exhibit B.

25            (Whereupon Exhibit B was marked

```
 1            for identification.)

 2   BY MR. MOST:

 3       Q.  This appear to be an exchange of e-mails

 4   including Melanie Benedict and yourself; is that

 5   right?

 6       A.  It does look -- yeah, that's the way it

 7   seems.

 8       Q.  Melanie's e-mails says, "We are holding

 9   all hernia requests."  Do you see that towards the

10   bottom of the page?

11       A.  Yes.

12       Q.  This is dated December 4, 2013.  And then

13   your e-mail from you, December 4, 2013, says, "I've

14   instructed Melanie not to schedule any hernia

15   patients until the clinical guidelines group

16   finishes its recommendation."  Is that accurate?

17   Or do you see that on the page?

18       A.  I'm reading it.  Actually, I was focusing

19   here, then I saw this.  Okay, I do see that.

20       Q.  Is it true that you instructed Melanie not

21   to schedule any hernia patients until the clinical

22   guidelines group finishes its recommendation?

23       A.  That's what it seems like, yes.

24       Q.  Well, is it true, or it seems true?

25       A.  It is true.
```

1      Q.   Okay.  It's true that you instructed that?

2      A.   Yes.  That's what the e-mail says.

3      Q.   So you ordered a pause of any patient

4  being scheduled for hernia surgery; is that true?

5      A.   Well, that's one piece of this whole

6  equation.  Because in our conversation, we were

7  talking about routine hernia cases.  There may be

8  many more e-mails where the staff was clearly

9  advised to any patient who has any life-threatening

10  or near life-threatening, we don't have to wait for

11  hernia -- incarcerated hernia to become worse to

12  seek emergency medical care without any prior

13  authorization.  So all of this routine scheduling

14  was for routine care.  So the health care, offsite

15  care was broken down into pieces.  If a patient has

16  an emergent need or a patient has an urgent need,

17  that care did not need to follow the routine

18  pathway, because we started prior authorization.

19  So all the things that you were talking about is

20  routine care where the primary care provider who

21  had actually evaluated the patient, determined,

22  based on his or her medical opinion, that the care

23  was a routine care and there was no immediate

24  threat, no urgency to do that.  So, yes.  So for

25  all that were routine, the answer was yes.

1       Q.   Okay.

2       A.   Because I felt like that, you know, the

3   health care -- this work group was working really

4   hard coming up with good guidelines, and we needed

5   to create a statewide system to have consistent

6   practices.  So we wanted to make sure that they --

7   if it's a routine, it can wait and they were not

8   getting surgery done with -- to begin with anyway

9   due to LSU issues.

10      Q.   So this pause on routine hernia surgical

11  care, was that policy supposed to end once the

12  guidelines were created?

13      A.   Yeah.

14      Q.   Okay.

15      A.   I think it was about to happen, like,

16  within the next few weeks or something like this.

17  This is December, and that's actually not a good

18  time -- that was not a good time to get routine

19  surgeries done, you know, with Thanksgiving and

20  Christmas and newer holidays with LSU.

21      Q.   Your next sentence on here says, quote,

22  "Lately, every patient who has seen a surgeon is

23  coming back with an order for surgery."  End quote.

24      A.   Yes.

25      Q.   It sounds like you felt that was a

1   problem?

2       A.   That's not a problem, but that's a

3   deviation of the standards, and I had multiple

4   e-mails back and forth with LSU head of surgery.

5   The way it used to work -- and actually, we also

6   changed that.  LSU used to send residents.  You

7   know, not the fully -- like, full surgeons.  That's

8   like -- let me put this way -- to Angola clinics.

9   And Melanie Benedict used to work for LSU and Earl

10  K. Long, and she's run all the clinics, surgery

11  clinics at Earl K. Long, and she used to tell us

12  that residents, when they are finishing a rotation,

13  they have to finish their quota of certain

14  surgeries.  So from then, it was not about whether

15  surgery is an urgent surgery, you know, and

16  something like that.  They have to finish the

17  quota.  And so they're going to start sending

18  patients for surgery, and that's the way the LSU

19  system worked.

20          So I took up this issue because it was

21  creating a real problem for us when I was trying to

22  do a patient prioritization, wanting to know that,

23  you know, who needs surgery with the limited

24  capacity at LSU and whose surgery can wait.  Well,

25  if you have, like, big surgeon -- surgical resident

1    saw 25 patients and all 25 of them need surgery,
2    then it's hard for me to presume that all 25 need
3    urgent surgery.
4         So I took this up with the LSU head of
5    surgery, and, actually, we made a major change.  I
6    said that no more residents.  I need a full surgeon
7    and staff physician, and that's when Dr. Morrison
8    and Dr. Batson (spelled phonetically) started to
9    come to Angola.  Because if they are saying this
10   patient needs surgery, so it's not necessarily to
11   finish their residency requirement to be a surgeon.
12   It's basically to meet, so it was more like a trust
13   issue that, yes, this patient needs surgery.
14        And there was another thing.  So all these
15   surgical residents, when they recommended surgery,
16   it doesn't mean patient got surgery.  Because then
17   they have to send the records to the staff
18   physician to review.  Because I'm sure, you know,
19   with the residency training, there are supervisory
20   requirements.  So if they recommended surgery on
21   all 25, two months down the road, we would get
22   information back from LSU that the staff physician
23   agreed to only 10 out of the recommendation.  So it
24   was a very, very convoluted and very fragmented
25   system with LSU, you know, like all these steps.

1    Q.  Okay.  So based on this e-mail, I

2    understand then the fall or winter of 2013, you

3    directed a pause of routine hernia surgery care; is

4    that correct?

5    A.  I did not recommend surgery pause.  I

6    recommended the clinic operations.  If you read it

7    here.  Patient -- do not schedule any hernia

8    patients to the surgical clinics.

9    Q.  Okay.

10    A.  So I'm not recommending to pause surgery

11    if someone is coming back, you know, and needs

12    surgery.

13    Q.  But you directed that inmates with

14    non-urgent hernias would not go see a surgical

15    clinician; is that correct?

16    A.  That's right.  Because there were other

17    issues.  You see, the surgery clinic -- so we were

18    getting different kinds of information.  The units

19    were telling -- you know, the inmates were telling

20    that they need to see surgeon, but the

21    recommendation has to come from primary care

22    provider.  Once we are contracting, we are sending

23    surgeons.  There are not enough referrals in the

24    place.  So if a surgeon drives all the way from New

25    Orleans to Angola and we only have two patients,

1    you know, maybe we can send those two patients.  So

2    we are responding based on what we hear from the

3    field that we need more surgical time, but when we

4    are sending surgeons, there are not enough

5    patients, so there was a huge disconnect, and this

6    e-mail is about if the staff feels that telling

7    that you will need more surgical consultations, but

8    we are sending surgeons, so where are those

9    consultations?

10       Q.  Did this directive take the form of

11   non-reducible -- I'm sorry.  Let me start over.

12          Did this directive take the form that

13   reducible hernias should not be referred to

14   surgical clinicians?

15          MR. BLANCHFIELD:

16                 Object to the form.

17                 You can answer, if you can,

18          Doctor.

19          THE WITNESS:

20                 I would like to answer.  Say that

21          again.

22   BY MR. MOST:

23       Q.  Yeah.  You were saying just now that there

24   was a -- that you directed a pause in fall or

25   winter of 2013 for routine hernias going to a

1   surgical clinician, right?

2        A.   (Witness nodding).

3        Q.   The way you expressed that, was it that

4   reducible hernias should not go to a surgical

5   clinician at that period of time?

6        A.   I see your question, and I can definitely

7   see why you'll see there's a link, but like we had

8   talked previously, hernia being reducible is the

9   one -- one criteria which should -- should be used

10  by the clinician to determine whether it is routine

11  or not.

12       There are many other factors which will

13  classify your hernia as a routine case or an urgent

14  case, and we had talked about this big work group

15  and all that meeting and all that hours-long

16  discussion.  So hernia being reducible in the

17  smaller size would be one factor, but not the

18  factor -- the only factor, which should be used to

19  determine whether a hernia is routine or not.

20       Q.   Okay.  So you wouldn't have directed that

21  reducible hernias aren't to be referred to a

22  clinical -- a surgical clinician; is that right?

23       A.   So if your question is whether a routine

24  is interchangeable with reducible, you know, like,

25  routine is interchangeable, there may be more

1   e-mails, you know, so if you show me the e-mail

2   then I can -- because I do not want to lose the

3   context, taking one content out for a big e-mail.

4   And an issue which goes on for, like, months and

5   years to make a comment about this one statement.

6   So if you have a context, then I would love to

7   answer your question.

8           MR. MOST:

9               Okay.  So this is a document I'm

10              going to label Exhibit C.  This is

11              entitled "Offender Surgical Procedure

12              Request."

13              (Whereupon Exhibit C was marked

14              for identification.)

15  BY MR. MOST:

16      Q.  Do you recognize this document or hernia?

17      A.  I do.

18      Q.  Did you participate in making this

19  document?

20      A.  I should have, yes.

21      Q.  Okay.  At the bottom it says, "Revision

22  date, 10/28/2013."  So this is about the period of

23  time we've been talking about, right?

24      A.  That's correct.

25      Q.  And this appears to be a form that doctors

1  are to use to determine how to treat hernias; is

2  that right?

3      A.  Not how to treat hernias, but this is more

4  about the process.

5      Q.  Okay.

6      A.  Because we -- I don't think the treatment

7  is done by the medical schools and the experts.

8      Q.  So this is a form that helps detail the

9  process by which an inmate with a hernia will be

10  handled by the Department of Corrections medical

11  system; is that right?

12      A.  That's right.  So you have to see, there

13  was a huge disconnect between where the care is

14  being delivered to this place.  And the

15  headquarters role became the conduit through which

16  information is going to flow.  So if headquarters

17  is getting -- let's say -- just throw a number --

18  600 requests every day, there has to be a way to

19  let them know that this request cannot wait.  You

20  have to act on this one first.  You know, things

21  like efficient prioritization, I'm talking about.

22  And then, because then headquarters has to contact

23  LSU because we are not the only customers following

24  LSU.  They're dealing with way other people in the

25  system, so if I know this guy is urgent then I can

1   pick up a phone and call LSU and let them know.  So

2   this patient needs have to be communicated through

3   the entire chain unless we really bend the curve.

4         So this form, as I see it, is not telling

5   someone how to treat hernias, but how to make sure

6   what care has been determined is being delivered in

7   a timely fashion all the way through these

8   intermediaries to the ultimate care provided.

9      Q.   Right.  Was this form for the doctors at

10  the prisons or for the people at the Department of

11  Corrections headquarters?

12     A.   No.  This is an internal communication

13  between the DOC headquarters and prison facilities

14  requesting service.  So if I don't have an

15  electronic health record, the only thing I see --

16  and I didn't see, like, Melanie and her group.  If

17  a patient needs hernia surgery, that is not enough

18  information to help them jump, you know.  Like, it

19  can wait a few days, or it cannot.

20        So we were requesting more information.

21  So this had to be filled out by the unit where all

22  this primary encounters are happening.

23     Q.   And then this form would be sent to the

24  Department of Corrections headquarters?

25     A.   Yes.  And from there, those directions are

1   supposed to act and follow up based on information

2   they got.

3       Q.  Okay.

4       A.  Because you have to understand, those --

5   headquarters had no access to health care records.

6   No access means no in the real time.

7       Q.  So this was a form created by the

8   Department of Corrections headquarters and it was

9   given to the various prisons for how to communicate

10  to headquarters about hernias?

11      A.  That's right.

12      Q.  Okay.  There's some fields here about the

13  patient.  There's some check boxes for what kind of

14  hernia they have, and then it looks like there are

15  two checkboxes; one is for reducible hernia, and

16  one is for non-reducible.  Do you see that?

17      A.  Yes.

18      Q.  For reducible hernia, it says, "to be

19  managed non-operatively by primary care physician

20  at prison."  Do you see that?

21      A.  Yes, I do.

22      Q.  And then for non-reducible hernia, it

23  says, "Doctor will refer to general surgery."  Do

24  you see that?

25      A.  Yes.

1     Q.  So it looks like this is a binary choice.

2   Reducible hernias are to be managed

3   non-operatively; non-reducible hernias are to be

4   referred to general surgery.  Is that right?

5     A.  This is like -- this was a general

6   consensus at that time, because, like you just

7   eloquently described, non-reducible hernias need to

8   be operated upon.  And, you know, I chimed in that

9   there is no medical management.  So this tells us

10   non-reducible hernia is a separate track, that this

11   patient, you have to speed-track to get the surgery

12   done.

13         With reducible, then, you know, you can go

14   into more -- many more pictures.  Like, you know,

15   if reducible hernia can become a non-reducible

16   overnight or not.  So this tells a very clearly to

17   everyone else.  So all this -- like physicians

18   seeing a hernia patient is all the clinical care,

19   you know, you can go and make all those

20   appointments and keep on doing all those things.

21   But when you talk about surgery, which is a very

22   different track, different track means they have to

23   fill out surgical, you have to go and get the

24   pre-surgical checkup done, you have to get a

25   surgery date, you have to get other blood works

1   done, you know, it's a very separate track.  So

2   this really helped headquarters.

3           And then in surgery side, there are

4   multiple players.  You have to get them all aligned

5   up to get eventually surgeries.  And I'm sure if

6   you had -- no anyone who got a surgery done.  So

7   this form really triggered all those events for

8   someone with a non-reducible.

9       Q.   I see.

10      A.   So then the question was not -- you know,

11  whether he needs surgery, the question was when he

12  needs surgery.  So this actually changed

13  dramatically, because if anyone is checking

14  non-reducible.  Before that, experts can argue

15  whether this hernia patient needs surgery or not.

16  Needs surgery, all right.  But once this box is

17  checked off, non-reducible, then the question

18  changes from whether to when.  Do you follow what

19  I'm saying?

20      Q.   Uh-huh.

21      A.   That when means how urgent we need to get

22  surgery done.

23      Q.   And by contrast, if the box is checked

24  reducible hernia, then that person is to be managed

25  non-operatively?

1      A.   Most likely.  But, you know, it means

2   that, like we talked about, these are the

3   guidelines.  But you can have it, and it is up to

4   -- this is not written in the stone.  Medical

5   science is not written in the stone.

6          If a primary care provider -- and I can

7   give you about the examples, and I have to pull the

8   names.  We had a patient Angola provider delay that

9   he needed surgery.  He was sent to ER twice, and

10  they did not do surgery, and they sent him right

11  back.  The surgeons from LSU send him right back.

12  They did not do surgery.  And he went to the next

13  day -- his hernia was strangulated, and he was sent

14  back.  So more likely than not, if someone has a

15  reducible hernia, will not need an urgent surgery.

16  But can someone do the reducible hernia and get

17  incarceration?  Yes, possibly.

18      Q.   Okay.  So -- but they wouldn't get surgery

19  until it becomes incarcerated?

20      A.   No, not necessarily.  That's what I'm

21  trying to say.  The reducibility of hernia.  Okay.

22  Let me try one more time.  If hernia is

23  non-reducible, then it's very clear that this

24  patient needs surgery.  The question is not whether

25  he needs surgery.  The question is when he needs

1    surgery depending of multiple other factors.

2            If the hernia is reducible, then the

3    provider should look at all of the factors before

4    making this determination.  There was the size of

5    the hernia, comorbid conditions we talked about.

6    If someone has a COPD, someone has nephritis,

7    someone has raised and dropped down blood pressure,

8    all kinds of things go into this decision-making

9    process.  And now I'm talking if I'm the provider,

10   what I'm going to look before making this

11   recommendation.

12      Q.  So it sounds to me like you're saying it

13   would be too simplistic to have a rule that just

14   says reducible hernias, no surgery.  You have to

15   look at a lot of factors; is that right?

16      A.   Exactly.  And, you know -- so you have to

17   take -- and I can certainly understand why you

18   jumped to the conclusion based on looking at this

19   form, the history is all those work group meetings

20   which you read about.  So all the people who were

21   supposed to use that form, they know.  So they know

22   what exactly the core group has consensus come to,

23   but you cannot be creating 50-page form for every

24   patient.  So that's more about the training and

25   those guidelines to telling them what to do and the

1   exception pathway.  You know, we have only two

2   check boxes, but can there be a patient who may not

3   be fitting either of the check boxes?  Yes.  So

4   that's the exception pathway.  Two patients are

5   also white or black, no.  Sometimes you see you

6   don't know what to do.  But --

7       Q.  Was this form to be temporary or was this

8   to be a long-term form?

9       A.  Well, hindsight is 20/20.  So -- but when

10  I'm going to answer that, I'm sitting in 10/20/13.

11  Nothing is permanent in my world, really.  Look

12  where I am.  I never thought I'm going to be here.

13  So the only thing ever permanent is change.

14      Q.  Sure.  But I understand that.  In fall of

15  2013, you observed a crisis situation dealing with

16  the redesign, the closure of Earl K. Long.  Was

17  this supposed to be sort of a temporary triage

18  measure until that crisis was over, or was this

19  going to be the long-term consensus going forward?

20      A.  I see your question.  And answer is, yes,

21  this was supposed to be temporary.  But the

22  objectives were slightly different.

23          We were trying to create a very efficient

24  communication system.  So -- and communications

25  means that all the providers.  It's a teamwork.  He

Dr. Raman Singh

1   is not only one provider in Angola.  You know, it's

2   not old country doctors who does everything.  You

3   know, from delivering babies to operating on your

4   hernia.  You know, it's a team.  How does

5   information flow?  From one player to another, to

6   the next doctor to the next doctor so that patient

7   eventually gets, in a timely manner, what he needs.

8           So the answer was we really intended to

9   create this forms and they keep on improving on

10  these forms as medical times are changing as you

11  are learning about the process.

12          THE COURT REPORTER:

13              Doctor, if I could ask you to slow

14          down just a little bit.

15          THE WITNESS:

16              Sure.  Sure.

17          MR. MOST:

18              Okay.  This next document, we're

19          going to label Exhibit D.

20              (Whereupon Exhibit D was marked

21          for identification.)

22  BY MR. MOST:

23      Q.  Okay.  This is an e-mail with an

24  attachment.  The e-mail is dated March 31, 2014; is

25  that right?

1     A.  Yes.  Looks like an e-mail from March 31,
2   2014.
3     Q.  And the -- it's from C McVea to
4   Stephanie Falgout.
5         MR. BLANCHFIELD:
6             It's Stacy Falgout.
7         MR. MOST:
8             Oh, Stacy.  Thank you.
9   BY MR. MOST:
10    Q.  It's from C McVea to Stacy Falgout.  The
11  subject line says, "Hernia guidelines."  It says,
12  "The part that is blinking -- They're comments from
13  Dr. Singh and do not need to be in our official
14  guidelines."  Then the attachment looks like -- it
15  says, "Referral guidelines, Louisiana Department of
16  Corrections for hernias."  Is that right?
17    A.  Yes.
18    Q.  Okay.  Looks to me like this was a draft
19  of referral guidelines for hernias that you were
20  coming up with; is that right?
21    A.  The draft of the guidelines that the work
22  group was coming up with.
23    Q.  Okay.
24    A.  I'm not an -- I'm going to be honest.  I'm
25  not a hernia expert.  I'm not an expert.

1      Q.  And on the last page here, it says, "Some

2   things we may want to look at are usual length of

3   sentence, work status, ability to do manual labor

4   if hernia is fixed, et cetera.  If we try and

5   repair all hernias, the money will be gone."  Are

6   these notes that you typed in there?

7      A.  I don't think so.  I'm not a good typist,

8   to begin with.  Let me put it this way, the way --

9   and I'm going to tell you why.  My English is not

10  that strong that I'm going to put all these things

11  in here.  So based on what I think, who I am is

12  very unlikely that I typed those things up with

13  there.

14     Q.  Were these your comments, though?  Did

15  these reflect your comments?

16     A.  I'd have to go back and look in the file.

17  But this may be discussion.  You know, we had,

18  like, so many meetings about the hernias.  Who

19  commented what?  I think people are trying to take

20  notes, but, you know, it's like multiple hours, but

21  we talked about contents length.  We talked about

22  work status, but it's very hard for me to recall in

23  that meeting, which was attended by many health

24  care providers, who made those comments.

25     Q.  Okay.  When C McVea notes in the body of

```
 1   the e-mail, "The part that is blinking -- They're
 2   comments from Dr. Singh and do not need to be in
 3   our official guidelines," which part do you think
 4   McVea is referring to?
 5              MR. BLANCHFIELD:
 6                    Object to the form.
 7              THE WITNESS:
 8                    I think you have to ask them.
 9              Like, I -- blinking means -- like, if
10              you would help me understand what is
11              blinking in here so I can say so.
12   BY MR. MOST:
13        Q.  I have no idea.
14              MR. BLANCHFIELD:
15                    I don't see anything blinking.
16   BY MR. MOST:
17        Q.  I don't see anything blinking, but, I
18   mean, you know, this last part?
19        A.  Yeah.
20        Q.  The part about if we try and repair all
21   hernias, the money will be gone.  Doesn't make into
22   the hernia guidelines, of course, so I inferred
23   that's what McVea is referring to.
24        A.  And I can see why you would think that's
25   what McVea is referring to, but me knowing the big
```

```
 1   picture where we're talking about 50 million, and I
 2   just showed to you that hernia is only $325,000.
 3   It behooves me, you know, why I made the comments,
 4   because I knew from the get-go I was one of the few
 5   people who knew all the small pieces in the puzzle,
 6   that hernias are -- in fact, I wish that we could
 7   get a way to get all the -- should I talk to you or
 8   someone else that go find a surgeon to do the
 9   hernia surgeries --
10        Q.   We're going to get to that.
11        A.   Yes.  No.  No.  We're going to come that.
12   You know, point is what is giving so much headache
13   and we were so much fixated on getting -- and I'm
14   not trying to downplay the importance of hernia.
15   Believe me.  If that's was a patient has, that is
16   the most important thing.  I'm not trying to
17   downplay those things, by any means.  So I don't
18   see that comment coming from me, but over ten
19   years, you talk to -- you know, your colleagues
20   become your friends, and they come back and kill
21   you.  That's another thing.  But the comments I
22   have made -- but it's hard for me to justify that
23   hernia surgery will drain all the money if you just
24   look at the evidence, $325,000, 50 million every
25   year.
```

 1        Q.   Okay.  So someone made the comment, "If we
 2    try to repair all hernias, the money will be gone,"
 3    but you don't think it was you?
 4        A.   Listen.  I'm not vouching for either way
 5    of any way, and I'm not sure if someone made the
 6    comment, but you are correct.  I see that comment
 7    on this piece of paper in the e-mail.
 8            MR. MOST:
 9                  So this next document is going to
10                  be -- we're on E, I believe.  Okay.  So
11                  this is the first page in an excerpt
12                  from what's entitled "The Louisiana
13                  Department of Public Safety and
14                  Corrections Clinical Referral Guidelines
15                  For Offender Care."  2014 Edition.
16                  (Whereupon Exhibit E was marked
17                  for identification.)
18            MR. BLANCHFIELD:
19                  And the page that you picked is
20                  from where?
21            MR. MOST:
22                  It's 14 pages into this document.
23                  We're looking at Bates stamps number
24                  05005 and 05019.
25            MR. BLANCHFIELD:

```
 1                    You understand this is --
 2           THE WITNESS:
 3                    Kind of, yeah.  Okay.
 4    BY MR. MOST:
 5       Q.  Okay.  So who created this document?  Was
 6    this headquarters that created the Louisiana
 7    Department of Public Safety Clinical Referral
 8    Guidelines, 2014 Edition?
 9       A.  Yes.
10       Q.  Okay.  The second page of what we're
11    looking at, does this look like part of those
12    clinical referral guidelines?
13       A.  It does.
14       Q.  Okay.  Do you see where it says, towards
15    the bottom of the page, "Hernias -- if hernia is
16    reducible, continue to manage non-operatively?
17       A.  I do see that.
18       Q.  So this -- if hernia is reducible, manage
19    nonoperatively has become part of the guidelines
20    for offender care in 2014; is that right?
21       A.  Yeah.  Like, reducibility of hernia was a
22    major criteria.  Not the only criteria, but that
23    was a major issue.
24       Q.  What other criteria do you see here?
25       A.  Well, if you have access to all other
```

1  documents, we have so many documents about hernias

2  where we -- and we also consulted with the

3  surgeons.  This work was entitled.  And I still

4  remember doing the Google search and finding this

5  court case.  The Court has that, and I shared that

6  with the entire staff, meaning all the prisons that

7  what a court has declared about hernia.  Size, we

8  have talked about, we have talked about comorbid

9  conditions.  Like, you know, and I'm going back to

10  this issue what's making hernia worse in addition

11  to reducibility.

