UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


EARL PETERS, et al

                         NO. 16-842-SDD-RLB

     Plaintiffs

V.

RAMAN SINGH, et al

     Defendants


        30(b)(6) DEPOSITION OF LOUISIANA
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,
through its designated representative, RANDY L.
LAVESPERE, M.D., given in the above-entitled
cause, pursuant to the following stipulation,
before Raynel E. Schule, Certified Shorthand
Reporter in and for the State of Louisiana, at
Louisiana State Penitentiary at Angola, Angola,
Louisiana, 70712, commencing at 12:15 o'clock
p.m., on Thursday, the 3rd day of January, 2019.

1                    I N D E X

2                                      Page

3    Caption                          1

4    Appearances                      3

5    Agreement of Counsel             4

6    Examination

7         MR. ADCOCK                   5

8    Reporter's Certificate         153

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2

     For the Plaintiffs:

3

     JOHN ADCOCK, ESQ.

4    Attorney at Law
     3110 Canal Street

5    New Orleans, Louisiana    70119

6

     For the Defendant:

7

     MESSRS. KEOGH, COX & WILSON

8    Attorneys at Law
     BY:  ANDREW BLANCHFIELD, ESQ.

9    701 Main Street
     Baton Rouge, Louisiana    70802

10

11   Reported By:  Raynel E. Schule
                   Certified Shorthand Reporter

12                 State of Louisiana

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              S T I P U L A T I O N
2              It is stipulated and agreed by and
3     between Counsel for the parties hereto that the
4     deposition of LOUISIANA DEPARTMENT OF PUBLIC
5     SAFETY AND CORRECTIONS, through its designated
6     representative, RANDY L. LAVESPERE, M.D. is
7     hereby being taken pursuant to the Federal Rules
8     of Civil Procedure for all purposes in
9     accordance with law;
10             That the formalities of reading and
11    signing are specifically waived;
12             That the formalities of sealing,
13    certification, and filing are hereby
14    specifically waived.
15             That all objections, save those as to
16    the form of the question and responsiveness of
17    the answer, are hereby reserved until such time
18    as this deposition or any part thereof is used
19    or sought to be used in evidence.
20                        * * * * *
21             Raynel E. Schule, Certified
22    Shorthand Reporter in and for the State of
23    Louisiana, officiated in administering the oath
24    to the witness.
25
```

```
 1              RANDY L. LAVESPERE, M.D., having been
 2         first duly sworn by Raynel E. Schule, was
 3         examined and testified on his oath as
 4         follows:
 5                        EXAMINATION
 6    BY MR. ADCOCK:
 7    Q.   Doctor, I'm going to hand these to you, but
 8         we're going to go through, like, the
 9         preamble and formalities just before I
10         start asking about those.  I'm just doing
11         this ahead of time.  The exhibit letter is
12         down at the bottom for your information.
13          Okay.  Dr. Lavespere, so you've given -- so
14         are you aware of this lawsuit?
15    A.   Yes.
16    Q.   Okay, and my name is John Adcock.  We've
17         met before.
18    A.   We have.
19    Q.   And you've given a deposition before,
20         correct?
21    A.   Sure.
22    Q.   And about how many do you think you've
23         given?
24    A.   15, 10, 15.
25    Q.   Okay, and so then you're -- so doctor,
```

6

```
 1           you're aware that when I ask a question,
 2           you need to tell me if you don't understand
 3           it.  Is that your understanding?
 4    A.    Sure.
 5    Q.    And then if I ask a question and you don't
 6           ask me to repeat it, I'm going to assume
 7           that you understood it, okay?
 8    A.    Okay, yes, sir.
 9    Q.    And then if it's a yes or no question or
10           something like that, I need you to say that
11           and enunciate that for the court reporter's
12           benefit.
13    A.    Sure.
14    Q.    Okay, and doctor, you've given -- you're
15           aware of what a 30(b)(6) deposition is,
16           correct?
17    A.    I don't know all the numbers.  I mean, I've
18           given depositions before.
19    Q.    Okay.  I'm showing what I've marked
20           previously as "Exhibit A."  (Counsel hands
21           document to witness.)  Have you seen that
22           document?
23    A.    I have.
24    Q.    So you have seen that?
25    A.    I have.
```

```
 1   Q.   Okay.  Now, so a 30(b)(6) deposition is --
 2        just to review is it allows the Plaintiffs
 3        or the defense, here it's the Plaintiffs to
 4        tell a defendant who's an organization,
 5        whether it be a city or a company or an arm
 6        of state government in this case, excuse
 7        me, to say I actually want to ask questions
 8        about these 16 topics in this case, and the
 9        duty of that organization is to designate
10        the person who knows a lot about those
11        topics.  Does that sound -- does that make
12        sense?
13   A.   It makes sense.
14   Q.   Okay, and I just want to go through about
15        what topics you've been designated for.
16        Let's see here.  So if you'll turn to Page
17        2 of this Deposition Notice, which is
18        "Exhibit A," feel free to take your time
19        and read over that, but my understanding is
20        -- and you'll have time to read over this
21        before you answer, you've been designated
22        as the Department of Corrections
23        representative for Topics 2, 3, 4, 5, 6, 7,
24        8, 9, 10, and then partially for 11 and 13.
25   A.   Not for 11.
```

1    Q.    Not for 11.  Okay.

2    A.    13.

3    Q.    And are you able to testify about those

4          topics today?

5    A.    Sure.

6    Q.    Okay.  So doctor, what -- what particularly

7          have you done to prepare for today's

8          deposition?

9    A.    Just read over these documents, the ones

10         that you've just given to me.

11   Q.    Okay.  I think they were attached to the

12         Deposition Notice perhaps?

13   A.    Well, I didn't -- all of them weren't

14         attached.  I mean, for example, "Exhibit A"

15         wasn't attached; "Exhibit B" wasn't

16         attached; Exhibit -- I think I had "Exhibit

17         C," but I should be familiar with those.

18   Q.    Okay, okay.  Now, doctor, I want to ask a

19         few questions about policy to start off

20         with.  So my understanding, correct me if

21         I'm wrong, is the Department of Corrections

22         has a policy for how to manage hernias and

23         cataracts and when to operate on hernias

24         and cataracts.  Is that right?

25   A.    No.

1    Q.    Okay.

2    A.    The Department of Corrections does not

3          determine when to operate.

4    Q.    Huh-huh.

5    A.    At all.

6    Q.    Okay.

7    A.    They have no say when to operate.  Those

8          are -- those decisions are made by the

9          surgeons.

10   Q.    Okay.  Well, tell me if you can turn to

11         Exhibits E and F and G --

12   A.    Okay.

13   Q.    -- I'm referring to those policies.

14   A.    Okay.

15   Q.    So E, F, and G, are those the policies of

16         the Department of Corrections as far as you

17         know?

18   A.    They are.

19   Q.    Okay, and in "Exhibit G," that right there

20         (indicating) --

21   A.    Huh-huh.

22   Q.    -- that looks, correct me if I'm wrong,

23         like a draft policy.  Do you know if that

24         has been promulgated as the policy of the

25         DOC?

```
1    A.    I'm not sure.

2    Q.    You don't know?

3    A.    I know this guideline here (indicating).

4    Q.    "Exhibit E"?

5    A.    "Exhibit E."

6    Q.    Okay.  It's the same page.  I don't know

7          why it's --

8    A.    No, I didn't go over this one, but it's

9          pretty much the same as -- it looks like

10         the same as this one (indicating), just in

11         a little bit more detail.

12   Q.    Okay.  So -- so exhibit -- if we can go to

13         "Exhibit E" then.

14   A.    Okay.

15   Q.    As far as is this the current policy of the

16         Department of Corrections?

17   A.    These are the hernia guidelines for the

18         Department of Corrections.

19   Q.    Huh-huh, and on Page 2, it says the last

20         review for this guideline was March 2014.

21   A.    Yes.

22   Q.    You see that.  Do you know if it has been

23         updated?

24   A.    I thought the one that I had said revised

25         2-1 of '16.
```

```
 1    Q.    2-1 of '16.  Okay, and can you testify
 2          whether this is virtually similar to the
 3          one from 2016?
 4    A.    Very similar.
 5    Q.    Very similar.  Okay.
 6                    MR. ADCOCK:
 7                    All right.  Can we go off the
 8              record.
 9                    (Off the record.)
10                    MR. ADCOCK:
11                    So by stipulation of the
12              attorneys, we're going to add in an
13              "Exhibit E-1," which is going to be the
14              February 1, 2016, revision of the
15              Referral Guidelines for hernias for the
16              Louisiana Department of Corrections.
17                    We can do after the deposition ends.
18    BY MR. ADCOCK:
19    Q.    Well, looking at "Exhibit E," doctor, are
20          you familiar with these?
21    A.    With the exhibit?
22    Q.    Sure.
23    A.    Yes.
24    Q.    Okay, and do you know who created this --
25          these guidelines and what they're for?
```

```
 1    A.    My understanding is Dr. Singh created the
 2          guidelines.
 3    Q.    Okay, and what are they for?  What's their
 4          utility?
 5    A.    They're -- they're guidelines to manage the
 6          hernias that come into your facility.
 7    Q.    Okay, and were you consulted about drawing
 8          up this policy?
 9    A.    No.
10    Q.    Okay.  Okay.  Now, I want to go down to the
11          middle where it says, "Ongoing Management
12          and Objectives."
13    A.    Right.
14    Q.    It says, "Hernia are" -- "are defined" --
15          "as defined above may be managed
16          non-operatively by PCP."
17    A.    Right.
18    Q.    Did I read that correctly?
19    A.    You did.
20    Q.    And what's PCP?
21    A.    Primary care physician.
22    Q.    Primary care physician, and who would --
23          who would that be in the case of a
24          prisoner?
25    A.    That would be any of the physicians that
```

```
 1        are on staff at Angola.
 2   Q.   Okay, got you.  Would that include you?
 3   A.   It would.
 4   Q.   Okay, and when it says, "hernias as defined
 5        above," what does that reference?
 6   A.   Whether they have inguinal hernia,
 7        umbilical hernia, incisional hernia,
 8        ventral hernia.
 9   Q.   So is it -- the hernias described in the
10        first part of this policy?
11   A.   Sure.
12   Q.   Okay.  So the second point says, "In
13        general, no urgent condition exists if the
14        hernia is REDUCIBLE or ASYMPTOMATIC EXCEPT
15        FOR ITS PRESENCE.  Did I read that
16        correctly?
17   A.   You did.
18   Q.   Okay.  Can you explain what means.
19   A.   That means hernias are usually considered
20        to be elective procedures, which they're
21        not emergent like if somebody ruptures an
22        appendix or has a perforated gastric ulcer.
23        So, you know, time is not of the essence.
24   Q.   As they would be for an appendectomy.
25        You've got to do that right away?
```

```
1                    MR. BLANCHFIELD:
2                    Object to the form.
3      BY MR. ADCOCK:
4      Q.   By contrast?
5      A.   A ruptured appendix or a very hot appendix,
6           sure, that would be emergent, something
7           that you would want to take care of right
8           away.
9      Q.   And is there -- does a hernia ever become
10          non-elective?
11                   MR. BLANCHFIELD:
12                   Object to the form.
13     BY MR. ADCOCK:
14     Q.   Go ahead.  You can answer.
15     A.   There's an occasion if a hernia gets, you
16          know, incarcerated or strangulated that it
17          can become an emergent situation.
18     Q.   Okay, and what does strangulation mean?
19     A.   Well, strangulation, the hernia becomes
20          incarcerated in the area that it protrudes
21          through if you can't get it back in.  It's
22          strangulated as a result of the
23          incarceration where there's a possibility
24          that the bowel could die.  You know, the
25          blood supply gets cut off to the -- to the
```

```
 1          bowel.
 2     Q.    Huh-huh.
 3     A.    And that would be considered a
 4          strangulation.
 5     Q.    And the -- the second -- the third one
 6          says, "Most hernias can be reduced with
 7          gentle pressure with the patient
 8          recumbent."  Did I read that correctly?
 9     A.    Yes.
10     Q.    What does recumbent mean?
11     A.    Lying on their back.
12     Q.    Lying on their back.  And that would be
13          usually I guess on the table or something
14          like that?
15     A.    Sure, exam table.
16     Q.    And then when it says, "reduced with gentle
17          pressure," what does that mean?
18     A.    That just means when you -- when you --
19          when you lie the patient back, and they
20          take the pressure off of their abdomen, and
21          a lot of times you can just put gentle
22          pressure and pop the hernia right back in
23          its place.
24     Q.    Meaning you don't -- gentle pressure, you
25          don't have to push very hard?
```

```
 1    A.    No.

 2    Q.    Okay.  All right.

 3    A.    Sometimes you may have to push if there's a

 4          little bowel in there, but, you know,

 5          normally you don't have to push very hard.

 6    Q.    Okay, and if you did have to push hard,

 7          would that -- that wouldn't apply to this,

 8          correctly?

 9    A.    It would -- if it's reducible, it's

10          reducible.

11    Q.    Okay, but if it's reducible without gentle

12          pressure, meaning maybe more than one

13          person has to push, this particular policy

14          wouldn't apply.  Is that right?

15    A.    More than one person wouldn't be pushing.

16    Q.    Okay.

17    A.    If it's reducible, it's reducible.

18    Q.    But if it's reducible with a lot of

19          pressure, not just gentle pressure?

20                MR. BLANCHFIELD:

21                Object to the form.

22                THE WITNESS:

23                I mean, kind of a play on words,

24             what's the difference between gentle

25             and a lot?  You know, I mean, if you --
```

```
 1              if you can put a hernia back in, it's
 2              reducible.
 3    BY MR. ADCOCK:
 4    Q.   Huh-huh.  Okay.  Well, what if it takes
 5         you, you know, 25 minutes to put it back
 6         in?
 7    A.   Then I'd probably send the guy to the
 8         hospital.
 9    Q.   For what?
10    A.   To get them to evaluate his hernia.
11    Q.   To see if he needs surgery or not?
12    A.   Sure.
13    Q.   Okay.  It says, "Most" -- this last one
14         says, "Most EPIGASTRIC HERNIAS are
15         non-reducible, but usually cause few
16         symptoms."  Did I read that correctly?
17    A.   You did.
18    Q.   What's an epigastric hernia in your words?
19    A.   In -- in my words, I -- I look at an
20         epigastric hernia as one that's called a
21         rectus diastasis, which is a weakening of
22         the linea alba where in most larger men,
23         there's a protrusion there (indicating).  I
24         have one.
25    Q.   Huh-huh.
```

```
 1    A.    You know, it's not a big deal.
 2    Q.    Huh-huh, and you're pointing to, like, the
 3          middle of your chest --
 4    A.    Yeah.
 5    Q.    -- below the breast bone?
 6    A.    The area right below where your rib cage
 7          comes together is considered your xiphoid,
 8          which is what's -- what's here
 9          (indicating), from your xiphoid to your
10          navel.
11    Q.    Huh-huh, got you.  Okay, and those are
12          non-reducible and usually cause few
13          symptoms.  Why is that?
14    A.    Because they're -- they're basically
15          non-pathological.  They don't fix them.
16    Q.    What do you mean, "they don't fix them"?
17    A.    That surgeons don't really operate on
18          rectus diastasis.
19    Q.    Why is that?
20    A.    Because they -- they don't cause anybody
21          any issues.
22    Q.    Okay.  They don't cause any pain; there's
23          no danger having them?
24    A.    No.
25    Q.    Okay.  Now, you see the -- the next, the
```

```
 1            bottom kind of sections, "Indications for
 2            Specialty Care Referral"?
 3    A.    Right.
 4    Q.    What does indications for special --
 5            specialty care referral mean?
 6    A.    That means when you would want to refer a
 7            patient to a surgeon for an evaluation.
 8    Q.    Okay, and at Angola, the doctors at Angola
 9            have the ability to do that?
10    A.    Yes.
11    Q.    Okay, and do the doctors at Angola have the
12            ability to say this particular person needs
13            hernia surgery?
14    A.    No.
15    Q.    Okay.  Who has the ability to do that?
16    A.    The surgeon.
17    Q.    The surgeon, the specialist?
18    A.    That comes to Angola, yes.
19    Q.    That comes to Angola?
20    A.    Right.
21    Q.    Okay.
22    A.    Or if we send them to the hospital, which
23            we have done several times, thinking that a
24            hernia is incarcerated, and they put the
25            hernia back in, they'll send them back.  So
```

```
 1          it's the surgeon is going to make the call
 2          on whether or not the patient needs
 3          surgery.
 4     Q.   Okay.
 5     A.   Only.
 6     Q.   Okay, and so is there any -- is there any
 7          instance in the last, you know, since 2013
 8          where a doctor at Angola has requested
 9          surgery for a hernia patient or someone --
10          a prisoner with a hernia?
11     A.   Sure.  In the Giovanni case, we sent
12          Giovanni down to Angola -- I mean, we sent
13          Giovanni down to ILH I think a couple of
14          times, and they put his hernia back in and
15          sent him back.
16     Q.   But my question is, is there any time since
17          2013 that a doctor at Angola has
18          recommended surgery for a prisoner?
19     A.   I can't recommend surgery.  I can recommend
20          a surgical evaluation, but I can't
21          recommend surgery.
22     Q.   So no?
23     A.   No.
24     Q.   Okay, and so indications -- so would this
25          section, just explain this to me, so is
```

```
 1            this section about when a doctor at Angola
 2            should refer someone to a specialist?
 3     A.    That's exactly what it is.
 4     Q.    Okay, and it seems like it says, "Hernia is
 5            non reducible."  That's the first criteria.
 6            Is that correct?
 7     A.    That is.
 8     Q.    Okay, and I think we went over this
 9            earlier, but non reducible means to you
10            what?
11     A.    Can't put it back in.
12     Q.    At all?
13     A.    At all.
14     Q.    Okay, and then it says, the second one is,
15            "Hernia is very large in size failing
16            medical management."  Did I read that
17            correctly?
18     A.    Yes.
19     Q.    Okay, and then what does medical management
20            mean?
21     A.    Medical management would be maybe you tried
22            a hernia belt; maybe you tried some
23            nonsteroid anti-inflammatories for pain;
24            maybe you've given them a lifting
25            restriction on duty status.  Those type of
```