12      Q.  But none of those factors appear on this

13  page of the clinical referral guidelines?

14      A.  No, they don't.

15          MR. BLANCHFIELD:

16              Object to the form.

17  BY MR. MOST:

18      Q.  Okay.  You indicated that this reducible

19  hernia is to be managed nonoperatively was intended

20  to be a temporary measure, right?

21      A.  We are going back and forth.  This

22  operating a hernia is a purely, purely, purely

23  clinical issue.  What we are talking -- we are

24  mixing business with the clinical issues.

25              Managing hernia nonoperatively is a purely

1   clinical issue.  And now we're talked about how to

2   get that hernia operated upon when Louisiana was

3   facing a huge crisis.

4        So if I have to answer that question, is

5   it going to be -- if clinical finds this is not

6   changing, which I don't think has changed, the plan

7   was eventually any hernia where a surgeon is

8   recommending surgery should get surgery done in a

9   timeframe recommended by the surgeon.

10       And the intent for creating all these

11  forms were because we did not have an electronic

12  health records.  So to know whether this patient,

13  you know, how urgent the surgery needs, I have to

14  have a document in my place -- my hand to, you

15  know, so that headquarters can reach out to LSU and

16  create all those referrals.

17       The way it used to work prior to Earl K.

18  Long closure, the residents from Earl K. Long went

19  to Angola.  And once they determined -- and we can

20  talk about, you know, but let's not go there, that

21  this -- let's say the best case scenario that this

22  patient needed surgery, they would fill out the

23  surgical paperwork, and that had nothing to do with

24  DOC.  They would bring that packet back to the

25  staff physician at Earl K. Long, and they would

1    have their meetings, and the staff physician would

2    sit down and approve.  Then they would send that

3    package to a surgery review committee in New

4    Orleans Dr. Mike Kaiser used to head.  And that

5    committee used to review and approve or not

6    approve, and they schedule the surgery.  Then that

7    packet would come back to Earl K. long, And then

8    Earl K. Long would contact Angola and say that's --

9    yes.  That this inmate A can come back on November

10   the 15th for surgery.

11          So once DOC was facing this crisis and had

12   to recreate, that's when we went back to LSU.  But,

13   guys, how did you all do it?  How did this

14   information, you know, went from one place to

15   another?  And we had started to create the database

16   and system so that we can replicate and duplicate

17   what exactly LSU did.

18          So to answer your question, reducibility

19   of hernia, that's a purely clinical issue that has

20   nothing to do with the business side on, you know,

21   how you make things happen.

22   Q.  So was there a rule that nonreducible

23   hernias would be managed nonoperatively?

24          MR. BLANCHFIELD:

25                  Object to the form.

Dr. Raman Singh

```
 1          THE WITNESS:
 2               Nonreducible?  I think you
 3          misstated.
 4          MR. BLANCHFIELD:
 5               Yes.  You're right.  And it's been
 6          asked and answered now three or four
 7          times, so --
 8  BY MR. MOST:
 9     Q.  Was there a rule that reducible hernias
10  would be managed nonoperatively?
11     A.  I never made a clinical rule.
12     Q.  Okay.
13     A.  Because rules are means -- rules of laws,
14  they are set in the stone.  These are clinical
15  guidelines.  These are not the rules.  No health
16  care provider was ever forbidden from doing what he
17  felt was the best patient clinical care.
18     Q.  Okay.  So after the redesign, my
19  understanding is the way the system worked was an
20  inmate would be seen by a doctor at their prison,
21  say Angola.  If the doctor thought that they needed
22  to be assessed for hernia surgery, if they had a
23  hernia, they would make a notation in the
24  electronic exception system, that would go to
25  Department of Corrections headquarters where staff
```

Dr. Raman Singh

```
1   were scheduling people would then schedule an

2   appointment with a outside surgical expert; is that

3   right?

4        A.  Yes and no.  That part was even before the

5   redesign.  When I used to work at Angola, and based

6   on my clinical knowledge, I determined that this

7   patient's, you know, needs for further evaluation.

8   Then I would fill out a referral, and that referral

9   would go to LSU surgical residents.

10            What then actually the headquarters did is

11  to replicate that model, because that system was

12  completely taken away from the picture by internal

13  forces like we talked about.

14       Q.  Okay.

15       A.  So it's not that the new system told the

16  doctor, yes, patient has any complaint can fill out

17  sick call, access to health care, and he should be

18  seen by your provider.

19       Q.  Okay.  So it would go an inmate fills out

20  sick call, sees a health care professional at

21  Angola.  If there's a hernia that they think should

22  be accessed by a surgical expert, they would send

23  it to headquarters, and then headquarters would

24  schedule an appointment; is that right?

25            MR. BLANCHFIELD:
```

1                   Object to the form.

2           THE WITNESS:

3                   And based on the guidelines.  So

4               it's not only the process.  Then we are

5               also talking about the guidelines that

6               who should get, who should not get a

7               referral.  When you are referred -- when

8               you don't -- you know, it's like if your

9               opinion is nonreducible hernia, then you

10              must refer kind of thing also, yes.

11  BY MR. MOST:

12      Q.  But it would go through headquarters; is

13  that right?

14      A.  It's exception.  It was like a system.  So

15  like the referral I filled out when I was a staff

16  physician didn't change much.  But the difference

17  was, at that time, the nurse used to fax that to

18  Earl K. Long, and now we created an electronic

19  system that that referral would be scanned by the

20  nurse, not necessarily by the health care provider.

21  And headquarters will also access that referral to

22  work on it.  So this way headquarters can forward

23  that information to LSU in New Orleans.  So we had

24  the liaison from LSU.

25                  So the Nurses at the headquarters who take

1    out the referral and put in the LSU system.

2    Because LSU said now you are an external consumer,

3    so we had no access to LSU's record.  So

4    Eceptionist -- I'm -- I saw a patient in Angola.  I

5    wanted a cardiologist, let's say just to get out

6    from this hernia issue and he needs to see a

7    cardiologist, I would fill out a referral, and my

8    -- the nurse would scan the referral in

9    Eceptionist.  Eceptionist will -- you know, the

10   headquarters will access, take that -- our copy and

11   paste and put in the LSU's request center.  That

12   would go to LSU.  Because LSU never worked on

13   Eceptionist.  Even though that's where we got it

14   from, but let's keep it simple.

15          And then LSU will process and send this

16   information back to headquarters in LSU's system.

17   And once headquarters will see that headquarters

18   will go and input in Eceptionist and see if your

19   patient has got an appointment or no, LSU is asking

20   for more information.

21          Q.  Okay.

22          A.  So same thing work for hernia like.

23          Q.  So after '13, every surgical referral for

24   hernia went through headquarters?

25          A.  Yes.  And every other referral went in

1    Eceptionist.

2              MR. MOST:

3                   Okay.  That was E.  The next

4              exhibit is going to be F.

5                   (Whereupon Exhibit F was marked

6              for identification.)

7    BY MR. MOST:

8        Q.  This appear to me to be an exchange of

9    e-mails between you and M. Callahan, Melissa

10   Callahan; is that right?

11       A.  Uh-huh (affirmative response).

12       Q.  This is dated June 19, 2014; is that

13   right?

14       A.  Uh-huh (affirmative response).

15       Q.  So looking at the second page, looks to me

16   like representative Smith has been inquiring about

17   Tony Cormier, an inmate at Hunt, who's been

18   suffering from an inguinal hernia since 2012.  And

19   it says -- here is the response from Hunt.  Quote,

20   "He has been referred for hernia repair, but HDQ

21   denied as hernia is reducible with instructions to

22   resubmit if condition worsens.  He has not been

23   denied pain medication and is welcome file to an

24   ARP as no retaliation will take place."  Do you see

25   that?

1          A.   Yeah.

2          Q.   So Hunt present -- I'm sorry.  Let me

3     start over.

4               Is HDQ, is that a reference to DOC

5     Headquarters?

6          A.   That's correct.

7          Q.   Okay.  So Hunt is saying this inmate,

8     Tony Cormier, has been referred for hernia repair,

9     but headquarters denied as hernia is reducible.

10    That's what Hunt is saying?

11         A.   That's what it looks like.

12         Q.   Is that what would happen back then,

13    headquarters would deny surgeries as reducible for

14    hernias?

15         A.   Once again, I'm going to give you the same

16    answer.  It shouldn't have happen.  Because when

17    you people talk about headquarters, they usually

18    means medical and mental head director.

19              So my instruction to the staff was that

20    headquarters -- and you will find countless e-mails

21    from me saying this thing, the headquarters means

22    which I meant my office should not approve or deny.

23    But did everyone follow those instructions all the

24    time?  I cannot vouch for that.

25         Q.   Okay.  Later in this e-mail, Melissa

1   Callahan writes, "Apparently surgeries like this

2   must be approved by the department's medical/mental

3   health director."  Do you see that?

4        A.   That's what she believed.

5        Q.   Was she right or was she wrong?

6        A.   I don't think so, no.  Because, you know,

7   there's like -- imagine for a second, you are the

8   medical/mental health director, there are hundreds

9   and hundreds and thousands of requests coming from

10  referral.  And then at the same time,

11  medical/mental health director is also responsible

12  for redesigning the mental health system, drug core

13  system creating this LSU transition in addition to.

14  You think if it is possible for medical/mental

15  health director to go through each record, the

16  answer is, no, I did not.  I did not even touch it.

17  So a lot of presumption realistically -- in your

18  day, you are supposed to work eight hours.  I used

19  to work 9 to 10 hours, like, whatever.  You think I

20  could have gone through each referral, being some

21  we did in Eceptionist, and Eceptionist was not only

22  about DOC.  We were also talking about 104 jails,

23  creating this process at the same time.  Working

24  with the Governor's office.  And in addition to my

25  all other rules being the chairman of sex offender

1    task force, working on the electronic health care

2    task force, working on -- no.  What I'm trying to

3    say, no.

4        Q.  Okay.

5        A.  So I don't remember.  I do not -- I

6    absolutely no for sure that I did not deny any

7    request because my philosophy is same.  And since I

8    did not do it, so I can vouch that I did not do it.

9    I did not deny any surgery.

10       Q.  And you didn't create a rule that would

11   deny surgery, like reducible hernias don't get

12   surgery?

13       A.  My instruction and my e-mails to all my

14   staffs, all the time, and including the new stuff

15   who were hired at DOC headquarters to oversee this

16   process and implement this process was very clear

17   from day one.

18           Headquarters does not approve, does not

19   deny.  Sometimes you need more information to make

20   a prioritization determination, because I do not

21   want bureaucracy to slow down needed care, but we

22   were not in approval or denial business.

23           And if you have access to my e-mail, I

24   don't know if you can do a search and you will

25   find, like, countless e-mails.  It's restating this

```
 1   fact.
 2       Q.  So Hunt was wrong when it said, if
 3   referred for hernia repair, but headquarters
 4   denied?
 5           MR. BLANCHFIELD:
 6               Object to the form.  It's not
 7               Hunt.  It's -- someone wrote that
 8               e-mail.
 9   BY MR. MOST:
10       Q.  It says "Hunt."  Here's the response from
11   Hunt.  So whoever wrote the response from Hunt was
12   wrong when they said he has been referred for
13   hernia repair, but headquarters denied as hernia is
14   reducible.  That was wrong?
15       A.  This is not a yes or non question.  I did
16   not deny it, but headquarters has more staff than
17   me.  So if you want to go into the details to get
18   the answers, if you bring file to Cormier, I can
19   look, you can look and we will see, if it was
20   denied, who denied it.  Because that's the beauty
21   of Eceptionist.  It's all electronically tracked.
22   Talking about if someone denied it, that person
23   should have signed into the account.
24       Q.  So no one at the Department of Corrections
25   headquarters should be declining or denying
```

1    surgery?

2        A.   Yes.   I can absolutely answer this

3    question.   There should be.

4        Q.   Okay.

5        A.   Because that was the instruction from me.

6            MR. MOST:

7                    So the next document is F -- I'm

8                sorry, G.

9                    (Whereupon Exhibit G was marked

10               for identification.)

11           MR. BLANCHFIELD:

12                   Yeah.

13           THE WITNESS:

14                   Can I just take a bathroom break?

15           MR. MOST:

16                   Of course, yeah.   We'll take a

17               pause.

18                    (Off the record.)

19           MR. MOST:

20                   We just took a five-minute break.

21    BY MR. MOST:

22        Q.   Okay.   So we're looking at a document --

23    this is Exhibit D.   It says, "LPS hernia repair

24    list, updated 3/28/14."   Do you see that?

25        A.   Yes, sir.   I do.

1        Q.   Have you ever seen this document before?

2        A.   I do recall seeing this document before.

3        Q.   Okay.  We were talking just before the

4   break about how headquarters shouldn't be denying

5   or declining surgical referrals for hernias, right?

6        A.   Yes.

7        Q.   Okay.  So this list, the far left column

8   has names of inmates.  It's got the date of birth.

9   Do you see number of diagnosis date recommendation

10   for some of them and then additional comments to

11   the far right?  Do you see that?

12        A.   Yes, sir, I do.

13        Q.   And it looks like some of them are also

14   labeled by color according to category, categories,

15   4, 4.5 or 5 hernias.  Is that the 1 to 5 scale for

16   hernias that was developed for rating the severity

17   of hernias?

18        A.   I think Angola, Dr. Lavespere, yes.

19        Q.   Five being the worst, one being the least

20   bad?

21        A.   I have to go back and see, but something

22   like this, you know.

23        Q.   Okay.  Do you see that the additional

24   comments for many, if not more than half, perhaps

25   of these says "declined by HQ"?

1        A.  I do see those comments.

2        Q.  So why would this chart say "declined by

3  HQ," if HQ shouldn't have been declining hernia

4  repair?

5        A.  I definitely agree with you.  And you may

6  want to ask the people who prepared these charts.

7        Q.  Okay.

8        A.  Because I can only tell you HQ had many

9  people working for HQ, medical/mental health

10 records, my instructions were clear from day one

11 till the day I left.  And still I hold to the same

12 belief.  When I look back, headquarters was not in

13 a situation to approve or deny any medical

14 procedure or any medical necessity when you have

15 not laid your eyes on the patient.  If you have not

16 seen, you just should not be doing it.  It's that

17 simple.

18       Q.  Okay.  So some of these -- and then it

19 says, "recommendation surgical repair," and then it

20 says "declined by HQ."  That seems like a real

21 problem, if that's actually what's happening,

22 right?

23       A.  Absolutely.

24       Q.  Right.  So it seems like this document

25 would be a major red flag to you if it's got dozens

```
 1    of men with notations declined by HQ for hernias,

 2    some of them with recommendations surgical repair?

 3        A.  Yes.

 4        Q.  Okay.  When did you see this document?

 5        A.  Once again, I have to go back and pull

 6    that file out if you know the exact date, but I

 7    know when Angola prepared the document, they

 8    e-mailed it to many folks at headquarters, and when

 9    it came to me, I cannot guarantee you when exactly,

10    but I reviewed it in a timely manner.

11        Q.  So you think it might -- you might have

12    received this shortly after it was created in 2014?

13        A.  Say that again, please.

14        Q.  So you were saying you received these

15    spread sheets like this in your job?

16        A.  I reviewed.

17        Q.  You reviewed them?

18        A.  Yes.

19        Q.  And --

20        A.  This one, yes.  I do recall reviewing this

21    one.

22        Q.  Okay.  What did you do after you reviewed

23    this one?

24        A.  I think there was a big meeting in my

25    office about this document because this was not
```

1    happening in, like, silos.  Angola has the

2    documents, and I'm still a member -- we had an LPN

3    in my office.  She was a specifically assigned.

4    This become a huge topic after we were done with

5    all those, you know, big issues kind of thing,

6    figuring out LSU fiscal -- hernia did become a

7    major, major issue.  We talked a lot about hernia.

8    So as I remember assigning a nurse specifically so

9    that, you know, we stay on the top of the situation

10   creating a list.  Okay, how many hernia patients we

11   got?  How many surgeries?  So if I was going to

12   LSU, that meaning more surgical slots so put

13   yourself in my shoes.  Dr. Singh, I need more

14   slots.  So what would Dr. Singh have?  How many

15   slots do you need?  That's a common sense.  You

16   know, if you're young in a business transaction, so

17   I wanted to know from the feel.  Okay, how many

18   patients should I ask for what?  Was is the need?

19   Let's go and have a good handle on the situation.

20   So, yes.  We were meeting talking about this, doing

21   video conferencing about the list.  Because I

22   wanted to know.  There were patients who really

23   needed surgery.  And then there were patients who

24   could wait for surgery.  There were patients who

25   should be, based on the clinical guidelines,

1  managed by health care professionals.  And we

2  needed to know things.  I needed to know.  And I

3  know it was hard to know the exact numbers, but the

4  ballpark so that the I can go to LSU and ask for

5  those resources.

6      Q.  So it sounds like part of what you saw

7  here is that a lot of inmates need surgery, and so

8  you worked with LSU to try and get slots; is that

9  correct?

10     A.  Oh, absolutely.

11         MR. BLANCHFIELD:

12             Object to the form.

13         THE WITNESS:

14             Sorry.

15 BY MR. MOST:

16     Q.  What about this issue about declined by

17 HQ?  Did you look into that?

18     A.  Yes, I did.

19     Q.  What did you find?

20     A.  Well, all this was headed by the chief

21 nursing officer's office.  You know, all these

22 nurses and understanding of the training.  And

23 occasionally, I'd find the variance from the

24 practice from the instructions and the guidelines.

25 So the supervisors had to act on that and correct

1    it.

2        Q.   So do you mean you did find that

3    headquarters was declining hernia surgeries?

4        A.   So the way declining worked was likely

5    different.  It was not as a health insurance is

6    declining a procedure.  Sometimes headquarters

7    would ask for more information.  That, you know, we

8    need.  So before we created this form, or maybe

9    sometimes after we created this form, if

10   information is not enough, and you take all this

11   information in Eceptionist and you send to LSU.

12   Now LSU needs more information.

13       Keep in mind there was no tool in the

14   market just to meet this very specific need for

15   Louisiana DOC created by LSU's privatization.  We

16   had compromised on getting on Eceptionist because

17   we needed a tool to communicate information between

18   different systems because electronic health records

19   were not talking.  But there was nowhere in

20   Eceptionist to where you could say, Okay, I'm going

21   to pend it.  All right.  I need more information

22   back and forth.  So sometimes they had to close the

23   files.

24       Denied, as it was explained to me by the

25   staff who are managing that office at the

1  headquarters, was seeking more information, or in

2  some times, it was a misunderstanding, and

3  sometimes it was a training issue.

4      Q.   What was a misunderstanding?  That there

5  were headquarters staff declining hernia surgeries?

6      A.   Like -- repeat the question.

7      Q.   I'm sorry.  Yeah, let me start over.  I

8  don't totally understand you.

9           The question was, did you find out whether

10 headquarters was declining hernia surgeries, and

11 you said that you found out that they were asking

12 for information.  So you are saying when you

13 investigated this, you found out, no, there was no

14 declining going on, there was just requests for

15 more information, or did you find out, yes, there

16 was some declining going on and that's a problem

17 that needs to be solved?

18     A.   Why I'm taking time, because this was a

19 very complex issue.  You know, you had a policy in

20 the place, but you got a lot of staff trying to

21 implement this new thing.  So how to tell this to

22 you in a very summarized form, which will -- well,

23 describe what was happening.  So you have to bear

24 with me on that issue.

25          Okay.  Let me think.  Headquarters was

**Dr. Raman Singh**

1    never supposed to decline any surgery.  That was my

2    instruction.  That was my philosophy.  That is my

3    still philosophy.  Headquarters should not decline,

4    unless it's absolutely you do it, you know, totally

5    like cosmetic where they don't know the law.  So we

6    have agreed to put that part aside; is that

7    correct?

8         Q.  Correct.

9         A.  So if we don't talk about whether it's

10   completely, like, same.

11        Q.  We can just say --

12        A.  Although we were are talking about hernia

13   or, like, any other surgery or medical procedure,

14   headquarters, that was my instruction was never

15   supposed to decline or approve.  We would not do

16   any of the approval business.  You know, we were

17   only facilitators.  We were only supposed to

18   facilitate the process.  And at the same time, that

19   was not the only job medical/mental health

20   director's office had.

21        My other job is to make sure that

22   physicians are trained.  There are guidelines and

23   you know, the practices are consistent, they meet

24   the standard.  So now we are talking about all

25   these issues in one, and that was also part of my

Dr. Raman Singh

1    job.  If a physician is not following the standard,

2    then there has to be systems so that I can find out

3    and I can act and I can write things like this.

4         So your question is, there are many

5    e-mails about this headquarters declining, this was

6    a major issue because this was so new, even for the

7    fields and even for the staff because that's what

8    they feel like.  I don't think I have good answer

9    for you.

10    Q.  You can't answer whether you found out

11    whether headquarters was declining hernia

12    surgeries?