```
 1            things would be medical management.
 2    Q.    Got you, and so -- and it says, "failing
 3          medical management," does that mean medical
 4          management didn't work?
 5    A.    That would mean medical management didn't
 6          work.
 7    Q.    Okay, and what -- what -- how would you
 8          determine if medical management did not
 9          work for a hernia, it failed?
10    A.    Basically it's a clinical decision.
11    Q.    Yeah, and what would you -- what would you
12          use to make that decision?
13    A.    Well, at some point they put me in charge
14          of the -- the hernia clinic, and I kind of
15          developed a very crude system that I was
16          going to be seeing them all the time.  So I
17          developed a system where I would know if
18          the hernia got bigger; there was more pain;
19          it was difficult to reduce.  So, you know,
20          that's what I did personally so --
21    Q.    Huh-huh.
22    A.    -- by seeing offenders on a continual basis
23          and having a little continuity of care can
24          determine if medical management works or
25          not.
```

```
 1   Q.   Huh-huh, and what -- you used some kind of
 2        criteria you said.  What -- what was --
 3        what was it exactly?
 4   A.   I -- I don't have them in front of me, but
 5        there was a category system that I used
 6        that I developed so that I would see if an
 7        offender progressed, you know, to the point
 8        where he would need referral.
 9   Q.   Huh-huh, and that would be a ranking, a
10        number ranking system?
11   A.   Yeah, ranking.
12   Q.   From one to five?
13   A.   It was.
14   Q.   Okay, and do you remember what constitutes
15        an one versus a five?
16   A.   Right off the top of my head, I don't.
17   Q.   Okay.
18   A.   I -- I -- it was a very crude system, not
19        in any medical books, but, I mean, they put
20        me in charge of the -- the hernia clinic,
21        so I wanted to -- to have some criteria
22        that I knew, that I went by that I would be
23        able to follow these patients.
24   Q.   Okay, and do you know when you implemented
25        that system, when you started using it?
```

```
 1   A.    I -- I don't.  At some point in time I
 2         think Dr. Collins was still the Medical
 3         Director, they -- they said, You're going
 4         to be in charge of the -- of hernia clinic,
 5         and I was, like, "okay."  So I started
 6         seeing a few of them, and then upon their
 7         return visit, I was, like, let me kind of
 8         develop something that's going to give me
 9         an idea of what he looked like last time,
10         more so than a physical exam, give me --
11         maybe put a number to it, and that kind of
12         helped me along.  It's not anything that's
13         accepted in any textbook.
14   Q.    Huh-huh, and you were doing that because
15         you're seeing so many people?
16   A.    Not necessarily.  I wanted to -- I wanted
17         to do it because I wanted to know what the
18         guy looked like to me from the last time I
19         saw him.
20   Q.    Okay.  What I meant is it helps you figure
21         out kind of where they are because you're
22         seeing so many people, you want to know
23         kind of immediately if someone was a three
24         last time, you just want to know that as
25         opposed to having to go through all their
```

```
1          symptoms?
2    A.    No.  If it -- if his -- if his hernia was a
3          two when I saw him, again, very crude, and
4          I saw him, and I would classify him as a
5          four, that would kind of lend me to
6          believe, you know, this guy's hernia is
7          getting larger very fast --
8    Q.    Huh-huh.
9    A.    -- and maybe he's somebody we need to take
10         a look for referral.
11   Q.    Huh-huh, got you.
12   A.    That's all it is.
13   Q.    Got you.  And then, let's say, someone is a
14         five, and I assume five means they need
15         surgery?
16   A.    No.  Five means they need a referral --
17   Q.    Okay.
18   A.    -- for surgical evaluation.
19   Q.    Okay, and so -- and you -- you would make
20         that referral?
21   A.    I would.
22   Q.    Okay, and then in terms of this process
23         about how people get surgery at Angola, for
24         prisoners at Angola, what would happen
25         after you make that referral?  What -- what
```

```
 1        mechanism is in place?
 2   A.   What would happen then is, you know, I
 3        would -- I would make a surgical referral
 4        for Dr. Morrison for an evaluation.  That
 5        would go to Headquarters Office.
 6        Headquarters would make an appointment in
 7        the surgery clinic for the offender to see
 8        Dr. Morrison, and Dr. Morrison being a
 9        staff doctor at UMCNO would be able to
10        schedule -- he wouldn't be able to
11        schedule.  He would be able to put the guy
12        up for hernia surgery.  Pending on when the
13        slots would come open in the surgery
14        schedule, they would be put in through
15        Headquarters.
16   Q.   Huh-huh, meaning Headquarters would
17        actually schedule the surgery?
18   A.   No.  Dr. Morrison would take a surgical
19        evaluation.  He would make a surgical
20        evaluation.  If he says yes, I need to fix
21        this hernia, he would make a referral for
22        hernia repair, and say this guy needs to
23        have his hernia fixed.  Several things have
24        to happen there.  I mean, there's only so
25        many -- so many hours in a day for a
```

```
 1          surgical suite to operate.  So how many
 2          slots do they have to repair hernias in New
 3          Orleans, and they would kind of match up
 4          the need, and then they would give us a
 5          date.  So New Orleans would send us a date.
 6     Q.   Huh-huh, and you'd have to wait on UMC to
 7          come up with a date to do the surgery?
 8     A.   Sure.
 9     Q.   Okay.  Is there anything you could do to
10          make sure a prisoner who's a five gets
11          surgery sooner rather than later?
12     A.   No.
13     Q.   Okay.  You can't, like -- you're just --
14          you're powerless to do that because you
15          don't have an operating room?
16     A.   I don't have any control over surgery.  I
17          can't tell a surgeon to operate on him.
18          Once Dr. Morrison sees a guy and says you
19          need surgery, you know, it's pretty much in
20          his hands to say, okay, I -- I want to
21          operate on you.  So let's see how -- how
22          much operating room time I have.
23     Q.   Huh-huh.
24     A.   Let's see when I -- I have hernia schedule
25          --
```

1    Q.    Huh-huh.

2    A.    -- and then we'll coordinate with

3          Headquarters.  So once Dr. Morrison sees

4          him, it's basically up to UMC to say we

5          have a slot available.  Do you have a guy

6          that can fit this slot?

7    Q.    Huh-huh.

8    A.    They work it out like that.

9    Q.    Right, but my question is in that -- within

10         that scenario you just described, there's

11         nothing a prison can do to make sure that

12         surgery happens in January versus May?

13   A.    No, not that I'm aware of.  Not from my

14         end.

15   Q.    Got you, and is there anything the prison

16         could do if, say, that happened -- we're in

17         January now, that happened today, and by

18         December of 2019, the person still hasn't

19         had surgery?  Is there anything the prison

20         could do or prison personnel could do to

21         say, you know, this guy actually needs the

22         surgery?

23   A.    I don't -- I don't think that would happen

24         today.

25   Q.    Well, if and when it did, is there anything

```
 1           that the prison personnel could do to speed
 2           up that surgery?
 3      A.   No, it --
 4                     MR. BLANCHFIELD:
 5                     Object to the form.
 6                     THE WITNESS:
 7                     It wouldn't happen like that
 8             today.
 9      BY MR. ADCOCK:
10      Q.   But my question is, so it did happen
11           before?
12      A.   Well, there's -- there's a big gap that's
13           -- that's being left out of the deposition
14           in the fact that when Earl K. Long closed,
15           you know, we had no resources.  Katrina
16           came in and wiped out Charity.  So the
17           medical schools were working out of a
18           little interim hospital and not only had
19           resources to -- to not take care of New
20           Orleans, they had no resources for anybody.
21           I mean, Dr. Morrison told me at that time
22           there was a several year waiting list for
23           hernias for people of New Orleans.  No
24           different than it was for DOC.
25      Q.   Huh-huh.
```

```
1    A.    And so until they built a new hospital and
2          resources opened up, you know, we -- we had
3          to manage had accordingly.
4    Q.    Huh-huh.
5    A.    So but now that the resources are opened
6          up, you know, there's -- there's a flow of
7          surgical dates that -- that, you know,
8          haven't been stopped.
9    Q.    Huh-huh.
10   A.    Plus, you know, Dr. Morrison is my new
11         Medical Director.  You know, I call him,
12         you know, which he has, you know, input at
13         UMCNO.  So that wouldn't happen today.
14   Q.    Huh-huh.  And Dr. Morrison, what's his
15         capacity right now?
16   A.    Well, he's the Medical Director of the
17         Department of Corrections, plus he's still
18         a staff surgeon at UMCNO.
19   Q.    Before he was the Medical Director at
20         Headquarters, he was -- what was his
21         position?
22   A.    He was a staff surgeon at UMCNO.
23   Q.    And what was his relation to the DOC then?
24   A.    Well, he came down here and ran our surgery
25         clinic.
```

```
 1   Q.   Okay.  For all surgery or just hernias?
 2   A.   No.  General surgery.
 3   Q.   General surgery.  Like what for instance?
 4   A.   Gallbladder, appendix --
 5   Q.   Okay.
 6   A.   -- you know.
 7   Q.   And how often would he come up here to
 8        evaluate people?
 9   A.   He usually comes up a couple of times a
10        month.  It just depends on what time of the
11        year it was, how -- how busy his schedule
12        was managing the residents, but for the
13        most part, he came up, you know, a couple
14        of times a month --
15   Q.   Huh-huh.
16   A.   -- at least once a month.
17   Q.   Huh-huh.  So is it your understanding that,
18        like, someone who has been, you know,
19        referred for hernia surgery by an Angola
20        doctor has never had to wait more than a
21        year for that surgery?
22             MR. BLANCHFIELD:
23             Object to the form.
24             THE WITNESS:
25             I wouldn't say that's true.
```

1    BY MR. ADCOCK:

2    Q.    You wouldn't say that's true?

3    A.    No.

4    Q.    Okay.  Now --

5    A.    Now, from the time that Dr. Morrison said I

6          want to operate on him, I would -- I would

7          hope that that is not true, but, you know,

8          that -- like I said, once we turn it over

9          to Dr. Morrison, to I -- it's an ILH thing.

10   Q.    Huh-huh.

11   A.    It's a UMCNO thing.  We have no control

12         over their surgery book.

13   Q.    Huh-huh.

14   A.    We have no control over when they do

15         surgery.

16   Q.    Huh-huh.

17   A.    They could have a surgery scheduled.  They

18         could have a bunch of trauma in New

19         Orleans, they're going to cancel elective

20         surgeries, because they're elective.

21   Q.    Huh-huh.

22   A.    So, you know, that's -- that's the thing we

23         don't have control over.  All we can do

24         from my perspective is identify which ones

25         need to go to the surgeon, send them to the

```
 1            surgeon and let them take over from there.
 2    Q.    Right.  You can't do anything else beyond
 3            that?
 4    A.    I can't.
 5    Q.    Yeah, because it's out of your hands at
 6            that point?
 7    A.    It's out of my hands.
 8    Q.    Okay, and so in that scenario, it's out of
 9            your hands; you sent them to Dr. Morrison
10            so to speak.  He says this person needs
11            surgery, and let's say you see them six
12            months later, they still haven't had that
13            surgery, the hernia is really, really bad,
14            it's -- it's still out of your hands as to
15            when they get that surgery?
16    A.    Re-refer them.
17    Q.    Re-refer them, but that's all you can do?
18    A.    That's all I can do.
19    Q.    Yeah, that's what I'm asking.
20    A.    Yes, sir.
21    Q.    And is there -- have you ever referred
22            someone for hernia or cataract surgery and
23            it goes to Headquarters, and Headquarters
24            says they don't need this surgery?
25                MR. BLANCHFIELD:
```

```
 1                      Object to the form.
 2                 THE WITNESS:
 3                      I don't refer them for cataract
 4           surgery.
 5      BY MR. ADCOCK:
 6      Q.    Okay.  Have you ever referred someone for
 7           hernia surgery and Headquarters says, no,
 8           this person doesn't need that surgery?
 9                      MR. BLANCHFIELD:
10                      Object to the form.
11                      THE WITNESS:
12                      I've never referred them for
13                 hernia surgery.  I may have referred
14                 them for a hernia evaluation --
15      BY MR. ADCOCK:
16      Q.    Huh-huh.
17      A.    -- by the surgeon.
18      Q.    Huh-huh.
19      A.    And they would go back and say manage them
20           per guidelines.
21      Q.    Huh-huh.  Who would?
22      A.    The -- the Headquarters Offices would send
23           that back to us sometimes through
24           Eceptionist.
25      Q.    So but is it your testimony that
```

```
 1         Headquarters has never denied someone's
 2         surgery before?
 3                  MR. BLANCHFIELD:
 4                  Object to the form.
 5                  THE WITNESS:
 6                  You know, there was -- there was a
 7            time when ILH denied a bunch of
 8            surgeries, because they didn't have
 9            resources.  I can't really say that I
10            know of a case where Dr. Morrison or
11            one of the general surgeons said, look,
12            I need to operate on this guy, and they
13            referred him for a date, and
14            Headquarters turned that date down.  I
15            don't know -- I can't say that I know
16            that there's -- there's one of those.
17     BY MR. ADCOCK:
18     Q.   Huh-huh.
19     A.   But I know there are some where we wanted
20          to send them to the surgery -- surgeon
21          because they had a hernia that we thought
22          Dr. Morrison would look at, but they fit
23          within the guidelines, so they told us to
24          manage per the guidelines.
25     Q.   Huh-huh.
```

```
1    A.    Some of those.
2    Q.    Huh-huh.  Okay, so all right.  I think you
3          just answered that.  Good.  Now, go to the
4          next one, "Any signs/symptoms indicating
5          incarceration or strangulation."  Did I
6          read that correctly?
7    A.    You did.
8    Q.    Give me an example of signs or symptoms to
9          be obvious about it that would indicate
10         strangulation or incarceration.
11   A.    Severe pain, intractable pain, you know.
12         You know, when you try to reduce a hernia,
13         a pain out of proportion of what you
14         expect; you know, no bowel movement, fever,
15         you know, those kind of things.
16   Q.    Huh-huh.  You said no bowel movement?  Is
17         that what you said?
18   A.    Well, sometimes if you're incarcerated, you
19         can't move stool through the bowel.
20   Q.    Huh-huh, and what's the danger there?
21   A.    Well, the danger there is, you know, the
22         bowel could become necrotic, you know, but
23         we never had one like that.
24   Q.    And what is diminished cough reflex?
25   A.    You -- you -- diminished cough reflex is
```

```
 1           when you put your finger in a guy's
 2           inguinal canal, and you have them cough,
 3           usually you can feel the hernia pressing
 4           down on -- on there, and that would be --
 5           that would be one that would be far down
 6           the line, you know, because I would -- I
 7           would look at the pain out of proportion of
 8           what you have, because you can obviously
 9           see a hernia --
10     Q.    Huh-huh.
11     A.    -- if it's incarcerated in there, and
12           sometimes it maybe be purple; sometimes
13           they may be red, you know, but it's -- you
14           don't have -- it doesn't take a mental
15           giant to figure out if one is incarcerated.
16           The -- the -- the offender would be very
17           uncomfortable.
18     Q.    Huh-huh.  So just -- just so I understand,
19           diminished cough reflex is when you put
20           your finger in the anal canal and you do --
21     A.    Not the anal canal.
22     Q.    I'm sorry.
23     A.    The inguinal canal.
24     Q.    What -- oh, the inguinal canal.  What is
25           that?
```

1    A.    Well, that's right on -- on the side of

2          your -- your pelvis, and normally when

3          there's a hernia, you can feel the hernia

4          pressing down on your finger in the

5          inguinal canal.

6    Q.    Huh-huh.  In that scenario, what is

7          diminished cough reflex?

8    A.    That means it wouldn't -- it wouldn't press

9          down as -- as hard, as strongly as it

10         should.

11   Q.    Okay.  You're the doctor; I'm not.  It

12         seems like it would be worse if you do feel

13         it more when someone coughs.

14   A.    Well, if it's strangulated on the outside,

15         then the hernia probably couldn't move as

16         well.

17   Q.    Okay.

18   A.    So it wouldn't be pressing.  It would be

19         diminished in your cough reflex.

20   Q.    Okay, and then significant pain -- the next

21         one is "Significant pain/discomfort

22         requiring" -- "requiring

23         narcotics/inpatient pain management."  Did

24         I read that correctly?

25   A.    Right.