13    A.  Well, headquarters was not declining, but

14    yeah, in many cases, headquarters was sending

15    requests back to the provider.  And in many cases,

16    training did not only involve the provider, but

17    also involved the headquarters staff that they

18    should not had done it.  So hernias is one of the

19    issues.

20    Q.  So headquarters staff was sometimes

21    inappropriately sending requests back to the

22    prison?

23    A.  If you take inappropriate, because that

24    would require me to review the record and to give

25    you my judgment on each case.  But was headquarters

1   sending requests back to the field?  Many times.

2   Did I -- when it was brought to my attention, did I

3   side with the headquarters all the time?  No.  Many

4   times I felt like, no, this shouldn't have been

5   done.  But this was my unusual impression.  And

6   then we would go back and correct and train the

7   headquarters staff on all those issues, and that

8   was a very different show.

9        Okay.  I know what -- here's what's going

10  on, so that -- please bear with me.  First, we

11  talked about the policy, you know, how should it

12  be.  Now we are talking about the practice and

13  implementation, which requires, like, you know,

14  staffing and the staffing training.  So we are in a

15  very different territory right now you and I.

16       So first part of my deposition was all

17  about the policies and how should it be and, you

18  know, what our goals were.  Now we're talking about

19  the execution.

20       So if a doctor felt like headquarters

21  denied?  Yes, he did.  Were other units also many

22  times felt like headquarters was denying?  Yes.

23  Because you just showed me the e-mail from Hunt.

24  Did I hear that unit was saying headquarters was

25  denying?  Absolutely, yes.  Did we work on that?

Dr. Raman Singh

1    Yes.  We had our internal meetings at the

2    headquarters figuring out what exactly happened,

3    how often it required retraining, explaining this

4    concept to this new staff, which we did.  But was

5    normally on the policy issue at the execution and

6    this office was being managed by other people.

7         Q.  So what required retraining?  The fact

8    that they were declining hernia referrals?

9         A.  To answer truthfully this question, you

10   know, you have to pull that individual record and

11   talk to the people who handled that case.

12        Q.  No, I'm asking you what you just said,

13   some people needed to be retrained?

14        A.  That's right.

15        Q.  What were they doing wrong that they

16   needed to be retrained?

17        A.  Well, in some cases, not necessarily

18   hernia, so my statements are like, you know, very

19   generally statements.  Like they were asking for

20   more guidelines or like in an MRI case, if the

21   patient should have an X-ray or a sleep study case,

22   this sleep study should be ordered by a sleep

23   expert.  And then this provider will pick up a

24   phone and call me and say, No, that's not what the

25   consensus is.  And I would say, yeah, I'm going to

Dr. Raman Singh

```
 1   review the file and then we will have a meeting and
 2   we will retrain this nurse and let the headquarters
 3   know.
 4           You know, in general, a patient who
 5   requires MRI, needs an X-ray, but not necessarily
 6   all the time, so they provided -- he's recommending
 7   MRI.  Being a nurse, you should overrule a
 8   provider.  Or they say that this patient needs not
 9   MRI, CAT scan, then you are not the prescriber.
10   You know, this call has to come from the provider,
11   not from the nurse.
12      Q.  Did anybody need to be retrained as a
13   result of this document here that says, "declined
14   by headquarters maybe 50 times"?
15           MR. BLANCHFIELD:
16               Object to the form.  It doesn't
17           say "50 times."
18           THE WITNESS:
19               But understanding your concern,
20           like recall many meetings about this
21           document, not necessarily declining was
22           a major issue, but at the same time, the
23           primary objective of creating this
24           document was to get a handle on this
25           hernia situation to know how many
```

Dr. Raman Singh

```
1               patients we have and how serious they
2               are.
3                    So first thing, it was making
4               Angola understand the new process.  You
5               know, these providers were working in
6               their silos.  So understanding that if
7               you don't get hernia surgery, that's how
8               they saw it.  So to them, it was
9               declined and that's it.  It may be LSU
10              telling that we don't have a spot.  So
11              there was a huge disconnect with this
12              multi-step process letting them know
13              that that is what's happening.
14                   At the same time, in some cases,
15              we did find, well, you know, this staff
16              made an error and closed accidentally a
17              request or send the request back
18              accidentally.  Sometimes we found that
19              patients got transferred and Eceptionist
20              had no feature to transfer a patient
21              from Angola to Hunt.  So that request
22              was closed and then patient went back to
23              Angola and they are simply presuming
24              that, well, this patient was seen, let's
25              say four months ago.  We made a
```

Dr. Raman Singh

1              recommendation, and now it's declined.

2              What exactly happened when patient got

3              transferred to Hunt, Eceptionist

4              automatically closed the request.  Then

5              he went back to Angola, Angola not

6              knowing how Eceptionist works and all

7              those things.  So we had to work with

8              Eceptionist.  We had to pay them money

9              because I believe that offender transfer

10             is a routine business in DOC.  They get

11             transferred all the time.  Why should a

12             request close?  Because that

13             complicates, compromises continuity of

14             care.

15   BY MR. MOST:

16        Q.  So this document is largely wrong, that

17   headquarters was not declining as many hernia

18   surgeries?

19        A.  By and large, headquarters was not in the

20   business to decline.  But a lot of people -- Angola

21   is not the only one who had that have impression at

22   that time.

23        Q.  I'm not asking if they were in business,

24   I'm saying is this document right or wrong,

25   headquarters was declining a lot of hernia

1    surgeries?

2        A.   I can only tell you what I knew head

3    headquarters was doing.  And to say this document

4    is right and wrong, you may want to go and look on

5    individual cases and come to this conclusion by

6    yourself.

7        Q.   Based on your experience, what would you

8    answer be?

9        A.   My answer would be headquarters shouldn't

10   have been declining.

11       Q.   I'm not asking about should or shouldn't;

12   I am asking about what they were doing.  Based on

13   your experience, your understanding, were they

14   declining them?

15       A.   As far as I know, headquarters was not

16   declining.

17       Q.   Okay.

18       A.   As for the majority of the cases, they

19   were not.

20       Q.   So this is wrong?

21           MR. BLANCHFIELD:

22               Object to the form.

23           THE WITNESS:

24               That conclusion, headquarters

25            declined, is largely wrong.

Dr. Raman Singh

1           MR. MOST:

2                 Okay.  Now we're on Exhibit G.

3           I'm sorry, no. It is H.

4                 (Whereupon Exhibit H was marked

5           for identification.)

6     BY MR. MOST:

7         Q.  Okay.  This appears to me to be a

8     document, an e-mail from Dr. Lavespere to Terry

9     Cannon, cc'ed to Stephanie Lamartiniere and

10    Stephanie Farmer; is that right?

11        A.  Yes.

12        Q.  It's dated March 23, 2015, right?

13        A.  Yes.

14        Q.  It writes, "I had Michael Kelly called

15    over this afternoon to evaluate his hernia.

16    Michael has a left inguinal hernia of small to

17    medium size.  It is easily reducible when lying

18    supine.  By DOC, hernia guidelines, he is not a

19    surgical candidate."  Do you see where it says

20    that?

21        A.  Yes.

22        Q.  Is Dr. Lavespere right or wrong about his

23    statement, by DOC hernia guidelines, he is not a

24    surgical candidate?

25        A.  And I'm going to presume what he meant,

Dr. Raman Singh

```
 1   that for surgical reference based on sending him to
 2   a surgical clinic for a surgical evaluation.  I
 3   recall that was the guideline at that time.
 4        Q.  What was the guideline?
 5        A.  Well, you have to pull the guidelines, you
 6   know, exact details we talked about, those
 7   guidelines.  And until I have yet to see the
 8   guidelines, because I recall it differently, that
 9   when you refer, when not to refer, the consensus
10   report from the work group.
11        Q.  It says, "Michael has been referred to the
12   surgeon, 4/24/14.  However, the consult was
13   returned because the herniation was reducible.
14   According to headquarters note, 'Please have PCP
15   continue to monitor reducible hernia and refer if
16   condition changes.'"  Do you see that?
17        A.  I do see that.
18        Q.  So it sounds to me like this Angola inmate
19   was referred to a surgeon, and then headquarters
20   returned it because the herniation was reducible;
21   is that right?
22        A.  That's what it seems to me, too.
23        Q.  Okay.  Is that the way it should have
24   been?
25        A.  Based on the guidelines.  And, once again,
```

1   you know, we are talking with, based on our
2   presumption, without having the details in front of
3   me.  You showed me a form where there was a check,
4   reducible and nonreducible, so if you put two and
5   two together, then that's what seems like the
6   guidelines were --
7       Q.   Okay.
8       A.   -- mostly.
9       Q.   So headquarters would bounce back a
10  surgical referral, if the hernia was reducible?
11      A.   Asking PCP to follow, and that was the
12  medical units medical director's job, that if the
13  work group provided physicians have come to a
14  consensus and have created a guideline, the
15  expectation is for providers to stick to the
16  guidelines.  And if there's a reason to not follow
17  the guideline, then follow this exception pathway
18  and explaining why, you know, this patient needs --
19  that he needs a surgical consult, but he doesn't
20  meet guideline.  Because no -- there was no blanket
21  stop.  So the guidelines are there as a guideline.
22  They're not the rules.  But by and large, you
23  expect the staff to follow guideline and to pick up
24  a phone and call and give you more information, if
25  they believe this patient needs to be seen by a

```
1    surgeon, but does not meet the guideline

2    requirement.

3        Q.  Okay.  So the guideline was, reducible

4    hernias are to be managed nonoperatively.  So has

5    here, if a prison doctor refers someone for surgery

6    and they have a reducible hernia, DOC is going to

7    bounce it back and say please have PCP continue to

8    monitor and refer if condition changes, right?

9            MR. BLANCHFIELD:

10               Object to the form.

11           THE WITNESS:

12               I'm going to give you the same

13               answer that you had asked, like, almost

14               30 minutes ago.  And, you know, maybe

15               you may want to see the guidelines, the

16               complete and totality by the DOC.

17               As I recall, hernia being

18               reducible was one of the factors, not

19               the only factor.  We talked about

20               intraabdominal pressure.  We talked

21               about the smoker, the COPD, and other

22               considerations which should go into the

23               decision-making process.

24               It's not a knee-jerk straight

25               reducible and nonreducible.  Once again,
```

1              I'm going to explain.  If a hernia is

2              nonreducible, then it's very

3              straightforward treatment pathway.  The

4              question is not whether surgery; the

5              question is when based on other clinical

6              information.

7                   But if a hernia is reducible, then

8              you are -- the clinician should consider

9              other factors before making a clinical

10             decision whether a patient needs to be

11             sent to surgery or not.

12                  So your question is very

13             straightforward.  The way it comes out

14             to me, and I may be wrong, if it's

15             reducible, it's not operation.  That may

16             be the case; that may not be the case.

17   BY MR. MOST:

18        Q.  This e-mail says, "However, the consult

19   was returned because the herniation was reducible."

20   So it sounds like whoever is doing the return, the

21   consulting, is considering reducible to be the key

22   characterization?

23            MR. BLANCHFIELD:

24                  Object to the form.  And you're

25             only reading part of the e-mail.  That

Dr. Raman Singh

1              e-mail goes on to many other factors.

2          THE WITNESS:

3              So the answer would be the same

4          thing.  Lack of information.  If hernia

5          is reducible, but still patient needs to

6          be seen by the surgeon -- and that's

7          when we talked about -- the headquarters

8          should have sent it back to the unit

9          asking for more information.  Then

10          please, you know, provide more

11          information.  Because that information

12          will go to a surgeon.  And, you know,

13          before seeing the patient based on would

14          like to see.  Just having this

15          information that hernia is reducible may

16          not be enough information for a surgeon

17          and not enough information for the

18          prioritization.

19          MR. MOST:

20              This is going to be Exhibit I.

21              (Whereupon Exhibit I was marked

22          for identification.)

23      BY MR. MOST:

24      Q.  This appears to me to be an e-mail from

25      Annette Dupuis to Connie Leonards dated November

```
1    7th, 2013, an e-mail; is that right?
2        A.  It seems to be right.
3        Q.  Looking at the second page, do you see
4    where, towards the bottom of the page, it says,
5    "FYI:  Her doctor is saying all hernias that are
6    reducible will remain pending until further
7    notice."
8        A.  I do see that.
9        Q.  So that's a pretty simple rule, all
10   hernias that are reducible will remain pending
11   until further notice?
12           MR. BLANCHFIELD:
13               Object to the form.
14   BY MR. MOST:
15       Q.  Is that right?
16           MR. BLANCHFIELD:
17               Object to the form.  You keep
18           using the word "rule," and he keeps
19           correct you.
20           THE WITNESS:
21               You answer a question.  That
22           e-mail didn't come from me.  If you show
23           me an e-mail from me, what Mr. Dr. Singh
24           said, that all reducible hernias --
25           Dr. Singh wrote in the e-mail -- that's
```

Dr. Raman Singh

1          me -- will remain pending until further

2          notice, then we can talk.  This is not

3          from me, this e-mail.  This is from

4          someone in the headquarters office to

5          LSU nurse talking about whatever she

6          understands about this new process, and

7          that is what's reflected in the front of

8          the e-mail that appears as confusing if

9          you go back to the front page before you

10         go to the second page.

11   BY MR. MOST:

12       Q.  So this is a false statement that, per

13   Dr. Singh, all hernias that are reducible remain

14   pending until further notice?

15       A.  The statement from Dr. Singh was, once

16   again, it's the same, that the hernia is not

17   non-reducible, send to surgery.  If it's

18   incarcerated, send to an ER.  If it's reducible,

19   the consensus work group had come up with the

20   recommendations.  Follow the recommendations.  Look

21   for comorbid conditions.  If the consensus work

22   group, if -- you may want to see those hernia

23   guidelines -- recommend non-operating management

24   following by PCP, do it.  If you don't agree

25   because this individual case is different, doesn't

1    fall -- you know, fall into either category, then

2    provide more documentation and get the appointment

3    done.

4         Q.   So this is wrong?

5              MR. BLANCHFIELD:

6                   Object to the form of your

7              question.

8              THE WITNESS:

9                   Well, I'm not sure.  Like,

10             reducible is one of the factors, and

11             there are many more factors, so I think

12             if -- let me answer this way.  If the

13             author of the e-mail believes that

14             reducibility is the only factor on

15             Dr. Singh's mind in deciding whether a

16             hernia should be operated on or not,

17             then author is wrong on multiple levels.

18             The first thing, reducibility is one

19             factor.  Surgery is another factor.

20        MR. MOST:

21                  Okay.  So we're going to look at

22             Exhibit J.

23                  (Whereupon Exhibit J was marked

24             for identification.)

25   BY MR. MOST:

 1      Q.  And so this is an e-mail that appears to
 2  be from Alicia Hughes to -- I'm sorry.  Let me
 3  start over.
 4          This appears to me to be an e-mail from
 5  KHawkins@corrections.state.la.us to Alicia Hughes
 6  regarding Michael Kelly, an inmate.  It's dated
 7  October 6, 2015.  Does that look right?
 8      A.  It does look right.
 9      Q.  Kelly Hawkins writes, "Can you please
10  check and see if this offender has had hernia
11  surgery?  I checked his chart and I don't think he
12  has because it is still reducible."
13          Do you see where she says that?
14      A.  Yes.
15      Q.  It sounds like that's also wrong because
16  you're saying it's a multifactor thing and
17  reducible isn't enough, and so this is --
18          MR. BLANCHFIELD:
19              Object to the form.  Are we going
20          to go down this road, how many times,
21          Williams?
22          MR. MOST.
23              We're going to do it a lot,
24          because --
25          MR. BLANCHFIELD:

```
 1              No, we're not.  We're not, because
 2         it's getting to be harassing.
 3    MR. MOST:
 4              It's not harassing.
 5    MR. BLANCHFIELD:
 6              Yes, it is.  It's very close, and
 7         when it gets a little further, we're
 8         going to stop, so I'm just telling you.
 9    MR. MOST:
10              Drew, do you think --
11    MR. BLANCHFIELD:
12              It's the same answer.  It's the
13         same issue.  It's the same words.  It's
14         the same answer.
15 BY MR. MOST:
16    Q.  Dr. Singh, this is a wrong statement; you
17 see here?
18    MR. BLANCHFIELD:
19              Object to the form.
20 BY MR. MOST:
21    Q.  This is just a wrong thing, that reducible
22 is all you need to look at for --
23    A.  Mr. Most.
24    Q.  Yes.
25    A.  I would suggest that you talk to the
```

1    author --

2        Q.  Okay.

3        A.  -- of this e-mail.  I can give you my

4    clinical opinion, my recollection of the memory,

5    but to make me sit here and judge every e-mail from

6    a non-health care person.  Kelly Hawkins is a

7    wonderful, wonderful employee, but as far as I

8    know, she has no medical training.  What she's

9    thinking, asking me to judge, that seems very

10   unfair to those authors of the e-mail.  You may

11   want to call them and ask them.  So really, I don't

12   see why -- you know, judging others' e-mails and

13   just saying right or wrong, that doesn't seem right

14   to me.

15       Q.  Okay.  I mean, we looked at a form that

16   has two check boxes, and the only thing that

17   indicated whether a hernia would be managed

18   operatively or non-operatively was whether it was

19   reducible.  That was the only factor on that form,

20   right?

21       A.  You want me to answer the question?

22       Q.  Yeah.

23       A.  Mr. Most, I see -- we talked about this.

24   If you have -- it's impressive at how much work you

25   have done on picking this hernia out, and it amazes

1    me that you don't have those hernia guidelines with

2    you.

3         Q.  I do have these hernia guidelines.  Do you

4    want to look at them?

5         A.  Yeah.  So that, you know, we talked about

6    the entire context and the picture, because you are

7    going to ask the same question.  I'm going to

8    answer the answer the answer I'm going to give you,

9    that hernia being reducible is just one factor.

10   But if you're going to ask me that -- why didn't

11   that clinician do it, that's beyond me.

12        Q.  Okay.

13        A.  I did create a work group of the

14   providers, and they were -- their task was to

15   review any and all hernia literature, talk to

16   surgeons, talk to hernia experts -- because I'm not

17   one -- and coming back with a consensus guidelines,

18   and let's talk about training so all health care

19   professionals can follow the same standards.

20        Q.  Okay.  So is this the document you're

21   talking about?

22        A.  Yeah.  It's -- like.  Seems like it.

23   Yeah, this does looks like it.

24             MR. MOST:

25                   We'll label this Exhibit K.

1                    (Whereupon Exhibit K was marked

2              for identification.)

3    BY MR. MOST:

4        Q.   You can look over it.   This appears to be

5    a document, Louisiana Department of Corrections

6    Referral Guidelines For Hernia.

7        A.   Okay.

8        Q.   It says at the bottom, "Indications for

9    specialty care referral."

10             Does that mean surgery?

11       A.   Specialty care means that -- when you say

12   surgery, that may mean the actual surgical

13   procedure, but that means surgery clinic.

14       Q.   Okay.

15       A.   So I'm going to answer your question.   I'm

16   going to read it.   "Indications for specialty care

17   referral."   And that was the question.   First one

18   is, "Hernia is non-reducible."   And we spent, like,

19   a few hours talking about this.

20             Next one is, "Hernia is very large in

21   size, failing medical management."   For the record,

22   that hernia can be a reducible hernia.   But this

23   can be a very large, and that is clearly an

24   indication for a specialty care referral.

25             Third one is -- last one -- "Any

1   significant pain."  That hernia can be a reducible

2   hernia with significant pain, and it's still --

3   guideline is that you take the next step and refer

4   to the surgery, because only a surgeon can make a

5   determination about a surgery.  I cannot tell a

6   surgeon to do the surgery.  So we have been talking

7   about this for so long, reducible and

8   non-reducible, and as far as I see on these

9   guidelines, there are four criteria, and three of

10  them.  Hernia can still be reducible, and still,

11  the primary care provider should refer that patient

12  to the surgeon.

13      Q.  Okay.  So this document has four criteria

14  suggesting a surgical referral, one of which is

15  whether the hernia is reducible or not?

16      A.  That's right.

17      Q.  Okay.  And Exhibit E, which we looked at,

18  The Guidelines For Offender Care, 2014 Edition, had

19  only one.  If hernia is reducible, continue to

20  manage non-operatively, correct?

21          MR. BLANCHFIELD:

22              Object to the form.

23              I'd like to see it.

24          THE WITNESS:

25              This is the hernia guideline,

1          which I recall as the hernia guideline

2          because there was so much talk about

3          hernia.  In this Exhibit E, I see hernia

4          being addressed in one paragraph with

5          three sentences.  Because the staff who

6          were supposed to implement these hernia

7          guidelines were supposed to know and be

8          trained on this multipage document and

9          the multiple video conferences to know

10          about them, so if I have a doubt if

11          there's a contradiction between

12          Exhibit E and Exhibit K, Exhibit K is

13          the document to go to.

14    BY MR. MOST:

15        Q.  Okay.  Where does it say that, that K

16    controls over E?

17        A.  Excuse me.  Say that again.

18        Q.  Yeah.  So you're saying Exhibit K is the

19    definitive statement for how to deal with hernias,

20    correct?

21        A.  No.

22        Q.  Okay.

23        A.  Well, I made it very clear.  The

24    guidelines are not the definitive statement.

25    Headquarters was not opening a medical school to

1    train physicians how to treat hernias.  These are

2    guidelines about the process, and I'm saying a

3    hypothetical scenario.  Since you have been asking

4    same question for last two or three or four hours

5    about reducible, so I suggested that we go to the

6    guidelines, and I'm so glad that you finally pulled

7    that guideline out, which has, like, way more

8    information about what was the guideline, not the

9    rule to manage a patient with a hernia.  So this

10   guideline has multiple indications for referral,

11   and if, still, a physician would agree to make a

12   referral as long as physician provides enough

13   information to justify so that LSU surgeon can

14   review and see that patient.

15       Q.  So these referral guidelines are a poor

16   criteria for surgical referral; these 2014

17   guidelines for offender care has one.  Which one of

18   these is the controlling document?

19            MR. BLANCHFIELD:

20                 Asked and answered.

21            THE WITNESS:

22                 Your answer controlling document

23            is the clinical signs.

24   BY MR. MOST:

25       Q.  Clinical signs.  Okay.

Dr. Raman Singh

1      A.   That's right.   And you have to show me on

2   Exhibit E.   I'm sure it's a multi-page document.

3   You know, the guidelines.   I have to see the

4   complete guideline, because the Louisiana

5   Department of Public Safety & Corrections Clinical

6   Referral Guidelines For Offender Care, 2014

7   Edition, and I'm only looking at page 15.   And in

8   the page 15, actually, the top doesn't even look

9   like the guideline.   It looks like someone is

10  sending e-mail about, "Hi, we have a lady from here

11  LCIW here today for urology."   That sentence

12  doesn't belong to a guideline.   "JS DOC 109119."