```
 1   Q.   Sorry?
 2   A.   You did.
 3   Q.   So just explain requiring -- "Significant
 4        pain or discomfort requiring narcotics,"
 5        what does that mean?
 6   A.   Well, it means if the guy is hurting so bad
 7        that he has to be admitted to the -- to the
 8        ward, you know, for evaluation.
 9   Q.   That would be inpatient pain management,
10        right?
11   A.   That would be inpatient pain management.
12   Q.   Okay, and what -- what narcotics are you
13        talking about?  What would constitute
14        narcotics?
15   A.   Well, Ultram is what we use.  Ultram or
16        Norco.
17   Q.   Okay.  What else?
18   A.   Those are the two main ones that we use.
19   Q.   Ultram or Norco?
20   A.   Right.
21   Q.   Okay.
22   A.   Two pain medicines that we use commonly.
23   Q.   And what would -- where would they be in
24        the scale of pain medications?
25   A.   Ultram would be, you know, five out of ten,
```

```
 1          four out of ten; Norco, five, six out of
 2          ten.
 3    Q.    Where do they relate -- I -- I honestly
 4          don't know that much about this -- between
 5          Morphine and Percocet and all that?
 6    A.    Percocet is probably a six, seven.
 7          Morphine is eight, nine.
 8    Q.    I've got you.  Okay.
 9    A.    It depends on the dose you give too.
10    Q.    Yeah.
11    A.    I mean, you can touch somebody with a
12          little Morphine, it wouldn't be anymore
13          than if you give them a little Norco.
14    Q.    Huh-huh.
15    A.    You know, if you give them a big dose of
16          Morphine, that would be, you know.  So it's
17          all relative to the dose you give.
18    Q.    Huh-huh, and so if you don't know, it's
19          okay, but just take someone who's six, one,
20          200 pounds, and you thought they needed
21          Ultram, like, how much, what dosage would
22          you give them?
23    A.    50 q 6.
24    Q.    Okay, and that's just general without -- I
25          know you're not looking --
```

```
 1   A.    Yes.
 2   Q.    -- at a particular patient right now.
 3         That's just general.
 4   A.    But I try not to give them pain medicine in
 5         that case, because if you have something
 6         that's really uncomfortable, you know, pain
 7         is your body's mechanism to tell you
 8         something is wrong, right?  So you block
 9         the pain response, and you miss something,
10         because now it's not hurting, then you --
11         you're not doing him a favor.
12   Q.    Huh-huh.  Huh-huh, but in terms of
13         indications for a speciality care referral,
14         does someone need to fulfill all of these
15         requirements --
16   A.    No.
17   Q.    -- to be --
18   A.    Like I said, these are guidelines, and, you
19         know, you -- you go through your training
20         that you go through as a doctor.  You know
21         when a guy needs a referral and when he
22         doesn't need a referral.
23   Q.    Huh-huh.
24   A.    It's not -- it doesn't take rocket science.
25   Q.    Huh-huh.
```

```
 1   A.   I mean, you see enough of them, which we've
 2        all seen hundreds of them, and -- and these
 3        -- like I say, these are guidelines.
 4   Q.   Huh-huh.
 5   A.   If you can't reduce a hernia, you need a
 6        referral.
 7   Q.   Huh-huh.
 8   A.   You know, you've got pain out of proportion
 9        to what you expect, you need a referral.
10   Q.   Huh-huh.
11   A.   You know, still we're not saying we're
12        going to operate on you, because it's not
13        left up to me to operate.
14   Q.   Huh-huh.
15   A.   It's left up to the surgeon, but, you know,
16        I refer them when I think they need
17        referral.
18   Q.   Huh-huh.
19   A.   Yeah.
20   Q.   But you follow these guidelines?
21   A.   I follow -- I follow my clinical judgment
22        --
23   Q.   Huh-huh.
24   A.   -- in conjunction with these guidelines.
25   Q.   Huh-huh.
```

```
 1   A.   If they don't meet these guidelines, but I
 2        still think they need a referral, I refer
 3        them.
 4   Q.   Okay.  So you refer people for surgery?
 5   A.   For surgical evaluation.
 6   Q.   You refer people for surgical evaluation
 7        when people don't need narcotics for pain
 8        management?
 9   A.   Sure.
10   Q.   Okay.  Can you think of anybody you've done
11        that for recently?
12   A.   Not recently.  I don't manage the hernia
13        clinic anymore, but dozens.
14   Q.   Huh-huh.
15   A.   I mean, you've got the hernia list.  All
16        you've got to do is look how many I
17        referred.
18   Q.   Okay.
19   A.   You know, and none of them have had
20        narcotics.
21   Q.   Huh-huh.
22   A.   So sure.
23   Q.   Okay, and so -- so you've referred people
24        for surgery -- for surgery eval -- surgery
25        evaluation for hernias when there was no
```

```
 1        incarceration or strangulation?
 2   A.   Sure.
 3   Q.   Okay, and so you've referred people for
 4        hernia where the hernia is reducible?
 5   A.   Sure.
 6   Q.   Okay.
 7   A.   If my clinical judgement tells me that a
 8        guy needs a referral, I'll refer him.
 9   Q.   Huh-huh.  If you turn -- well, I guess at
10        the bottom there of what you're looking at,
11        the 2016 version, which would be E-1, so
12        that last sentence of that last full
13        paragraph, "If" -- I'm going to read it,
14        "If operative surgeon recommends F to F due
15        to complexity of surgery, recommendation
16        for F to F will be granted."  Did I read
17        that correctly?
18   A.   Yes.
19   Q.   And what's F to F?
20   A.   Face to face.
21   Q.   And what's that?
22   A.   Well, that really doesn't apply to me,
23        because Dr. Morrison does all our
24        surgeries, and he's the one who comes here.
25   Q.   Huh-huh.
```

```
 1   A.    So say, if there was a -- say, Dr.
 2         Greiffenstein did a surgery, and he wanted
 3         to see the guy face to face, but I have Dr.
 4         Morrison coming down here to the surgery
 5         clinic, who runs the residency program, you
 6         know, he's a Board Certified General
 7         Surgeon.  Any Board Certified General
 8         Surgeon can follow up a hernia surgery.
 9   Q.    Huh-huh.
10   A.    All right, so, you know, we try to do what
11         we can.  If it's a resident coming down for
12         a clinic, sure, we'll let the staff doctor
13         look at them.
14   Q.    Huh-huh.
15   A.    But, I mean, if you're a Board Certified
16         Surgeon, it doesn't matter.  You should be
17         able to follow up a hernia case.
18   Q.    Say that last part again.  If you're a
19         Board Certified Surgeon --
20   A.    If you're a Board Certified General
21         Surgeon, you should be able to follow up a
22         hernia case, you know, a post-surgical
23         followup.
24   Q.    What do you mean --
25   A.    I guess that's what that's saying here.
```

```
 1   Q.   What do you mean, "you should be able to
 2        follow up"?
 3   A.   You should be able to.  I mean, you -- you
 4        should be able to look at a guy post
 5        surgically, you go, hey, you're doing well;
 6        you're not doing well.
 7   Q.   Right.
 8   A.   You know.
 9   Q.   Huh-huh, but you -- but you refer -- in the
10        scenario you're talking about, you're
11        referring to, like, hours after the
12        surgery, the same day as the surgery?
13   A.   No.  Usually, there's a two-week followup
14        --
15   Q.   Huh-huh.
16   A.   -- you know, and we usually let Dr.
17        Morrison see all our two-week followups.
18   Q.   Okay.
19   A.   Of late, we've been having some of our
20        hernia surgeries being done at Lallie Kemp.
21        Well, I don't send my post-surgical
22        followups back to Lallie Kemp.  I let Dr.
23        Morrison see them at Angola.
24   Q.   Huh-huh, got you.  He's a Board Cert --
25        he's a Board Certified Surgeon?
```

```
 1   A.   Sure.
 2   Q.   Okay.  Even though he didn't do the
 3        surgery, he should be able to do that
 4        followup?
 5   A.   Sure.
 6   Q.   That's your point?
 7   A.   That's my point.
 8   Q.   Got you.
 9             MR. ADCOCK:
10             Can we take a short break?
11             MR. BLANCHFIELD:
12             Huh-huh.
13             (Break in proceedings.)
14   BY MR. ADCOCK:
15   Q.   So doctor, we're back on the record.  I'm
16        going to ask you about cataract surgery.
17        Can you look at "Exhibit F."  There it is
18        right there (indicating).
19   A.   Okay.
20   Q.   Do you recognize that?
21   A.   I do.
22   Q.   Okay.  What is that?
23   A.   That's a referral guideline for cataract
24        surgery.
25   Q.   Okay, and is that the policy for the
```

```
 1        Louisiana Department of Corrections?
 2   A.   Well, it doesn't have a policy number on
 3        it, but it -- it's the cataract guidelines
 4        that we use.
 5   Q.   Huh-huh, and that was -- this was -- do you
 6        know who devised this?
 7   A.   I would assume Dr. Singh did.
 8   Q.   Okay.
 9   A.   It came from Headquarters.
10   Q.   Did you any input into this?
11   A.   No.
12   Q.   Okay, and so what's the -- what are these
13        guidelines for?
14   A.   Well, these guidelines -- now, I do have an
15        ophthalmologist.  I don't -- rather I have
16        an optometrist that comes to Angola, okay,
17        and that's his speciality --
18   Q.   Huh-huh.
19   A.   -- you know, eyes.  So as far as my
20        concern, when he refers somebody for a
21        cataract evaluation, I refer them --
22   Q.   Huh-huh.
23   A.   -- for a cataract evaluation.
24   Q.   Huh-huh.
25   A.   You know, I sign off on all his referrals.
```

1    Q.    Huh-huh.

2    A.    I have nothing to do with -- with Dr.

3          Couillard's exam, but he's an optometrist,

4          and he comes, and when he thinks a guy

5          needs to be referred for surgical

6          evaluation, you know, those come across my

7          desk, and I sign off on them.  I've never

8          turned one down.

9    Q.    Huh-huh, got you.  And so what are these

10         guidelines for?

11   A.    They are for him.

12   Q.    They're for him.

13   A.    Right.

14   Q.    Okay, and so -- and Dr. Couillard, does he

15         work for the Department of Corrections?

16   A.    He's a contract optometrist.

17   Q.    Okay.  Where does he -- where is he --

18         where does he normally practice?

19   A.    Well, he -- he -- he comes from down south,

20         but he used to have an office in Zachary.

21         I think he has a little office in St.

22         Francisville.  He just comes down here

23         every Wednesday.

24   Q.    Okay.  So four times a week -- four times a

25         month?

1    A.    Four times a month.

2    Q.    Roughly.  Okay.  So okay, do you know when

3          these guidelines were put into place?

4    A.    I don't.

5    Q.    Okay.

6    A.    Now, if you look at "Initial Diagnosis and

7          Management," go down to the second one.  It

8          says, "The development of cataracts in

9          older patients can be markedly asym" --

10         "asymmetric.  Cataracts often cannot be

11         detected without special equipment (i.e., a

12         slit lamp biomicroscope."  Did I read that

13         correctly?

14   A.    Yes.

15   Q.    What does asymmetric mean?

16   A.    Unequal.

17   Q.    Unequal.  So when cataracts are unequal,

18         what does that mean?

19   A.    Like I said, I'm not an eye specialist,

20         okay.  I would -- if a guy tells me he's

21         not -- he's having trouble seeing, I refer

22         him to Dr. Couillard.

23   Q.    Huh-huh.

24   A.    I don't diagnose cataracts.

25   Q.    Huh-huh.

```
 1   A.   And so if you ask me what my interpretation
 2        is, it may be different than Dr.
 3        Couillard's.  He trumps me on the eyes at
 4        any --- any time --
 5   Q.   Huh-huh.
 6   A.   -- you know.  I don't really -- I'm not
 7        trained in the field of eye exam with a
 8        slit lamp.
 9   Q.   Okay.
10   A.   But as far as referrals for cataract
11        surgical evaluation, they all come through
12        me.
13   Q.   Huh-huh.
14   A.   And so I look at Dr. Couillard's
15        evaluations, and I sign off on them.
16   Q.   Got you.  So you're here to testify about
17        Topic 8, which are the Louisiana DOC
18        Cataract Guidelines, correct?
19   A.   Right, and I can -- I can testify on that.
20   Q.   Okay.  I'm just asking you what does it
21        mean when cataracts can be markedly
22        asymmetric.  That's what I'm asking.
23   A.   It means he can have a smaller one in one
24        eye and a big one in the other eye.
25   Q.   Got you.  So one eye can have significant
```

```
 1            eyesight problems, and the other one can be
 2            relatively untouched?
 3   A.    Seems reasonable, yes.
 4   Q.    Right.  And when it refers to a slit lamp
 5            biomicroscope, do you know what that is?
 6   A.    Yes.
 7   Q.    Okay.  What is that?
 8   A.    That's a slit lamp where it's a machine
 9            that we have over here where you put your
10            chin in a -- in a -- in a fixed position,
11            and he can -- he can put a beam right down
12            the -- into your eye, and he can look very
13            closely and get a good retinal exam, get a
14            good lens exam.  He can do a specialized
15            eye exam using that microscope.
16   Q.    Huh-huh, and that's probably a routine
17            machine to use for eye exams?
18   A.    Yes.
19   Q.    It's like a steth -- stethoscope in other
20            contexts?
21   A.    It's one of his main pieces of equipment.
22   Q.    Yeah, yeah.  And Angola has one of those?
23   A.    Yes.
24   Q.    And so he would presumably use that when he
25            comes up here?
```

```
 1    A.    Yes.
 2    Q.    Okay, and that would be at the treatment
 3          center, the Barrow Center?
 4    A.    Right.
 5    Q.    Okay, and then the last thing there --
 6          well, let me ask you this, the next line
 7          says, "Pinhole visual acuity will help
 8          determine if the decrease in vision is
 9          refractive (i.e., the patient needs new
10          glasses.)"  What is pinhole visual acuity?
11    A.    Well, Pinhole visual acuity is there's this
12          card that they would put on your eye, and
13          it has a bunch of little pinholes in it.
14    Q.    A card.
15    A.    It's a -- it's like a --
16    Q.    Cardboard?
17    A.    -- certain kind of piece of cardboard.
18    Q.    Got you.
19    A.    And certain piece, and they have a bunch of
20          little pinholes in it, and you hold it up
21          to your eye, and depending on what you see
22          through that when he covers up certain
23          pinholes, that's going to determine whether
24          or not you need new glasses.
25    Q.    Okay, and presumably you're looking at
```

```
 1          something on the other side --
 2   A.    Right.
 3   Q.    -- and he asks you whether you can see it?
 4   A.    Sure.
 5   Q.    Okay, and that's the -- probably a -- a
 6          routine test that eye doctors use?
 7   A.    I've had it done on me before, just routine
 8          eye exam.
 9   Q.    Right, and the last one where it says,
10          "Asymptomatic patients with visual acuity
11          of 20/40 may be" -- "may be followed," can
12          you explain what that means.
13   A.    It means if you come in to -- to Dr.
14          Couillard, and you -- you have a cataract,
15          but your vision is 20/40 and you don't have
16          any complaints, he'll probably just follow
17          you.  It means he won't refer you.
18   Q.    Huh-huh, and asymptomatic means what you
19          just said, like, no complaints?
20   A.    No complaints, no visual complaints, no
21          decrease in your visual fields.  You know,
22          a lot of people with cataracts have
23          problems with glare --
24   Q.    Huh-huh.
25   A.    -- sunlight bothers them, so if you have no
```

```
 1         complaints and you're asymptomatic and
 2         your vision is 20/40 --
 3    Q.   Huh-huh.
 4    A.   -- he'll probably just follow you.
 5    Q.   So people have cataracts all the time, and
 6         they go work and play basketball, and
 7         tennis and all that kind of stuff.
 8    A.   They do.
 9    Q.   And so this is -- this is describing the
10         people in kind of that category generally?
11    A.   I would say so, yes.
12    Q.   Yeah, and we're just talking generally?
13         When it says -- when it says, "may be
14         followed," just explain what that means.
15    A.   That means he'll have you come back for a
16         clinic visit.
17    Q.   Huh-huh.
18    A.   He may say, come back in four months, come
19         back in six months, come back in a year.
20    Q.   Huh-huh.  So just monitor that person?
21    A.   He would just monitor them regularly in the
22         eye clinic.
23    Q.   Okay, and that would be Dr. Couillard?
24    A.   Yes.
25    Q.   And would he -- what's the communication
```

```
 1          between him and doctors at Angola about

 2          following someone with cataracts?

 3   A.    There are none.

 4   Q.    Okay.  Just the --

 5   A.    He corresponds with me.

 6   Q.    Okay.  So it's just between him and you?

 7   A.    Right.

 8   Q.    But, I mean, is it fair to say -- I don't

 9          know how this works, but the communication

10          is via the medical records?

11   A.    The communication would be via a referral

12          process.

13   Q.    No, no.  I mean just generally, like, the

14          way you figure out what some other doctor

15          did two years ago or a month ago is you

16          look at that patient's records --

17   A.    To --

18   Q.    -- to the extent that you have them?

19   A.    Right.

20   Q.    And do you-all have electronic records yet?

21   A.    We don't.

22   Q.    Okay, and so my question is, so you're

23          saying that the -- kind of correct me if

24          I'm wrong, the verbal communication with

25          Dr. Couillard is between him and you
```

```
 1        exclusively?
 2   A.   No.  There's -- if it's about a referral
 3        for a cataract, it's between he and I.
 4   Q.   Okay.
 5   A.   Okay.  There's a -- there's a lady that's
 6        -- that runs the eye clinic, Shirley Byrd
 7        that works hand in hand with Dr. Couillard.
 8        Like I say, he's only there every
 9        Wednesday.  So if we have a question about
10        interpretation of his exams, interpretation
11        of his writing, interpretation of his --
12        say, his plan of action, we go to Ms. Byrd.
13        Ms. Byrd gets in touch with Dr. Couillard,
14        and we go from -- we -- we interpret like
15        -- we correspond like that.
16   Q.   Huh-huh, okay.
17   A.   So we can catch him on Wednesdays --
18        Wednesdays, but any other time, Ms. Byrd
19        would be in communication with -- with Dr.
20        Couillard.
21   Q.   And just generally what would cause you and
22        Dr. Couillard to have to talk about any --
23        any particular patient?
24   A.   He may want a specific duty status for a
25        patient.
```

```
 1    Q.    Huh-huh.
 2    A.    And then that would go through me, but
 3          that's pretty much about it.
 4    Q.    Okay, and what's your understanding whether
 5          it's hernia or cataracts or glaucoma or
 6          whatever, Bell's Palsy, how someone gets a
 7          duty status because of what may be caused
 8          by the disability?
 9    A.    Well, I don't -- I don't classify it like
10          that.  I look at physical limitations.
11    Q.    Yeah, sure.  I mean, I'm saying you know --
12    A.    I don't look at disabilities, but I look at
13          physical limitations.
14    Q.    Okay.
15    A.    If a guy has a fractured wrist, it's going
16          to get better.  You know, so while his
17          wrist is healing, I would give him a
18          limited duty status that would protect his
19          wrist.
20    Q.    Huh-huh, right.
21    A.    Same thing, you know, with -- with hernias.
22          A lot of them, you know, say if they have
23          pain with lifting, we'll give them a
24          lifting restriction on the duty status.
25    Q.    Huh-huh.
```

```
 1    A.    You know, if Dr. Couillard recommends
 2          something for the eye, we -- we usually
 3          give them something for the eye.  My
 4          doctors don't give duty statuses for eyes.
 5          Dr. Couillard gives those.
 6    Q.    Okay, and so Dr. Couillard gives those for
 7          eyes?
 8    A.    He recommends those.  I give them.
 9    Q.    Okay, and so he says this guy needs so and
10          so because his eye -- his eyesight is bad,
11          and you initial --
12    A.    You know, he may recommend something away
13          from sunlight.
14    Q.    Okay.
15    A.    And so I would write an appropriate duty
16          status that would take him away from the
17          majority of the sunlight.  Nobody can be
18          away from sunlight completely --
19    Q.    Huh-huh.
20    A.    -- you know, take him out of the field, put
21          him indoors --
22    Q.    Huh-huh.
23    A.    -- you know, that kind of thing.
24    Q.    Huh-huh, and after you do that, what
25          happens then after you say this person
```