13  That's a very confidential information.   That

14  sentence does not belong to a guideline.   On the

15  same Page 15 we are talking about, which is being

16  shown to me as the 2014 guideline, and I'm being

17  asked to tell whether Exhibit E guideline, which

18  talks about, "Hi, there's a lady from LCIW," and

19  Exhibit K, which one is controlling.

20      Q.   So you don't think that's actually a page

21  from the 2014 guidelines?

22      A.   I'm not going to guess and think.   You

23  showed me the guideline, and I'm going to give you

24  my opinion.   You are asking me too much, Mr. Most,

25  today here.

Dr. Raman Singh

```
1            MR. BLANCHFIELD:

2                   That's your document, Mr. Most.

3                   Exhibit E is your document put together.

4            MR. MOST:

5                   It came from the Department of

6              Corrections.

7            MR. BLANCHFIELD:

8                   Well, no.  It's actually way of

9              out of order, and there's no rhyme or

10             reason to it other than you chose to

11             staple the second page to what looks to

12             be a title page of the Department of

13             Public Safety & Corrections.

14           THE WITNESS:

15                  If you allow, I'm going to answer

16             the question.

17     BY MR. MOST:

18        Q.  Okay.

19        A.  Any document which starts with, "One idea

20     that was talked about was for the units to create a

21     spreadsheet with all offenders on 340-b."  The next

22     sentence is -- like, next paragraph, "Please feel

23     free to provide any input."  The next sentence is,

24     "Hi, we have a lady from LCIW."  Does not belong

25     into any official guideline, but I'm not going to
```

1    vouch whether this is a guideline or not.  But in

2    my opinion, this does not belong to a guideline.

3         Q.  Okay.  So let's compare it, instead, the

4    referral guidelines to Exhibit C.  Exhibit C has

5    only one criteria for whether a hernia will get

6    operative care, right, whether it's reducible or

7    not?

8              MR. BLANCHFIELD:

9                   Object to the form.  Object to the

10              repetition.

11   BY MR. MOST:

12        Q.  Am I misreading this document?

13        A.  You asked the same question before, and my

14   answer is same.  You can go back in the record and

15   look for my answer.

16              MR. MOST:

17                   Okay.  So next, we're going to

18              look at Exhibit L.

19                   (Whereupon Exhibit L was marked

20              for identification.)

21   BY MR. MOST:

22        Q.  Okay.  Exhibit L appears to me to be a

23   June 5, 2002, e-mail from Dianthe Rogers to LSU

24   wardens and other folks.  The subject, "Call out

25   for Warden Norris."  Is that right?

1        A.  If it looks to you, then it should be

2   right.

3        Q.  All right.  Do you see the last page of

4   this that's attached to that e-mail?  It's a list.

5   It says, "Hernia surgeries needed as of 5/21/2012."

6        A.  I do see that, but I don't know whether

7   this is the same e-mail or not.  Like, these are

8   three pages stapled together, so if you are reading

9   the first part, that is the e-mail, but unless --

10  are you vouching that this document is what is

11  attached to this e-mail?

12       Q.  I'm vouching that's how it was presented

13  to us, yes.

14            MR. BLANCHFIELD:

15                 It's not Bates stamped at all,

16            which suggests it was not produced by my

17            office.

18            THE WITNESS:

19                 So I can go on if you vouch --

20  BY MR. MOST:

21       Q.  Sure.

22       A.  -- in giving my opinion.

23            MR. BLANCHFIELD:

24                 No, I don't want you to assume

25            anything.

```
1              THE WITNESS:
2                   Okay.
3    BY MR. MOST:
4        Q.  Okay.  Then look at the third page.
5        A.  Okay.  Yes.
6        Q.  This is a page that says, "Hernia
7    surgeries needed as of 5/21/2012."
8            Do you see that?
9        A.  I see a page which -- without any
10   letterhead, anything which says, "Hernia surgeries
11   needed as of 5/21/2012."  I don't see any name of
12   the author.  I see name of the inmates, DOC
13   numbers, location, dates, diagnoses, and notes.
14   That's the page I see.
15       Q.  Have you ever seen this document before?
16       A.  I can't truthfully answer your question,
17   have I seen this document before.  Like, this form
18   on this page?
19       Q.  You don't recall?
20       A.  Well, I'm saying I cannot answer this
21   question.  I don't know whether I have seen.  I may
22   have seen.  I may not have seen the document
23   before.
24       Q.  You can't answer because you can't recall?
25   I don't understand why you can't answer.
```

1      A.   Like, six years ago, did you read The

2   Advocate on March 21, 2013?

3      Q.   I don't know.  I can't recall.

4      A.   Exactly.  So exactly.  If this e-mail was

5   sent to me or was in a file, I should have seen it.

6      Q.   But you don't recall seeing this document?

7      A.   I cannot truthfully answer the question

8   whether I have seen this e-mail or not.

9      Q.   Okay.  You see that it says, "Hernia

10  surgery needed"?

11     A.   I see it's on the piece of paper, there's

12  written, "Hernia surgeries needed."

13     Q.   Do you have any reason to doubt that these

14  men needed hernia surgery?

15          MR. BLANCHFIELD:

16               Object to the form.

17          THE WITNESS:

18               I'm not going to answer this

19               question because I do not know the

20               author; I do not know who came to this

21               conclusion, "Hernia surgeries needed";

22               what is the medical information on this

23               form, this patient.  So it's very, very

24               wrong for me to start judging, as I have

25               no clue who authored this.  Is this

Dr. Raman Singh

```
 1                authored by a physician?  Is this
 2                authored by a surgeon?  Is this authored
 3                by a non-health care professional?  And
 4                how they came up with the criteria?  And
 5                whose opinion is this, "Hernia surgeries
 6                is needed"?  Is this LSU surgery chief,
 7                or this is the inmate deciding and
 8                creating this document that hernia
 9                surgery was needed?  I'm not saying any
10                way, so one needs more information to
11                get an informed opinion.
12  BY MR. MOST:
13      Q.  So if these men were to be still waiting
14  for surgery several years after 2012, would that be
15  a problem?
16                MR. BLANCHFIELD:
17                    Object to the form of your
18                question.
19                THE WITNESS:
20                    Well, the first determination
21                needs to be made is a clinical by a
22                health care professional whether hernia
23                surgery is needed.  So if you're
24                providing me information that who made
25                that distinction/determination right
```

1          here and then tell me what was going on,

2          then I can give you my professional

3          opinion.

4    BY MR. MOST:

5        Q.  If a clinician determined hernia surgery

6    needed for these men, would it be a problem if they

7    were still waiting for hernia surgery several years

8    later?

9        A.  So that clinician also determines how soon

10   hernia surgery was needed?  Because that was a part

11   of the job and guideline.  So how soon he decided,

12   the clinician decided that hernia surgery was

13   needed, how quickly those surgeries were needed?

14       Q.  Let's suppose the clinician just -- all

15   you have here is hernia surgery needed.

16       A.  So you are playing the suppose game, and

17   it doesn't work that way in the clinical science.

18          MR. MOST:

19               Okay.  We're on to Exhibit M.

20               (Whereupon Exhibit M was marked

21          for identification.)

22   BY MR. MOST:

23       Q.  Do you recognize this document, Dr. Singh?

24       A.  Yes, I do.

25       Q.  What do you recall about this document?

```
 1        A.   This document.  That's what I recall.

 2        Q.   You just recall that it exists?

 3        A.   Seeing it.  Reading it.  Working on it.

 4        Q.   Yeah.  What did you do to work on it?

 5        A.   I read it, got the information, and

 6   processed it.

 7        Q.   What did you do to process it?

 8        A.   Reviewed it, got this information, went to

 9   the inmate's records, found out information.

10   That's how I processed it.

11        Q.   What did you find out?

12        A.   It should be in the file I had in my

13   office.

14        Q.   Do you recall what you found out?

15        A.   Well, I'm not going to guess.  This is an

16   important case.  If I have access to the file, I

17   can tell you what I recall.  My notes -- usually, I

18   write my notes.  This is almost two and a half

19   years ago.

20        Q.   Okay.  Well, what do you recall about what

21   you found out about --

22        A.   What I found out is in that file.

23        Q.   Do you recall anything about this?

24        A.   I recall this document.  I recall

25   everything, but I'm not going to guess wrong, so
```

1   whatever I had in my notes is in that file.

2       Q.  Well, you have to answer the questions.

3   Like, if -- you're not allowed to --

4           MR. MOST:

5               Let's go off the record for a

6           second.

7           THE WITNESS:

8               Okay.

9               (Off the record.)

10          MR. MOST:

11              Okay.  Let's go back on the

12          record.

13  BY MR. MOST:

14      Q.  I'm going to ask you about this document,

15  Exhibit M, and I don't need you to recall anything

16  that's beyond your memory.  I only want to know

17  what you recall about what happened after you

18  received this document and what you did next.  Do

19  you recall receiving this document?

20      A.  Yes, I do, and I'm going through the

21  document because now your question is a very good

22  question, which I can answer, like, recall from my

23  memory, so I will tell you what I recall as soon as

24  I'm done reading.

25      Q.  Thank you.

**Dr. Raman Singh**

1       A.   Okay.  I'm ready to answer.

2       Q.   Okay.

3       A.   What I recall is -- and I may not be very

4  accurate when it comes to the timeline.  We had

5  created a folder at headquarters because it was

6  such a huge issue, and I always believed that if

7  someone is complaining, that complaint merits a

8  fair investigation.  No one should jump to the gun

9  that all the complaints are false or all the

10  complaints have merit.  And it was not an easy

11  thing to do because we didn't have electronic

12  health records, so you have to get all the copies

13  from Angola.  And you have to understand, this is

14  an extra task on already -- resources and Angola

15  staff, so we created a folder and electronic

16  documents, started pulling all this information to

17  review each record individually to create a medical

18  summary, which is all in that folder, to see when

19  the initial -- when they were seen, when the

20  referral was made, and what exactly happened out

21  from that referral.  So we looked very carefully at

22  each of these names, and, at the same time, there

23  was another big lawsuit going on from Justice

24  Initiative Health Care at Angola, so many of these

25  names -- some of these names, I'm going not to

1    vouch, but some of these names overlapped, so we
2    were pulling all those records at the same time to
3    look into.  So what I recall is me taking this
4    letter from you very seriously and getting the
5    copies and following of the Angola -- sometimes the
6    information was not exactly what I was looking for,
7    getting information from LSU, and creating medical
8    summaries on each of these records to see what was
9    done so that I know what was going on.
10        Q.  This letter talks about the pattern of
11   delay.  Did you find a pattern of delay?
12        A.  Once again, I'm going to answer your
13   question truthfully.  There was some delay in the
14   cases due to LSU issues.  I did find that, in some
15   cases, there was some system issues, you know, like
16   doctor made the referral but the nurse didn't
17   enter.  What I don't recall is which delay in which
18   case, but, like, a major red flag where this should
19   have been done and not done, I don't recall getting
20   something like that.  Was it perfect every time and
21   all the names?  No.  Does that satisfy your
22   question?
23        Q.  Yeah.  This letter has a lot of dates of
24   first diagnosis and first surgery referral, for
25   example, on the last page, and then when the

Dr. Raman Singh

1   surgery was completed.  Did you find that this was

2   roughly accurate, or did you find that these

3   numbers were really wrong?  Do you recall?

4       A.  Most of the cases, the information was

5   correct, but in some cases, in fact, one of the

6   lawsuits, that surgery was already done, and I'm

7   talking about a cataract surgery, because this

8   talks about some of the cataract surgery, but

9   patient had right cataract and left cataract.  One

10  cataract was done.  Second cataract.  And, once

11  again, I cannot recall the name exactly, the

12  surgeon has stated patient doesn't need surgery,

13  and similarly in hernia.  Same thing was happening.

14  When we found that patient, you know, needs

15  surgery, you go back and tell the surgeon, and it's

16  a different surgeon, and he has different opinion,

17  so going back and forth.

18      Q.  So understanding that there may have been

19  some inaccuracies in these numbers, you found it

20  was roughly accurate; is that right?

21      A.  What I'm asking is more about

22  understanding, like your previous question.  Like,

23  you know, what a non-health care person

24  understands.  So for a non-health care person, if

25  you see surgery recommended, it means patients

1    needs to get surgery.  There's way more things

2    going on between this recommendation from a

3    nonsurgical, like me being an internist, to the

4    surgeon, who actually does the surgery.  There are

5    many more steps.

6        Q.   Okay.

7        A.   And opinions can change at any of those

8    steps.

9        Q.   So did you see that there was a big

10   picture problem here with inmates waiting hundreds

11   of thousands of days for surgery?

12           MR. BLANCHFIELD:

13               Object to the form of your

14               question.

15           THE WITNESS:

16               For cataract surgery, so this is

17               getting to the cataracts.  So I'm going

18               to be honest upfront.  So we have a

19               cataract hernia.  These were, like,

20               issues where, by and large, they were,

21               like, non-urgent interventions.  Unless

22               someone's lenses, like, you'd find

23               losing sight seriously.  And we work

24               closely with LSU in getting the

25               recommendations from them that how do

1     you want us to process and send this
2     information, because DOC headquarters
3     was supposed to be only the passthrough
4     phase.  It used to go through LSU to do
5     this scheduling and how you did it, so
6     as far as I know, even before this LSU
7     transition, I have worked at Angola as a
8     staff physician.  Most of the patients
9     usually waited four, five, six years to
10    get cataract surgery, because the answer
11    from LSU was we will schedule when we
12    have a clinic slot, and it's okay.  It's
13    not a life-threatening situation.  So
14    from that experience, this was not very
15    unusual for me to see, because this
16    situation did get worse after the
17    transition.
18        I would be wrong if I would say
19    that as soon as LSU was privatized,
20    situation immediately, overnight got
21    better.  No.  The fact is Louisiana law,
22    very important, capacity when it comes
23    to health care.  OR beds, inpatient
24    beds.  The doctors and the nurses, they
25    left.  So the LSU capacity to provide

1              care when in doubt, and it took them at

2              least a year and a half to come back to

3              their baseline.

4    BY MR. MOST:

5        Q.   So when you were at Angola, you saw four,

6    five, six years waiting for cataract surgery

7    commonly?  Is that what I heard you say?

8        A.   With LSU, because we had no information,

9    it wouldn't surprise me to get MRI.  The wait time

10   was too long to get surgeries done.  You never

11   know.  And I'm talking about -- I was in Angola

12   from 2002 to 2007.  The inmates waited many -- long

13   time.  But we believed that LSU -- what LSU was

14   doing was doing was founded on the clinical

15   science, and that's how they treated.  So I'm not

16   judging.  I'm not giving you my opinion based on

17   saying that this was wrong and now we're we picking

18   it.  No.  So to see this after going through

19   individual' records, most of the times, I do not

20   recall finding a major red flag where the health

21   care standard was breached or something wrong was

22   done, by and large.

23       Q.   Okay.  But just -- yes or no -- I heard

24   you say when you were working at Angola, you saw

25   inmates waiting four or five or six years for

1    cataract surgery; yes?

2        A.   Possibly, yeah.   That would have surprised

3    me.   So, like, given this frame for cataracts.

4        Q.   What about for hernia surgery?

5        A.   Well, the hernia surgery was hit and miss

6    with -- you know, the way the system works is the

7    resident, they have to do a certain number of

8    surgeries to fulfill their training obligations.

9    So if he was missing on hernia surgeries, you will

10   see that, you know, the next two months, we would

11   get, like, 20 hernia surgeries done.   But residents

12   rotate every month.   There was new residents coming

13   out.   So if the new resident is already done with

14   the hernia surgeries, then you would start seeing a

15   delay in hernia surgeries, because now he wants to

16   do more nose surgeries.   He has to cancel on his

17   nose surgeries to meet the qualifications and

18   standards.   That's why we wanted to eliminate, that

19   it should not be based on what residents are

20   supposed to do.   It should be based -- strictly

21   based on patients' needs, what patient needs.   And

22   that's when we cancelled the contract with LSU --

23   and, actually, I did that -- to stop sending a

24   resident and send a staff physician, a faculty who

25   is more trained and his focus is on purely patient

1    care, because these are routine surgeries.  What

2    they're called is elective routine surgery.  Means

3    no one -- in their opinion, no one is dying if

4    surgery is done tomorrow or if surgery is done

5    three months later.

6        Q.  Would you similarly see a multiyear wait

7    for hernia surgeries like you did with cataract

8    surgeries?

9            MR. BLANCHFIELD:

10               Object to the form.

11           THE WITNESS:

12               Before all this transition?

13   BY MR. MOST:

14       Q.  Yes.

15       A.  For a small reducible hernia, I wouldn't

16   be surprised, at that time, given LSU's -- the

17   benchmark and experience, which is that if someone

18   would wait, like, a few years, or, eventually, some

19   of them may get released before they get their

20   surgery done.  And this is 2002 to 2007 I'm talking

21   about.

22       Q.  What about after the redesign?

23       A.  After the redesign, the first -- because

24   there was no capacity to do any routine surgery.

25   It's not inmates.  I fought really hard with LSU,

1   because, unlike free people, they don't stay.  That

2   inmate wait time has to be equal than free people.

3   That's what LSU -- and I would say no.  It has to

4   be less than free world because the free people

5   have the choice to go to Ochsner.  They have choice

6   to go to East Jeff and West Jeff.  You know, we

7   deal with LSU.  You are my provider.  But the fact

8   is they were really down on their capacity, but my

9   hope was eventually.

10          So urgent surgeries didn't need to wait at

11   all, period.  The instruction was send them to the

12   closest ER.  They can go to the Lake.  Made it very

13   clear, publicly.  They do not -- did not want to do

14   inmate health care, even though they had assumed

15   the function of Earl K. Long.  They made it very

16   clear.  Still, I told the Lake, if it's an urgent

17   situation or an emergent situation, we would take

18   inmates to the closest hospital.  The routine

19   surgery, if any patient needs surgery, based on the

20   complete patient's picture, reducibility being one

21   of the factors -- and it's a very important

22   factor -- I will give you the credit where it

23   belongs.  Reducible hernia is important factor, but

24   the hernia is found comorbid.  If a patient needs

25   surgery, eventually the plan was they should get

1    surgery way before it gets strangulated or

2    incarcerated.  You don't have to wait for hernia to

3    be strangulated, make it worse.  You know, no one

4    has to die or be near death before you get the

5    health care, so that was the hope.

6        Q.  So after the redesign, did you have

7    inmates waiting several years for hernia surgery?

8        A.  Well, it's only --

9            MR. MOST:

10                Object to the form.

11            THE WITNESS:

12                -- four or five into redesign, so

13            several years -- do you have, like, an

14            objective number?  We are going back to

15            the same -- where we were, so my hope

16            was that if inmates need surgery, he

17            should get surgery in a timely manner.

18            And how do you define "timely"?  It's

19            not set in stone, and that's why they

20            should be followed up by the primary

21            care provider, and that's why we have a

22            surgery clinic outside that you have

23            surgeons sitting right there, and you

24            say, Hey, surgeon, this patient -- you

25            know, what you think?  How quickly he

1            needs surgery?  And if he says that this
2            guy needs surgery next two months or
3            three months, based on whatever criteria
4            he uses, then he should get surgery in a
5            timely fashion.
6    BY MR. MOST:
7        Q.  Okay.
8        A.  And, actually, we started -- I contracted
9    with Lallie Kemp, and I still remember talking to
10   LSU's CEO.  Because Lallie Kemp, to get a surgery
11   done, you have to go and see the surgeon who's
12   going to do the surgery, and that was creating a
13   bottleneck.  So I said, This is your colleague from
14   New Orleans.  Why can't you trust his writings and
15   just do the surgery, and they agreed.  We did the
16   pilot study at Lallie Kemp, so surgeon was from New
17   Orleans where surgery was being done at Lallie
18   Kemp, and that was successful, so we expanded on
19   that, so that had really opened up, cleared so much
20   backlog from Angola.
21           MR. MOST:
22               So speaking of Lallie Kemp, let's
23           look at Exhibit N.
24               (Whereupon Exhibit N was marked
25           for identification.)

1    BY MR. MOST:

2        Q.   It says, "LSP hernia process for Lallie

3    Kemp."

4            Do you see that?

5        A.   I do.   It looks like I'm jumping the gun.

6    You were ready, and I started spilling the beans.

7        Q.   Do you recognize this document?

8        A.   I do.

9        Q.   Did you have any part in making this

10   document?

11       A.   I'm not sure about making the document,

12   but, you know, it was a team work.

13       Q.   Okay.

14       A.   And I think working.

15       Q.   So were you part of the team that made

16   this document?

17       A.   Kind of.   Like, LSP is on its own.   And me

18   being the headquarters facilitator, so I started

19   this process with Lallie Kemp, you know, as a

20   policy that there is so many hernia patients, we

21   started creating a list to quantify how severe the

22   problem is.   Then when I'm working with New

23   Orleans, realizing they just don't have enough

24   capacity, no matter what, then you don't have to

25   find more places.   Then I reached out to Lallie

Dr. Raman Singh

1   Kemp.  Then we realize that Lallie Kemp, you have

2   to send your patient to Lallie Kemp, and they have

3   to come to the conclusion the patient needs surgery

4   before they will do the surgery.  Surgery is

5   different from -- I'm giving you the history so

6   that you have a clearer picture.  Surgery is

7   different from the medical care.  Like, if you have

8   high blood pressure, you can go to any doctor.  He

9   may prescribe a different kind of medication, but

10  eventually, you know you will be on some

11  medication.  With surgeons, the surgeon who does

12  the surgery, he has to see the patient first and

13  comes to the conclusion.  No one tells a surgeon to

14  do the surgery.

15       Q.  Okay.

16       A.  What we do is to bring.  So we streamlined

17  this process, that even though patient was seen by

18  a non-Lallie Kemp surgeon, they can only review the

19  documents, and we would do the pre-op, all the

20  blood work at Angola and send them straight to

21  Lallie Kemp for surgery.  So that's how.

22       Q.  So this document says hernia -- it says,

23  "LSP providers will categorize hernia with level

24  classification of 1 to 5.  Hernia 1 to 3 will be

25  monitored by LSP primary care provider.  4 to 5,

1    LSP will refer to general onsite surgery clinic."

2    Right?

3        A.  Yes.

4        Q.  Okay.  So if a hernia was rated 1 to 3, it

5    wouldn't even get to a surgical clinic referral; is

6    that right?

7        A.  That's what it seems like, yeah.

8        MR. MOST:

9                Okay.  We're going to look at

10               Exhibit O.  This is a letter from

11               William Most to Dr. Raman Singh.

12               (Whereupon Exhibit O was marked

13               for identification.)

14   BY MR. MOST:

15       Q.  Do you recognize this document?

16       A.  Yes, I do.

17       Q.  Do you recall receiving this document?

18       A.  Yes, I do.

19       Q.  And, actually, let me back up a second.

20   Do you recall the last time we were in this room

21   doing a deposition, you and me?