```
 1         needs restrictive duty status for a month
 2         or something like that?
 3    A.   Well, he gets a duty status, and then it
 4         goes to Classification, and Classification
 5         would implement a job.
 6    Q.   Right.
 7    A.   I don't give them jobs.  I just tell them
 8         what the physical limitations would be, and
 9         Classification would assign them jobs.
10    Q.   Okay.  So they kind of -- all right.  They
11         look at your recommendation, and they kind
12         of figure out what to do with the guy?
13    A.   Right.
14    Q.   Okay.
15    A.   They assign jobs.
16    Q.   Got you, okay.  And then we can go to,
17         "Ongoing Management and Objectives."  So it
18         says, "Cataracts" here, "do not improve
19         with time."  Did I read that correctly?
20    A.   You did.
21    Q.   And is that true?
22    A.   My experience tells me they don't.
23    Q.   Okay.
24    A.   Not unless there's intervention.
25    Q.   Right, like a surgery or something else or
```

```
 1            eyeglasses or something like that?
 2    A.    Could be.  They try different modalities.
 3    Q.    Like what?
 4    A.    Eyeglasses, surgeries, lenses, that kind of
 5          thing.
 6    Q.    Huh-huh.  Well, lenses would be the same as
 7          glasses, right?
 8    A.    Well, they -- they try different kind of
 9          lenses and glasses sometimes.
10    Q.    Yeah, right.
11    A.    But then sometimes they replace the lens in
12          the eye.
13    Q.    You mean physically replace it?
14    A.    Physically replace --
15    Q.    Got you.
16    A.    -- which would be in the surgery.
17    Q.    Got you, and that would be different from
18          cataract surgery removing the cataract?
19    A.    Yes.
20    Q.    Okay, and where it says here, "There is no
21          definitive primary care treatment for
22          symptomatic cataract," did I read that
23          correctly?
24    A.    Right.
25    Q.    What does that mean?
```

```
 1    A.   It means from a primary care standpoint,
 2         once you have a visually significant
 3         cataract, there's really nothing you can do
 4         that's from a primary care standpoint.  It
 5         has to be surgically corrected.
 6    Q.   Meaning, like, you can't give them medicine
 7         or something like that?
 8    A.   Right.  Drops don't work.
 9    Q.   Got you.
10    A.   You know, you've got a cloudy lens.
11    Q.   Got you.
12    A.   You know.
13    Q.   Right.
14    A.   The correct term they use the lens would be
15         opacified.
16    Q.   Okay.  Be opaque?
17    A.   Right.
18    Q.   Okay, got you.  And cataracts, in terms of,
19         you know, we talk about people who have
20         cataracts, and they can do whatever; they
21         go to work; they can go play sports,
22         whatever, to go from there from -- to,
23         like, 2400 vision in both eyes, that can
24         happen, correct?
25    A.   Sure.
```

```
1   Q.   Yeah, and the length of time between kind
2        of whether you want to say it's diagnosis
3        or the onset of cataracts, which might be a
4        month before you see it, so when they get
5        really bad, like, 2400 in an example like
6        this, that can vary with time depending on
7        the person, correct?
8   A.   Sure.
9   Q.   Okay.  Have you -- do you have an opinion
10       about how short or how long that could be
11       in terms of book ends?
12  A.   I don't know.
13  Q.   Okay.  Now, the next section says,
14       "Indications for Specialty Care Referral,"
15       so I don't misstate, what does that mean?
16       What does that refer to?
17  A.   That means -- to me it means when would Dr.
18       Couillard refer the guy for a surgical
19       evaluation.
20  Q.   Okay, and do you know if he's familiar with
21       these guidelines?
22  A.   Sure.
23  Q.   Okay.  Sure meaning yes, you do?
24  A.   Yes, I think he's familiar with them.
25  Q.   Okay, and do you know whether he follows
```

```
 1        these guidelines?
 2   A.    I do not.
 3   Q.    Okay.
 4   A.    Dr. Couillard has been an optometrist
 5        probably going on 35, 40 years.
 6   Q.    Huh-huh.
 7   A.    So I think he has probably his own set that
 8        he goes by.  I'm sure he looked at these
 9        guidelines, and it's very likely that he
10        follows them, but I can't say 100 percent
11        that he does.
12   Q.    Got you.  Would you know who follows these
13        guidelines?
14   A.    Those guidelines were -- like I say,
15        they're guidelines.
16   Q.    Huh-huh.
17   A.    They're not absolutes.
18   Q.    Huh-huh.
19   A.    So they sent out -- they're sent out by the
20        Headquarters Office.  Dr. Couillard is
21        taking a look at them, but just like me
22        with the hernias, if he feels like the guy
23        really needs an evaluation, he's going --
24        he's going to base his decision on his
25        clinical experience, and he's going to send
```

```
 1          the guy.  If it fits within the guidelines,
 2          you know, I'm sure the majority of them do,
 3          but there may be a case that he feels,
 4          like, you know, I need to have a guy looked
 5          at even though he may not fit in the
 6          guidelines.  I don't know that to be true,
 7          but the same thing for hernia, if there was
 8          a guy that didn't exactly fit in the
 9          guidelines, but I thought he needed a
10          surgical evaluation, I'd send him --
11     Q.   Huh-huh.
12     A.   -- based on your clinical judgement.
13     Q.   Got you.  Okay.
14     A.   So these are just guidelines.  They're not
15          absolutes.
16     Q.   Okay.  And when -- so the first thing here
17          where it says an indication for specialty
18          care referral, would be quote, "Any
19          cataract in infants" -- "infants and
20          children."  Did I read that correctly?
21     A.   Yes.
22     Q.   Why is that in there?
23     A.   I don't know.  I guess they got it out of a
24          textbook.
25     Q.   You-all don't have any kids up here under
```

```
 1          18 --
 2    A.    No.
 3    Q.    -- or 16 as far you know?
 4    A.    Right, we don't.
 5    Q.    Okay, and so you don't know how that got in
 6          there?
 7    A.    No.
 8    Q.    Okay.  Now the second one, "Adults with
 9          symptomatic, slow, progressive, painless
10          decrease in vision that affects activities
11          of daily living."  Did I read that
12          correctly?
13    A.    You did.
14    Q.    What is your understanding of what -- an
15          example of what affects activities of daily
16          living, you know, for cataracts?
17    A.    Well, for example, if you -- you have
18          difficulty seeing, bumping into objects.
19          You know, you -- you may have a task at
20          work that -- that you may work on a
21          computer, but all of a sudden, you can't
22          really see the screen very clearly.  You
23          know, activities of daily living, you know,
24          seeing, breathing, you know, taking care of
25          yourself, your hygiene, you know, feeding
```

```
 1          yourself, and vision is one of them.
 2     Q.   Huh-huh.
 3     A.   So any -- any vision -- any impairment of
 4          vision to the point where it affects your
 5          activities of daily living would be
 6          significant.
 7     Q.   Huh-huh, and can -- can having prescription
 8          glasses, prescription lenses, excuse me,
 9          can they -- can they ameliorate the effects
10          of cataracts?
11     A.   Not 100 percent, I don't think.
12     Q.   No.  Can you explain what that means.
13     A.   From my knowledge of cataract, once they
14          get to a certain point, they need to be
15          removed --
16     Q.   Huh-huh.
17     A.   -- in order for your vision to be back to
18          the normal, and they're very easily done.
19          You know, of course cataracts again are an
20          elective procedure.  All the eye doctors
21          will agree on that.  So, you know, it's not
22          something that they rush to do.  As a
23          matter of fact, we send them down to LSU
24          all the time.  Dr. Couillard refers them on
25          a regular basis, and LSU does not do
```

```
1              cataract surgery on them.  That happens all
2              the time.  You know, sometimes their exam
3              -- their exams are different than -- than
4              the exams that -- that he gets.
5     Q.    Huh-huh.
6     A.    You know, but he's an optometrist.  They're
7              ophthalmologists.
8     Q.    Huh-huh, and what's the difference in your
9              mind?
10    A.    Well, there's a big difference.  An
11             ophthalmologist is a M.D.  They go to
12             medical school first.  They're a medical
13             doctor, and then they go four years of
14             training in -- in eyes.  Dr. Couillard, he
15             doesn't go -- he's not a M.D., and he
16             probably does two or three years of -- of a
17             program.
18    Q.    Huh-huh.  So there's a difference in
19             training?
20    A.    Sure.
21    Q.    What's the difference in what they can do,
22             optometrist versus ophthalmologist?
23    A.    Well, one, optometrists can't do surgery --
24    Q.    Huh-huh.
25    A.    -- you know, and they basically, you know,
```

```
 1        give you glasses and, you know, provide
 2        drops, but they can't do any kind of
 3        intervention within the eye.
 4   Q.   Huh-huh.
 5   A.   And optometrists can do everything --
 6        ophthalmologist rather can do everything --
 7   Q.   Huh-huh.
 8   A.   -- from operating, writing medicines, to
 9        any kind of intervention.
10   Q.   Huh-huh.
11   A.   There's a great deal of difference.
12   Q.   And do you give any different weight to
13        what Dr. Couillard says versus an
14        ophthalmologist?
15   A.   Sure.
16   Q.   Okay.  How so?
17   A.   Well, the -- it's just like a general
18        surgeon.  If I say a guy needs a hernia
19        surgery, but the general surgeon says he
20        don't need it, well, he's the specialist.
21        I'm going to go with what he says.
22   Q.   Huh-huh.
23   A.   Dr. Couillard can say all day long the guy
24        needs cataract surgery, if the surgeon says
25        he don't need it, he don't need it.
```

1    Q.   Huh-huh.

2    A.   You know.

3    Q.   Huh-huh, got you.

4    A.   So he's the supreme authority as far as,

5         you know, when it comes to cataract.

6    Q.   Okay, and Angola doesn't have an

7         ophthalmologist -- ophthalmologist that

8         comes here regularly?

9    A.   We don't have one that comes here at all.

10   Q.   Okay, and -- okay.  So if we go down to

11        "Criteria for Return to Primary Care," it

12        says, "Ophthalmologic evaluation shows no

13        organic etiology for decrease in vision,"

14        and then it say, "(amblyopia)."

15   A.   Amblyopia.

16   Q.   Amblyopia.  Thank you.  Can you tell me

17        what etiology means?

18   A.   Etiology means the cause of.

19   Q.   Cause of.

20   A.   The cause.

21   Q.   And what's amblyopia?

22   A.   It would be a difference in vision.  I

23        think they -- they use that term to

24        diagnose a lazy eye, maybe if an eye drifts

25        to the side, and the vision is not really

```
 1            as -- as appropriate as it should be.
 2     Q.    Huh-huh.  So that would be an example?
 3     A.    That would be an example.
 4     Q.    Got you.  Got you, okay.
 5     A.    Basically they're just saying the guy goes
 6           down there, and they don't find any
 7           etiology for his visual changes or he has
 8           already had treatment, then he goes back to
 9           the primary care.
10     Q.    Huh-huh.  Okay, and if he goes back to
11           primary care, he could perhaps develop
12           cataracts, and you just monitor that.  If
13           that gets bad --
14     A.    We re-refer him.
15     Q.    Yeah, right.  Does that happen a lot that
16           you refer -- I know you said it happens a
17           lot Dr. Couillard might refer someone for
18           cataract surgery, and they don't do it for
19           whatever reason.
20     A.    He refers them for cataract surgical
21           evaluation.
22     Q.    And then the surgery doesn't happen?
23     A.    And then they go down there, and they do a
24           series of tests on them --
25     Q.    Huh-huh.
```

1    A.    -- and they determine that the cataract to

2          be non-visually significant, then they

3          don't do surgery, sure.

4    Q.    And non-visually significant means what?

5    A.    That it doesn't impair their -- their

6          vision to an extent where their activities

7          of daily living are impacted.

8    Q.    Okay.  Are there any other scenarios that

9          you know of where that whole process would

10         happen, and the hospital would not do the

11         surgery when it is visually significant?

12   A.    I don't know of any since I've taken over

13         medical directorship.  Usually when -- when

14         they -- when they do their workup and they

15         say we -- we want to do a cataract surgery,

16         you know, they do cataract surgery.

17   Q.    Huh-huh.

18   A.    But they do them all the time.  I mean,

19         again, we don't have any impact on

20         scheduling their surgeries.

21   Q.    Huh-huh.  Nothing you can do about that?

22   A.    Nothing we can do about that.

23   Q.    Yeah, got you.  So doctor, if you can look

24         at Exhibits C and D, I'm not trying to

25         trick you here, doctor, but and just let me

```
 1          finish my question, so are these basically
 2          -- does it appear that these are basically
 3          the same policy or directive, just one
 4          applies to Angola and one applies to all of
 5          DOC?
 6     A.   Sure.
 7     Q.   Okay.  Have you seen this policy before?
 8     A.   Yes.
 9     Q.   I'm sorry.  Have you seen both of these
10          policies before?
11     A.   Yes.
12     Q.   Okay, and it looks like the Angola policy
13          is from November 2010, and the DOC policy
14          is from August of 2010.
15     A.   Yes.
16     Q.   Okay, and is it safe to assume that they've
17          been updated since then?  If you don't
18          know, you don't know.
19     A.   I don't know.
20     Q.   Okay.
21     A.   I assume they are, though, because every
22          year they look at them.
23     Q.   Huh-huh.  Got you, and have you looked at
24          these policies recently?
25     A.   Yeah, before I came in here.
```

```
 1    Q.    Okay.  Did you look at these or did you
 2          look at the updated ones?
 3    A.    No.  I looked at these.
 4    Q.    Okay, and doctor, so these are the -- what
 5          does -- how does a Louisiana State
 6          Penitentiary Directive apply to a DOC
 7          healthcare policy?  What's the relationship
 8          between the two?
 9    A.    Well, the DOC policy comes from
10          Headquarters.
11    Q.    Huh-huh.
12    A.    And that's their idea of how things should
13          go, but within each institution we're to
14          where we're going to modify our policies to
15          a certain extent as long as they stay
16          within close parameters of what the DOC reg
17          has.
18    Q.    And that's depending on the population, the
19          prisoners you're dealing with?
20    A.    Well, yeah.
21    Q.    The people at -- correct me if I'm wrong,
22          the people at Hunt, the prisoners at Hunt
23          might have more health problems than people
24          at, you know, Clinton or something like
25          that, DCI?
```

1    A.    I don't know if I'd say it like that.  It
2          just -- it just gives each facility a
3          little bit leeway.
4    Q.    Flexibility?
5    A.    Yes.
6    Q.    Depending on who they're seeing everyday?
7    A.    Sure.
8    Q.    Got you.  So -- so -- and -- and if you
9          look at "Exhibit C" that you're looking at
10         right now, so you see there's some
11         definitions, and so I'm going to read that.
12         A says, "Elective procedure:  Any planned
13         non-emergency procedure.  It may be either
14         medically necessary or optional."  Did I
15         read that correctly?
16   A.    Yes.
17   Q.    Okay, and then as an example of medically
18         necessary, it says, "cataract surgery,
19         routinely scheduled heart surgery, etc."
20         And then for optional, the example it gives
21         is, "cosmetic, etc."  Is that correct?
22   A.    That's correct.
23   Q.    And cosmetic would be, like -- what would
24         cosmetic be?
25   A.    Keloid removal.

1   Q.   What is that?

2   A.   A scar revision --

3   Q.   Huh-huh.

4   A.   -- or, you know, lipoma excision, you know,

5        benign tumor that's not going to cause you

6        any problem, but it's -- if it's on the

7        face, it's cosmetically unappealing.

8   Q.   Huh-huh, but if you left it there for the

9        rest of your life --

10  A.   It wouldn't hurt you at all.

11  Q.   Yeah, right.  And what does elective mean,

12       elective, an elective procedure?  What does

13       it mean when something is an elective

14       procedure?

15  A.   Like it just means it's something that you

16       want done.

17  Q.   Huh-huh.

18  A.   I mean, I'd like to have my hernia fixed.

19       I've got friends of mine that have had

20       hernias for 12 years.  They don't want to

21       have them fixed.

22  Q.   Huh-huh.

23  A.   You know, but if they desire to have them

24       fixed, it would be an elective procedure.

25       They're not going to rush you to the

```
 1            emergency room and -- and fix it.  They'll
 2            schedule it as an outpatient on a date.
 3     Q.    Huh-huh, and the opposite of elective would
 4            be an emergency procedure?
 5     A.    Sure.
 6     Q.    And that would be, like, an appendectomy or
 7            --
 8     A.    Emergency appendectomy.
 9     Q.    Brain aneurism?
10     A.    Right, something like that.
11     Q.    Got you, okay.  Are there any other kind of
12            -- the way things are classified medically,
13            are there any other kind of categories
14            that's emergent?  There's -- there's
15            elective.  Is there any kind of --
16     A.    Those -- those are the two big ones.
17     Q.    Yeah.
18     A.    That I -- we go by.
19     Q.    Are there any others that you know of?
20     A.    Not that I know of.
21     Q.    Okay, and when this says an elective
22            procedure is any planned emergency
23            procedure, and it says, "It may be either
24            medically necessary" --
25     A.    It's a non-emergent procedure.
```

1    Q.   Thank you.  "Any planned non-emergency
2         procedure.  It may be either medically
3         necessary or optional."  What does
4         medically necessary mean?
5    A.   That means eventually you're going to need
6         it done.
7    Q.   Okay.  Eventually, but it's not right now?
8    A.   Not right now.
9    Q.   Not in the next day or week or something
10        like that?
11   A.   No, there's no time table on that.
12   Q.   Yeah, sure.  You don't need to be rushed to
13        the hospital?
14   A.   You don't need to -- that there's no need
15        to rush.
16   Q.   Okay.  So medically necessary in this
17        context means when it becomes emergent?
18   A.   No.
19   Q.   Okay.  What does it mean?
20   A.   Medically necessary means when it -- when
21        it becomes to the point to where you need
22        it done.  That doesn't necessarily mean
23        it's emergent.
24   Q.   Huh-huh.
25   A.   For example, a hernia.  You go from a small

```
 1            hernia to a rather large hernia.  That's
 2            not emergent.  I mean, so the -- the
 3            surgeon sees him, and he schedules him over
 4            time.  That's still an elective procedure,
 5            but it's medically necessary.
 6      Q.    Huh-huh.
 7      A.    Not emergent.
 8      Q.    Huh-huh, and when would cataract surgery
 9            become medically necessary?
10      A.    When it's determined by the ophthalmologist
11            that, you know, it's a visually significant
12            cataract.
13      Q.    Okay, and do you know what it means when
14            it's visually significant?
15      A.    In my opinion it would be when it starts
16            impairing your activities of daily living.
17      Q.    So --
18      A.    That would be my interpretation.
19      Q.    Huh-huh.  So if it prevents you from --
20            from walking or writing or doing anything
21            like that, reading?
22      A.    That's my opinion.
23      Q.    Yeah, sure.
24      A.    But I'm not a surgeon.
25      Q.    Right.  Just give me a second here.  I
```

```
 1              thought I wrote notes on this.  Okay.  If

 2              you turn to Page 2, doctor.  In the middle

 3              there, you see where it says, "Procedures,"

 4              Item 5?

 5    A.    Yes.

 6    Q.    Okay, and then below that is A, "Elective

 7              Procedures"?

 8    A.    Yes.

 9    Q.    I'm just going to read that and then ask

10              you questions about it.  "Non-medically

11              necessary elective procedures are not

12              routinely provided."  What does that mean?