22       A.  Yes.

23       Q.  It was the day that the flooding started.

24   It was raining really hard outside.

25       A.  Yes, I do.

Dr. Raman Singh

```
1        Q.   Do you recall that, after the deposition,

2   we had a conversation about inmate surgery?

3        A.   Am I on the record or off?

4        Q.   You're on the record, yeah.

5        A.   I do recall, but that conversation was on

6   the record or off the record?

7        Q.   That conversation, to my recollection, was

8   off the record, but we had a conversation.

9        A.   Yes.  So you want to bring off-the-record

10  conversations to on the record now?

11       Q.   Yeah.

12       A.   Okay.

13       Q.   And my recollection of that conversation

14  was that you told me it really wasn't about cost,

15  that inmates -- some inmates weren't getting hernia

16  surgery or cataract surgery and that it was really

17  about finding doctors who were willing to do it,

18  and you told me that if we could find surgeons and

19  hospitals willing and enable to do the surgeries,

20  the Department of Public Safety & Corrections would

21  make it happen and pay for it, even if the cost was

22  above the Medicaid rate.  Do you remember that?

23           MR. BLANCHFIELD:

24                That's your recollection, and

25                you're asking him?
```

 1              MR. MOST:

 2                   Yeah, that's my recollection.

 3      BY MR. MOST:

 4          Q.   Is that your recollection as well?

 5          A.   So let me think about this.

 6          Q.   Sure.

 7          A.   And let me ask you a few questions so that

 8      I recollect the exact same conversation.

 9          Q.   Sure.

10          A.   So the first thing, you are saying I told

11      you in an off-the-record conversation that cost was

12      not an issue; is that right?

13          Q.   My recollection is you told me that if

14      inmates weren't getting surgery, it really wasn't

15      because of the cost; it was because of the

16      difficulty in finding doctors willing to do it.

17          A.   So, you know, we have talked back and

18      forth through the letters to the collections, so

19      what you're telling me is that I told you that cost

20      was not an issue?

21          Q.   Correct.

22          A.   Off-the-record conversation; is that

23      correct?

24          Q.   That's my recollection.

25          A.   That I told you the cost was not an issue,

1    because we talked about cost a lot here.

2        Q.   Right.

3        A.   Okay.  So my next question is I just had

4    an off-the-record issue here in this room.  Will

5    that be on the record down the road?

6        Q.   I don't have any intention of bringing up

7    your recent off-the-record conversation.

8        A.   Thank you for that.  But, you know, you

9    got to do what you got to do.  So my recollection

10   is that -- and, in fact, I recollect very clearly

11   and what I was thinking about our conversations

12   later when I got the letter from you, and because

13   it goes back to same principle.  Cost was not an

14   issue.  The issue at that time, after LSU

15   redesigned, was the capacity and to create a new

16   system, because that system was completely gone.

17   Because we are talking about multiple providers in

18   multiple locations providing care to the same

19   patient, so to build that system.  Where I remember

20   and not, you know -- and, yes, I do recall that

21   conversation is we tend to ignore the first thing

22   which initiates all these things is this medical

23   necessity and urgency, which I go back to again and

24   again and again when you talk about reducibility.

25            So in a hypothetical situation, if I have

**Dr. Raman Singh**

1  a patient who needs hernia surgery -- not

2  determined by the patient, not determined by the

3  patient's attorney, not determined by me sitting at

4  headquarters -- determined by a competent,

5  qualified provider who has guidelines, who is

6  following the guidelines, is not, you know, going

7  away from guidelines completely without any facts.

8  If he thinks the patient needs surgery and LSU is

9  telling me at the same time that they cannot do

10 surgery, yes, I will take that patient anywhere, no

11 matter, wherever I can find a doctor if it's a

12 non-urgent.  Because you have to understand.  For

13 urgent, you can send and push to, Lake, Lane,

14 anywhere and say, Please do the surgery.  I don't

15 have the convenience of surgeon in an ER to do

16 surgery on a gangrenous hernia, you know.

17        Any surgeon is his right mind will jump

18 and do the surgery and save the life.  But the

19 question is the medical is not black and white.

20 What do you do with those gray people where you

21 feel like the patient may need surgery.  Yes.  I

22 told you yes.  If you have someone -- and the

23 Medicaid rate is the lowest, but if I have a

24 patient -- if I run into a situation, if I have a

25 patient where the medical science tells me this

Dr. Raman Singh

1  patient needs surgery before his hernia is

2  strangulated and LSU does not have the capacity,

3  when I told you that now, unlike before, DOC is

4  responsible, that's what I meant.  That I cannot go

5  back and tell a judge, Hey, judge, LSU said no, so

6  we couldn't do it.

7         I felt that it was DOC's responsibility to

8  go and find a provider anywhere, but where the

9  point was being missed is it is based on the

10 patient's presumption that a qualified, competent

11 health care professional using clinical judgment

12 and clinical skill set and having seen the patient

13 made that determination.  Not me, not plaintiff's

14 attorney, or not Mr. Blanchfield making that

15 determination, or not patient.

16    Q.  So do you recall telling me that if an

17 inmate needed surgery and we could line up the

18 doctors for it, that the Department of Public

19 Safety would pay for it?

20    A.  Were willing to explore, because a doctor

21 lining up -- you know, it's the contractual issues,

22 which, you know, doctor -- you can find a doctor,

23 but you have to have a contract.  This is

24 taxpayers' dollars.  This is not me being your

25 friend and I'm going to do surgery and you're going

1    to pay me.  So what I told you, that if you if you

2    find a doctor.  "If."  I have a lot of patients who

3    need surgery based on all those presumptions, and

4    if LSU doesn't have capacity and if you find a

5    doctor, then I was willing to enter into the

6    contractual negotiations with physician to have

7    more slots, and that's what we did.  I told you I

8    walked my talk, went out, reached out to Lallie

9    Kemp, and entered into a contractual agreement.

10   Because these are not handshake deals using

11   taxpayers' money.  You have to have a business

12   affiliate agreement in place.

13       Q.  So Lallie Kemp, that was before this

14   conversation, right?

15       A.  At the same time all these things are

16   happening, because you are not the only person

17   concerned about hernia.  That was my job.  I was

18   concerned to begin with, so when you came to my

19   office, you talked to me, you didn't bring news.  I

20   had more information.  You know, these things

21   didn't happen because a letter was sent to my

22   office.  You know, you don't run a department.

23   When you get a complaint, that should be the job,

24   to go and figure out what's going on.  ARP are

25   filed way before a lawsuit is filed.  You do your

1    monthly meeting with your staff.  You hear from

2    them.  You don't wait for the earthquake.  So all

3    this work was in that overnight, gathering all

4    those records, reviewing all those records.  They

5    take hours and hours and weeks of work negotiating

6    with CEOs, figuring out all these processes,

7    creating Eceptionist, and then finely tuning how we

8    can do a better job.  Okay.  This didn't go well.

9    Let's do this.  These things take a long time, so

10   you-all didn't bring it so I could tell you-all

11   that, because all that work was right behind me.

12   My knowledge was there so that I could tell you.

13       Q.   Okay.  So let's talk about this letter,

14   this June 28, 2016, letter.  You received this

15   letter?

16       A.   Yes.

17       Q.   Okay.  And this letter says, "We have

18   found surgeons and hospitals willing to operate on

19   two of our clients, Russel Ware and Regan Mayo"?

20       A.   Uh-huh (affirmative response).

21       Q.   The letter says that Dr. Balart of the

22   Hernia Institute of Louisiana is willing to perform

23   the hernia surgery on Mr. Ware, and Dr. Charles

24   Williamson is willing to perform the cataract

25   surgery on Mr. Mayo.  Do you see that?

Dr. Raman Singh

1      A.   Yeah.

2      Q.   What did you do after you received this

3  letter?  What did you do with it?

4      A.   Well, I had the records from on patient

5  Russell Ware and Regan Mayo.  Do you have Mr. Regan

6  Mayo's record?  What did it say about his

7  cataracts?  So, you know, once again, Mr. Most, I'm

8  going to emphasize it.  I have agreed that what I

9  was trying to tell you that since the redesign, DOC

10 is completely responsible.  Before that, DOC had no

11 funding.  They had to rely on LSU after that.  LSU

12 not having capacity was a big challenge.  You know,

13 what do you do?  But if you're basing this medical

14 care, we had to go anywhere else where the care was

15 available and make all the first to get that inmate

16 that care because the funding was with us.  But

17 this was based on presumption that Reagan Mayo

18 needed, based on the DOC providers and LSU

19 providers' opinion cataract surgery urgently, which

20 we could not wait, and then Dr. Charles

21 Williamson -- we don't have a contract with

22 Dr. Charles Williamson, so you sending me e-mail

23 saying that Dr. Williamson is willing to operate.

24 You didn't say that Dr. Williamson is going to do

25 it for free.  I can't do taxpayers' money,

**Dr. Raman Singh**

1   Dr. Williamson is going to operate and I'm going to

2   write you a check.  Division of administration is

3   going to kill me and fire me on that.  Those

4   things -- that's where the details get lost that,

5   you know, we jump to conclusion.  And Mr. Regan

6   Mayo, if you pull his chart, then you will find

7   out and if you have a chance and if DOC gives you.

8   Because I hear you loud and clear when you say

9   that's all you got, so I'm not sure what they're

10  going to give to you.  But go and ask DOC to give

11  you Regan Mayo's folder in my office, and you will

12  see my handwritten comments and my summaries.  I

13  took your complaints seriously, and I'm not

14  saying -- if you have a chance to go and look, you

15  will pages and pages of me going through all the

16  documents and writing summaries on those files.

17       Q.  So did you find out if Mr. Mayo had not

18  been referred for surgery?

19       A.  Once again, this is such an important

20  issue, and my answer is very important to you.  I

21  would say that please let's go and get the record

22  from my office about Mr. Mayo, and then you will

23  see my notes, and I don't have to explain what's

24  written on that note.

25       Q.  Okay.  So I don't have Mr. Mayo's

Dr. Raman Singh

1  documents here today.  What I do have is Mr. Ware's

2  documents.  Okay.  So this letter June 28, 2016, it

3  says, "Mr. Ware has bilateral inguinal hernias.  He

4  was referred for hernia surgery on August 1, 2013,

5  by a doctor at Angola."

6       So you're saying we need to figure out

7  whether Russell Ware was actually referred for

8  hernia surgery and whether he got it; is that

9  right?

10    A.  What I'm saying is that you need to go

11  look at Russell Ware's, because these are very

12  simplified statements.  If he was referred for

13  surgery by a non-surgeon like me, then that doesn't

14  mean anything, because surgery has to be

15  recommended by a surgeon who's willing to do the

16  surgery who sees the need.

17    Q.  Okay.  So let's start from the beginning

18  with Russell Ware, and we'll work our way up.  I

19  think that's a good idea.

20    A.  Sure.

21    MR. MOST:

22         So that's Exhibit P.

23         (Whereupon Exhibit P was marked

24       for identification.)

25    MR. BLANCHFIELD:

```
 1              You're going to show him Russell
 2         Ware's medical chart?
 3    MR. MOST:
 4              Yeah.
 5    MR. BLANCHFIELD:
 6              Well, obviously, you don't have
 7         the chart here.
 8    MR. MOST:
 9              What do you mean?
10    MR. BLANCHFIELD:
11              You do not have Russell Ware's
12         medical chart here.  I've given you his
13         medical chart; have I not?
14    MR. MOST:
15              Right.
16    MR. BLANCHFIELD:
17              You don't have it here.  I'm
18         looking at what you have, and it's not
19         his medical chart.
20    MR. MOST:
21              I've got his medical records.  Is
22         that what you mean?
23    MR. BLANCHFIELD:
24              Well, obviously, it's not his full
25         chart, is it?
```

```
 1              MR. MOST:
 2                   You mean the entire sum of his
 3          medical records?
 4          MR. BLANCHFIELD:
 5                   Yeah.  I mean, you've just
 6          selected pieces from his medical chart?
 7          Is that what you've done?
 8          MR. MOST:
 9                   Yeah.
10          MR. BLANCHFIELD:
11                   Okay.  Well, then let's make that
12          clear.
13          MR. MOST:
14                   Okay.  Dr. Singh, we're going to
15          look at some documents from Mr. Ware's
16          medical records.
17          MR. BLANCHFIELD:
18                   That you have selected,
19          Mr. William Most?
20          MR. MOST:
21                   Yes.
22          MR. BLANCHFIELD:
23                   Yes.
24          MR. MOST:
25                   Yeah.
```

1          MR. BLANCHFIELD:

2                    Okay.

3          MR. MOST:

4                    How else do you think I show

5               documents?

6          MR. BLANCHFIELD:

7                    Well, you're suggesting that you

8               have his whole medical picture, and you

9               obviously don't.

10         MR. MOST:

11                   Well, I've got his whole medical

12              picture here.  His whole medical picture

13              is thousands of pages.  If you --

14         MR. BLANCHFIELD:

15                   It's not thousands of pages.

16              That's not true either.

17         MR. MOST:

18                   I think it actually is.

19    BY MR. MOST:

20         Q.  If you would like, Dr. Singh, if you feel

21    like, as we look at these documents, that any of it

22    is incomplete, we can look through his whole

23    medical records.  We've got them here.  Drew's got

24    them.  I've got them.  But I pulled some documents

25    that I think are relevant to his referral for

Dr. Raman Singh

```
 1   hernia surgery.  So Exhibit P, you see, this looks
 2   to me like a November 20, 2012, referral for a
 3   hernia surgical consultation; is that right?
 4        A.  It does, but I have no clue.  I can't read
 5   the signature.  But you are right.  It does look
 6   like that.
 7             MR. MOST:
 8                  Okay.  So that's 2012.  Next
 9             document is Exhibit Q.
10                  (Whereupon Exhibit Q was marked
11             for identification.)
12   BY MR. MOST:
13        Q.  This is November 2012.  It's an Angola --
14   looks like a medical record from Angola, and it
15   says, "The plan is referral for surgery for him for
16   bilateral inguinal hernia."
17             Is that what this looks like to you?
18        A.  No, it does not.
19        Q.  Okay.
20        A.  And that's -- maybe that's why we are
21   going in the circles, and I'm going to try again,
22   since you have been so patient.  The Exhibit P and
23   Exhibit Q, in all likelihood, are the same
24   documents coming from the same encounter.
25        Q.  Okay.
```

1      A.  Where I think a lot of confusion is coming

2  from, that when a health care provider who is a

3  primary care health provider is referring a patient

4  to a surgery clinic, it may be -- may not be the

5  case being presumed that patient needs surgery.

6  There's a clear difference and distinction when a

7  primary care provider who is a family practitioner,

8  who is an internal medicine doctor is referring a

9  patient to be seen by a surgeon.  Because

10 recommendation for surgery has to come from a

11 surgeon, that determination.  So this document Q is

12 from a primary health care provider, possibly a

13 nurse practitioner, and this Document P is way

14 before LSU redesign, and it's basically -- if you

15 look at the top, that's what we used to fax LSU.

16 504 is a New Orleans LSU 504 number.  It doesn't

17 mean referral for surgery.  It means referral to

18 surgery clinic, and that's only the beginning.  So

19 if you jump to the gun that this guy was

20 recommended surgery on 11/20 and he didn't get

21 surgery, then that's an erroneous judgment.

22      Q.  If I said that, I misspoke.

23      A.  Am I making myself clear?  That, you know,

24 we're going to go do this for a long time, so I

25 want to make sure that you understand what I'm

1    saying, why I disagree with you.

2         Q.   Okay.

3         A.   This is a primary care practitioner's

4    referral for surgery clinic on the Q document, and

5    the P document is that actual referral which went

6    to LSU before LSU redesigned.

7         Q.   Okay.  So November 2012, he was referred

8    by a doctor at Angola to be seen by a --

9         A.   In the surgery clinic.

10        Q.   Right.  To evaluate whether or not he

11   needed surgery?

12        A.   Up to that.  Like, you know, he didn't

13   write it down, but he may have said it, but I'm

14   simply reading here -- let me read this Exhibit Q.

15   And this is about Mr. Russell Ware, Jr., dated

16   November 12, 2012.

17             Complains of shortness of breath, cough.

18   Thick, clear cough.  Lungs, wheeze.  Heart, normal.

19   Eczema.  And look at this, the quality of

20   standards, which gives me heartburn.  So a patient

21   is being seen by shortness of breath and cough, and

22   the diagnosis is bilateral inguinal hernia and

23   referral for surgery and scrotal support.  I do not

24   see any examination by this practitioner for hernia

25   before reaching to this diagnosis, though I have no

Dr. Raman Singh

1  doubt in my mind that this patient has the

2  diagnosis, and that's what the biggest challenge

3  was.

4        Now I'm sending this to LSU before

5  redesign, and they don't seek any documentation,

6  any information.  Well, I was talking about

7  training.  I was telling professionals that if you

8  want a patient to be seen by a surgeon, please do

9  the examination, which should be problem-oriented

10 and focused.  And then someone will say, Well,

11 headquarters denied my request.  Well, patient is

12 being seen for cough; diagnosis of hernia and

13 surgery.  There has to be more.  It's not denial.

14      Q.  Okay.  So in November 2012, he was

15 referred for a surgical consult?

16      A.  It's what it was seems like, you know, and

17 I wouldn't be surprised if you tell me that that

18 was pointed back to Angola, because the clinical

19 history which goes with this doesn't talk about

20 hernia at all.  Not in findings, reducible,

21 non-reducible, how big, what it is for, how long it

22 has been, how it's affecting patient's quality of

23 life.  The practitioner does not talk about it.

24      MR. MOST:

25             Okay.  So let's look at Exhibit R

```
1              now.
2                    (Whereupon Exhibit R was marked
3              for identification.)
4         THE WITNESS:
5                    Okay.
6    BY MR. MOST:
7         Q.  This appears to me to be an LSU document
8    for Russell Ware, and it says, "Plan:  Elective
9    repair when approved."
10        A.  Yes.
11        Q.  Do you see that?
12        A.  Yes.
13        Q.  So that looks like me like he's had a
14   surgical consult, and the plan is that he's to have
15   surgical repair for his hernia when approved,
16   right?
17        A.  Well, that's the assessment.  That's the
18   plan, yes.
19        Q.  Okay.  That's January 2013, right?
20        A.  That's correct.
21        MR. MOST:
22                   Okay.  So here's Exhibit S.
23                   (Whereupon Exhibit S was marked
24              for identification.)
25   BY MR. MOST:
```

Dr. Raman Singh

1      Q.   This is a health care request form.   It's

2  dated July 19, 2013.   And offender writes, "I am

3  suffering severe burning pain from a hernia."   And

4  let's see.   It says below, disposition, "Offender

5  has upcoming appointments for hernia," it looks

6  like.

7           Do you see that?

8      A.   Yes.

9      Q.   So it looks like he's still got the hernia

10  in July of 2013?

11      A.   Yeah.

12      MR. MOST:

13             Okay.   So this is Exhibit T.

14             (Whereupon Exhibit T was marked

15         for identification.)

16  BY MR. MOST:

17      Q.   This is a -- looks to me like an

18  Eceptionist printout for Russell Ware.   There's a

19  note.   It says -- looks likes to me -- "August 26,

20  2013, requesting a surgical clinical appointment

21  for offender with bilateral inguinal hernia."

22           Is that right?

23      A.   Yeah, you're right.   And my question is

24  what did LSU do when he was seen on July 13th and

25  LSU was still under control?   Why didn't they

1    operate then and there?  It's a surgeon's call, and

2    DOC is not in control, and surgeon deems that

3    patient needs surgery.  Why didn't they do the

4    surgery?

5        Q.  So the plan on the LSU document was for

6    surgical repair, right?

7        A.  If approved.  And at that time, DOC

8    headquarters was not in the picture, so which

9    approval that surgeon was talking about?

10       Q.  Well, what approval do you think they were

11   talking about?

12       A.  I know the answers, and you may not like

13   the answers, so --

14       Q.  Let's hear it.

15       A.  If you dig deeper, I can tell you which

16   approval he was talking about, but my question is

17   why do you think they didn't do the surgery when

18   they had all the cash flow and they were all --

19   they were responsible for doing it.  Why didn't --

20   how come a surgeon is seeing a patient with a

21   hernia and DOC headquarters is not in the picture

22   and they're saying LSU surgery was approved.  Which

23   approved?  Why don't you do it?  Who is stopping

24   the surgeon from doing it?

25       Q.  What do you think the answer was?

```
 1        A.   Well, I know the answer.  I don't think.

 2        Q.   Okay.  What's the --

 3        A.   But let me ask you this:  What do you

 4   think the answer was?

 5        Q.   I don't think it's a true statement that

 6   the Department of Corrections was not in the

 7   picture before 2013.

 8        A.   Yeah.  That's a wrong statement.

 9        Q.   Okay.

10        A.   Because LSU has its own review process and

11   approval and denial process or how to schedule a

12   hernia, and once we inherited that, we had to

13   create it.  We didn't need to reinvent the wheel.

14   I got in touch with CEO, Mike Kaiser.  They made me

15   sit down with the LSU surgery chief.  We just

16   wanted to know what is your scheduling process, and

17   that was one of the main reasons DOC had hired

18   Melanie Benedict, because she ran LSU's surgery

19   clinic for 15 years.  So that, you know, our

20   offenders don't -- their care doesn't get --

21   doesn't lose the continuity of care.  So that LSU

22   resident is talking about LSU's own process of

23   approval, because Mike Kaiser, the ex-CEO made a

24   rule that no offender surgery will be done at Earl

25   K. Long.  At that time, Earl K. Long was open.  All
```

Dr. Raman Singh

1    offender surgeries will be done at New Orleans

2    because they were doing their own resource

3    management.

4        Q.  Okay.  So --

5        A.  That had nothing to do with LSU -- DOC

6    headquarters, just to make it very clear about it.

7    And yes, reducible surgeries, unless there's more

8    documentation to support the need, at that time

9    when LSU was going through the transition, they had

10   significant loss in their capacity to do routine

11   elective surgery, as you showed me in your

12   document, that surgeon deemed it to be an elective

13   surgery means to me, as a physician, there was no

14   life-threatening situation.  There was no urgency.

15   You could sit on it, and once you can argue for how

16   long you can sit on it, well, you keep on following

17   up, keep on sending back.  At that point, yes,

18   DOC's priority was work with LSU, work with other

19   systems to make sure urgent surgeries are done

20   without any delay in care.  And reducible hernia,

21   just one factor, not -- in and of itself, did not

22   raise a patient to an urgent situation.

23       Q.  So when the LSU doctors said the plan is

24   elective repair when approved, it meant that it

25   wasn't an emergency, but this hernia should be

1    repaired, right?

2            MR. BLANCHFIELD:

3                    Object to the form of your

4            question.

5            THE WITNESS:

6                    The answer is two-fold answer.

7            First thing, there is no medical

8            management of hernia.  All hernias

9            eventually need surgery, and when that

10            LSU doctor talks about approval, he's

11            talking about LSU's own approval.  He is

12            not talking DOC in that document, and I

13            can vouch for that.