13    A.    That means if you have something that's not

14              going to cause you any health consequences,

15              it's not going to cause you any long-term

16              harm for your health, then they're probably

17              not going to do it, like, a keloid

18              revision.

19    Q.    Huh-huh, and it says, "In exceptional cases

20              when a procedure that is non-medically

21              necessary is recommended, the unit's

22              Medical Director shall notify the Warden,

23              who shall submit a written request to the

24              Department's Medical/Mental Health Director

25              for consideration."  Did I read that
```

1      correctly?

2  A.    Yes.

3  Q.    Can you explain that.

4  A.    Well, in the case of a keloid.  A keloid --

5  Q.    And tell us -- explain what that is for the

6      record.

7  A.    A keloid -- the African American population

8      when they cut themselves, sometimes when

9      they heal, they heal in a very abnormal

10     manner, which makes a big lesion on their

11     face.  The length -- it becomes like a big,

12     long scar, and those scars can continue to

13     grow.  They're benign.

14  Q.    And that's a keloid?

15  A.    It's a keloid.  They're benign.  They don't

16     cause any problem.

17  Q.    Can you spell that.  I'm sorry to be asking

18     this.

19  A.    K-e-l-o-i-d.

20  Q.    Okay.

21  A.    And we've had a guy that had a keloid on

22     his chest and non -- non-emergent deal, but

23     the keloid started growing to the point to

24     where it was pulling very tight on his

25     chest --

```
1    Q.    Huh-huh.
2    A.    -- and so we thought that that's something
3          that dermatology should look at.
4          Dermatology looked at it, and they injected
5          it several times, tried non-operative
6          management, and then we ended up referring
7          him to a surgeon, but we had to employ this
8          here.
9    Q.    Huh-huh.
10   A.    You know, we wrote -- and so the general
11         surgeon could look at his keloid.
12   Q.    Huh-huh, okay.  And then the process, it
13         says here, quote, "The unit's Medical"
14         record -- "Director shall notify the
15         Warden, who shall submit a written request
16         to the Department's Mental/Medical Health
17         Director for consideration," unquote.  Is
18         that how it works?
19   A.    It's just a referral.
20   Q.    Okay.
21   A.    Basically a written request is a referral.
22         So you just make a referral, but usually
23         you tie that in with a phone call --
24   Q.    Huh-huh.
25   A,    -- you know.
```

1    Q.    And so "the unit's Medical Director shall
2          notify the Warden," but do -- I mean, when
3          that happens here, do you have to tell the
4          warden, Warden Cain or Warden Vannoy?
5    A.    No.   That's my Medical Warden.   I mean, I
6          tell -- I tell him everything.
7    Q.    And that's Warden Falgout I just met?
8    A.    Yes.
9    Q.    Okay, and then it goes to Headquarters?
10   A.    Sure.
11   Q.    Okay.   What does Headquarters do with it?
12   A.    Well, they'll look at it, and they'll say,
13         hey, it's just a keloid, and but what I do
14         is I call them ahead of time and say, look,
15         I'm sending this keloid, this -- this
16         referral for a keloid up there.   No, it's
17         not emergent procedure, but this is -- this
18         is the story on the guy.
19   Q.    Huh-huh.
20   A.    So I give them a little background
21         information so they'll know what's coming,
22         you know, because I don't just send
23         referrals up there that are just for the
24         heck of sending one.
25   Q.    Huh-huh.

```
 1    A.    You know, I want them to know that to take
 2          it serious.
 3    Q.    Got you.  And what is the relationship
 4          between what you're looking at, which is
 5          "Exhibit C" and then the guidelines we just
 6          looked at, which are E and F?
 7    A.    What are -- what are you talking about?
 8    Q.    Like, are the guidelines an update on
 9          Healthcare Policy 16?
10    A.    No.
11    Q.    Okay.
12    A.    I wouldn't think so.
13    Q.    Are they an addendum to it?
14    A.    I wouldn't think so.
15    Q.    So they're both kind of --
16    A.    Individualized.
17    Q.    But they both apply to Angola?
18    A.    They do.
19    Q.    Okay.  Now, if you look at "Exhibit G" --
20    A.    Now, is that on -- on Exhibit --
21    Q.    No, no, it's not.  What -- what's the
22          relationship between "Exhibit E" and
23          "Exhibit G"?
24    A.    I don't know.  I -- I didn't look at
25          "Exhibit G" before coming here.  I looked
```

```
 1        at what's on the paper.
 2   Q.   Okay.  Well, you can take a look at it.
 3        When I refer to "Exhibit E," that's the
 4        Referral Guidelines for hernias.
 5                  MR. BLANCHFIELD:
 6                  Was this produced in this
 7            litigation?
 8                  MR. ADCOCK:
 9                  Yes.
10                  THE WITNESS:
11                  This "G"?
12   BY MR. ADCOCK:
13   Q.   Yes.
14                  MR. BLANCHFIELD:
15                  Why is there no -- why is there no
16            Bate's Stamp on it?
17                  MR. ADCOCK:
18                  I don't know.
19   BY MR. ADCOCK:
20   Q.   But so have you ever seen "Exhibit G"?
21                  MR. BLANCHFIELD:
22                  No, hold on.  I don't produce
23            documents that I don't Bate's Stamp.
24                  MR. ADCOCK:
25                  Okay.
```

```
 1              MR. BLANCHFIELD:

 2              This is not Bate's Stamped.

 3              MR. ADCOCK:

 4              Okay.

 5              MR. BLANCHFIELD:

 6              So my question is, why are we

 7         going through this if it wasn't

 8         produced in this litigation and not

 9         identified with a Bate's Stamp?

10              MR. ADCOCK:

11              I can show the witness anything I

12         want.

13              MR. BLANCHFIELD:

14              No, you can't go beyond your

15         30(b)(6) Notice, which is what you're

16         doing.

17              MR. ADCOCK:

18              I'm not doing that, no, no.  I'm

19         questioning the witness about the

20         Hernia Referral Guidelines, and I want

21         to see if there's any relation to this,

22         what appears to be a draft policy for

23         management of hernias.  That's my only

24         question.

25              MR. BLANCHFIELD:
```

```
 1              That's fine.  You can ask the
 2         question.
 3    BY MR. ADCOCK:
 4    Q.   So can you look at "Exhibit E."  So you've
 5         never -- have you ever seen "Exhibit G"
 6         before?
 7    A.   I've never seen it.
 8    Q.   Do you know if that's the policy of the
 9         Department of Corrections?
10    A.   I don't think it's a policy.  It's not
11         numbered.
12    Q.   Okay.  So you don't know if this was ever
13         promulgated and made into a policy?
14    A.   No.
15    Q.   Okay, and what -- what relationship, if
16         any, is there between Exhibits E and G?
17    A.   I don't know if there is a relationship.
18         I've never seen the -- the document before.
19    Q.   Okay.
20    A.   Would you like my opinion?  I've looked
21         through this.
22    Q.   Go ahead.
23    A.   This very likely came first, and these were
24         the -- this (indicating) is the final
25         document.
```

```
 1    Q.    Okay.
 2    A.    That's just my opinion.
 3    Q.    You -- you say "Exhibit G" likely came
 4          first?
 5    A.    Somebody probably tried to start writing
 6          some hernia guidelines.  They just got a
 7          bunch of information together, and then
 8          somebody reviewed it and made a final
 9          hernia guideline.
10    Q.    Which would be "E"?
11    A.    Which would be "E."
12    Q.    Okay.
13    A.    That's what I believe.
14    Q.    Now, doctor, how long have you worked at
15          Angola?
16    A.    I've worked at Angola nine and a half
17          years.
18    Q.    Okay.  So since 2009?
19    A.    2009.
20    Q.    (Counsel hands document to witness.)
21          "Exhibit H."  Doctor, do you recognize
22          "Exhibit H"?
23    A.    No.
24    Q.    Okay.  It says at the top there, "Hernia
25          Surgeries Needed as of 05/21/2012."  Is
```

```
 1        that right?
 2   A.   Yes.
 3   Q.   Okay, but you've never seen this before?
 4   A.   No.
 5   Q.   Okay.  (Counsel hands document to witness.)
 6        So I'm showing you "Exhibit I."  Doctor, do
 7        you recommend that -- do you recognize
 8        that?
 9   A.   No.
10   Q.   Okay, and you see -- can you turn to Page 3
11        of that -- of "Exhibit I."  It says, "Eye
12        Surgeries" at the top.
13   A.   Huh-huh.
14   Q.   And it's about roughly half a page of
15        inmate names?
16   A.   Right.
17   Q.   Okay, and the first page at the top, it
18        says, "Hernia surgeries"?
19   A.   Right.
20   Q.   And that's almost two pages of people under
21        the title, "Hernia Surgeries"?
22   A.   Yes.
23   Q.   Okay, and do you know who put this
24        together?
25   A.   I do not.
```

```
 1    Q.   Okay.  (Counsel hands document to witness.)
 2         So I'm showing you "Exhibit J."  Do you
 3         recognize that, doctor?
 4    A.   I do not.
 5    Q.   Okay.  It says up at the top left, it says,
 6         "LSP Hernia Repair List," correct?
 7    A.   Correct.
 8    Q.   And below it it says, March 28th, 2014?
 9    A.   Right.
10    Q.   And if you look at Page 3, the last page --
11    A.   All right.
12    Q.   -- you see there's a few boxes underneath
13         the graph.  It looks like a color key?
14    A.   Sure.
15    Q.   Okay.  So there's yellow, green, and blue,
16         and yellow is Category 5 hernias; green is
17         Category 4.5 hernias; blue is Category 4
18         hernias.
19    A.   Sure.
20    Q.   And do you know what that means?
21    A.   Sure.
22    Q.   Okay.  Can you explain that.
23    A.   Well, evidently somebody took my work and
24         went through my hernia -- I had -- I made
25         my own hernia list.
```

```
 1    Q.   Huh-huh.
 2    A.    I didn't make it in this form, but I made
 3          my own hernia list, and somebody must have
 4          taken my hernia sheet and put it in this
 5          type of spread sheet form.
 6    Q.   Huh-huh.
 7    A.    So that's what it is.
 8    Q.    No, but I'm asking -- I'll ask about that
 9          in a second, but what is -- can you explain
10          the Cat 5 for me, Cat 4.5, Cat 3?
11    A.    Yes, Cat -- Cat 5 hernias would be the
12          hernias that are obviously the ones that
13          are the worse ones.
14    Q.   Huh-huh.
15    A.    You know, the ones that I thought would be
16          the largest, most difficult to deal with,
17          and that's why I would give them a Category
18          5.
19    Q.   Huh-huh.
20    A.    Category 4.5 would be right under that, not
21          really as -- as big, and Category 4 is
22          still significant.  So these -- these three
23          guys over here, Kenneth Leslie, Stephen
24          Wyatt, Demarcus Jones, they had pretty
25          large hernias.
```

```
 1    Q.    Huh-huh.  You're referring to names there
 2          on Page 3?
 3    A.    Right.
 4    Q.    Got you, and what about Category 4?  What
 5          does that refer to?
 6    A.    Larry Sharp, Chris Gilkers, same thing,
 7          they had pretty significant hernias as
 8          well, and so these would be the guys that
 9          if I did refer, I would refer these first.
10    Q.    Okay, and what -- do you -- so that in --
11          there's -- there's line items here where
12          they're color coded.  There are some blue;
13          there are some green; there are some
14          yellow, correctly?
15    A.    Right.
16    Q.    Correct?
17    A.    There is.
18    Q.    And then there's a bunch of white there,
19          right?
20    A.    Yes.
21    Q.    And do you know by looking at this what
22          category those prisoners are?
23    A.    No.
24    Q.    Okay.
25    A.    You can -- you can go back and look at the
```

```
 1            -- the back sheet, and but I didn't color
 2            code them.
 3      Q.   Okay.
 4      A.   You know, but I can look at William
 5            Anderson and turn to the back and know that
 6            he has got a 4.5 hernia.  He has got a big
 7            hernia.
 8      Q.   When you say, "back sheet," you mean Page
 9            3?
10      A.   Page 3.
11      Q.   Got you.
12      A.   I mean, so somebody took what I did, and
13            they have put a color coding system to it,
14            and then they put it on the spread sheet.
15      Q.   Huh-huh, and why -- why categorize hernias?
16      A.   Why did I do them?
17      Q.   Huh-huh.
18      A.   Because I was going -- I'm seeing them on a
19            regular basis, and I want to know if
20            there's any progression.  You know, so it's
21            just something that I did so I would know
22            what I'm looking at.
23      Q.   Huh-huh, okay.
24      A.   Very simple.
25      Q.   Okay, and it looks like blue is Category 5
```

```
 1            -- or yellow is Category 5, correct?
 2     A.    Let's see.  Yellow would be Category 5.
 3     Q.    Okay, and if you look on Page 1, there's it
 4            looks like Eddie Giovanni is the only
 5            Category 5 on Page 1?
 6     A.    Edward Giovini, yes, sir.
 7     Q.    On Page 1.
 8     A.    On Page 1.
 9     Q.    And it say all the way over on the right
10            under the column for additional comments,
11            it says, "No referral in chart."
12     A.    Well, there was no referral in the chart.
13     Q.    Yeah.  What does that mean there's no
14            referral in the chart?
15     A.    Well, because looking at this sheet, I know
16            the story of Edward Giovanni.  Edward
17            Giovanni had such bad pulmonary disease
18            that nobody would clear him for surgery,
19            and although I -- I knew he had a big
20            hernia, I couldn't get a pulmonologist to
21            sign in giving -- giving him -- as a matter
22            of fact, when I sent him to the
23            pulmonologist for surgical clearance, they
24            said, surgery.  You need -- you need to put
25            the guy on hospice.  You know, so they
```

```
1          wouldn't clear him for -- for a surgical
2          procedure --
3    Q.    Huh-huh.
4    A.    -- plus he had Hepatitis C.
5    Q.    Huh-huh.
6    A.    You know the story of Giovanni, you know,
7          but that's -- that's why he didn't have a
8          referral in the chart because Pulmonary
9          wouldn't clear him.
10   Q.    Huh-huh.  And did he ever get hernia
11         surgery?
12   A.    He did.
13   Q.    He did?
14   A.    He did.  We -- I went to Dr. Morrison, and
15         Dr. Morrison actually set him up through
16         UMCNO.  They were going to try to do it at
17         Lallie Kemp.  They couldn't do it.  They --
18         they didn't have ICU.  They didn't have the
19         necessary backup in case something went
20         wrong with him.  I kept talking to Dr.
21         Morrison about it, and Dr. Morrison agreed
22         to try to do it at -- at UMCNO, which he
23         did.
24   Q.    Huh-huh.
25   A.    That's why there's no referral in the
```

```
 1          chart.
 2     Q.    Okay.  If you turn to Page 2, doctor --
 3     A.    Huh-huh.
 4     Q.    -- you see up at the top, near the top,
 5          there's the third line item, it's for Allen
 6          Johnson?
 7     A.    Right.
 8     Q.    And it says -- over on the right, it says,
 9          "Declined by HQ."
10     A.    Huh-huh.
11     Q.    What does that mean?
12     A.    Declined by Headquarters.
13     Q.    And what does that mean, declined by
14          Headquarters?
15     A.    That means evidently, I -- I sent a
16          referral in, and they -- they declined it.
17     Q.    Meaning they decided --
18     A.    I sent -- I sent a referral to have Dr.
19          Morrison see the individual, and even
20          though his hernia must -- must have been
21          pretty large, which I think it was, and I
22          could possibly reduce it, they fit it
23          within the guidelines, and basically that's
24          them saying manage per guidelines.
25     Q.    That's what "Declined by HQ" means to you?
```

```
 1   A.    To me, that's what it means.
 2   Q.    Okay, and Ulysses Jones is also a yellow
 3         too, correct?
 4   A.    Yes, sir.
 5   Q.    And that's the same thing, that was
 6         declined by HQ?
 7   A.    That was declined by HQ.
 8   Q.    Okay, and who makes that decision at
 9         Headquarters?
10   A.    It goes -- there's a team up there, Melanie
11         Benedict is up there.  Back then, Tamara
12         Young was up there, and, of course, Dr.
13         Singh.
14   Q.    Huh-huh.  Got you.  Do you know who makes
15         that decision?
16   A.    With this --
17               MR. BLANCHFIELD:
18               What decision?
19   BY MR. ADCOCK:
20   Q.    The decision.  It says, "Declined by
21         Headquarters," so someone made a decision.
22   A.    Well, I'm going to say Dr. Singh.
23   Q.    Okay, and the same for Raymond Moliere,
24         correct?
25   A.    Right.
```

```
 1   Q.   He was declined by Headquarters even though
 2        he's a Category 5.
 3   A.   Category 5, yes.
 4   Q.   Okay.
 5   A.   Now, keep in mind too, at this point, like,
 6        I think Raymond was diagnosed on 5-28 of
 7        '13.  Okay.  We -- we had no surgical
 8        option at that point.  You know, unless it
 9        was an emergent surgery, there -- there was
10        no option for us.  We had no resources.
11   Q.   Huh-huh.
12   A.   Earl K. Long had closed down.  You know and
13        unless it was an -- an emergent procedure,
14        hospitals won't operate on offenders to do
15        elective surgeries --
16   Q.   Huh-huh.
17   A.   -- private hospitals.  We couldn't send one
18        to The Lake.  We couldn't send one to Lane.
19        We couldn't send one to Baton Rouge
20        General.  You know, we even tried to send
21        Giovanni down there a couple of times, and,
22        you know, they sent him back.  They reduced
23        it and sent him back.  So unless -- they
24        had no resources.  So until resources
25        opened up, we had no outlet.  So "Declined
```