14    BY MR. MOST:

15       Q.  Okay.  But is he saying whether the hernia

16    should get surgery?

17       A.  Oh, every hernia should get surgery

18    eventually, but the question is not whether hernia

19    should get surgery.  The question is when.  And

20    once again, I'm going to reemphasize, you are

21    making that approval with DOC.  That's not the

22    timeline.  I know that case.  That surgeon is

23    talking about LSU's own approval.  They needed

24    approval from LSU's review board to schedule any

25    offender surgery.  That surgery, that document,

Dr. Raman Singh

 1   that January 2013 is not talking about DOC's

 2   process of approval.  Nothing.

 3       Q.  Okay.  But it does --

 4       A.  And I have documents in my office and my

 5   e-mails to back all this up, because I looked, so I

 6   want to make sure that you got that right.  At that

 7   time, LSU was in total control.  If they -- in

 8   their opinion, patient needed surgery, no one --

 9   DOC was not stopping them from getting surgery

10   done.  It was their own call and their own thing,

11   process.

12       Q.  Okay.

13       A.  And since we're talking about a lot of

14   surgery cases way, before Earl K. Long was shut

15   down, LSU has already redesigned their own offender

16   health care process where they have sent e-mails

17   that no offender surgery will be done at Earl K.

18   Long, just because of the issue I raised with you.

19   All those residents were doing surgeries which were

20   deemed probably unnecessary by the surgery

21   professor, because those patients really didn't

22   need surgery because residents were doing it.  And

23   they were having a hard time in managing it,

24   because there was no way.  And it was every

25   different resident going to Angola, different time.

1   So the way LSU -- and this is all beyond DOC.  DOC

2   had no involvement, but we were only being

3   notified.  They decided that no more offender

4   surgery at Earl K. Long.  Urgent, nonurgent,

5   routine, nonroutine.  Does not matter.  Every

6   surgery has to go to LSU New Orleans, and that was

7   way before the redesign.  I think this is 2010 and

8   '11, and since then, LSU changed its own policy.

9        Q.  Okay.  So in 2013, LSU doctor says Russell

10  Ware's hernia is to be operated on; it's just a

11  question of when?

12            MR. BLANCHFIELD:

13                Object to the form of your

14                question.

15  BY MR. MOST:

16       Q.  Is that a fair summary?

17       A.  January of 2013, plan is elective repair,

18  and elective to mean not imposing any threat in the

19  near future to patient' life or quality of life.

20       Q.  Okay.

21       A.  And it says if approved, and my

22  understanding of approval is that he's talking

23  about LSU.  Approval from LSU's own bosses and

24  LSU's own policy.  Nothing to do with DOC's

25  process, which came into the picture months and

**Dr. Raman Singh**

1    months later.

2        Q.   Okay.  So that was January 2013.  Let's

3    look at this Eceptionist document, Exhibit T in

4    front of you.  Do you see that it has an August 26,

5    2013, request for surgery, clinic appointment

6    offender with bilateral and inguinal hernia?

7        A.   Yes.

8        Q.   So someone at Angola was asking for a

9    surgery clinic appointment for Mr. Ware?

10       A.   On July 8, 2014?

11       Q.   I'm sorry.  August 26, 2014.

12       A.   Oh, you're talking about reason for

13   request.  Okay.  Yes.

14       Q.   Okay.  And then there's a note that says

15   "January 8, 2014, reducible per notes."

16           Do you see that?

17       A.   I do see the notes, but I have a lot of

18   comments.

19       Q.   Okay.  Well, let's get through this

20   document.

21       A.   Well, so that you get the complete

22   picture.  You know, you were asking me to say yes

23   and no, so you have a document.  I don't

24   understand, Mr. Most, why you want me to say yes to

25   a document you are showing to me, what's written on

1   it.  What's the purpose of this?  It's killing

2   time.  Like, you just gave me Exhibit T, and you're

3   saying, Is it written on this?  It is written on

4   this, the document you gave me to me.

5       Q.  Right.

6       A.  So I don't see -- so I'm presuming that

7   you want me to fill you in with the history and

8   information to make a sense out of the document.

9       Q.  Yeah.  But let's get through the document

10  first.

11      A.  I'm confused, because if we keep on

12  reading it, then --

13      Q.  Okay.  Give me your --

14          MR. BLANCHFIELD:

15              The document speaks for itself.

16          MR. MOST:

17              Sure.

18          MR. BLANCHFIELD:

19              You're going to attach it to the

20          deposition, so we can establish it says

21          what is says.  You know, we can save

22          that time.

23  BY MR. MOST:

24      Q.  Okay.  So let me just give the brief

25  summary, and then you can tell me what it means and

1  everything.

2       August 26, 2013, Doctor at Angola requests

3  surgery clinic appointment for Mr. Ware.  January

4  2014, there's a note of headquarters, reducible per

5  notes, and then February 2014, there's a note from

6  headquarters, "Hold all surgeries if hernia is

7  reducible per medical director effective 10/31/13."

8       It says that, right?

9       A.  On the document you showed me, it does say

10 all that.

11      Q.  Okay.  Now you can tell me whatever you

12 want to about what you think this means.

13      A.  Well, if your question is about the

14 document, so you are correct, whatever it states on

15 the document, so you have to ask me what you want

16 me to tell you about this.

17      Q.  Okay.

18      A.  I'm at a loss now because you are asking

19 me to read the document, and, you know, the

20 documents speaks for themselves.

21      Q.  It looks to me like there was an August

22 2013 request for a surgery clinic appointment for

23 Mr. Ware, and it was canceled in February of 2014

24 because his hernia was reducible.  Is that wrong?

25      A.  Yes.

Dr. Raman Singh

1     Q.  Okay.

2     A.  Can I go back to the document?

3     Q.  Yeah.  Of course.

4     A.  This is what I'm looking for.  So this is

5  a timeline with Eceptionist requesting a surgery

6  for 8/26/2011, Colleen Leonard, and this goes back

7  to the same examination where there was no

8  examination findings pertaining to hernia by the

9  health care practitioner.  And then reducible per

10 note and additional note came back, and there's a

11 difference in the date, 8/26/2013, and you will say

12 why they waited six months.  It's, like, almost

13 four or fives months.  The note came back.  It was

14 reducible.  By that time, LSU crisis had really hit

15 us hard where we were barely -- we were struggling

16 to get life-saving surgeries done, and there was no

17 way, and LSU was telling if hernia is reducible,

18 there is no other sign, you have to hold off on

19 that because we just do not have enough operating

20 room tables enough to get it done.  So at that

21 point, unfortunately, this patient is in that

22 timeframe, and Katrina had hit New Orleans, so you

23 have to prioritize where you want to go first.  The

24 determination is hold all surgeries if hernia is

25 reducible, by and large, unless you have some other

1    signs and reasons because LSU is not doing it, so

2    what's the point in filling out the paperwork and

3    clogging the system when we are barely getting

4    life-saving surgeries done?  So that's what this

5    document is.

6        Q.  Okay.  So Mr. Ware was subject to that

7    sort of temporary crisis, pause on all reducible

8    hernia?

9        A.  Yeah.

10        Q.  Surgical --

11        A.  Mr. Ware was like 39,000 other inmates and

12    other hundreds and thousands of people in New

13    Orleans and Baton Rouge area.  Yes.  He was one of

14    those where his care was affected by the closure of

15    a major, major hospital, and the answer is yes.

16            MR. MOST:

17                Okay.  Exhibit U is a health care

18            request form.  Russell Ware.

19                (Whereupon Exhibit U was marked

20            for identification.)

21    BY MR. MOST:

22        Q.  "Offender complaining of hernia pain to

23    health care professional," is written in

24    assessment.  "Patient has chronic complaint of

25    hernia protruding in lower right area.  Patient

1    ambulatory with difficulty."

2            Do you see this on here?

3            MR. BLANCHFIELD:

4                    Yes.  We have already said that,

5                you know, the document speaks for

6                itself.  You don't have to read it.

7            MR. MOST:

8                    Well, I'm trying to -- I'm

9                interpreting some of these, because R

10               are with a circle, I interpret to mean

11               right.  Down arrow, I interpret to mean

12               lower.  So I'm trying to clarify this

13               document because this document doesn't

14               really speak for itself.

15   BY MR. MOST:

16       Q.  I'll say it again, and you can tell me if

17   I'm reading this document right.  I'm reading this

18   document as a care request form for Russell Ware.

19   It's dated August 14, 2014.  "Offender's

20   complaining of hernia pain."  "Health care

21   professional" is written.  "Patient has a chronic

22   complaint of hernia protruding in lower -- right

23   lower area.  Patient ambulatory with difficulty.

24   Patient asked, Can I see a doctor."

25           Am I interpreting this document right?

1      A.  I don't know.  I'm going read this

2   document, exhibit to you.

3      Q.  Sure.

4      A.  Exhibit U given to me by Dr. Most.  At the

5   top, 004584, and the upside down numbers are

6   002279, and if my English is not correct, can you

7   please correct me, Mr. Most?  Form HC-01-A, 14

8   September 2009.  Health care request form.

9   Institution.  Handwritten, "LSP."  I don't know

10  whether that handwriting belongs to a health care

11  professional or not.  Name, Russell Ware.  DOC

12  #118323.  Age seems like 45.

13        Is that correct, Mr. Most?

14     Q.  His age?

15     A.  Yeah.  Like, written.  I'm just reading

16  the document, you know, asking.  Housing seems like

17  04.  Job assignment, nursing aide.  Offender to

18  complete this section only -- complaint and/or

19  request.  I read SDE, which, actually, in Angola

20  terminology is self-declared surgeries, so I don't

21  expect any inmate to use these words, so this

22  form -- or this section was supposed to be

23  completed by the offender.  Hernia pain, but looks

24  like this person who has completed this form.  Then

25  health care professional screening is there, and

Dr. Raman Singh

1   Mr. Most wants me to read and give my

2   interpretation about.

3            So first thing, I don't know whether this

4   is a health care professional who filled out this

5   form, so I can't give my impression about this

6   form.

7       Q.  Does R with circle mean "right"?

8       A.  You have to ask the person who has filled

9   that out what he meant by R and a circle.

10      Q.  Do you use shorthand as a doctor?

11      A.  Well, I'm using electronic health records

12  now, so there's no shorthand on electronic health

13  records.

14      Q.  Have you ever used an R with a circle

15  around it as shorthand --

16      A.  I have --

17      Q.  -- for --

18      A.  I have used R sometimes with circle,

19  sometimes without circle.

20      Q.  Well, does it mean "right"?

21      A.  You have to ask the person who writes it.

22  I don't know.  I have never read any literature

23  that says that R with a circle means "right."

24      Q.  Okay.  So that was August 2013, so it

25  looks like he's still got a hernia in August 2014?

Dr. Raman Singh

1   A.  I don't know whether he's got -- I'm a

2   physician.  If you're going to ask me to read

3   someone else's writing and interpret, I need to see

4   the patient.  I'm not going to give you my medical

5   professional opinion based on a document you

6   produced to me that I have no idea about the

7   author; I have no examination comments.  So you can

8   keep on asking me.  You show me a document and then

9   ask me whether he has had hernia or not, that's a

10  medical comment, and I'm not going to do it.

11      Q.  Well, you asked to see his medical records

12  so you could help interpret the background of

13  Russell Ware, and that's what I'm showing you.

14  Okay.  You can't comment on anything about this

15  document, what it means, who wrote it.  Okay.

16      A.  That's a wrong statement.  I can comment.

17  Your question was does he have hernia.

18      Q.  Okay.

19      A.  That's medical decisionmaking, and I can't

20  say, based on a document.  I don't even know

21  whether a health care professional, you know, a

22  trained health care professional has filled it out.

23  It's a physician, it's a nurse, it's an EMT, it's

24  an inmate himself, I don't know.  So I'm not sure

25  how you expect a physician to respond to your

1   question, which is very specific.  Does Mr. Ware

2   have hernia on this date or no, and based on a

3   piece of paper?

4       Q.  So you --

5       A.  I don't think that's a fair question,

6   Mr. Most.

7       Q.  Okay.  So when you look up an inmate's

8   health care history, right, as you did, you said,

9   in response to this June 28, 2016, letter.  Is this

10   the kind of document that you would be looking at?

11       A.  One of the documents.  I would look at the

12   physician's examination note, and that's what I was

13   telling you will feed back if I don't see.  Like in

14   that reference, I don't see any examination about

15   hernia, and I have to chime in, and I have to

16   respond to you about this hernia.  Then I'm going

17   to get back to Angola medical director and say

18   that, Hey, I need hernia examination notes if you

19   are documenting or health care physician is

20   documenting cough with green or clear sputum and

21   making a diagnosis, that's not good information for

22   me to respond as DOC's medical director to Mr. Most

23   to hold you in that respects, so that's back and

24   forth goes on, which I was talking about.

25           MR. MOST:

1             Okay.  So let's go back to this
2             document which I'm labeling Exhibit V.
3             (Whereupon Exhibit V was marked
4             for identification.)
5   BY MR. MOST:
6      Q.  Which is the June 28, 2016, letter about
7   Russell Ware and Regan Mayo.
8      A.  Yeah.  And, you know, not to cut you off,
9   but if you want a medical opinion, show me a
10  document with a physician, and I'll you've you my
11  opinion, you know, what I think what he has
12  written.  But showing me a simple form and asking
13  me about hernia, that's not a fair question.  And
14  I'm not trying to be disrespectful, but I want you
15  to see what I'm talking about.  If you show me a
16  document -- like, you showed me a surgery
17  resident's note, and I never doubted what the
18  diagnosis was.  We talked about it.  We talked
19  about the real substance, you know, real issue.  So
20  if you show me a physician's examination on this
21  date and say, Hey, Dr. Singh, what you think, I
22  will give you my opinion.
23     Q.  Okay.
24     A.  But not based on something where I have no
25  clue, no examination, nothing.

1      Q.   Okay.  So going back to this --

2           MR. BLANCHFIELD:

3                Why are we going to the same

4           exhibit, now giving me a different

5           exhibit?

6           MR. MOST:

7                That was an accident.  You want to

8           rip up Exhibit V?

9           MR. BLANCHFIELD:

10               I would think, for the record, you

11          probably would want to, just given

12          what --

13          MR. MOST:

14               Okay.  Let's rip up Exhibit V.

15          It's the same as Exhibit O.

16     BY MR. MOST:

17     Q.   Okay.  Looking at Exhibit O, which is the

18     letter from me to you dated June 28, 2016.  So it

19     mentions Russell Ware.

20     A.   (Witness nodding.)

21     Q.   In June of 2016, based on the medical

22     record we've looked at, he's had a diagnosed -- at

23     least one hernia for at least four years, right?

24     A.   You want me to look at Exhibit O.  This is

25     letter from you, an attorney, and now you're

1 telling me to make a medical decision whether he
2 has hernia on the date you wrote me the letter?
3      Q.  Okay.  After you got this letter, you
4 looked up his medical records?
5      A.  I did.
6      Q.  Okay.  And it seems to me that you would
7 have found that he'd had a diagnosed hernia for at
8 least four years, right?
9      A.  I saw the documents.  Once again, I don't
10 have access to those records.  I have my notes in
11 those records.  You showed me a document from LSU
12 surgery clinic, and, you know, let -- once again,
13 my memory is, like, January 2013, where he was
14 found with hernia.
15      Q.  Right.
16      A.  That's a document you showed to me.  After
17 that, if you show me any other medical documents
18 after that date, then I can give you my opinion on
19 that.
20      Q.  Okay.
21      A.  I'm agreeing with you.  You showed me
22 medical document, and I did not doubt that
23 document.
24      Q.  And I showed you one from 2012, right?
25      A.  Yeah, that's right.  But before '13, so

1    let's go with 2012.  That 2012 document -- we

2    talked about it -- did not describe examination at

3    all.  The patient came to that clinic with cough,

4    and there was no examination finding.  Was only

5    that lungs, which showed wheeze, and the heart,

6    which is written ROR.  And then the diagnosis is

7    inguinal hernia.  Refer to surgery clinic.  That's

8    the document you're talking about?

9        Q.  Right.

10       A.  Okay.  So we talked about the document.

11   So the only documents that I'm seeing examination

12   findings supportive of the hernia diagnosis is

13   January 2013 from LSU, though I'm not doubting.

14   I'm not saying.  This guy may have hernia for ten

15   years.  He may still have it.

16       Q.  Okay.

17       A.  But for you to give me my opinion, I need

18   to see the medical documents.

19       Q.  Okay.  So you get this letter.  You look

20   up his medical history.  Do you recall what you

21   found about Russell Ware?

22       A.  That all those documents I had seen and

23   it's all in the file and my summaries.  I wrote

24   down my summaries.  You know, once you review

25   hundreds of documents, you can always forget, so I

Dr. Raman Singh

1    write down my summaries.

2        Q.  Okay.

3        A.  So that next time -- I knew you -- you

4    know, this is a lawsuit, so I will go back to that

5    file again and again and again.

6        Q.  Okay.  Do you recall sort of the big

7    picture, what you found about Russell Ware?

8        A.  The big picture was I did not see any red

9    flags in his health care.  That's what I recall,

10   but if you want the details, then, you know, if you

11   bring that file to me, then I can provide you the

12   details for supporting that conclusion.

13       Q.  Okay.  It looks like you found that he had

14   a hernia for a couple of years, right?

15       A.  Sure.  He may have hernia for -- yeah,

16   2013 documents and all those thing.

17       Q.  And the plan a couple years ago prior to

18   getting this letter had been for him to get

19   elective hernia surgery when approved?

20           MR. BLANCHFIELD:

21               Object to the form.

22           THE WITNESS:

23               Approved by LSU.  That was the

24           plan, I thought.  And, you know, I was

25           surprised.  Why didn't LSU do the

1              surgery?

2    BY MR. MOST:

3         Q.   Okay.

4         A.   Why they sat on it?  You know, that still

5    baffles me.

6         Q.   Okay.  So then you got this letter.  You

7    looked up his medical records.  What did you do

8    next about Russell Ware?

9         A.   I think he was sent back to the -- like,

10   for a clinic evaluation, so I do remember talking

11   to Angola medical director too, because he is

12   medical director on onsite.  You know, hernia may

13   have got worsened.  Even though it may look like

14   the need for an elective surgery in January 2013,

15   at that time, the need may have changed.

16        Q.   Okay.

17        A.   So what he needed was a further clinical

18   and updated clinical examination.  Everything

19   needed is driven by the examination.

20        Q.   Okay.  So then did you send me a response

21   at that time?

22        A.   I think this -- I recall this letter being

23   on my table for a long time, but at the same time,

24   we were pulling the records for the big lawsuit and

25   going back and forth.  When I saw that the

1    examination from 2012, I needed an updated exam in

2    Angola, so --

3         Q.   Okay.

4         A.   Do I remember talking to you once?  Like,

5    you called my office once to talk to me about this

6    going on, and as I recall -- and I may be wrong --

7    that I filled you in what I had at that time,

8    because giving an official written response to an

9    attorney's letter.  You know, I know you care about

10   your inmates.  Seriously, that's what I thought

11   about you, so off the record I could tell you yes,

12   we're going to go and --

13        Q.   So we're still on the record.

14        A.   Yeah.  I know.  I know.  I know.

15        Q.   Okay.

16        A.   But I believe that you really cared about

17   the inmates.  You are not into the money-making

18   business.  Like, you know, like inmates felt like

19   he had a hernia and he needed to be operated upon.

20   And as a physician, my opinion may not always align

21   with what patient thinks is the best, and that's in

22   the medical practice, and I thought I filled you

23   in, but to give an official response to an

24   attorney's letter, I think the practice is to go

25   through your legal office and make sure that the

1    attorneys are involved, because this is not two

2    friends talking, you know, that you give all this

3    information.  So I do remember taking action, a

4    thorough review, getting back to Angola, talking to

5    Dr. Lavespere about these inmates and other inmates

6    about their care, ensuring that care was not

7    compromised, whatever needed was done and in as

8    timely manner as it could, based on the medical

9    necessity, but the details are in that file.

10        Q.  Okay.  And the phone call you mentioned,

11   my recollection is I called the Department of

12   Corrections about something else completely

13   separate, and you picked up the phone, which I was

14   very surprised at, and you talked told me that you

15   were working on a update to the letter.

16        A.  Yes.

17        Q.  Does that sound about right?

18        A.  Maybe.  Probably, yeah.

19        Q.  Okay.

20        A.  Because giving the response and sending

21   the response is something different, but taking

22   care of business is something different.  You know,

23   as a physician, I took care of the patient, but

24   sending a latter to an attorney requires multiple

25   steps.

1          MR. MOST:

2                Okay.  So Exhibit W is an e-mail

3          correspondence between you and Ashli

4          Oliveaux.

5                (Whereupon Exhibit W was marked

6          for identification.)

7     BY MR. MOST:

8     Q.  It looks to me like you've asked for

9     information about Regan and Ware, and Ashli

10    Oliveaux provides you with information and notes

11    that Mr. Ware has no request to see surgery.  Is

12    that what we're looking at here?

13    A.  Yes.

14    Q.  Okay.

15    A.  You gave me the document, so I'm looking

16    at the document you gave to me.

17    Q.  Did you do anything in response to this

18    e-mail?

19    A.  I did -- like, you know, this was in

20    response to answer your previous question, because

21    Ms. Oliveaux was the specific nurse designated to

22    check and gather all this information and talk to

23    me and work with Angola to make a complete picture,

24    so yes.

25    Q.  And what does it mean here, Eceptionist

1   notes he has no request to see surgery?

2        A.   You have to ask Ms. Oliveaux.  I can give

3   you my understanding, but that may not be truthful.

4        Q.   Sure.  What's your understanding?

5        A.   Well, usually, inmate has to have a

6   request, like we talked about.  If I'm seeing a

7   patient in Angola and I'm going to refer him to a

8   specialist, then I have to fill out a referral form

9   with information that what exactly I want the

10  specialist to do, and that note has to be scanned

11  in Eceptionist.  So I'm second guessing here,

12  Ms. Oliveaux.  The question is that Angola has

13  no -- at that time, and Eceptionist, you know, it

14  was evolving.  She may not have seen any request in

15  Eceptionist, but that doesn't mean anything,

16  because the request may have been processed, and

17  that request is going to be looking like it's

18  closed unless you go in the closed section, so at

19  that time, Russell Ware.  That's what it -- there

20  are many -- to be honest, many possibilities.  So

21  Eceptionist was only seeking the request,

22  seeking -- and once he has been seen, it drops off

23  from Eceptionist, you know, because patient has

24  been seen.  Eceptionist only carries active

25  requests at the time we talked about the offender

1    transition.