```
 1        by Headquarters" could mean numerous
 2        things.  It could mean, No. 1, we had no
 3        resources or No. 2, could have been within
 4        the guidelines.  I'm not up there making
 5        that decision.  So everything I'm telling
 6        you is my opinion.
 7    Q.   Huh-huh.
 8    A.   But maybe ask Dr. Singh.
 9    Q.   When you say, "The Lake," you're referring
10        to Our Lady of the Lake Hospital?
11    A.   Our Lady of the Lake, yes.
12    Q.   And that's in Baton Rouge?
13    A.   Sure.
14    Q.   And you referred to Lane.
15    A.   Lane is in Zachary.
16    Q.   That's a hospital in Zachary?
17    A.   A hospital in Zachary.
18    Q.   Lane General or something?
19    A.   Lane Memorial.
20    Q.   Lane Memorial Hospital in Zachary,
21        Louisiana?
22    A.   In Zachary, Louisiana.
23    Q.   What, about 45 minutes from here?
24    A.   Yeah.
25    Q.   Okay, and you referred to, like, 2013.
```

```
 1          Don't let me put words in your mouth, but
 2          you were, like, there's no resources to get
 3          non-emergent elective surgery for people?
 4     A.   If I'm not mistaken I think Earl K. Long
 5          closed in April of '13 maybe.
 6                    MR. BLANCHFIELD:
 7                    Correct.
 8                    THE WITNESS:
 9                    Is that right?
10                    MR. BLANCHFIELD:
11                    April.
12                    THE WITNESS:
13                    So during that timeframe not only
14             did we not have resources, the
15             residents didn't even have a place to
16             operate.
17     BY MR. ADCOCK:
18     Q.   Huh-huh.
19     A.   You know, so they didn't know what they
20          were going to do.
21     Q.   Huh-huh.
22     A.   And if you know the history, ILH set up a
23          panel to review all incoming referrals, and
24          they put through what they wanted to put
25          through, you know, but from my standpoint,
```

1       it looks like I referred them.  I'm sure

2       Dr. Singh would be able to tell you a

3       little bit more about what the "Declined by

4       Headquarters" means.  My opinion as far as

5       what I was doing, I looked at them, I said,

6       hey, you have a hernia.  I think you need

7       to be referred for evaluation, so I

8       referred them.

9   Q.   Huh-huh, and so "Declined" -- okay, got

10      you.  And when you're referring until

11      resources opened up, when -- when -- if you

12      know, when -- when were resources available

13      for them to start giving surgeries to

14      people who had number of Category 5s and

15      Category 4.5?

16  A.   Well, what happened was they -- they

17      started looking at it hard.  They started

18      looking at accessing Lallie Kemp.  You

19      know, Lallie Kemp is in Independence,

20      Louisiana.  It's a very strong hospital,

21      and they have some capabilities.  They

22      don't have a lot of capabilities, but all

23      these -- all these things were going on.

24      They were building the big UMCNO.  I mean,

25      UMCNO was -- was getting close to being

```
 1          ready to be opened up, but still, they were
 2          working out of the interim hospital.  They
 3          had the Tulane residency program.  They had
 4          the LSU residency program.  They even had
 5          to ship some of the residents up to Our
 6          Lady of The Lake to -- to work with some of
 7          the staff doctors up there just so they
 8          could get their residency training.  So
 9          there were not a whole lot resources --
10    Q.    Huh-huh.
11    A.    -- unless something was emergent, you know.
12          It's one of those things where we -- we --
13          watched them.
14    Q.    Huh-huh.
15    A.    You know, as long there weren't any health
16          consequences, which none of them had any
17          health consequences, you know, we watched
18          them.
19    Q.    Huh-huh.
20    A.    When resources opened up, we were ready to
21          go.  We had our list, and then -- I can't
22          -- we probably had over 115 of them fixed
23          since -- since this list was made.
24    Q.    Huh-huh.  In 2012?
25    A.    Not in 2012.  It started opening up
```

```
 1        probably --
 2    Q.    In 2014?
 3    A.    20, something like that but it -- but when
 4          the resources opened up, they went off of
 5          my list, and boom, boom, boom, boom, boom,
 6          they started knocking them out.
 7    Q.    Huh-huh.
 8    A.    And so, you know, it was a resource issue.
 9          It wasn't a DOC issue saying we're not
10          going to pay for this I don't think.  It
11          was a resource issue.
12    Q.    Huh-huh, and when you refer to resources
13          opening up, about when was that
14          approximately?
15    A.    You know, I don't -- we started accessing
16          Lallie Kemp before UMCNO actually opened
17          up.  I can't really -- I don't know.  I'd
18          be guessing.
19    Q.    In 2014?
20    A.    I'd -- I'd be guessing.
21    Q.    Okay.
22    A.    But they did open up, and once the
23          resources opened up, people got fixed.
24    Q.    Okay.
25    A.    You know, and all, every one of these guys
```

1          have been fixed (indicating).

2     Q.    Huh-huh.

3     A.    Every one of them.

4     Q.    Every one of them.

5     A.    I -- I would say every one of them.

6     Q.    And you're referring to "Exhibit J" right

7          there?

8     A.    Yeah, and more.  No, I take that back.  I

9          don't think Cecil Odom has been fixed

10         simply because he has had five recurrent

11         surgery -- five recurrent hernias that are

12         all incisional hernias, and he's about 380

13         pounds, and I don't think he's -- he keeps

14         telling them he's going home, and he wants

15         to get his hernia fixed when he goes home.

16         So right off the top of my mind, right off

17         the top of my head, Cecil Odom hasn't been

18         fixed, but looking at the list, I would

19         think pretty much everybody on this list

20         has possibly been fixed if they had a

21         hernia.

22    Q.    Huh-huh, and take someone, if you go back

23         to Page 1, I'm going to ask you about

24         Herman Bella.

25    A.    Okay.

1    Q.    I guess he's one, two, three, four, five,
2          six, seven, eight -- eight down.
3    A.    Huh-huh.
4    Q.    It looks like his diagnosis -- I guess that
5          means diagnosis of hernia was July 26th,
6          2013?
7    A.    Let me check.
8    Q.    Okay.
9    A.    Actually in July the 11th of 2013 he was
10         seen in the HIV clinic, and he complained
11         to Dr. Stewart (phonetic), and Dr. Stewart
12         noted that he had a right inguinal hernia,
13         and he sent him to the -- to the hernia
14         clinic on 7-26 of '13.  That's where the
15         official diagnosis was for sure, that's
16         true.
17   Q.    Okay, and do you know when or if he got
18         surgery, hernia surgery?
19   A.    I do.  He got surgery 1-24 of '17.  He saw
20         Dr. Morrison.  A referral was made to Dr.
21         Morrison 9-12 of '16.  He saw Dr. Morrison
22         11-30 of '16 and had surgery 1-24-17.
23   Q.    Okay, and go two down to Wallace Breaux.
24         That says diagnosis date is March 12.  It's
25         two down from Herman Bella. I just want to

```
 1         know what year that is.  I would say it's
 2         2014, but there's 2014s in here or there's
 3         three numbers for the dates.
 4    A.   Wallace -- Wallace Breaux had a little bit
 5         different issue there.  He was diagnosed --
 6         he actually saw the general surgery clinic
 7         at -- at Angola 1-21 of '12, and they
 8         diagnosed an inguinal hernia.  They -- when
 9         they saw him again, and they scheduled
10         what's called C-scope because Wallace
11         Breaux is a big man, and they wanted to
12         make sure that -- that his colon was good.
13         So they scheduled a C scope.  Well, on 6-19
14         of '12, Wallace denied our referral for a
15         C-scope.
16    Q.   Okay.  What's a C-scope?
17    A.   Colonoscopy.
18    Q.   Okay, and that's what's on the right -- go
19         ahead, keep going.
20    A.   Okay.  So they wanted to operate on him
21         after his colonoscopy, but New Orleans,
22         you know, said we don't have resources.
23         Again resource issue.  That's what a lot of
24         this was.  You know, had they said hey,
25         we'll do the colonoscopy, we'll fix his
```

```
 1          hernia.  So he went on, and he was actually
 2          fixed a couple of years, but his -- his
 3          hernia, once he started seeing me was very
 4          small.  As a matter of fact, there were
 5          certain times I couldn't even see it
 6          because he's -- he -- he's a fat guy.
 7    Q.    Huh-huh.
 8    A.    And because of his habitus, I couldn't even
 9          see his hernia.  The only way that I could
10          detect his hernia is through inguinal canal
11          exam.
12    Q.    Huh-huh.
13    A.    So we had a rectus diastasis as well as a
14          hernia.  He went through many non-duty
15          statuses, but he ended up being fixed,
16          let's see, it looks like around 12 of '17.
17    Q.    So December of '17.
18    A.    Right.  He had a very, very small hernia.
19          In fact, when I started seeing him, 5 of
20          '15, the hernia was, like, a 2 -- a 2.5.
21    Q.    Huh-huh.
22    A.    And it stayed a 2.5 for months and months
23          and months.
24    Q.    Huh-huh.
25    A.    When he first came to me, he -- he thought
```

```
 1              -- what -- what he thought was a hernia was
 2              really a rectus diastasis, and they never
 3              repaired that.
 4        Q.    Huh-huh.  Now, if we go to Page 2, and you
 5              see one, two, three, four, five, six --
 6              seven down, Walter Koon?
 7        A.    Huh-huh.
 8        Q.    And there's no diagnosis date, but there's
 9              a date 11-6-2013 for date seen in surgery
10              clinic, and then the recommendation is
11              repair, and then the additional comments
12              are "Declined by HQ"?
13        A.    I don't know about that -- that case, but
14              that's what it says.
15        Q.    So you don't know what happened in that
16              particular case?
17        A.    I don't.  That wasn't on the list of -- of
18              the ones there were sent to me.  He wasn't
19              on that list.
20        Q.    And what is -- what do you mean the list
21              that was sent to you?
22        A.    Well, there were some names that were sent
23              to me to review their records, and those
24              are the records I reviewed --
25        Q.    Got you.
```

1    A.    -- and Walter's name wasn't on there.

2    Q.    And when it says, "Date Seen In Surgery

3          Clinic," that blue column --

4    A.    Huh-huh.

5    Q.    -- what does that refer to?

6    A.    Generally that's going to mean the date

7          that he was seen by the general surgeon.

8          Now, keep in mind there were -- prior to

9          Dr. Morrison coming to Angola, which I

10         don't know that date, you'd have to find

11         that out, residents came to Angola, okay.

12         Residents can't schedule surgery.  All

13         right.  So even though a resident would

14         come to Angola and say, "I want to operate

15         on you," that didn't go anywhere until the

16         staff doctor approved it.  So that would

17         have to be sent back to New -- New Orleans

18         for the staff doctor to approve; however,

19         when Dr. Morrison started coming since he

20         was a staff doctor, you know, he could

21         approve the surgeries.

22    Q.    Huh-huh.

23    A.    So there was a little bit of a changeover

24         when the residents quit coming and Dr.

25         Morrison came -- started coming, because

1        you had a resident versus the staff.

2   Q.   Huh-huh.

3   A.   It's a little smoother.

4   Q.   Got you.  Then down here where it says,

5        Kenneth Leslie --

6   A.   Right.

7   Q.   -- that's a few down.  You see that?

8   A.   Yes.

9   Q.   His diagnosis date it looks like was May

10       28th, 2013, and then that was declined by

11       HQ?

12  A.   Well, again May 28th, 2013, Earl K. Long

13       closed April of '13.  Okay.  We had no

14       resources.  Okay.  So he had a

15       non-incarcerated hernia.  So that was the

16       one that they're -- they're going to watch,

17       you know, and that's what happened.

18  Q.   Huh-huh, and you --

19  A.   When resources opened up, he was one of the

20       first ones getting fixed, because I made

21       sure of it.  I followed him for several

22       months in the hernia clinic.

23  Q.   Huh-huh.

24  A.   And I know Kenneth.  Kenneth worked in

25       horticulture, you know.  I told him quit

```
 1              lifting up on those pots.  He still wanted
 2              to go to work.  He's -- he's -- you know,
 3              he's a worker, and he lost some weight.  He
 4              did everything he was supposed to do, and
 5              when the resources opened up, he was one of
 6              the first ones to get fixed I can tell you
 7              that.
 8      Q.     Huh-huh.  Okay, and then down here where it
 9              says -- down towards the bottom, there's
10              Raymond Rochon.
11      A.     Right.
12      Q.     And then over on the right, it says, "Not
13              in Ecept/will enter."
14      A.     Right.
15      Q.     Do you know what that means?
16      A.     There's a program call Eceptionist where
17              they communicate with New Orleans, and
18              evidently his name wasn't in Eceptionist,
19              and they -- but Raymond had a rather large
20              hernia as well.  He was one of the first
21              ones to get fixed.
22      Q.     Huh-huh, got you.  And so the fact that
23              he's not in Eceptionist, what does that
24              mean?
25      A.     It means he just needed a referral.
```

```
 1    Q.   Okay.  So that's different from no referral
 2         in chart that says in some of these?
 3    A.   Well, maybe somebody checked on him and
 4         said, well, what about Raymond Rochon, and
 5         somebody tried to pull him up, and they
 6         said, well, he's not in Eceptionist.  Well,
 7         I'll go ahead and enter it.
 8    Q.   Huh-huh, and do you know how -- I think I
 9         asked you this, how people got on this
10         list?
11    A.   I -- at some point they said, Dr. Lavespere
12         you're going to start doing this hernia
13         clinic.  I said, okay, fine.  So they
14         started sending them to me, and so I
15         started making a -- a notebook, and one day
16         they -- they came to me.  I think your --
17         your wife and them wanted my notebook, and
18         I said, "I'm not giving them my notebook."
19         I said, "You can take my notebook and make
20         a list," and so I think that's where they
21         got this list from, my notebook.
22    Q.   Okay, and your notebook, that's where you
23         were tracking people that had hernias?
24    A.   Yes.
25    Q.   Okay.
```

```
 1    A.    Tracking people that I saw in the hernia
 2          clinic.
 3    Q.    Were you doing that for people that had
 4          cataracts too?
 5    A.    No.  Like I said, I'm not an eye guy.  You
 6          know, and I just had to put confidence in
 7          Dr. Couillard.  I mean, if he sent me a
 8          referral, I -- I referred it.  I never
 9          turned down one of his referrals.
10    Q.    Okay.  You're on Page 1.  So up at the top
11          there there's William Anderson.
12    A.    Right.
13    Q.    So his is a Category 4.5?
14    A.    Yes.
15    Q.    And over on the right, it says -- what
16          does that say in "Additional Comments"?
17    A.    Well, of course, you got to know -- know
18          this.  William Anderson, he was
19          affectionately known as Jethro.  He lived
20          over there on Nursing Unit 2.  He stayed in
21          a wheelchair the whole time.  The only
22          thing he did that was active was he planted
23          a garden on the back of the nursing unit.
24          You know, he grew tomatoes.  That's one of
25          the things he wanted to do, but he had a
```

```
 1            medium, about an egg -- eggplant size
 2            hernia that -- that I couldn't reduce.  It
 3            was big, but it wasn't causing him any
 4            problems, you know, and he ended up having
 5            a -- a repair I think.  I'm pretty sure he
 6            did.  He was one of the first ones.
 7      Q.    He was one of the first ones?
 8      A.    He was one of the -- he was one of the top
 9            ones.  Now, he had some also -- he also had
10            some -- some issues with -- with pulmonary
11            or cardiac.  He had one of those issues
12            that kind of kept him from being at the top
13            of the list.  He had to get -- I think he
14            had to get cardiology clearance or he had
15            to get pulmonary clearance, but he did get
16            fixed.
17      Q.    Huh-huh.  Where it says, "No repair @ this
18            time" under "Recommendation," do you know
19            what that means?
20      A.    No.
21      Q.    Okay.  Do you know who determined no repair
22            at this time?
23      A.    No, but if they pulled his chart, I could
24            go back in the records and look.
25      Q.    Okay.  On that same note, you see there's
```

1          people on Page 1 who under "Recommendation"
2          says, "Surgical repair," "repair,"
3          "repair," "repair," "repair"?
4      A.   Huh-huh.
5      Q.   You see that, but they're not in Category 4
6          or higher it appears, right?
7      A.   That means they were probably fixed before
8          -- you know, that -- that means -- to me
9          that would mean that when I saw them, they
10         were already repaired.
11     Q.   Okay, and then -- but on -- on the right
12         there for all of them, it says, "Declined
13         by HQ."  So what do you think that -- what
14         do you think happened there?
15     A.   I don't know.  Like I said, I didn't put
16         the list together.  Okay, so Ernest Crook
17         for example.  I know him.
18     Q.   What's the name?
19     A.   Ernest Crook.
20     Q.   Huh-huh.
21     A.   He went -- he didn't have a repair.  I
22         guess our recommendation was that he have a
23         repair, and they -- they declined.  Maybe
24         he -- and Ernest always had a reducible
25         hernia.  He stayed in a wheelchair 98

```
 1          percent of the time, never had any problem
 2          with a hernia, because he always sat in the
 3          wheelchair, but I could always put Ernest's
 4          hernia -- hernia back in.  He stayed in the
 5          cell block.  He was a cell block inmate.
 6          So he never was out.  He never had a job.
 7          He never had anything like that.  So that's
 8          what that means.  We must have recommended
 9          him for repair, and because his hernia was
10          reducible, it was declined by Headquarters
11          to fit into the guidelines.
12     Q.   Okay.
13     A.   That would be my guess.
14     Q.   But you're not sure?
15     A.   Not sure.
16     Q.   Okay, and you see where it says Lavelle
17          Myers?
18     A.   Right.
19     Q.   That's on Page 2.  It's just -- just three
20          below Raymond Moliere.
21     A.   Huh-huh.
22     Q.   It says that -- it looks like his diagnosis
23          was 11 -- November 1 of 2012.
24     A.   I have him.  Okay.  So -- so Lavelle Myers,
25          actually November the 5th, 2012, he came
```

```
1            into the clinic, not -- not hernia clinic,
2            just a regular clinic, said he had a
3            six-month history of a hernia to his
4            abdomen.  He works as an orderly, and they
5            were able to reduce his hernia very easily,
6            and at that time they made a general
7            surgery consult, and on 7-7 of '13, he had
8            an annual physical, and he says that two
9            years prior he had that hernia repaired,
10           but it returned.  So basically he had a
11           ventral hernia to the right of his
12           umbilicus, and when he finally came to the
13           hernia clinic, he had a two-by-two
14           reducible hernia to the right side of his
15           umbilicus about a -- I categorized it two
16           and a half, 2.5.
17      Q.   When you say, "two-by-two," what do you
18           mean?
19      A.   A two-inch-by-two-inch reducible hernia.
20      Q.   That's the size of it?
21      A.   Right.
22      Q.   Got you.
23      A.   Reducible, spontaneous return.  I followed
24           him.  It never grew in size.  Basically on
25           4 of '16, he came in, and it had gotten
```