2        Q.  And we looked at his Eceptionist record,

3    and it showed that --

4        A.  At that time, because that's also

5    important.  So if a patient has been seen, I'm just

6    giving you hypothetical scenarios, since I don't

7    have, you know, the Eceptionist records in front of

8    me.  If patient A was requested to see a surgeon in

9    Eceptionist.  Eceptionist process.  Sent to LSU.

10   LSU gave a date, then that request is closed --

11   well, used to be closed in Eceptionist at that

12   time.  Then you won't see an active request because

13   that process is taken care of.

14       Q.  So we saw, from his Eceptionist record,

15   that a request was made and that it was canceled by

16   headquarters because of the reducible hernia thing?

17           MR. BLANCHFIELD:

18               Objection to the form.

19           THE WITNESS:

20               It wasn't canceled.  It was sent

21           back, because, once again, you are going

22           into reducible.  That's basically --

23           Eceptionist allows you to only use so

24           words in the comments section.  That

25           sounded to me like did not meet the

```
1              guidelines, so if you wanted patients to

2              be seen for a hernia and the clinical

3              note talked about the cost and green

4              sputum, then that request is not being

5              canceled, like you said.  It's being

6              sent back to the originating unit for

7              more than information, or if it does not

8              meed the consensus guidelines, then it's

9              being sent back to the unit's medical

10             director.

11   BY MR. MOST:

12        Q.   Okay.  So what happened next after you got

13   this e-mail from Ashli Oliveaux?

14        A.   What happened next?

15        Q.   Uh-huh.

16        A.   I sat down, I reviewed, and she had the

17   attached documents, the copies of the papers.  I

18   remember talking to Angola about these two cases,

19   and all those should be in the file in my office.

20        Q.   And did you find out that they needed

21   surgery, didn't need surgery?  What did you find

22   out?

23        A.   Well, for that, you have to -- you know, I

24   have to see the record.

25        Q.   What's your recollection?
```

1      A.  My recollection was that no, none of them.

2   In fact, this is the cataract guy I was talking

3   about, Mr. Regan Mayo.  If you look at that, at

4   that time, he already had -- offender had a

5   cataract surgery in March of 2007, if you look in

6   this document, and this is in 2016, and your

7   lawsuit -- you have the letter?

8      Q.  Yes.

9      A.  Of the lawsuit?  2006, and referred again

10  for surgery in the right.  He's awaiting right eye

11  cataract surgery, so we were talking about Dr.

12  Coulard, who is an optometrist.  He was seeing

13  posterior capsule opacity.  That was in 2015.  The

14  consultation was in 6/15, same recommendation as

15  the ophthalmologist.

16     Q.  Okay.  So you concluded that neither of

17  these people needed surgery?

18     A.  I don't conclude whether a surgery patient

19  needs surgery.  We are going back and forth on

20  this.

21     Q.  Okay.  But --

22     A.  Okay.  Let me make it clear.  I did not

23  conclude any surgery.  If I have a request of the

24  surgery, the only thing headquarters staff is going

25  to do is to ask for the supporting documents.  You

1  cannot recommend a surgery based on patient is

2  complaining about cough and now patients needs

3  hernia surgery.  The good clinical practice

4  requires a total documentation, very

5  object-oriented, specific.  No one is declining and

6  approving surgery.

7       Q.  Why did you ask for the records?

8       A.  Because you sent me a letter, so I have to

9  go and look what exactly happened to review it.

10      Q.  To determine what?

11      A.  To determine whether what was -- it

12  doesn't have to be determined.  It's the last step.

13  First thing is the factfinding, that what was going

14  on.  We just don't determine, jump to the

15  conclusion.

16      Q.  What did you want to find out by looking

17  at their records?

18      A.  Okay.  I wanted to find out what exactly

19  happened to his cataract, was he seen by a

20  ophthalmologist.  If he was seen by an

21  ophthalmologist, what did ophthalmologist say?  If

22  the ophthalmologist recommended surgery, what

23  exactly happened, what -- did he get surgery?  If

24  he followed up, what did he say in the follow-up?

25  What does follow-up show?  If he still has same

1    problem, if ophthalmologist recommended that, then

2    why didn't it happened?  Where did system fail?  If

3    system failed, how are we going to fix it?  First

4    thing, you get the release to your patient and then

5    look at the systematic issue.

6         Q.  So what did you find with these two men?

7         A.  I did not find any fault in the system.  I

8    did not find any fault in the health care delivery.

9         Q.  Okay.

10        A.  That's what I recall.  But to give you the

11   details, which you are entitled to, I have to go

12   and look at my notes.

13        Q.  Okay.

14        A.  But I don't determine -- you know, based

15   on these things, as soon as I saw something, I'm

16   going to determine patient needs surgery.  How can

17   I determine, sitting in the headquarters, what

18   patient needs cataract surgery, what patient does

19   not need cataract surgery.

20        Q.  Okay.  Did you provide a response to this

21   June 28, 2016, letter?

22        A.  I don't recall, but you can tell -- if

23   you're asking the question -- okay, let me ask you.

24   Did you get a response from me on this letter?

25        Q.  No.

Dr. Raman Singh

```
 1        A.   Thank you.
 2             MR. BLANCHFIELD:
 3                  I hope not.  I would sure hope
 4             that you would not send a response.
 5   BY MR. MOST:
 6        Q.   Okay.  Were you advised not to send a
 7   response?
 8             MR. BLANCHFIELD:
 9                  If he was advised, that's
10             privileged.
11             MR. MOST:
12                  Well, okay.
13   BY MR. MOST:
14        Q.   Were you advised by a non-attorney not to
15   send a response?
16        A.   I was not advised by a non-attorney, yeah.
17        Q.   Okay.  Fair enough.  So this letter, you
18   had an offer that there were surgeons willing to
19   provide surgery for these two men?
20             MR. BLANCHFIELD:
21                  Object to the form.
22   BY MR. MOST:
23        Q.   This is the letter you got, right?
24             MR. BLANCHFIELD:
25                  We're back to Exhibit --
```

```
 1          MR. MOST:

 2               Exhibit O, yeah.

 3          MR. BLANCHFIELD:

 4               O?

 5   BY MR. MOST:

 6     Q.  So you got a letter from me saying we got

 7   surgeons willing to do surgery on these two

 8   inmates, right?

 9     A.  You tell me.  Did you send me the letter?

10     Q.  Yeah.

11     A.  So why are you asking the question?

12     Q.  So you got an innate from a lawyer, me,

13   offering that we found surgeons willing to do

14   surgery on these two inmates; that's the letter you

15   got, right?

16     A.  Yeah.  I got the letter.

17     Q.  Okay.  And you did not accept that offer,

18   right?

19     A.  Because it made me realize that how less

20   you know about the system and how you know less

21   about how the government works, that I just cannot

22   go and use taxpayers' money, because, you know,

23   there will be allegations against ethics that maybe

24   I know the surgeon.  There has to be a bidding

25   process.  If you have to do a professional service
```

1    contract, it goes through the approval process.

2    And before that, you completely ignored how the

3    health care is delivered in the patient care

4    setting using taxpayers' dollars.  First, there

5    would have to be a medical necessity.  Attorneys do

6    not decide.  Departments of medical and mental

7    health director not does decide whether a patient

8    needs surgery.  Attorneys do not decide whether a

9    patient needs surgery.  Patient does not decide

10   whether he needs surgery.  It has to be done by the

11   experts in that field, backed up by the

12   documentation.  Once that is done, then the

13   business side kicks in, and no matter how much I

14   care about the patient, I cannot break this State's

15   rules and laws using taxpayers' dollars.

16        Q.  Then what were you offering me when you

17   told me, if you can --

18        A.  Offering me to negotiate, that if you know

19   a surgeon -- you know, if -- I told you this

20   situation, and I'm very clear, that if I have a lot

21   of patients where I know that experts are

22   recommending surgery and using my clinical

23   knowledge, I know that they need surgery and

24   there's a capacity issue, and then you provide a

25   doctor.  I am willing to enter into a negotiation.

Dr. Raman Singh

1   You know, that's what I was offering to you, and

2   maybe I should have made it clearer to you,

3   Mr. Most.

4        Q.  Did you enter into a negotiation with

5   Dr. Charles Williamson or Dr. Todd Balart?

6        A.  I did not need to.

7        Q.  Because why?

8        A.  Because at that point, I did not -- after

9   based on all my clinical reviews and consultation,

10  we felt like that we were providing appropriate

11  care to those inmates.

12           MR. MOST:

13                This is going to be Exhibit X.

14                (Whereupon Exhibit X was marked

15           for identification.)

16                This is a document entitled --

17                it's a letter from William Most dated

18                November 30, 2016, to LeBlanc, Vannoy,

19                Singh, and Lavespere regarding work

20                release denial of Kevin Mathieu.

21  BY MR. MOST:

22       Q.  Do you recognize this document?

23       A.  I do.

24       Q.  Okay.  Did you receive this document?

25       A.  I did.

1      Q.  It references how Mr. Mathieu was screened

2  for work release eligibility by DOC headquarters.

3  They determined he was not eligible due to medical

4  concerns.  Do you see that on here?  It's in the

5  quotation part here.

6      A.  Okay.  I do see it.  So do you have that

7  review by the DOC headquarters saying that?

8      Q.  Yeah.  You want to look at it?

9      A.  Sure.

10         MR. MOST:

11              It's going to be Exhibit Y.

12              (Whereupon Exhibit Y was marked

13           for identification.)

14         THE WITNESS:

15              And I'm not asking the question.

16              I agree, but that would give me more

17              information to answer your follow-up

18              question.

19  BY MR. MOST:

20      Q.  That's fine.  Exhibit Y is a memo dated

21  November 9, 2016.  Subject line:  Screening for

22  work release.

23      A.  I guess you don't have -- maybe you have

24  not what I'm looking for.

25      Q.  This is what I have.

1      A.   Yeah.

2      Q.   Okay.  So the November 9, 2016, memo says,

3   "To:  Kevin Mathieu.  Health status was screened

4   for work release eligibility by DOC headquarters.

5   After review of your information, they determined

6   that you are not eligible at this time due to

7   medical concerns."

8           That's what the memo says, right?

9      A.   If you say so.

10     Q.   Well, take a look at it.

11     A.   Okay.  You want me to read again the

12   documents you are giving to me, and you want me to

13   confirm?  I read it, so --

14     Q.   Okay.  Is that what it says?

15     A.   The document says -- given to me by

16   attorney Mr. Most is exactly what he is describing.

17     Q.   Okay.

18     A.   He wants me just to verify every document

19   he hands to me, making sure that I know English.

20     Q.   It helps for the record.

21     A.   Oh, okay.  Sorry.

22     Q.   This helps for the transcription because,

23   that way, we don't always have to be looking for

24   the exhibits.  Right?  If we --

25           MR. BLANCHFIELD:

Dr. Raman Singh

```
1                  Just ask a question.
2            THE WITNESS:
3                  I know, but I'm going to say this.
4            I know you are doing the proper, but we
5            have to end this.  I've been away from
6            my kids for four and a half hours.
7  BY MR. MOST:
8       Q.  Yeah.
9       A.  So -- and I know this is part of your job,
10  but this is not a part of my job.  Believe me.
11       Q.  I know.
12       A.  I'm doing not doing this for pro bono
13  time.  Seriously.  So I know you're doing your
14  process, but just to let you know.
15       Q.  Okay.  So you received this letter
16  November 30, 2016, that references this denial work
17  release, right?
18       A.  Yes.
19       Q.  Okay.  Did you do anything in response to
20  this November 30, 2016, letter?
21       A.  I did remember looking into his records,
22  so --
23       Q.  What did you find?
24       A.  Well, that's what I'm saying.  I don't
25  think you have internal documents.  What did I
```

1    find?  It should be in my notes what I found,

2    really.

3        Q.  What do you recall?

4        A.  Well, I recall this -- it looks to me --

5    maybe you know how this screening process works.

6    This has nothing to do with DOC's medical mental

7    health director's office.  This process has nothing

8    to do with it.

9        Q.  Okay.

10       A.  So there's a Louisiana DOC regulation

11   which determines how to screen offenders for work

12   release, and it has medical and mental health

13   criteria.  So the unit's medical staff has to fill

14   out that form, screening form, and they have level

15   of cares, 1 to 5 and 1 to 3 on medical, and then

16   there's a DOC regulation that goes to Office of

17   Adult -- Office of Adult Services, and they look at

18   that screening done by the unit's medical and

19   mental health staff, and if it's a level of one

20   medical care, for example, then inmates are not

21   eligible.

22       Q.  Okay.

23       A.  So to answer your questions, cataracts and

24   all those things, to have to go and look at those

25   internal screening documents, which should have

1    been done by the prison where he was held, and from

2    there, it goes to the warden's office.  From there,

3    it comes to the DOC security site.  Has nothing to

4    do with the medical and mental health director.

5        Q.  Okay.  So your office wasn't involved in

6    this determination?

7        A.  No.  Directly, no.

8        Q.  So did you do anything in response to this

9    November 13, 2016 --

10       A.  Yeah, I did.  And, you know, you have to

11   go back in the notes, but I'm telling you, after I

12   got there, I did not agree with many of the

13   practices with the work release screening, and I

14   convinced the leaders to change the work release

15   guidelines, because I always believed that the work

16   release was a very good re-entry tool, and I always

17   believed that medical professionals should help

18   their patient to live their life, so we really cut

19   down restrictions to the point that we even allowed

20   patients with mental health issues to go to work

21   release as well as with HIV, but I -- once again,

22   we can talk about the bureaucracy in the system.

23   We have to make sure that how they're going to get

24   their medication.  So we did all that.  I was a big

25   proponent of work release, that no one should be

1    denied based on the medical, unless absolutely

2    there's a serious contraindication.

3        Q.  Okay.  Did you do that in response to this

4    letter?

5        A.  No.  Once again, like, the questions you

6    are asking are not new questions.  These are the

7    old challenges.

8        Q.  Okay.  Besides looking at Mr. Mathieu's

9    records, did you do anything in response to this

10   letter?

11       A.  At this stage, it's hard for me to say.

12   It's all in the file what I did.

13       Q.  Do you recall if you did anything besides

14   look up his records in response to this November

15   30, 2016, letter?

16       A.  For the work release letter?  It's hard

17   for me to recall right now.  I've been in this for

18   four and a half hours, so it's really --

19       Q.  It's okay.

20       A.  I'm not pushing too much.

21       Q.  All you have to do is say, "I don't

22   recall" if you don't recall.  I mean, that's an

23   okay answer.

24       A.  Okay.

25       Q.  Okay.  Dr. Collins testified about how he

```
1   built a facility at Angola to conduct hernia
2   surgeries.  Do you know anything about that?
3        A.  He was talking about it.  I didn't know
4   that he built the facility.  The facility he is
5   talking about is actually built through the LSU
6   transition money.  I don't recall Dr. Collins
7   playing any role in the building of that facility.
8        Q.  Was the facility built?
9        A.  But not for hernia surgery.  Yes, the
10  facility was built, because if you stop taking your
11  offenders to LSU because Earl K. Long has been shut
12  down, there has to be a place where that encounter
13  takes place.  So now with DOC getting funding, we
14  thought that maybe I can talk to LSU and send those
15  specialists to Angola, because it's better for
16  inmates.  Those conditions are horrible.  Those
17  inmates get locked up early morning, and they stay
18  like that for the entire day.  That used to break
19  my heart.  You know, why can't you pay a little bit
20  more money to the cardiologist to go to Angola?  So
21  we built, I think within three, four months next to
22  nursing unit 2, a facility for clinical encounters
23  for TeleMed as well as I was thinking that let's
24  not just think about today.  Let's think about our
25  future needs in ten years down road when the dust
```

1    settles down.  Maybe we can do some surgical -- you

2    know, minor surgical procedures here.

3         Q.  Okay.

4         A.  Which are uncomplicated.  And so why I

5    contracted follow the state laws with the

6    gastroenterology associates.  They go there, so

7    they do endoscopies, colonoscopies at Angola.  So

8    that was all -- that's all being done at this new

9    facility I guess he's referring to, but I don't

10   recall him building or anything like that.

11        Q.  So this was a facility at Angola?

12        A.  Yeah.  This was built at Angola during

13   that timeframe.

14        Q.  Okay.  And by "that timeframe," you're

15   mean 2013-2014?

16        A.  Maybe that time, you know, when we got the

17   money.  2013 is when this hit us, and the money --

18   fiscal year was coming next year, but you can check

19   with Angola when exactly that was happening.

20        Q.  Okay.  And this was a facility where,

21   hypothetically, some surgical procedures could have

22   taken place if other things were put into place; is

23   that right?

24        A.  Possibly.  Like, minor surgery.  Well, we

25   definitely did endoscopies, like GI procedures

1    there.  We did Telehealth.  We did our clinics, and

2    we were exploring the possibility of doing more

3    surgeries as much as possible.

4        Q.  Would hernia or cataract surgeries be

5    among those surgeries that you were exploring?

6        A.  Yeah.  We were exploring the possibility.

7    You know, talking to surgeons.

8        Q.  Did that ever come to pass that hernia or

9    cataract surgeries were done in that facility?

10       A.  No, I don't think so.  Because after

11   talking to many surgeons and many

12   anesthesiologists, we all came back to the point

13   you made, like, two hours ago, that Angola was so

14   far and what I was informed -- I have never done

15   any surgery in my life.  I internal medicine with

16   some cardiology training -- that any surgery can go

17   wrong.  No one has a crystal ball.  You know, it

18   looks like a very minor, small procedure, but

19   there's always a possibility.  Then we felt like

20   Angola is so far, that if things go wrong, just

21   anesthesia complications.  So I don't think I felt

22   like that it was in the best patient care to do any

23   kind of surgical procedures away from, you know, a

24   tertiary level backup, but I know Dr. Collins was

25   pushing it really hard.

```
1        Q.  Dr. Collins testified that he knew there

2   was going to a wave of lawsuits related to hernias

3   based on the 2012 list of inmates who were

4   identified as hernia surgery needed.  He didn't

5   want any part of it, so he moved up his exit date.

6   Do you know anything about that?

7        A.  No, I don't.

8        Q.  Okay.

9        A.  But the lawsuits are like part of life,

10  and I'm not blaming, you know.  If inmates feel

11  like it, that's their recourse.  I've filed a

12  lawsuit when I feel I am being wronged.  So, you

13  know, who's stopping anyone?  That's the justice

14  system.  You know, I believe a complaint should be

15  filed, and it's about the system should respond

16  appropriately.  And appropriate response is

17  investigate and litigate, and, finally, the truth

18  should prevail.  But I don't know how he was

19  getting, but that's up to him.

20       Q.  Sure.

21       A.  And if he moved his exit date, that's all

22  up to him.  You see, I'm not in direct -- I was not

23  in direct in charge.  Like, isn't that

24  Dr. Lavespere or Dr. Collins was reporting to me

25  for day-to-day operations.  You know, they -- each
```

1   unit is responding to their own chain of command

2   through assistant warden.  I was more in consulting

3   role, talking to the secretary and talking to the

4   warden who were there, wanted my opinion.  They got

5   my opinion.  But no one was obligated to follow my

6   opinion, unless, in some places, it's in department

7   regulation when I had a chance revise it.  So

8   thinking that me telling Angola, well, they would

9   listen to me when they wanted to listen to me.  If

10  they don't have to listen to me, they don't have to

11  listen to me, like in my previous role.

12       Q.  Speaking of lawsuits, do you know about a

13  lawsuit, Sheppard v. Louisiana Department of Public

14  Safety & Corrections about an inmate asking for

15  surgery?  Do you know about that case?

16       A.  I don't recall his name right now.

17       Q.  Was it was a case where the 19th Judicial

18  District ordered the Department of Corrections to

19  provide the surgery for that innate within 30 days.

20       MR. BLANCHFIELD:

21            Object to the form of your

22            question.  I mean, do you have the case?

23            Let's look at the case.  I don't trust

24            your rendition of what the case was

25            about or what was ordered.  I've seen

Dr. Raman Singh

```
 1              how you brief issues on that.  If you
 2              have a case, let's look at it.
 3                   Do you know anything about that
 4              case?
 5         THE WITNESS:
 6                   Really, to be honest, I don't
 7              recall, and I can tell you it's, like,
 8              five hours into this on a Sunday
 9              evening.  I'm really pushing myself too
10              hard.
11    BY MR. MOST:
12         Q.  I understand.
13         A.  But if you have a document that I can
14    reviewed and give you my best opinion.
15         MR. MOST:
16                   Yeah.  I'm just seeing if you
17              recall anything about it, so can we go
18              off the record for a little bit.
19                   (Off the record.)
20    BY MR. MOST:
21         Q.  So I'm looking at -- I've got in front of
22    me the May 4, 2016, deposition of Dr. Raman Singh
23    from Varnado v. LeBlanc for consolidated cases.
24    I'm going to read from this deposition the
25    questions and answers that you gave and ask you if
```

1   that is your testimony in this case as well.  All

2   right, Dr. Singh?

3       A.  Yes, sir.

4       Q.  So on Page 43 to 44, I asked you, "How

5   does the clinician or staff physician communicate

6   to DOC headquarters that a surgery is medically

7   necessary?"  And you answered, "Through Eceptionist

8   and this form for surgical procedures."

9           Is that your testimony in this case as

10  well?

11      A.  That's correct, sir.  At that time, like

12  we saw here, the recommendation for a surgery

13  clinic was sent without any documentation to do

14  efficient prioritization.  It's the only the

15  clinician who has examined the patient is in the

16  bast situation to determine, you know, necessity

17  and urgency, so the form's sort of amended so that

18  clinician has to check.

19      Q.  And you're pointing to this form.  Are you

20  talking about the form that had two check boxes?

21      A.  (Witness shaking head.)

22      Q.  Which form are you talking about?

23      A.  The form -- the two check boxes were for

24  hernia, but, you know, there were more surgeries

25  than hernia.  So in the Eceptionist, when this is

1    being input, those were the questions we had

2    designed, because it was almost impossible to get

3    the copies of the entire medical record into

4    Eceptionist.  You know, you run into -- what is

5    that called?  Capacity.  The IT capacity issue.  So

6    we wanted physicians to check.  You missed

7    questions in this deposition sometimes, so I'm

8    asking is it asking medically necessary or not, and

9    how urgent the situation is.  So to answer your

10   question, yes, this is still true for this case.

11        Q.  And the form you're referring to,

12   specifically with regard to hernias, is that two

13   check box form?

14        A.  No.

15        Q.  No?

16        A.  The medical necessity, I did not see

17   medical necessity check box in that hernia form, so

18   there was a different form for medical necessity.

19        Q.  Okay.  So on Page 55, I asked you, "What

20   happens if there are more requests of comparable

21   urgency than there are slots, say, more hernia

22   surgeries of comparable priority than there are

23   slots."  And you gave an answer over the next

24   couple of pages that included, on Page 57, "If they

25   came back, they tried hard.  There are no slots.

1    Nothing can be done.  They are dealing with major

2    issues.  We will look around the state.  If there

3    are no slots nowhere else, then we will push hard.