```
 1              larger.  So on 4 of '16, I referred him to
 2              Dr. Morrison, and he got repaired.  He got
 3              repaired -- he got recommended for repair
 4              7-27 of '16, and he got repaired 9 of '16.
 5              So when his hernia got larger, 4-16, by 9
 6              of '16, he's repaired.
 7       Q.     September of 2016?
 8       A.     Right.
 9       Q.     So the first recommendation for surgery
10              there is in 2016 --
11       A.     Right.
12       Q.     -- according to your notes?
13       A.     Right.
14       Q.     Okay, and then Earl Peters, it looks like
15              his diagnosis is April of 2013?
16       A.     Let's see.  Earl Peters.  Okay.  What did
17              you say the date was?
18       Q.     It says here April 16, 2013.
19       A.     That's true.  He was -- he was seen in the
20              clinic April 16, '13, complained of a right
21              hernia -- right hernia pain for two months,
22              and whomever saw him, right inguinal hernia
23              that was reducible, and they referred him
24              to the surgery -- referred him to surgery
25              clinic.  This is where the resource problem
```

1      is right here.  So we referred him to ILH.
2      ILH turned him down.
3  Q.   What -- what -- what date did you --
4  A.   They turned him down 6-21 of '13.
5  Q.   What did you refer him?
6  A.   "This service cannot be authorized."  We
7      referred him around April -- April 16th.
8      When he came in on the 13th, we referred
9      him.  "Referral you placed for Earl Peters
10     has been carefully reviewed by a clinician
11     in ILH Surgery Clinic.  This service cannot
12     be authorized."
13 Q.   Do you know what that means?
14 A.   That means ILH said we don't have
15     resources.  This is what I've been telling
16     you.
17 Q.   That's what you think that means?
18 A.   I know that's what that means.
19 Q.   All right.
20 A.   So we resubmitted it again 8-21 of '13, and
21     then in 10 -- 10-22 of '14, he came in, and
22     again his hernia reduced easily, managed
23     per guidelines.  1 of '15, he had a
24     moderate to large hernia, and it didn't
25     involve his scrotum.  It was reduced

```
 1         easily, and then his hernia got larger on
 2         5-20 of '15.  It went from a three and a
 3         half to a four and a half in my opinion,
 4         and so I thought that was -- that was
 5         large, and so I referred him 9-24 of '15.
 6         I tried an extra large scrotal support.  It
 7         didn't work.  I could reduce it with some
 8         difficulty, but I could reduce it, and then
 9         referred him 9-24-15, and he got repaired
10         8-3-16.
11    Q.   When you -- you've been saying the word
12         "repaired," when you say that, you mean
13         that's when they got their hernia surgery?
14    A.   Yeah, yeah, hernia surgery.
15    Q.   And if you go to Page 3 and you look at the
16         -- right under Charles Unger, there's Hymel
17         Varando.  I think that's Varando.
18    A.   Hymel Varando.
19    Q.   And it looks like his diagnosis was
20         February of 2013.
21    A.   Right.
22    Q.   Okay, and that says, "Declined by
23         Headquarters," and again, you don't
24         specifics of that?
25    A.   I don't.
```

1    Q.    Okay, and then Russell Ware, it looks like
2          his diagnosis was January of 2013.
3    A.    Russel always had a very small hernia until
4          at -- at the end.  I know Russell well.
5          Now, Russell was seen in 2012 because he
6          claimed to have surgery.  Russell has got
7          some mental health issues.  He -- he don't
8          like to get undressed in front of people.
9          He's -- his crime is of a sexual nature,
10         and he's -- he has got to trust you to --
11         to let you exam him.
12   Q.    Huh-huh.
13   A.    So he was seen on Telemed, and he refused
14         to take his pants off in front of the
15         camera.  He wasn't going to do it, and so
16         they referred him without even an exam,
17         possible bilateral inguinal hernia.  All
18         right, and Russell is a very anxious guy.
19         So I started seeing him in the hernia
20         clinic, and on 8-1 of '13, I couldn't even
21         hardly see it, you know, but he -- he said
22         he felt a pulling sensation in his lower
23         abdomen, but I could feel it through the
24         inguinal canal.  So I referred him.  Ecept
25         notes --

1    Q.    Can I stop you there, doctor --

2    A.    Sure.

3    Q.    -- and ask you a question.

4    A.    Sure.

5    Q.    So you refer -- you said -- two seconds ago

6          you said that you evaluated him by Telemed?

7    A.    No, no.  No, no.

8    Q.    When he came to you and you saw him, he was

9          on Telemed --

10   A.    No, no.

11   Q.    -- and refused to take his clothes off?

12   A.    The first -- the first deal he had -- see,

13         again, look at the date, 1 -- 1-7 of '13.

14         That's when everything was starting to

15         getting rolling.  You know, we're trying to

16         figure out what are we going to do.  We

17         started incorporating Telemed for a wide

18         variety of things.  Okay.  Earl K. Long was

19         just about to close.  All right.  They had

20         moved all their services from Baton Rouge,

21         and there were no services in Baton Rouge.

22         You know, things were being seen, you know,

23         in New Orleans on Telemed.  We were trying

24         -- people were scrambling.

25   Q.    Huh-huh.

```
 1    A.    They closed our hospital.  Jindal closed
 2          our hospital.  What are we going to do?
 3          That's our outlet.  You know, we really
 4          didn't know what we were going to do.  So
 5          we're trying to get these people seen.  I
 6          think that's something that -- that the
 7          Department of Corrections ought to be
 8          commended for.  You know, we're still
 9          making an attempt.  You know, we're not
10          turning our back on anybody.  So they tried
11          to get him seen by general surgery through
12          Telemed, and he didn't want to take his
13          pants off in front of the camera.
14    Q.    Huh-huh.
15    A.    So he needed some a face-to-face
16          management.
17    Q.    You said the people -- correct me I'm
18          wrong, the people in New Orleans, talking
19          about Telemed?
20    A.    That would be where Telemed would be seeing
21          him.
22    Q.    In that -- in that instance?
23    A.    Right.
24    Q.    Okay.
25    A.    It would have been Telemed in New Orleans.
```

```
 1    Q.   So you-all -- are you-all not seeing people
 2         by Telemed here?
 3    A.   Not surgery.  We don't have to, because we
 4         don't have a surgeon.
 5    Q.   Not surgery, but otherwise you are?
 6    A.   Sure, a bunch -- a bunch of specialists.
 7    Q.   And so, like, you'd be at the treatment
 8         center, and they'd be at Camp D or
 9         something like that?
10    A.   No.  We bring everybody over here, and then
11         we access New Orleans.
12    Q.   Oh, okay.  That's what I'm asking.  You --
13         any prisoners in Angola, they come see you
14         in person?
15    A.   Any prisoner that -- that comes to Telemed
16         and wants to be seen by -- that needs to be
17         seen by Telemed, they go to that new
18         building over there --
19    Q.   Huh-huh.
20    A.   -- and Telemed is set up for cardiology,
21         rheumatology, pulmonary.  You know, we have
22         a wide variety of specialities that are
23         seen.  We don't need that for general
24         surgery because they come here.
25    Q.   Huh-huh.  When you say, "that building over
```

```
 1         there," you mean on the grounds here,
 2         right?
 3    A.   Brand new building by the treatment center.
 4    Q.   Got you.  You use for Telemed?
 5    A.   We do.
 6    Q.   But my -- but my question is, if someone is
 7         a prisoner incarcerated in Angola --
 8    A.   Huh-huh.
 9    Q.   -- and they have a medical problem and they
10         need to be seen for that and you see them,
11         for instance, would -- is there any
12         circumstance where you would see them via
13         Telemed?
14    A.   No.
15    Q.   Okay.  So you were talking about Russell
16         Ware.
17    A.   Yes, so --
18    Q.   Did he -- go ahead.
19    A.   So Russell ended up being fixed, you know,
20         at a -- at one point in time.  Like I say,
21         he -- Russell has got some mental issues.
22         He's got very high anxiety; he has got HIV;
23         he's got a bunch of things going on.  I
24         know him very well.  He comes to me all the
25         time when he has problems with his
```

```
 1          medicine.  I tell him, "Russell, you've got
 2          take it easy."  You know, so I've developed
 3          a relationship with the guy.  Russell gets
 4          himself worked up.  So at one point in
 5          time, he's, like, "Man, I can't make it to
 6          the" -- you know, "to the lunchroom."  So I
 7          had his meals brought to him in the
 8          lunchroom -- I mean, in his dorm, and that
 9          was around 9 of '13.  Tried a hernia belt.
10          There were some times his hernia was big.
11          There were some times his hernia was small.
12          He's one that we referred to the
13          Headquarters Office, and Headquarters said,
14          "Hey, it's a reducible hernia, just hold
15          him, manage it per guidelines."  Ultimately
16          I referred him to general surgery on 2 of
17          '17, and he got repaired at Lallie Kemp.
18    Q.    When was that?
19    A.    May of '17.
20    Q.    May of '17?
21    A.    Huh-huh, yes, and his hernia was never very
22          big.
23    Q.    Huh-huh.
24    A.    And that's after -- again, when all the 4s
25          and 5s started being knocked out, people
```

```
 1          kept moving up on the list.
 2     Q.    Huh-huh.
 3     A.    So as we slowly started working down the
 4          list, people with less significant hernias
 5          were being fixed.
 6     Q.    Huh-huh.
 7     A.    We fixed them all.
 8     Q.    Huh-huh, and correct me if I'm wrong, it
 9          looks like you looked up the information on
10          some of the Plaintiffs in this case?
11     A.    They sent me ten or so names and two more
12          in here (indicating).  That's -- that's
13          what they sent me.
14     Q.    Okay.
15     A.    So, you know, I like to be prepared when I
16          come here.
17     Q.    Yeah, you're doing your homework.  And so
18          okay, good.  Let's see.  All right.  I'm
19          going to show you what I'm marking as
20          "Exhibit K."  (Counsel hands document to
21          witness.)  So doctor, does "Exhibit K" look
22          like kind of another version of "Exhibit
23          J," the -- the chart you just went over?
24     A.    It does.
25     Q.    Okay, but it looks like some people aren't
```

```
 1          categorized as Category 4, 4 1/2, or 5?
 2     A.   There's no color coding there on the chart.
 3     Q.   There's no color coding on "K"?
 4     A.   On "K."
 5     Q.   Right, and then on the third page, there's
 6          no reference to Category 4, 4 1/2, or 5,
 7          correct?
 8     A.   Correct.
 9     Q.   Okay.  Do you know why that is?
10     A.   Like I say, I don't put the list together.
11     Q.   Okay.
12     A.   I just do the work.
13     Q.   Yeah.  Do you know who did -- who put
14          "Exhibit K" together?
15     A.   My best guess would be Annette.
16     Q.   Annette?
17     A.   Annette Carol.
18     Q.   Annette Carol?
19     A.   Yeah, because she scheduled my hernia
20          clinic for me, and she kind of took my
21          notebook here and there and -- and went
22          through it and made sense of it, put
23          everything in alphabetical order or
24          numerical order or whatever.
25     Q.   Huh-huh.
```

```
 1    A.    So Annette I would say.
 2    Q.    And so is it fair to say with Exhibits J
 3          and K the reason people are on these lists
 4          is because they were in your notebook?
 5                    MR. BLANCHFIELD:
 6                    Object to the form.
 7                    THE WITNESS:
 8                    I would say that would -- that's
 9              -- that's probably true.
10    BY MR. ADCOCK:
11    Q.    Okay, got you.  All right.  I'm showing you
12          "Exhibit L."  (Counsel hands document to
13          witness.)  Who does that start with,
14          doctor?  What's the first name there?
15    A.    Alton Adams.
16                    MR. ADCOCK:
17                    Drew, my paralegal messed up
18              stapling this.  You can have it, but
19              it's incomplete.
20                    MR. BLANCHFIELD:
21                    Let's see.  This is --
22                    MR. ADCOCK:
23                    Maybe Alton Adams might be on the
24              last page of the one in your right
25              hand.  The last page of the one in your
```

```
 1              right hand.
 2                   MR. BLANCHFIELD:
 3                   No.
 4                   MR. ADCOCK:
 5                   Okay.
 6                   MR. BLANCHFIELD:
 7                   It ends in the Ps.  That's why I'm
 8              concerned.
 9                   MR. ADCOCK:
10                   Okay.  Then that one starts on
11              Plaisance.
12                   MR. BLANCHFIELD:
13                   Oh, okay.  So this is a
14              continuation apparently.
15                   MR. ADCOCK:
16                   Let's do this.  Let's do this.
17              I'm going to show you the actual
18              exhibit I'm giving the court reporter.
19                   MR. BLANCHFIELD:
20                   Okay.
21                   MR. ADCOCK:
22                   You can actually look at it.
23              Unfortunately, it's not numbered.
24         BY MR. ADCOCK:
25         Q.   So I'm showing you exhibit -- what exhibit
```

1        is that, doctor?

2    A.    "L."

3    Q.    "Exhibit L."

4    A.    Huh-huh.

5    Q.    You recognize that?

6    A.    Yeah, I made it.

7    Q.    You made that?

8    A.    Yeah.

9    Q.    Okay, and what is that?

10   A.    Well, when, you know, your wife filed suit

11         against the Department of Corrections under

12         the Advocacy Group, and so the Advocacy

13         Group came in here, and they gave a list of

14         inmates that they wanted to talk to.  They

15         didn't tell anybody why they were talking

16         to them.  They didn't say anything other

17         than we -- we want to talk to these guys.

18         So I didn't know why they wanted to talk to

19         these guys, so I pulled every one of their

20         charts, and I went through every one of

21         their charts, and I looked at them, and it

22         was, like, well, what kind of issues could

23         they have?  This is nothing but a -- but a

24         me going through the charts saying what

25         could they possibly want to talk to the

1          Advocacy Group about, and that's what I

2          did.

3    Q.    Huh-huh.

4    A.    That's all that that is.

5    Q.    Huh-huh, and this was in -- this says it

6          was revised in February of 2015?

7    A.    You know, every time they added new

8          patients, I added new charts.

9    Q.    Huh-huh, but it says, revised February 10

10         of 2015 at the top?

11   A.    That's what it says.

12   Q.    Okay, and do you recall doing this around

13         about 2015?

14   A.    I -- I recall doing it -- been doing it for

15         the last three years.  So I -- I can't say

16         February of 2015 is when it started, but it

17         has an ongoing deal.

18   Q.    So you're still doing it?

19   A.    Not now.  We just finished the case.

20   Q.    Okay.  So you were doing this when the

21         Lewis case started?

22   A.    Sure.

23   Q.    Until it ended?

24   A.    Not until it ended, but 'til they quit

25         adding people.

1    Q.    Until they quit seeing people?

2    A.    Until they quit adding new people.

3    Q.    "Adding"?  What do you mean by "adding"?

4    A.    Well, every time that would come, they'd

5          say, oh, we want to see this offender; oh,

6          we want to see that offender.  Well, so the

7          -- the Headquarters would say, well, Dr.

8          Lavespere review that chart, review this

9          chart, review that chart.  So this is

10         nothing more than a guess of why these

11         folks would want to be talking to the

12         Advocacy Board.

13   Q.    Huh-huh.

14   A.    That's all it is.

15   Q.    And you -- all right.  So this is

16         exclusively people who would be seen by

17         people at the Advocacy Center?

18   A.    This is a list of names that were called

19         for by the Advocacy Group.

20   Q.    Okay.  To come visit and see at Angola?

21   A.    No.  To come -- the attorneys came in, and

22         they wanted to talk to these people.

23   Q.    Huh-huh.

24   A.    You know, they came in, and they'd copy

25         charts.  They did all this kind of thing,

```
 1          and so we wanted -- I wanted to know why
 2          they wanted to talk to them.  So I went
 3          through their medical record to see what
 4          they could possibly be complaining about.
 5    Q.    Huh-huh, but all my question is, is so the
 6          people on this list is because the Advocacy
 7          Center people, staff wanted --
 8    A.    Sure.
 9    Q.    -- came and visited and saw them at Angola?
10    A.    That's right.
11    Q.    Okay, and did anyone tell you to create
12          this?
13    A.    No.
14    Q.    And do you remember who helped you do this?
15    A.    Well, initially they had a bunch of nurses
16          that -- that looked at it, but it wasn't
17          complete.  So I went through every one of
18          them and looked at them myself.
19    Q.    Huh-huh.
20    A.    But Diantha, my -- my secretary put it in
21          this form.  They gave me a form to -- on my
22          computer, and, you know, I -- I just typed
23          it in.
24    Q.    Diantha Rogers.  Is that right?
25    A.    Diantha Rogers.  So she would tell me, you
```

```
 1          need to update the form, you need to update
 2          this, you need to do that.  So they -- they
 3          would just send me charts.
 4     Q.   So can you turn to the third to last page.
 5          The person at the top would be -- the
 6          person at the bottom would be McKinley
 7          Longmore.  I think it's the third to the
 8          last page.  Go to the last page, and it's
 9          three in.
10     A.   Okay.
11     Q.   And this is obviously not filled in like
12          the other ones, correct?
13     A.   Yes.
14     Q.   And do you know why that is?
15     A.   No.
16     Q.   Okay.
17     A.   Oh, these are people that died.
18     Q.   Okay.
19     A.   These are all deaths.
20     Q.   Okay.  Well, go back to -- go back -- you
21          see -- just keep going there.  There's
22          pages where they -- they -- you stopped,
23          there -- there's no filling in.  Just keep
24          -- I think it's the next page.  You see
25          right there, like, about only the first 25
```

```
 1          percent of that page is filled in, correct?
 2     A.   Right.
 3     Q.   And it looks like the ones that aren't
 4          filled in, it says, "Deceased," and gives a
 5          date?
 6     A.   Right.
 7     Q.   Okay, and did you -- did you fill in that
 8          they were deceased?
 9     A.   No, I didn't.
10     Q.   Do you know who did?
11     A.   No.
12     Q.   Okay, and you didn't go and look at their
13          charts obviously or else it would be in
14          here?
15     A.   Yeah, I didn't look at their chart.
16     Q.   Okay, and then if you go to the next page,
17          keep going to -- to the end, that's --
18          looks like it says up there, "Copies of
19          ARPs requested by the Advocacy Center"?
20     A.   Right.
21     Q.   Okay, and that's -- that might explain why
22          there's more than one mention of each
23          person there?
24     A.   True.
25     Q.   Okay, and if you go to the next page, and
```

```
1              in the middle part there's a line that's
2              blue that says, "Records of Deceased
3              offenders requested by The Advocacy
4              Center"?
5   A.    True.
6   Q.    And do you know why that's in a different
7              place than the deceased we just looked at?
8   A.    No, because when -- when their so-called
9              experts came down to -- to review charts,
10             they -- they went and they asked for
11             specific charts, and I'm sure these are the
12             specific charts that they asked for.
13  Q.    But you're not -- are you sure about that?
14  A.    Well, let's see.  Well, they brought up
15             pretty much everybody's name in the -- in
16             the courtroom, so I would assume these were
17             the charts that they -- they had a pool of
18             charts, and they only looked at a subset of
19             that pool.  So I'm sure these were the
20             charts that the experts had requested.
21  Q.    Okay.
22  A.    That would be a fair assessment.
23  Q.    And do you know if there's a version of
24             this document with that filled in, these
25             last few pages?
```

1    A.    There's not, because I would have had to do
2          it.
3    Q.    There's not?
4    A.    I don't think so.  I didn't do it.
5    Q.    You didn't do it.  So as far as you know,
6          there's not a version of this chart with
7          those filled in?
8    A.    No.
9    Q.    Okay.
10                    (Off the record.)
11   BY MR. ADCOCK:
12   Q.    Dr. Lavespere, I'm showing you "Exhibit M."
13         Do you recognize this?
14   A.    I know what it is.
15   Q.    What is it?
16   A.    Well, it's a compilation of the work that I
17         did in hernia clinic, and it looks like
18         because there's all categories there, and
19         that would be me doing that.  So somebody
20         again took my work and put it in a chart
21         form.
22   Q.    Okay.  You see in the middle there there's
23         a column that C-a-t?
24   A.    Right.
25   Q.    Do you know what that is?