4    Maybe we will send the patient to ED.  We will

5    violate our own rules because patient care comes

6    first, so we will send patient to ED and go and get

7    the surgery done."

8         Is that your testimony in this case, or

9    would you like more context?

10        A.  Well, yeah.  That is the testimony, and I

11   give you the context.  So emergency departments are

12   not designed to provide, you know, non-emergent

13   care.  It's abuse.  But, like I said, the medical

14   science is not always black and white.  So if there

15   were urgent cases, you know, and even the way

16   hospitals are designed, they have different OR.  OR

17   is operating room, for all my past and future

18   references.  So they have designated OR slots for

19   patients coming through ED.

20        MR. BLANCHFIELD:

21             And we will agree that his answer

22             will be the same as his answer appears

23             starting at Page 55 of the deposition

24             through 57.

25        MR. MOST:

1          Okay.

2          MR. BLANCHFIELD:

3               You gave a great answer.

4    BY MR. MOST:

5         Q.  The only thing I asked you about in that

6    deposition is I showed you the 1 to 5 scale.

7          MR. MOST:

8               We'll do this one too.

9          MR. BLANCHFIELD:

10              Actually, there was a Y that you

11          didn't label.

12         MR. MOST:

13              Let's go to Z.

14              (Whereupon Exhibit Z was marked

15          for identification.)

16   BY MR. MOST:

17        Q.  Okay.  We talked about a 1 to 5 scale

18   earlier for hernias, right?

19        A.  Yeah.

20        Q.  Okay.  You're looking at Exhibit Z, which

21   has categories I to V.  Is this the 1 to 5 scale

22   for hernias?

23        A.  This is 1 to 5 scale Angola had come up

24   with to triage, because they had a large enough

25   number of patients waiting for hernia.  What

1   exactly happened after the LSU transition, all

2   those old patients also came out where LSU was

3   taking on those for so long.  So, you know, when

4   hernias became a major issue, it wasn't only about

5   the new hernias at that time.  So all those

6   patients who were -- who had hernia and LSU, like,

7   you know, tacked on them, like we talked for a long

8   time.  They all were coming out from the woodwork,

9   so at that point, we realized that this is a much

10  bigger issue.  So we are going to clean up what was

11  happening after 2013 as well as all those previous

12  backlogs, trying to implement the clinical science

13  and to do our best, so Angola came up with this

14  priority.

15          And if you will see the attachment you had

16  shown to me, excerpt sheet -- name, number,

17  comments -- that's where -- so we said okay.  How

18  do you eat an elephant?  One bite at a time.  So

19  let's do some science, some prioritization.  Let's

20  find out how many category 5 we have so that I can

21  start negotiating so that we don't have to send

22  them to an ER.  We don't have to wait for them, you

23  know, to have gangrene and sepsis.

24      Q.  So this is essentially the key that

25  explains what 1 to 5 means?

1        A.   What Angola had come up with and what

2   Angola had used.

3        Q.   Okay.  So this is the key for what Angola

4   came up with and Angola used as a 1 to 5 scale for

5   hernias?

6        A.   For prioritization and to notify us about

7   any quantification of the need.

8        Q.   So that's a yes?

9        A.   Yes.

10        Q.   Okay.  Thank you.

11        A.   It's my bad habit.  I like to try to give

12   so much information.  I'm sure you know the type,

13   but I'm learning.

14        Q.   Yeah.  You know, "yes" and "no" answers

15   help make the transcript clearer.

16             So on Page 67 of the deposition, I asked

17   you, "So if a doctor recommends hernia surgery for

18   an inmate, that would be medically necessary?"

19   Your answer was, "Yes, I presume so."

20             Is that your testimony in this case as

21   well?

22        A.   Well, by and large, you know, but

23   medically necessary, like you were saying.  We are

24   saying we just saw a physician making a

25   recommendation about hernia clinic evaluation

**Dr. Raman Singh**

```
 1    without any examination, documentation about the
 2    hernia.  So by and large, I would presume that when
 3    a physician has made a determination, it's based on
 4    the examination findings that he has documented,
 5    but that may not always be the case, but that's my
 6    best case scenario.
 7        Q.  So your testimony in that case was "yes,"
 8    and your testimony in this case is "by and large"?
 9        A.  Yes.
10        Q.  Depending on the scenario?
11        A.  Yeah.  You know, if these other things,
12    like attorneys are supposed to follow ethical
13    standards, so --
14        Q.  Okay.  So your testimony is different in
15    this case than that case?
16            MR. BLANCHFIELD:
17                Object to the form.
18            THE WITNESS:
19                Well, I'm saying if a physician is
20                following the medical science and
21                following the standards of care and then
22                he makes a recommendation, not for the
23                surgery, patient to be evaluated by a
24                surgeon, then of course that is
25                medically necessary.
```

1  BY MR. MOST:

2      Q.  That's your testimony for this case?

3      A.  Yes.

4      Q.  Okay.  On Page 68, as to the question, "Is

5  it the Department of Corrections' obligation to

6  provide medically necessary health care to

7  offenders?"  Your answer was, "Yes."

8          Is that your testimony in this case?

9          MR. BLANCHFIELD:

10              Hold on.  What page?

11          MR. MOST:

12              Page 68.

13          MR. BLANCHFIELD:

14              And the question was?

15  BY MR. MOST:

16      Q.  "Is it the Department of Corrections'

17  obligation to provide medically necessarily health

18  care to offenders?"  And the answer was, "Yes."

19          Is that your testimony in this case?

20      A.  Before I change, my answer is yes.

21      Q.  Okay.  So now we're looking at Page 108,

22  109.

23          MR. BLANCHFIELD:

24              Hang on a second.  Okay.

25  BY MR. MOST:

1      Q.   So you were talking about -- you were

2   testifying about -- this is in September 2012 --

3   "The Department of Corrections had no funding, and,

4   by law, it was LSU's responsibility.  That was

5   exactly the question I was asking.  LSU's denial

6   letter did not talk about medical criteria, medical

7   necessity.  They were flat denials based on the

8   funding issue.  So I took this up with Dr. Kaiser

9   and Dr. Couk and Chief Pharmacist Danny Jackson.

10  They all work for LSU.  When I heard about

11  Dr. Opelka being appointed, I took it up with him

12  too.  Let us know.  Are you denying a medically

13  necessary life-threatening condition because of

14  fiscal, or it's a flat denial?  That letter --

15  those letters lacked that detail."  And I asked

16  you, "Did that resolve the problem?"  And you said,

17  "As I recall, yes."

18      A.   Yes.  So you understand the context.

19      Q.   Okay.  So that's your testimony in this as

20  well?

21      A.   That Dr. Kaiser, they were -- to us, it

22  seems like they were denying the care.  Even though

23  LSU had the money and LSU was responsible, when,

24  you know, they were reviewing their residents,

25  their utilization criteria, and we were not getting

1  the full information, so I got in touch with them,

2  and there was a misunderstanding previous when DOC

3  was getting money.  It's like right hand wasn't

4  talking to left hand at LSU, so they were denying

5  the DOC needs to approve it.

6        Q.  Okay.  And I asked you, "Did that resolve

7  the problem?"  You testified, "As I recall, yes."

8            Is that your testimony here today?

9        A.  Yes.

10        Q.  Okay.  And I asked you, "Approximately how

11  long did it take to resolve that problem?"  And you

12  said, "I'll say a few weeks."

13            Is that your testimony here too?

14        A.  Yes.  As soon as I came about it, I jumped

15  on it.  It was resolved at the top level.

16            MR. MOST:

17                Okay.  On Page 119.  Just tell me

18              when you're there.

19            MR. BLANCHFIELD:

20                Yes, I'm here.

21  BY MR. MOST:

22        Q.  I asked you the question, "If there were a

23  pattern or a large number of inmates who had been

24  recommend for hernia surgery but had not gotten

25  dates, that would be a red flag in your mind?"  And

1  you answered, "That's right.  Urgent hernia

2  surgeries and post redesign, it's DOC's

3  responsibility."

4        Is that your testimony in this case as

5  well?

6     A.  Yes.  Urgent hernia surgery is DOC's

7  responsibility.

8     Q.  Okay.

9     A.  And that would be a red flag.

10        MR. MOST:

11              For this one, we'll look at a

12           document you've seen before.  This is

13           going to be Exhibit AA.

14              (Whereupon Exhibit AA was marked

15           for identification.)

16  BY MR. MOST:

17     Q.  I appreciate your patience, Dr. Singh.

18     A.  You got to do what you got to do, and I'm

19  with you.

20     Q.  That's right.  I think everyone in this

21  room would rather be somewhere else on a Sunday

22  evening.

23        Okay.  So on the second page of this, it

24  appears to me to be a March 2012 e-mail from Preety

25  Singh to Denise Harrison; is that right?

```
1        A.  Yes.
2        Q.  And I believe that's Dr. Preety Singh; is
3    that right?
4        A.  Yes.
5        Q.  Okay.
6        A.  Last time I checked.
7        Q.  Right.  Dr. Preety Singh writes, "Issue is
8    for routine services not available due to budget
9    constraints at LSU.  How are we medicolegally
10   covered not providing routine care to offenders
11   like screening colonoscopy for 50 above or hernia
12   surgery or arthroscopic surgery or sleep study or
13   cataract surgery."  Right?
14       A.  Yes.
15       Q.  So she was raising an issue about how are we
16   we medicolegally covered for these issues, right?
17       A.  Yes.
18       Q.  And I asked you on Page 148 of the
19   deposition, "This issue raised by Preety Singh, by
20   Dr. Preety Singh, was that raised to you personally
21   at any point with regard to hernia surgery?"  And
22   you answered, "Yes.  Many times."
23           Is that your testimony in this case as
24   well?
25       A.  Yes.
```

1    Q.  Okay.  Then I asked you, "Was it raised to

2    the secretary of the department?"  And you

3    answered, "Yes.  We talk about this in the warden's

4    meeting.  We have many meetings.  It's a teamwork."

5           Is that your testimony in this case as

6    well?

7    A.  Yes.

8    Q.  Okay.

9    A.  But I would change everything to we

10   talked, like, in the past, because I'm not there

11   anymore.  Yeah.

12   Q.  Yes.

13   A.  Yeah.

14   Q.  Totally appropriate, right.

15          We looked at Eceptionist records today,

16   and some of them said "hold all."  It made a

17   reference to holding surgeries for reducible

18   hernias per medical director.  I asked you, on Page

19   154 of the deposition, "When it says medical

20   director here, that refers to you?"  And you

21   answered, "I think so."

22          Is that your testimony in this case as

23   well?

24   A.  Now my testimony will be, "I know so."

25   Q.  You know so.  Okay.  On Page 183, we were

**Dr. Raman Singh**

1  talking about Medicaid reimbursement rates for

2  hernia surgery, and I asked you whether it was

3  approximately 1,000, and your testimony was your

4  answer was, "$1,000.  Below $1,000."  Dot, dot,

5  dot.  "The average was below $1,000 per hernia

6  surgery."

7         Is that your testimony in this case as

8  well?

9     A.  That's what I recall, because the cost --

10  you know, I did a cost analysis and realized it

11  wasn't costing too much money, seriously.  And, you

12  know, it varies with the complications, so I'm

13  going to give you a history, since you have not.

14  It was from $7000 for an uncomplicated to up to, in

15  some cases, a few thousand dollars, but it wasn't

16  much.  Yeah.  I had my staff pull the cost report

17  for all the hernia surgeries done.

18     Q.  Okay.  On Page 202 of the deposition, I

19  asked you, "Would you describe a hernia that's been

20  recommended for surgical care as a serious medical

21  need?"  You answered, "It depends.  All hernias

22  eventually need surgery.  This is not pneumonia

23  where you fix a hernia by an antibiotic shot.  A

24  serious medical need is a patient in significant

25  pain.  Hernia has high risk of incarceration.  Like

1  those indications, there are serious medical need.

2  Outside of that, hernia fixing is a medical need,

3  but I'm not sure about the seriousness."

4        Is that your testimony in this case as

5  well?

6     A.  Pretty much.  Clinical science has not

7  changed.  And I think whoever transcribed got my

8  accent pretty good.

9     Q.  I wasn't trying to imitate your accent.

10     A.  No, I know.

11     Q.  For the record, I was not mimicking

12  anyone's accident.

13     A.  No, I'm talking about the transcription

14  lady, whoever did it.  Yes.

15     Q.  Ah, okay.

16     A.  Serious.  You know, the medical need is

17  there.  Serious is a different issue.

18     Q.  Okay.  So that is your testimony in this

19  case as well?

20     A.  Yes.

21     Q.  Okay.  On Page 203, I asked you, "Could a

22  hernia limit an inmate's abilities to participate

23  in sports in prison?"  And your answer was, "Yes.

24  If I have a big hernia hanging right here, I can't

25  run track or play basketball."

Dr. Raman Singh

```
1              Is that your testimony in this case as

2    well?

3         A.  Well, I would like to add some context.

4    You know, sometimes it is; sometimes it's not.

5    Sometimes inmates want to play, but, you know, they

6    can get hurt.  Like, it's a physician's job to give

7    their clinical opinion.  They want to play, but,

8    you know, if it's a big hernia and you just get

9    hurt, it can pop, and you can bleed to death.

10        Q.  So a hernia could limit an inmate's

11   ability to participate in sports?

12        A.  Yes.  Possibly.

13        Q.  Okay.  And I asked you if -- well, I'll

14   just ask you here.  Could a hernia limit an

15   inmate's ability to participate in the rodeo?

16        A.  What was my answer?

17        Q.  I can -- it was long.

18        MR. BLANCHFIELD:

19             You said you don't know what the

20          rules for the rodeo were.

21        THE WITNESS:

22             Yeah.

23   BY MR. MOST:

24        Q.  I mean, I'll read it to you if you want.

25        A.  No, that's okay.  But let me tell you this
```

Dr. Raman Singh

1    here.  So there are two pieces to this puzzle.

2    There's a medical determination, and then there's a

3    security and all other issues.  So going back to

4    work release, even if medical is claiming someone

5    to go to work release, it doesn't mean that inmate

6    is going to work release.

7        Q.  Right.

8        A.  He is being considered.  So to answer

9    hypothetical question, can an inmate?  Yes,

10   absolutely.  Like, you know, a bull can hit him

11   right there.  It can be life-threatening.  He may

12   not see it, but as a physician, I'm not going to

13   clear it, but can an inmates with hernia

14   participate in rodeo?  Yes.  Why not?

15       Q.  But some inmates might be limited from

16   doing rodeos because of the their hernias?

17       A.  Yes.

18       Q.  Okay.

19       A.  But there's a threat to their life and

20   their health, so I don't think the medical

21   professional was qualifying or disqualifying, but

22   giving their input.

23       Q.  Okay.  So on Page 210 of the deposition --

24           MR. BLANCHFIELD:

25               Okay.

**Dr. Raman Singh**

```
 1    BY MR. MOST:
 2        Q.  -- Mr. Blanchfield said, "Delay leads to
 3    strangulation, and strangulation leads to death.
 4    That's correct?"  And you answered, "Yes."
 5            Is that --
 6        A.  He said?
 7        Q.  Yeah, I think you were --
 8        A.  He was a physician that day?
 9        Q.  He was summing up what you said, I think.
10            MR. BLANCHFIELD:
11                    That was kind of out of context.
12            There was a long passage before it.
13    BY MR. MOST:
14        Q.  Yeah.  I thought that was a good summary.
15    "Delay leads to strangulation, and strangulation
16    leads to death.  That's correct?"  You answered,
17    "Yes."
18            Is that your testimony here?
19        A.  If you ask him to say yes to what he said.
20            MR. BLANCHFIELD:
21                    It looks like it was my testimony.
22    BY MR. MOST:
23        Q.  Well, and then he asked you, "That's
24    correct?"  And you said, "Yes."
25        A.  Possibly, yeah.  There's a possibility
```

1  always.

2      Q.  And you said, lower down, "Any

3  strangulation always runs the risk of

4  life-threatening conditions to the patient.

5  Patients can die if not afforded treatment in a

6  timely manner, but where I'm differing is that one

7  has to use objective criteria to assess that risk."

8          Is that your testimony here today?

9      A.  Well, strangulation is a very serious

10  medical occurrence, so I'll say yes kind of thing.

11  You know, if it's strangulation, I would take it

12  very seriously.

13      Q.  And you said, "Any strangulation always

14  runs the risk of life-threatening conditions to the

15  patient."

16          Is that your testimony today?

17      A.  Yes.  That's what strangulation means.

18      Q.  On Page 211, you testified, "Courts have

19  ruled again and again and again there should be no

20  additional delay in providing medically necessary

21  care to inmates."

22          Is that your testimony today?

23      A.  Yes.  As long as courts have rules.

24  Otherwise, I don't know about.

25      Q.  Okay.

 1      A.   Since I left in the last one year or so.

 2      Q.   On Page 213, I asked you the question,

 3  "Would an inmate with a hernia who has been

 4  recommended for surgery, would that be considered a

 5  medically necessary procedure?"  And your answer

 6  was, "Yes."

 7           Is that your testimony here today?

 8      A.   With all the qualifications, you know,

 9  recommended for surgery by a surgeon like we saw a

10  family nurse practitioner recommending to surgery

11  clinic, and it was presumed that he was being

12  recommended to surgery, and presuming that surgeon

13  did use the medical criteria and it is medically

14  necessary.

15      Q.   So if an inmate with a hernia who had been

16  recommended for surgery by a surgeon, that would be

17  considered a medically necessary procedure?

18      A.   Yes.

19      Q.   Okay.

20      A.   You know, no disrespect, but, you know,

21  I'm a surgeon, so I don't have -- I know basics

22  about hernia and when to refer.  That's what you

23  expect your primary care to do.  When you suspect

24  cancer, you send him to the cancer doctor.  But I

25  shouldn't be making the cancer, biopsy, diagnosis

1    and treatment plans.  That's stepping beyond my

2    training.

3              MR. MOST:

4                    Okay.  That's all the questions I

5              have.  Can we go off the record?

6              (Conclusion of deposition at 5:10 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     WITNESS' CERTIFICATE

 2

 3

 4        I, DR. RAMAN SINGH, read or have had the

 5   foregoing testimony read to me and hereby certify

 6   that it is a true and correct transcription of my

 7   testimony, with the exception of any attached

 8   corrections or changes.

 9

10

11

12

13

14        -------------------------

15               DR. RAMAN SINGH

16

17   ---- Signed with corrections noted.

18

19   ---- Signed without corrections noted.

20

21   DATE OF DEPOSITION: NOVEMBER 4, 2018

22

23

24

25
```

1                        REPORTER'S PAGE

2

3          I, DESIREE DELATTE, Certified Court

4    Reporter in and for the State of Louisiana, the

5    officer, as defined in Rule 28 of the Federal Rules

6    of Civil Procedure and/or Article 1434(B) of the

7    Louisiana Code of Civil Procedure, before whom this

8    proceeding was taken, do hereby state on the

9    Record:

10         That due to the interaction in the

11   spontaneous discourse of this proceeding, dashes

12   (--) have been used to indicate pauses, changes in

13   thought, and/or talkovers; that same is the proper

14   method for a Court Reporter's transcription of

15   proceeding, and that the dashes (--) do not

16   indicate that words or phrases have been left out

17   of this transcript;

18         That any words and/or names which could

19   not be verified through reference material have

20   been denoted with the phrased "(spelled

21   phonetically)."

22

23

     _____
24   DESIREE DELATTE
     Certified Court Reporter
25   Registered Professional Reporter

1
                    REPORTER'S CERTIFICATE
2
3                I, DESIREE DELATTE, Certified
    Court Reporter in and for the State of Louisiana,
4   as the officer before whom this testimony was
    taken, do hereby certify that DR. RAMAN SINGH,
5   after having been duly sworn by me upon authority
    of R.S. 37:2554, did testify as hereinbefore set
6   forth in the foregoing 239 pages;
                That this testimony was reported by me in
7   the stenotype reporting method, was prepared and
    transcribed by me or under my personal direction
8   and supervision, and is a true and correct
    transcript to the best of my ability and
9   understanding;
                That the transcript has been prepared in
10  compliance with transcript format guidelines
    required by statute or by rules of the board, and
11  that I am informed about the complete arrangement,
    financial or otherwise, with the person or entity
12  making arrangements for deposition services;
                That I have acted in compliance with the
13  prohibition on contractual
    relationships, as defined by Louisiana Code of
14  Civil Procedure Article 1434 and in rules and
    advisory opinions of the board;
15              That I have no actual knowledge of any
    prohibited employment or contractual relationship,
16  direct or indirect, between a court reporting firm
    and any party litigant in this matter nor is there
17  any such relationship between myself and a party
    litigant in this matter.  I am not related to
18  counsel or to the parties herein, nor am I
    otherwise interested in the outcome of this matter.
19
    Dated this 1st day of December, 2018.
20
21
22
23
    _____
24  DESIREE DELATTE
    Certified Court Reporter
25  Registered Professional Reporter



# Louisiana Dept. of Corrections

## Referral Guidelines

### Hernia

**Diagnosis/ Definition**

- An abnormal protrusion (swelling) of a body part through a natural or surgically created area of weakness in a muscle or fascial wall. Common subtypes are:
  - INGUINAL (groin): swelling in the upper scrotum or prepubic area.
  - UMBILICAL: hernia through the umbilical ring.
  - INCISIONAL: swelling and weakness in the area of a prior surgical incision.
  - EPIGASTRIC: swelling in the midline between the umbilicus and the xyphoid.
  - VENTRAL: swelling anywhere in the anterior abdominal area (overlaps with umbilical and epigastric hernias, but also includes less common abdominal wall hernias, such as SPIGELIAN).

**Initial Diagnosis and Management**

Diagnosis is made on basis of history of swelling of area in question, usually confirmed by the presence of a physically evident protrusion, which normally increases with straining and becomes less prominent when the patient is recumbent and relaxed.

**Ongoing Management and Objectives**

- Hernias as defined above may be managed non-operatively by PCP.
- In general, no urgent condition exists if the hernia is REDUCIBLE or ASYMPTOMATIC EXCEPT FOR ITS PRESENCE.
- Most hernias can be reduced with gentle pressure with the patient recumbent.
- Most EPIGASTRIC HERNIAS are non-reducible, but usually cause few symptoms.

**Indications for Specialty Care Referral**

- Hernia is non reducible
- Hernia is very large in size failing medical management
- Any signs/symptoms indicating incarceration or strangulation I.e. Diminished cough reflex
- Significant pain/discomfort requiring narcotics/ inpatient pain management


EXHIBIT

Criteria for Return to
Primary Care

For patients recovering from surgical repair, the patient will be followed in General Surgery until the wound is adequately healed and patient discharged from surgical care (approximately two weeks in the absence of complications).

Last Review for this Guideline: March 2014
Referral Guidelines require review every three years.