```
 1   A.   Yeah, that's the categories that I assigned
 2        to them.
 3   Q.   That's the ones you assigned to them?
 4   A.   Yeah.
 5   Q.   Okay, and do you have the criteria for
 6        these categories in writing?
 7   A.   Pinned up on my bulletin board.
 8   Q.   Okay, but there's not a policy of the DOC?
 9   A.   No.  I told you, it's a crude system that I
10        developed myself because I was going to be
11        seeing these guys over and over again --
12   Q.   Huh-huh.
13   A.   It's not a policy.  It's not anything other
14        than so I would know what I was looking at
15        over and over again.
16   Q.   Okay, and you still have that?
17   A.   Sure, somewhere.
18             MR. ADCOCK:
19             Drew, is it possible, could we get
20          that?  Do you still have that?
21             MR. BLANCHFIELD:
22             If he still has it, sure.
23   BY MR. ADCOCK:
24   Q.   Okay, and so you can't tell me right now
25        offhand, because you have it written down,
```

```
 1          like, what Category 2 versus 3.5 is?
 2    A.    No.  I can tell you Category 5 is a lot
 3          worse than Category 2.
 4    Q.    Huh-huh.
 5    A.    And that's what that system is designed to
 6          tell me as a practitioner.
 7    Q.    Huh-huh.
 8    A.    The last time I saw this guy, he's a 2. I
 9          wasn't really concerned about him.  He goes
10          from a 2 to a 5, I'm concerned about him.
11    Q.    Huh-huh.
12    A.    That's all that it was there for.
13    Q.    Huh-huh.
14    A.    Nothing more; nothing less.
15    Q.    And why didn't you just, like, consult his
16          medical records on his last visit rather
17          than use this ranking system as a
18          reference?
19    A.    Well, because I wanted to have something
20          that I put together.  Everybody has got
21          their own -- you've got your own way of
22          doing legal work, right?  I've got my own
23          way of doing hernia evaluations, and so
24          that's my system.
25    Q.    Huh-huh.
```

1  A.   And if I was going to be in charge of it, I
2       wanted to know not only where they were,
3       but how did they rank.
4  Q.   Huh-huh.
5  A.   Right?
6  Q.   Huh-huh.
7  A.   And that -- and that also told me, like,
8       the guys that had 5s, you know, they had
9       pretty big hernias.  I wanted to try to get
10      them repaired, you know, and then we worked
11      on the 4 1/2s, and we worked on the 4s, and
12      we worked on the 3 1/2s, you know, and so
13      that was the systematic approach that I
14      took to try to get everybody fixed.
15 Q.   Huh-huh, got you, and so these are the
16      categories that you assigned here, and so
17      if you look at Page 3 in the middle there,
18      you see in the middle there's a space, and
19      it says, "Category 1 Not significant"
20       "Category 5 Significant"?
21 A.   Yeah.
22 Q.   Okay.  So there's no relationship between
23      the category number and whether someone
24      needs surgery, is there?
25 A.   There's a relationship between what I

1        thought would be the significance of the
2        hernia.  If a guy has got a 1, I'm not
3        going to put him up for surgery before I
4        put up a guy that's 5.
5    Q.   Huh-huh.
6    A.   The eye doctor is not going to put a guy up
7        for a cataract surgery that has a non-
8        significant cataract versus a significant
9        cataract.
10   Q.   Huh-huh.
11   A.   It's just my system that I developed.
12   Q.   Got you.  So it sounds like the ranking has
13       no bearing on whether you refer someone for
14       a surgical evaluation?
15   A.   That's not true.
16   Q.   Okay.
17   A.   I think it does have a bearing on who was
18       referred.
19   Q.   How much?
20   A.   A good deal.
21   Q.   Okay, and what do you -- can you explain
22       that when you say, "a good deal"?
23   A.   Well, if I think the guy has got a
24       significant hernia, I want to try to get
25       him fixed.  If I think a guy is not having

```
 1           a significant hernia and he's -- he's not
 2           having any issues, I'm not going to worry
 3           about him.
 4     Q.    Huh-huh, right, of course, but if you think
 5           someone has a significant hernia, they
 6           could be what, like, a 4 or a 5, correct?
 7     A.    Sure.
 8     Q.    And then what determines whether you send
 9           them out for a surgical -- surgical eval?
10     A.    Well, I don't send them out.  I just make a
11           referral --
12     Q.    Yeah.
13     A.    -- to have that done on site.
14     Q.    Huh-huh.
15     A.    Well, when I look at them, when I examine
16           them, when I try to put their hernia back
17           in, their mannerisms.  There's a lot that
18           goes into it.
19     Q.    Okay.
20     A.    And so when I -- when I do the complete
21           physical exam when I try to put their
22           hernia back in there, I see what they're
23           dealing with, and I -- I look at the
24           patient, I make a determination.
25     Q.    Huh-huh.
```

```
 1    A.    You know, he's a 5.  I need to get him
 2          fixed.  Some of -- some of the guys, you
 3          know, there's -- it's a no brainer, you
 4          know.
 5    Q.    Huh-huh.
 6    A.    So if I see a guy that has got a
 7          significant hernia, he needs to be fixed,
 8          he's a 5.
 9    Q.    And what's the difference between a 4.5 and
10          a 5?  That doesn't seem like a big
11          difference.
12    A.    Well, there's a difference between a 5 and
13          4, right?
14    Q.    Well --
15    A.    At least in my book.  So a 4.5 would be
16          kind of on the fence.  You know, that's
17          what that tells me.
18    Q.    No, I understand that, but, like, what's
19          the difference between them?  Why is --
20    A.    That's my clinical interpretation.  That's
21          what it is.
22    Q.    I understand.
23    A.    So that -- that pretty much tells me that I
24          had a hard time putting the guy in a 4 or a
25          5, so I'm putting him at a 4.5, which tells
```

1    me he's right there where he -- where he
2    needs to be.
3  Q.   Okay, and what's -- what's the difference
4    between a 4 and a 5 in terms of, like,
5    what's going on with that person?
6  A.   It's the way I examine them and the way I
7    -- I put it down on paper.  Some of them
8    have a really big hernia that I can't put
9    back.  Somebody -- some of them have
10    architectural deviation of their penis.
11    Some of them have, you know, pain.  You
12    know, some of them -- there's different
13    criteria.
14  Q.   Huh-huh.  Now, this chart right here, were
15    you keeping -- are there any charts,
16    version of this chart after, you know, the
17    summer of 2015?
18  A.   I doubt it.
19  Q.   Why -- why is that?  Why do you doubt that?
20  A.   Because I -- I quit doing -- I'd have to --
21    I'd have to see when Dr. LaFleur started,
22    because when Dr. LaFleur started and he
23    showed that he was pretty competent with
24    reviewing hernias, I turned the hernia
25    clinic over to him because I had so much

```
 1          administrative work to do with the advocacy
 2          case that I couldn't keep up with it.
 3   Q.    Huh-huh, okay.  And Dr. LaFleur, what's his
 4          position?  What was his position?
 5   A.    He's still here.  He's a staff doctor.
 6   Q.    Okay, and is he -- is he kind of in charge
 7          quotes of hernias?
 8   A.    Well, he does the hernia clinic, but
 9          there's not that many of them left.
10          They're pretty much all have been fixed.
11   Q.    What's the hernia clinic?
12   A.    It's where people go to have a hernia
13          evaluated.
14   Q.    Okay.  By Dr. LaFleur or Dr. Morrison?
15   A.    Dr. LaFleur first.
16   Q.    Okay, and that's at the treatment center?
17   A.    Right.
18   Q.    Okay, and how long has he held that
19          position?
20   A.    I -- I don't really know.  I couldn't tell
21          you.
22   Q.    Was it 2015 or thereabouts?
23   A.    I don't know.  I think -- I don't even know
24          when he started, but after he started, I
25          saw that he was very competent in what he
```

```
 1            did, and I just kind of -- I worked with
 2            him for a few weeks, and, you know, turned
 3            it over to him.  So now he's in charge of
 4            it.  I don't know the exact date.
 5    Q.   Okay.  Now, on the right here under
 6            "Ashli's Notes," perhaps that's Ashli
 7            Oliveaux, and are these notes she wrote or
 8            that you wrote?
 9    A.   Those are notes she wrote.
10    Q.   Okay, and do you know where she's getting
11            that from?
12    A.   Do not.
13    Q.   Okay.  (Counsel hands documents to
14            witness.)  So doctor, I'm showing you
15            Exhibits N and O.
16    A.   Huh-huh.
17    Q.   You see those?
18    A.   Sure.
19    Q.   Do you recognize those?
20    A.   I -- I don't, but I know what they are.
21    Q.   Okay.  What is "Exhibit N"?
22    A.   It looks like a -- a list of people that
23            have cataracts.
24    Q.   Okay, and it -- it looks like the names are
25            redacted?
```

```
 1   A.   Right.
 2   Q.   And you said you -- you're unfamiliar.
 3        Have you ever seen this before?
 4   A.   No.
 5   Q.   Okay.  Do you know who compiled this?
 6   A.   My -- my guess would be Annette with --
 7        with the help of Shirley Byrd.
 8   Q.   Annette Car --
 9   A.   Annette Carol with the help of Shirley
10        Byrd, B-y-r-d, who runs the eye clinic.
11   Q.   And do you know who -- if anybody was in
12        charge of tracking cataracts?
13   A.   Well, Shirley Byrd tracked them through her
14        eye clinic, and then Annette, being the
15        nurse supervisor tracked them.
16   Q.   Okay, but it wasn't you?
17   A.   Wasn't me.
18   Q.   Okay, and do you know if they're keeping
19        any -- keeping any -- excuse me, any lists
20        for cataracts post 2015?
21   A.   I'm sure they are.
22   Q.   Okay, but you don't know?
23   A.   I don't know for sure, but they keep of a
24        list of everything.
25   Q.   Okay, and do you know why they were keeping
```

```
 1          a list for cataracts in 2015?
 2     A.   Well, they were -- they want to make sure
 3          that people that have referrals get seen
 4          and if they need to -- if they need to get
 5          fixed, they get repaired.
 6     Q.   Right, which is essentially the same reason
 7          you were doing it for hernias, right?
 8     A.   That's right.
 9     Q.   If you look at "Exhibit O," you see that?
10     A.   Okay.
11     Q.   You do see "Exhibit O"?
12     A.   Yes.
13     Q.   And that's just, like, an Eceptionist
14          entry, right --
15     A.   That is.
16     Q.   -- for Kevin Mathieu?
17     A.   It is.
18     Q.   Okay, and you see down at the bottom, it
19          says for 7/21/2014, the very last entry?
20     A.   Right.
21     Q.   I'm going to read that.  I'm going to read
22          that.  "Per," I don't know who that is,
23          "Ddr," second word, K-i-k-u-c-h-i, "this
24          patient and others are on list for cataract
25          surgery - may get done sometime late summer
```

1          - no set date yet" unquote.  Did I read
2          that correctly?
3     A.   Yes.
4     Q.   That name there, doctor -- they meant to
5          write, Dr. Kikuchi --
6     A.   He's an ILH doctor.
7     Q.   Okay.  That's doctor.  They just misspelled
8          it?
9     A.   Sure.  He's an ophthalmologist.
10    Q.   Okay.  He's at ILH?
11    A.   Right.
12    Q.   Which would be Interim LSU Hospital in New
13         Orleans?
14    A.   Right.
15    Q.   Okay, and that's no longer?  UMC kind of
16         took that place.  Is that right?
17    A.   Right.  He's probably still there, but now
18         he works at UMC.
19    Q.   Okay, and do you know what he's referring
20         -- do you know what that entry refers to?
21    A.   Yeah, that entry refers to just like what
22         we've been talking about all along, we
23         can't tell them when to do surgery.
24         They're going to do surgery.  They have a
25         list.  They call them when they're ready

```
 1            for them.  So he's saying, hey, this guy is
 2            on the list for cataract surgery.  He may
 3            get it done sometime in the late summer.
 4            Cases are booked out until mid August at
 5            this time.  So he's saying it's not an
 6            emergency; we'll get to it when we can.
 7            It's elective.
 8    Q.    Huh-huh.
 9    A.    You know, and so he said, hey, put him on
10            the list, and we'll try to put him in,
11            maybe we can get to him in August.
12    Q.    Got you, and when you say they have -- they
13            have a list, you're referring to Angola or
14            ILH?
15    A.    Well, both of them.
16    Q.    Okay.
17    A.    I'm sure ILH has a list too of people that
18            need cataract surgery.
19    Q.    Do you know if they do or you think they
20            do?
21    A.    Well, they're not -- they're not only
22            taking care of us.  They're taking care of
23            the City of New Orleans; they're taking
24            care -- but you once you get -- once you go
25            and you're into the system, you're into the
```

```
 1          system.  They know he has got a cataract.
 2          They're following him up.  You know, and so
 3          if -- if they -- they say might say, hey,
 4          you need cataract surgery.  Well, we're --
 5          we're book through mid -- through August,
 6          so we'll see you back you in September, you
 7          know.
 8     Q.   Huh-huh.
 9     A.   That's probably what they're tracking.
10     Q.   But do you know that for sure?
11     A.   Sure, I would -- I would -- that's how
12          things are done.
13     Q.   At ILH?
14     A.   That's how they're done at ILH.
15     Q.   Okay.
16     A.   And they say not booking for September yet.
17     Q.   Okay.  Good.  All right.  I'm done.
18                    (Whereupon, the taking of the
19             witness' testimony was concluded.)
20
21
22
23
24
25
```

1                    C E R T I F I C A T E
2              THIS CERTIFICATION IS VALID ONLY FOR
   A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
3  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
   PAGE.
4
               I, RAYNEL E. SCHULE, Certified Court
5  Reporter, #77005, in good standing, in and for
   the State of Louisiana, as the officer before
6  whom this testimony was taken, do hereby certify
   that RANDY L. LAVESPERE, M.D., after having been
7  duly sworn by me upon authority of R.S. 37:2554,
   did testify as hereinbefore set forth in the
8  foregoing 152 pages; that this testimony was
   reported by me in stenotype reporting method,
9  was prepared and transcribed by me or under my
   personal direction and supervision, and is a
10 true and correct transcript to the best of my
   ability and understanding; that the transcript
11 has been prepared in compliance with transcript
   format guidelines required by statute or by
12 rules of the Board, that I have acted in
   compliance with the prohibition on contractual
13 relationships, as defined by Louisiana Code of
   Civil Procedure Article 1434 and in rules and
14 advisory opinions of the Board; that I am not of
   counsel, not related to counsel or to the
15 parties herein, nor am I otherwise interested in
   the outcome of this matter.
16
17
18 _____      _____
   Date                  Raynel E. Schule, CSR
19                       Certified Shorthand Reporter
                         State of Louisiana
20
21
22
23
24
25

# Louisiana Dept. of Corrections

## Referral Guidelines

### Cataracts

**Diagnosis/Definition**

- A cataract is a congenital or acquired opacification of part or all of the normally clear crystalline lens.
- The most common complaint of cataract is painless, progressive loss of central visual acuity.
- Other common symptoms include disabling glare from bright lights, such as headlights during nighttime driving, and glare off rainy pavement.
- Visually significant cataract is a lens opacification that interferes with vision to the point that lifestyle is limited.

**Initial Diagnosis and Management**

- Moderately advanced cataracts will show a decreased red reflex or a patchy break up of the red reflex by direct ophthalmoscopy.
- The development of cataracts in older patients can be markedly asymmetric. Cataracts often cannot be detected without special equipment (i.e., a slit lamp biomicroscope).
- Pinhole visual acuity will help determine if the decrease in vision is refractive (i.e., the patient needs new glasses).
- Asymptomatic patients with visual acuity of 20/40 or better may be followed.

**Ongoing Management and Objectives**

- Cataracts do not improve with time.
- There is no definitive primary care treatment for symptomatic cataract.

**Indications for Specialty Care Referral**

- Any cataract in infants and children.
- Adults with symptomatic, slow, progressive, painless decrease in vision that affects activities of daily living.
- Patients whose visual acuity improves with a pinhole should be referred to optometry for measurement of new glasses. Ophthalmology does not prescribe routine glasses prescriptions.

**Criteria for Return to Primary Care**

- Ophthalmologic evaluation shows no organic etiology for decrease in vision (amblyopia).
- Has had definitive treatment and problem has resolved to greatest extent anticipated.

Last Review for this Guideline: **June 2013**

Referral Guidelines require review every three years.



EXHIBIT

F

PENGAD 800-631-6989