UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **EARL PETERS, IDDO BLACKWELL,** | * | **CIVIL ACTION** |
| **KEVIN MATHIEU, LAVELLE** | * | |
| **MEYERS, DAN RILEY, RUSSELL** | * | |
| **WARE** | * | **NUMBER: 3:16-cv-00842-SDD-RLB** |
| | * | |
| **VERSUS** | * | |
| | * | **JUDGE SHELLY D. DICK** |
| **RAMAN SINGH, JOHN BEL** | * | |
| **EDWARDS, JAMES M. LEBLANC,** | * | |
| **STEPHANIE LAMARTINIERE,** | * | **MAGISTRATE** |
| **DARRYL VANNOY, STATE OF** | * | **RICHARD L. BOURGEOIS** |
| **LOUISIANA, LOUISIANA** | * | |
| **DEPARTMENT OF PUBLIC SAFETY** | * | |
| **AND CORRECTIONS** | * | |

**************************************************************************

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, come Defendants, State of Louisiana, Louisiana Department of Public Safety and Corrections, John Bel Edwards, in his capacity as Governor of Louisiana, James LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections, Darryl Vannoy, Warden at Angola, Raman Singh, and Stephanie Lamartinere, Assistant Warden at Angola, who file this memorandum in opposition to plaintiffs' motion for summary judgment. Plaintiffs' motion should be denied.

The temporary policy implemented in 2013, to hold hernia surgeries for reducible hernias, was based on prevailing medical opinion, and to prioritize the need after Earl K Long closed. Plaintiffs were continuously treated for their hernias, and the non-operative treatment of a reducible hernia is constitutionally appropriate.

Further, plaintiffs fail to show that there existed a policy of delaying cataract surgeries;

-1-

instead, the medical records show that the outside physicians dictated the course of treatment, and if the outside physician recommended surgery, it was provided.

Plaintiffs' ADA claims should be denied, as plaintiffs' requested accommodation of surgery shows that their core complaint is medical care, which is not covered under the ADA.

## I.   Factual Background

### A.   Hernia Policy

At the outset, plaintiffs' recitation of facts is inaccurate. Aside from plaintiffs' reliance on numerous unauthenticated emails and medical records,[1] plaintiffs miss the big picture. The deposition testimony and authenticated documents show that in 2013, Earl K. Long, the charity hospital that performed surgeries for those inmates in the custody of the DOC, was shut down, forcing the DOC to redesign the medical system.[2] DOC contracts with hospitals to provide surgery to inmates.[3] As a result of limited capacity and operating rooms at each hospital across the state, the DOC is charged with prioritizing the need.[4]  After the redesign, DOC's first priority was to maintain access to emergency medical care, to include life threatening hernias.[5] As a result, in order to effectively prioritize the need, the DOC put together a group of doctors to promulgate guidelines for

---

[1] See *Amedee v. Shell Chem. LP-Geismer Plant*, No. CV 18-00487-SDD-RLB, 2019 WL 2330279, at *7 (M.D. La. May 31, 2019)(wherein this Court held that plaintiff's unauthenticated/hearsay documents were insufficient evidence for the purposes of summary judgment).

[2] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 23.

[3] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 17-18.

[4] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 181.

[5] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 56.

hernias.[6] Prevailing medical opinion is that a reducible hernia, with no other issues related to incarceration, strangulation or significant pain, does not require immediate surgery.[7] Thus, reducible hernias, which do not pose a immediate threat to a patient, were not considered emergency surgeries.[8] Therefore, taking into account the medical literature, and meeting with surgeons, the temporary policy was implemented in order to prioritize the medical care for inmates. Even during the transition, if an inmate's hernia did not meet the guideline, but the physician felt like the inmate needed a surgical consult, the physician could provide that information to DOC and the surgeon and request an evaluation.[9]

As a part of the redesign, DOC needed a way to communicate with the prison and the surgeons regarding referrals. DOC used the Eceptionist program to facilitate the care and manage referrals. As with any new software system, DOC had many issues in implementing the software and training its users.[10] When the program was first implemented, there was not a function to keep a request pending if more information was needed. As explained by the former medical and mental health director of DOC, Dr. Singh, initially, if DOC required additional information, the program would generate a "declined by HQ" note. The "decline" button was subsequently removed from the program, as it was a mis-communication issue, and DOC did not need a "decline" button.[11] DOC

---

[6] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 51.

[7] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 51-52.

[8] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 53.

[9] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 114-115.

[10] Exhibit A, Testimony of Stacye Falgoust, Lewis v. Cain, p. 134.

[11] Exhibit A, Testimony of Stacye Falgoust, Lewis v. Cain, p. 136-137.

was not declining surgeries; its focus was prioritizing the need for medical treatment.

Plaintiffs incorrectly state that the temporary 2013 policy became DOC's permanent policy. Plaintiffs cite to an unauthenticated purported "policy" for this proposition. Not only did Dr. Singh testify that this very document was not a DOC policy (See R.Doc.111-10, p. 130-131), but plaintiffs fail to cite to the **actual** policy that was promulgated after the 2013 redesign. Per the Hernia Guidelines that were implemented in 2014, a physician should refer an inmate for surgical consultation if the hernia is not reducible, the hernia is large in size and failing medical management, there are signs of incarceration, or significant pain requiring narcotics or pain management.[12] Thus, if an inmate's hernia was reducible, but there was some other issue, such as failing medical management, significant pain, etc., a physician could refer the inmate for a surgical evaluation.

Throughout plaintiffs' motion, they make gross misrepresentations regarding an email that purportedly shows that Dr. Singh cancelled 100 pending referrals. First, the email is not even written by Dr. Singh, but by an RN with the DOC, Melanie Benedict. Second, in response to Dr. Singh sending the *Johnson v. Doughty* case, wherein the Seventh Circuit found that non-surgical treatment of an inmate's reducible hernia was constitutionally appropriate, Ms. Benedict **asked a question if the inmates with reducible hernias  could be managed non-operatively**. This email does not show that anyone at DOC cancelled surgeries. These blatant misrepresentations by plaintiffs call into question all of their unauthenticated documents, as well as their "spin" on these documents.

### B.    Cataract Policy

Regarding cataracts, plaintiffs make unsubstantiated allegations that DOC has a policy of delaying cataract surgery. Plaintiffs  point to a DOC policy that states that a cataract surgery is

---

[12] Exhibit C, Hernia Guidelines.

"elective," but do not dispute that the surgery is indeed elective. In an attempt to prove that defendants delay cataract surgeries, plaintiffs point to a chart, prepared by plaintiffs' counsel, in a separate case (*Hacker v. Cain*), which was challenged by defendants on numerous bases, to include that the chart misrepresented the actual medical conditions of the inmates. Further, defendants note that after a trial on the merits in *Hacker*, a jury found that defendants were not deliberately indifferent with regards to plaintiff's claims that defendants had a policy of delaying cataract surgery, and the verdict was upheld on appeal. *Hacker v. Cain*, 759 F. App'x 212 (5th Cir. 2018).

Further, the DOC Cataract Referral Guidelines provide that an inmate should be referred to special care if there is symptomatic, slow, progressive, painless decrease in vision that affects activities of daily living.[13] The Guidelines also provide inmates will visual acuities of 20/40 or better may be followed by the Angola physicians, and not referred for surgery.[14] These Guidelines were followed in the treatment of plaintiffs' cataracts.

Plaintiffs cataract claims fail because there is no evidence that any policy operated to delay cataract surgeries. A review of plaintiffs' actual medical conditions show that either: (1) the inmate had visually insignificant cataracts that did not warrant a referral; (2) the inmate was seen by the outside ophthalmologist who did not recommend surgery; or (3) the inmates had other numerous medical conditions which held up a recommendation for surgery.

C.    Plaintiffs' Medical Treatment

Every plaintiff was provided continuous treatment for their hernia and/or cataracts. Plaintiffs would have this Court believe that defendants completely ignored plaintiffs' medical conditions. In

---

[13] Exhibit D, Cataract Guidelines; R.Doc. 11-14, Deposition of Dr. Lavespere, p. 54-55.

[14] *Id.*

fact, the medical records show the opposite. Each plaintiff was continuously treated for their conditions, monitored if surgery was not warranted, and referred for surgery once a surgeon determined that surgery was required. Defendants did not "refuse to treat plaintiffs, ignore their complaints, intentionally treat them incorrectly, or engage in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Brauner v. Coody*, 793 F.3d 493, 498 (5th Cir. 2015). Because plaintiff's summary of their medical treatment is incomplete, defendants outline the treatment below:

- **Earl Peters**: Peters was diagnosed with a hernia and referred to general surgery on April 13, 2013. His medical records indicate that on June 21, 2013, the <u>outside surgeon</u> carefully reviewed the referral and after consideration, the service could not be authorized.[15] Therefore, the surgeon, who is the only doctor who can recommend surgery, determined that it was not warranted. Between 2013 and 2015, Peters was seen for a hernia evaluation 9 times, and was a no show to two appointments. In September 2015, the hernia did not reduce, and he was referred for surgical evaluation. Immediately, DOC requested an appointment, which was scheduled by the outside surgeon for March 2016. The outside surgeon recommended repair, and DOC requested a surgery date, which was scheduled by the outside surgeon for August 3, 2016.[16]

- **Ronald Ailsworth**: Ailsworth was diagnosed with a hernia in July 2013, and it was noted that the hernia did not cause pain. Ailsworth refused his next three appointments. It was noted in 2014 that his exam was completely normal. Ailsworth did not complain of his hernia again until 2016, and was referred to Dr. Lavespere for hernia review. Ailsworth had other medical concerns at that time and underwent a liver biopsy to rule out carcinoma. In March 2017, it was noted that his hernia was reducible with pain, and he was <u>referred for a surgical consult for the first time</u>. The outside surgeon scheduled his appointment for July 2017, and referred Ailsworth for surgery. DOC requested a surgery date from the surgeon, and after numerous days waiting for an available operating room from Lallie Kemp, Plaintiff's surgery was

---

[15] R.Doc. 94-4, Bates #001570.

[16] R.Doc. 94-4.

scheduled for October 2, 2017.[17]

- **Herman Bella**: Bella was diagnosed with a small reducible umbilical hernia in 2010. Plaintiff underwent a hemorrhoidectomy in 2011. There were no other hernia complaints until 2013, wherein Bella was diagnosed with a reducible right inguinal hernia. It was noted that the hernia did not cause any pain. The Physician referred Bella to the surgical department for observation. The referral was put on hold because the hernia was reducible, and it was noted that if his conditions changed to resubmit the referral. From 2013-2014, Bella's hernia was evaluated four times, and it was noted that it was not getting larger and was reducible. Bella was also seen in the clinic four times in 2014 with no complaints regarding the hernia. Again in 2015, his hernia was evaluated numerous times, and there was no scrotal involvement, it reduced easily, and the plan was to manage per guidelines. Bella underwent a wrist surgery in 2016. In September 2016, Bella's hernia reduced with some discomfort, and he was referred for surgical evaluation. Bella was seen by the surgeon in November 2016, and the surgery was scheduled and performed in January 2017.[18]

- **Lavelle Meyers**: Meyers was diagnosed with a hernia in June 2012, and it was noted that the hernia was small with mild tenderness. Meyers was seen twice more in 2012 for his hernia. In 2013, Meyers was seen in the GI clinic, wherein Dr. Lavespere requested a colonoscopy and a surgical consult for his hernia. The Eceptionist record indicates that the because the hernia reduced easily, the surgical referral would be put on hold, and advised to resubmit if condition changed. Plaintiff underwent the colonoscopy. Meyers' hernia was evaluated twice more in 2014, and it was noted that its reduced easily. In 2015, Meyers was seen for a hernia evaluation on four occasions, and it was noted that the hernia was small, and rated a 2.5/5. In April 2016, the hernia was rated a 4.5/5 and Meyers was referred for a surgical evaluation. The surgeon scheduled the appointment for July 2016, noted that there was no strangulation or incarceration, and recommended repair. The surgeon scheduled and performed the surgery in September 2016.[19]

- **Russell Ware**: Ware was diagnosed with a questionable hernia in 2010. In 2012, he was referred for a surgical consult, and prescribed a scrotal belt. Ware was seen in January 2013 by IHL. The plan was elective repair of the hernia "when approved." The note from LSU doctors concerning "when approved" was referring to LSU's approval process. LSU needed approval from its board to schedule any offender surgery. In 2013, he was referred for a surgical evaluation. The Eceptionist notes

---

[17] R.Doc. 91-4.

[18] R.Doc. 90-4.

[19] R.Doc. 95-4.

indicated that the hernia was reducible, that these surgeries were on hold, and instructed the physician to re-submit the request if conditions changed. Between 2013-2014. Ware was seen several times for his hernia. The hernia was reducible, and the physician gave him appropriate duty statuses, and the plan was continued management as present. In 2015, Ware was seen five times for his hernia, and it was noted that the hernia was small and reduced easily. He was provided a scrotal belt and various duty statuses. During his fourth hernia review in 2016, it was noted that the hernia was reducible with discomfort, and he was referred for a surgical evaluation. The surgery clinic scheduled the appointment for February 2017. The surgeon recommended repair, and initially scheduled the surgery for April 2017, but subsequently cancelled and rescheduled the surgery for May 2017.[20]

- **Wallace Breaux**: In 2011, Breaux was referred for a surgical evaluation for his hernia. He underwent a CT scan and followed up with general surgery in 2012. The plan was to undergo a C-Scope prior to any hernia repair. However, the referral was reviewed and denied by the outside Gastoenterology Department, as Breaux's medical condition did not meet the criteria due to EKL capacity. Breaux continued to be evaluated by Angola physicians for his hernia. From 2012-2017, Breaux's hernia was evaluated at least 15 times. It was noted on many occasions that the hernia was small, not visual upon inspection, and rated a 2/5. Breaux also underwent a shoulder surgery and a cataracts extraction during that time. In September 2017, Dr. Lavespere noted that Breaux's condition usually did not warrant a surgical consult, but because of reported complaints of pain, Dr. Lavespere requested a consult. He was seen by a surgeon in November 2017, and surgery was performed December 2017.[21]

- **Ross McCaa**:
  - Hernia: McCaa was diagnosed with a hernia in May 2016. He was seen by Dr. Lavespere in November 2016. The hernia was reducible with discomfort and he was referred for a surgical evaluation. DOC requested an appointment with the outside surgeon, was noted that, due to the increased volume of referrals, plaintiff's appointment would be scheduled when an appointment became available and according to the time frame given by the on-site surgery clinic physician. The appointment was scheduled for June 14, 2017. Plaintiff was a no show for that appointment, and it was rescheduled for July 12, 2017. The surgeon recommended repair, and scheduled the surgery for August 2017.[22]

---

[20] R.Doc. 92-4.

[21] R.Doc. 103-4.

[22] R.Doc. 78-4.

- Cataracts: Meyers was diagnosed with a cataract in his right eye in 2012. His visual acuity was 20/25. The next mention of cataracts is 2014, where it was noted he had visually insignificant cataracts. In 2014, his visual acuity was 20/30 in the right eye and 20/20 in the left. Meyers did not complain of cataracts again until 2016, and his visual acuity was 20/20 in both eyes. He underwent hernia surgery in 2017. In October 2017, his visual acuity was noted to be 20/40. Meyers was never referred for a surgical evaluation, as it was not warranted.[23]

- **William Dickerson**:
  - Hernia: Dickerson was diagnosed with a hernia in December 2015 and was referred to Dr. Lavespere. Dickerson refused his next appointment and was seen by Dr. Lavespere in April 2016. A surgical evaluation was sent, and the surgeon scheduled the appointment for July 2016. Surgery was recommended and DOC immediately requested a surgery date. The surgery was scheduled by the surgeon for September 2016. The surgery was cancelled due to multiple skin lesions, and rescheduled for November 2016.[24]
  - Cataracts: Dickerson had a history of chronic uveitis. In 2011, he was diagnosed with a cataract in his left eye. The plan was to monitor. In 2012, he was referred to EKL Eye Clinic. He was given a laser treatment to improve vision following a 2005 cataract surgery on his right eye. No surgery was recommended for his left eye, and his vision was 20/20. In 2013, he was seen by UMC for his cataract. No surgical referral was given by the University Medical Center physician at that time. Dickerson did not show up for numerous eye clinic appointments. When he did show up, his visual acuity was 20/25. Dickerson was seen by Angola physicians and outside surgeon numerous times, and no referral was ever placed for cataract surgery, as it was not warranted.[25]

- **Iddo Blackwell**: Blackwell was diagnosed with cataracts in 2011. In 2012, he was referred for a surgical evaluation. The surgical referral was sent to IHL. LSU IHL advised on January 22, 2013, that the referral placed for Plaintiff was carefully reviewed by a clinician and it was determined that the service could not be authorized (Bates #000089). In 2013, Blackwell was referred for another surgical evaluation. Plaintiff was seen by Dr. Yen Hoang Ngo at LSU ILH on December 9, 2013, who noted that Plaintiff was referred by an optometrist for evaluation of cataracts in both eyes and complained of blurry vision in both eyes for years which had gradually

---

[23] R.Doc. 98-4.

[24] R.Doc. 93-4.

[25] R.Doc. 97-4.

worsened. Plaintiff was noted to have diabetes, blurry vision and possible cataracts. (Bates #000070). No surgery was recommended. The November 14, 2014, Eceptionist record was an Ophthalmology Referral request for Plaintiff due to blurry vision and possible cataracts. Plaintiff's appointment scheduled for December 30, 2014 was cancelled by the MD due to a family emergency and the appointment was rescheduled for January 16, 2015 (Bates #017493). Plaintiff was recommended for surgery by IHL surgeon on January 15, 2015. (Bates # 000061). The Eceptionist record of January 21, 2015 was a referral for cataract surgery for Plaintiff which was scheduled for March 30, 2015.[26]

- **Jimmy Turner:** Turner was seen by the outside UMC providers in September 2012. The surgeon noted that Plaintiff's best corrected visual acuity in the right eye was 20/25 and the plan was to observe and refract in the next exam; Turner needed better control over his diabetes mellitus and blood pressure. Again in 2013, the outside provider noted that his visual acuity was 20/40 and 20/25. The plan was to observe the cataract and refract on the next exam in six months. No surgery referral was given. In 2013, Turner was seen at the ILH Telemedicine Clinic. Plaintiff was noted to have a cataract in his right eye and the best visual acuity was noted to be 20/25. The doctor's plan was to observe plaintiff and for him to see the jail optometrist for refraction and glasses, and Turner's blood pressure and diabetes needed to be under control.        Plaintiff was seen from 2014-2016 by outside physicians concerning his diabetes and blood pressure, and underwent numerous tests to control these issues. On April 12, 2016, UMC recommended cataract extraction. (Bates #015260, #015266-015267), and on June 13, 2016, Turner received right eye surgery.[27]

- **Kevin Mathieu**: Mathieu had a history of a corneal transplant in his left eye, which complicated his treatment. He was seen by the outside physician in 2013, and physician requested that he be seen again in 3 months for evaluation and surgery regarding cataracts. In 2014, cataract extraction was recommended; however, the physician decided to not go forward with surgery, and a request was made to fit him with contact lenses to see if he would improve prior to surgery. He did not seen improvement, and he was rescheduled for surgery. Following the surgery in June 2015, doctors were concerned that plaintiff was having a graft rejection and continued to follow up monthly prior to scheduling surgery on his left eye.[28]

---

[26] Exhibit E, Blackwell Medicals.

[27] Exhibit F, Turner Medicals.

[28] Exhibit G, Mathieu Medicals.

-10-

## II.     LAW AND ARGUMENT

### A.     Plaintiffs' Deliberate Indifference Claims Fail

To prevail on a deliberate indifference claim, plaintiff must prove that medical care was denied and that the denial of the identified medical care constituted "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 97 S.Ct. 285, 291 (1976). In short, "deliberate indifference is an 'extremely high' standard to meet." *Brauner v. Coody*, 793 F.3d 493, 498 (5th Cir. 2015), citing *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir.2009). The Fifth Circuit holds that deliberate indifference encompasses "only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999). Negligence, neglect and medical malpractice do not rise to the level of a constitutional violation. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Further, to meet his burden, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Brauner*, *supra*.

### 1.     There are Genuine Issues of Fact Regarding Whether Plaintiffs Had a Serious Medical Need

Plaintiffs points out that there are three types of hernia situations: (1) a hernia that is strangulated, which is a medical emergency mandating surgery; (2) a hernia that is reducible yet so painful or debilitating that surgery is required; and (3) a hernia that is reducible and, given the dangers and risks inherent in any operation, can be treated through non-surgical means. *Johnson v. Doughty*, 433 F.3d 1001, 1014 (7th Cir.2006). As such, a hernia does not automatically present a serious medical need for the purposes of constitutional analysis. *Guy v. Carter*, No. CIV.A. 13-5730, 2014 WL 644321, at *9 (E.D. La. Feb. 19, 2014) (finding that an inmate's hernia did not present a

serious medical need when it presented no immediate medical emergency and was not so debilitating that immediate surgery was required); See also *Jones v. Schmidt*, No. CIV.A. 13-685-JJB, 2014 WL 6772493, at *4 (M.D. La. Dec. 1, 2014)(finding that the inmate, who had a reducible hernia, did not sufficiently allege that he had ever exhibited a medical need that was sufficiently serious).

The issue of whether each plaintiffs' reducible hernia was so painful or debilitating that surgery was required is an issue of fact, as weighing the credibility of plaintiffs' testimony regarding his pain level is required. Further, plaintiffs' medical records show that they each received treatment for their hernias, just not the treatment they believe they should have received. As such, there are issues of fact regarding whether each plaintiffs' reducible hernia presented a serious medical need and summary judgment should be denied.

Similarly, with cataracts, each plaintiff had different visual acuities and there is no evidence that each of them had a serious medical need. For example, Dickerson's worst visual acuity was 20/25, and McCaa's worst visual acuity was 20/40. Thus there are genuine issues of material fact and summary judgment should be denied.

### 2. Plaintiffs Failed to Meet Their Extremely High Burden of Proof Necessary to Establish a Medical Indifference Claim

It is well-settled that to prevail on an Eighth Amendment claim for the deprivation of medical care, a prisoner must be able to show that appropriate care has been denied and that the denial has constituted "deliberate indifference to serious medical needs."• *Thomas v. Carter*, 593 Fed. Appx. 338, 342 (5th Cir.2014), citing *Estelle v. Gamble*, 429 U.S. 97 (1976). Whether the plaintiff has received the treatment or accommodation that he believes he should have is not the issue because a prisoner's mere disagreement with his medical treatment, absent exceptional circumstances, does

not support a claim of deliberate medical indifference. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir.2006). Nor do negligence, neglect, medical malpractice or unsuccessful medical treatment give rise to a § 1983 cause of action. *Bagneris v. Collins*, No. CV 14-0724, 2016 WL 1122995, at *3 (M.D. La. Mar. 7, 2016), *report and recommendation adopted*, No. CV 14-724-SDD-EWD, 2016 WL 1189336 (M.D. La. Mar. 22, 2016). The Fifth Circuit has held that 'deliberate indifference is especially hard to show when the inmate was provided with ongoing medical treatment.' " *Henderson v. Tanner*, No. CV 15-804-SDD-EWD, 2019 WL 885914, at *5 (M.D. La. Feb. 22, 2019), quoting *Fails v. DeShields*, 349 F. App'x 973, 976 (5th Cir. 2009).

To be deliberately indifferent, the defendants must have acted with "a sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970). They must know of the serious risk to the prisoner's health, i.e., the serious medical need at issue, and they must also consciously disregard that risk/need so as to inflict cruel and unusual punishment upon the prisoner. *Farmer*, 511 U.S. at 837–38. A delay in medical care violates the Eighth Amendment only if it is based on deliberate indifference and results in substantial harm. *Cullum v. Texas Dep't of Criminal Justice*, 375 F. App'x 417, 419 (5th Cir. 2010). Based upon the facts of this case, and in light of established Fifth Circuit jurisprudence, plaintiffs cannot meet this burden.

### a.    Hernia claims

The evidence shows that the temporary policy that was implemented in 2013 was solely due to the closure of Earl K. Long and the need to prioritize medical care. Dr. Singh testified that DOC put together a group of doctors to promulgate guidelines for hernias during the transition.[29]

---

[29] R. Doc. 111-10, Deposition of Dr. Raman Singh, p. 51.

-13-

Prevailing medical opinion is that a reducible hernia, with no other issues related to incarceration, strangulation or significant pain, does not require immediate surgery.[30] Thus, contrary to plaintiffs' allegations, the temporary policy was not a blanket denial based on an administrative policy. Instead, the temporary policy was based on prevailing medical opinion, and was only in response to a shortage of operating rooms, and the need to prioritize medical care for all DOC inmates.

Therefore, plaintiffs cannot show the subjective element of the deliberate indifference standard, or that defendants acted with a "a sufficiently culpable state of mind." The record clearly shows that the purpose of the temporary policy was about prioritizing the need (See R.Doc. 109-12 "It is not about delaying care but to prioritize the need. There is limited OR availability"). Plaintiffs also cite to various "Hernia Repair Lists" throughout their motion. These lists are the anthesis of deliberate indifference. The lists demonstrate that LSP doctors were steadily evaluating each inmate and creating a category system to ensure that the inmates who were in most need of a surgical referral were able to be processed first. The DOC prioritized the need for inmate hernia surgeries given the limited operating room availability.

Plaintiffs incorrectly argue that every time a if-reducible-no-surgery policy has been implemented, it has been found to be unconstitutional. In fact, this Court found that **the precise policy at issue here** did not violate the Eighth Amendment. In *Davis v. Singh*, an inmate brought an action against Angola and DOC officials alleging the same hernia policy at issue here violated his constitutional rights.[31] This Court granted defendant's summary judgment. This Court noted

---

[30] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 51-52.

[31] *Davis v. Singh*, No. 16-0552, attached as Exhibit B.

that the 2013 policy was temporary and was only implemented due to the closure of Earl K. Long. Further, it was undisputed that "not all diagnosed incidences of hernia[s]... warrant surgical intervention, and the fact that a hernia may be easily reducible is one factor that militates in favor of conservative management." It was further noted that inmates are not entitled to the best medical care available or the most expeditious provision of such care. Thus, the policy did not violate the Eighth Amendment and the inmate's case was dismissed.

Further, in *Hamby v. Hammond*, 821 F.3d 1085, 1093 (9th Cir. 2016), the Ninth Circuit found that defendants were entitled to qualified immunity with regards to the inmate's deliberate indifference for non-surgical treatment of his hernia. Defendants had a similar policy to the policy at issue here, in that reducible hernias generally do not require surgery. The court noted:

> Dr. Hammond testified that in his medical opinion, hernias "typically" merit surgical treatment, but "[s]ometimes a condition can be monitored clinically without treatment." "Medical evidence and experience," he explained, "show that some reducible hernias can be clinically monitored and surgical repair is not required. Under those circumstances, monitoring or 'watchful waiting' is medically appropriate. Watchful waiting is ... medically acceptable for clinical management of both inguinal and umbilical hernias in many cases." Such monitoring can be done "more or less intensively," and will often involve behavior changes on the part of the patient and repeated examinations by medical personnel. Accordingly, Dr. Hammond testified, prison policy provides that surgery for reducible—otherwise known as non-incarcerated—hernias is deemed to be only "potentially medically necessary," and surgery in such cases must be specially approved on a case-by-case basis...Dr. Hammond declared that the CRC turned down Hamby's request for surgery because "there was no evidence that his hernia was incarcerated and [because] he was managing his activities of daily living."

See also *Vallado v. Segovia*, No. CA C-11-277, 2012 WL 1424982, at \*5 (S.D. Tex. Apr. 24, 2012), aff'd sub nom. *Vallado v. Mendez*, 547 F. App'x 396 (5th Cir. 2013)(wherein the court found that defendants were not deliberately indifferent in non-surgical treatment of plaintiff's hernia. In that case, defendants had a policy that "patients with a reducible hernia generally were not to be

referred to surgery.....Because Plaintiff's hernia was reducible, he did not meet the criteria for surgical referral").

Plaintiffs rely on two district court cases out of Oregon and Illinois. In *Delker v. Maass*, 843 F. Supp. 1390 (D. Or. 1994), <u>after a trial on the merits</u>, the court found that defendant's policy that surgery is never authorized for a routine, nonincarcerated, simple, small to moderate sized hernia, regardless of the inmate's subjective complaints, constituted deliberate difference. However, the temporary DOC policy in the present case was only put in place to prioritize the need for medical treatment. The permanent policy implemented does allow for surgery referral for a reducible hernia if there is significant pain or discomfort. Notwithstanding the fact that the *Delker* court made this determination after a trial on the merits and not on summary judgment, the policies at issue are distinguishable.

In *Heard v. Illinois Dep't of Corr.*, No. 06 C 644, 2012 WL 832566, at *1 (N.D. Ill. Mar. 12, 2012), defendant moved pursuant to FRCP 59 for remittitur only on the issue of punitive damages. The jury's determination that defendant was deliberately indifferent was not before the court. Again, deliberate indifference was only found after a trial on the merits. Further, the policy at question in *Heard* did not consider the inmates's level of pain as a factor in whether or not the inmate should have surgical repair of his hernia, which is distinguishable from the case at hand.

Numerous federal district and appellate courts throughout the United States have found that institutional policies dictating that reducible hernias should be treated non-operatively were medically and constitutionally appropriate. In *Jones v. Schmidt*, No. CIV.A. 13-685-JJB, 2014 WL 6772493, at *4 (M.D. La. Dec. 1, 2014), this Court noted that courts have often found that a failure

to undertake surgical intervention for a reducible hernia is not deliberate indifference to a serious medical need, citing *Clark v. Adams*, 233 Fed. Appx. 400 (5th Cir.2007) (upholding the dismissal, as frivolous, of an inmate's claim regarding a failure to provide surgical intervention for a reducible hernia) and *Mesa v. Kasule*, 2013 WL 2151706 (E.D.Tex. May 15, 2013) (dismissing an inmate's claim regarding non-surgical treatment of his hernia as frivolous). See also *Cullum v. Texas Dep't of Criminal Justice*, 375 F. App'x 417, 419 (5th Cir. 2010)(upholding the granting of summary judgment as to plaintiff's deliberate indifference claim where the delay in hernia surgery was two and one-half years); *Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006)(finding that doctor's decision to treat inmate's reducible  hernia by non surgical means was not deliberate indifference); *Hamby v. Hammond*, 821 F.3d 1085, 1094 (9th Cir. Wash. 2016)( finding that treatment of hernia by non-surgical means did not violate inmate's clearly established rights); *Brown v. Beard*, 445 Fed.Appx. 453, 455–56 (3rd Cir.2011) (per curiam) (holding prison medical personnel did not violate the Eighth Amendment when they refused to authorize surgery for a  prisoner's reducible hernia, instead prescribing pain medication and abdominal belt, plus monitoring, and despite another doctor's opinion that surgery was warranted); *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008)(classifying hernia surgery as elective did not violate inmate's Eighth Amendment rights); *Rossi v. Nevada Dep't Of Corr.*, 390 F. App'x 719, 720 (9th Cir. 2010)(upholding granting of summary judgment dismissing inmate's deliberate indifference claims for failure to receive hernia surgery).

Here, during the transition after Earl K Long was closed, hernia surgeries for reducible hernias were temporary put on hold. This policy was based on prevailing medical opinion, the need to prioritize the care and limited operating room availability. Each plaintiff was continuously treated

for their hernia during that time by Angola physicians. Even further, during the transition, if an inmate's hernia did not meet the guideline, but the physician felt the inmate needed a surgical consult, the physician could provide that information to DOC and the surgeon and request an evaluation.[32]  After the transition, DOC implemented permanent guidelines that list four indications for surgery referral: (1) hernia is not reducible; (2) hernia is very large is size and failing medical management; (3) any signs/symptoms indicating incarceration or strangulation; (4) significant pain/discomfort requiring narcotics/inpatient pain management. The DOC's policy is constitutionally appropriate, and summary judgment should be denied.

## b.    Cataract claims

Plaintiffs allege that cataracts surgeries are deemed elective and this somehow violates the constitution. Plaintiffs also make unsubstantiated allegations that DOC had a policy was delaying cataract surgeries, and allege that plaintiffs waited an average of 5.2 years for cataract surgery. This allegation is not supported by the medical records. For example, plaintiffs Dickerson and McCaa were never referred for cataract surgery because their cataracts were visually insignificant.[33] Plaintiff Blackwell was seen by outside ophthalmologist on several occasions and those doctors did not recommend surgery.[34] DOC cannot facilitate surgeries if the surgeons do not recommend it. Plaintiff Turner was evaluated by outside ophthalmologist who, in their medical judgment, determined that Turner's blood pressure and diabetes needed to be better controlled prior to surgery.[35] Kevin Mathieu

---

[32] R.Doc. 111-10, Deposition of Dr. Raman Singh, p. 114-115.

[33] R.Doc. 116-4; R.Doc. 98-4.

[34] Exhibit E, Blackwell Medicals.

[35] Exhibit F, Turner Medicals.

had a prior corneal transplant that complicated his treatment, he was provided surgery in one eye, and suffered a graft rejection, which had to addressed prior to a surgery in the other eye.[36] None of these facts show that DOC delayed surgery; instead the physicians determined a course of treatment, which is not deliberate indifference.

DOC Cataract Referral Guidelines provide that an inmate should be referred to special care if there is symptomatic, slow, progressive, painless decrease in vision that affects activities of daily living.[37] The Guidelines also provide inmates will visual acuities of 20/40 or better may be followed by the Angola physicians, and not referred for surgery.[38] These Guidelines were followed. If a plaintiff met the criteria for a surgical referral, they were referred to outside ophthalmologist. The course of treatment provided by the outside providers, based on each plaintiff's unique medical conditions, is not the DOC delaying surgery. Plaintiffs' claims are without merit.

Even further, plaintiffs have not identified a specific policy, nor have they alleged any specific defendant's involvement in such a policy. Thus they cannot show personal involvement, which is an "essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).

### 3.    Defendants Are Entitled to Qualified Immunity

Under the doctrine of qualified immunity, government officials acting within their discretionary authority are immune from civil liability for damages if their conduct does not violate

---

[36] Exhibit G, Mathieu Medicals.

[37] Exhibit C, Cataract Guidelines.

[38] *Id.*

clearly established constitutional rights of which a reasonable person would have known. *Flores v. City of Palacios*, 381 F.3d 391, 393-394 (5th Cir. 1984). The qualified immunity defense affords government officials not just immunity from liability, but immunity from suit. *Vander Zee v. Reno*, 73 F.3d 1365, 1368 (5th Cir. 1996) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985)). Qualified immunity allows officials the freedom to exercise fair judgment, protecting "all but plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Actions and decisions made by officials that are merely inept, erroneous, ineffective or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. *Alton v. Texas A&M University*, 168 F.3d 196, 201 (5th Cir. 1999). The defense of qualified immunity must be resolved at the earliest possible stage of litigation since it entails an immunity from suit and entitlement not to stand trial or face other burdens of litigation. *Pearson v. Callahan* 555, U.S. 223, 232 (2009).

The qualified immunity defense has two prongs: (1) whether an official's conduct violated a constitutional right of the plaintiff; and (2) whether the right was clearly established at the time of the violation. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir.2009). A court may rely on either prong of the defense in its analysis. *Id.* If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were "objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir.2004) (citations omitted). To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir.2008). In essence, a plaintiff must allege facts

-20-

sufficient to demonstrate that no reasonable officer could have believed his actions were proper. *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir.1994).

Although a plaintiff need not find "a case directly on point, ... existing precedent must have placed the ... constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741. That is, existing precedent must have replaced beyond debate the unconstitutionality of  the officials' actions, as those actions unfolded in the specific context of the case at hand. *Taylor*, 135 S.Ct. at 2044. Accordingly, the Supreme Court explained, "If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618, 119 S. Ct. 1692, 1701.

Given the foregoing doctrine, the question in this case must be: viewing the evidence in the light most favorable to plaintiff, at the time the defendants acted, was it "beyond debate" that their conduct violated the Constitution? If the answer is no– if the officials' actions did not clearly violate plaintiff's rights under the Eighth Amendment– then the officials are entitled to qualified immunity, and summary judgment must be entered in their favor. See *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

Plaintiffs cannot show that the alleged delay in hernia surgery violated a "clearly established right." Numerous district and appellate courts have found that treating a reducible hernia through non-operative medical treatment instead of surgery was medically appropriate and was not a violation of one's constitutional rights. See *Barrett v. Mississippi Dep't of Corr.*, 427 Fed. Appx. 349, 350 (5th Cir. 2011)(holding that defendants' non-surgical treatment of hernia did not constitute deliberate indifference); *Cullum v. Texas Dep't of Criminal Justice*, 375 F. App'x 417, 419 (5th Cir.

2010)(upholding the granting of summary judgment as to plaintiff's deliberate indifference claim where the delay in hernia surgery was two and one-half years); *Jones v. Schmidt*, No. CIV.A. 13-685-JJB, 2014 WL 6772493, at *4 (M.D. La. Dec. 1, 2014)(" [A]lthough the plaintiff apparently believes that surgery is appropriate for his condition, courts have often found that a failure to undertake surgical intervention for a reducible hernia is not deliberate indifference to a serious medical need."); *Clark v. Adams*, 233 Fed. Appx. 400 (5th Cir.2007) (upholding the dismissal, as frivolous, of an inmate's claim regarding a failure to provide surgical intervention for a reducible hernia); *Hamby v. Hammond*, 821 F.3d 1085, 1093 (9th Cir. 2016)("it is at least debatable that the officials complied with the Eighth Amendment, because– to the extent they played any role in the decision to deny [inmate] surgery for his umbilical hernia–the record makes clear that they did so based on legitimate medical opinions that have often been held reasonable under the Eighth Amendment."); *Jackson v. Jackson*, 456 Fed. Appx. 813, 814, (11th Cir. Ga. 2012)(finding that delay in hernia surgery was not deliberate indifference where the hernia remained treatable without surgery and did not pose of risk to inmate's health); and *Mesa v. Kasule*, 2013 WL 2151706 (E.D.Tex. May 15, 2013) (dismissing an inmate's claim regarding non-surgical treatment of his hernia as frivolous). See also *Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006)(finding that doctor's decision to treat inmate's reducible hernia by non surgical means was not deliberate indifference).

Because numerous courts have found that non-surgical treatment of a reducible hernia does not constitute deliberate indifference, it cannot be said that the right to hernia surgery for a reducible hernia is clearly established.    Defendants did not interfere with medical care as claimed by plaintiffs. In fact, plaintiffs were continuously treated for their hernias. Plaintiffs' broad sweeping allegations

that they are entitled to medical care does not show that defendants are not entitled to qualified immunity, as plaintiffs were in fact provided medical care.

Regarding cataract treatment, plaintiff cannot show that the failure to provide surgery violated a "clearly established right." The law is clear that medical opinion is controlling and will not be second guessed under a deliberate indifference standard. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'"). The cataract plaintiffs were treated in accordance with the outside physician's medical judgment. Thus, no clearly established rights were violated. See *Clark v. Adams*, 233 F. App'x 400, 401 (5th Cir. 2007) (finding that an inmate's allegation that a prison doctor should have referred him to corrective surgery did not amount to deliberate indifference, because the decision to provide additional treatment is a matter of medical judgment); see also *Samonte v. Bauman*, 264 F. App'x 634, 636 (9th Cir. 2008) (medical director's refusal to authorize cataract surgery after another doctor determined that such surgery was an option was a "difference of medical opinion," insufficient by itself to raise a triable issue of deliberate indifference, especially given that the inmate the doctors routinely saw him to monitor his condition); *Dupuis v. Caskey*, No. 4:08CV63–LRA, 2009 WL 3156527, at *4 (S.D.Miss. Sept. 28, 2009) (finding no deliberate indifference because cataract surgeries are considered elective (citing the American Optometric Association's Optometric Clinical Practice Guidelines)).

### B.     Plaintiffs' ADA Claim is Without Merit

"The ADA is a federal anti-discrimination statute designed '[t]o provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with

disabilities.'" *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567, 574 (5th Cir. 2002), quoting *Rizzo v. Children's World Learning Centers, Inc.*, 173 F.3d 254, 261 (5th Cir. 1999). Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to establish a violation of the ADA, a plaintiff must demonstrate:  (1) that he is a qualified individual within the meaning of the Act, (2) that he is being excluded from participation in or being denied the benefits of services, programs, or activities for which the defendants are responsible, or is otherwise being discriminated against by the defendants, and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *Lightbourn v. County of El Paso, Texas*, 118 F.3d 421, 428 (5th Cir.1997). A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination. *Carter v. Orleans Parish Pub. Sch.*, 725 F.2d 261, 264 (5th Cir.1984).

The plaintiffs do not have a disability as defined under the ADA, and their  claim for alleged inadequate medical treatment does not fall under the ADA.

### 1.    Plaintiffs Did Not Have a Disability As Defined Under the ADA

Under the ADA, the term "disability" means, with respect to an individual: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C.A. § 12102. A major life activity includes caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading,

-24-

concentrating, thinking, communicating, and working. 42 U.S.C.A. § 12102. Plaintiffs' medical records show that their medical conditions did not meet this definition.

Plaintiffs argue that by defendants providing a duty status, that each plaintiff had a disability as defined under the ADA. This interpretation of the ADA would lead to absurd results. Providing a temporary duty status does not automatically make an inmate disabled as defined under the ADA.

Looking to each plaintiffs' medical records, there is at least a genuine issue of fact as to whether each plaintiff was disabled. For example, most of plaintiffs' medical records indicate there was no or little pain associated with the hernias.[39] Further, many plaintiffs refused medical appointments on numerous occasions; an indication that the hernia did not substantially limit a major life activity.[40] Further, while plaintiffs argue that their "bowel" activity was substantially limited, the medical records show that the hernias did not involve the bowels.[41] Plaintiffs' attempt to expand the ADA to include reducible hernias within the definition of disability should be denied. Further, plaintiffs cannot rely on their self-serving declarations and ARPs to prove a disability, especially when those declarations are contradicted by the medical records.

Regarding cataracts, many of the cataract plaintiffs had visually <u>insignificant</u> cataracts. Further, under the ADA, the ameliorative effects of eyeglasses shall be considered in determining whether an impairment substantially limits a major life activities. 42 USCA 12102(4)(E)(ii). Thus,

---

[39] R.Doc. 91-4; R.Doc. 90-4.

[40] R.Doc. 91-4; 92-4; 94-4.

[41] R.Doc. 91-4; 90-4; 95-4; 94-4; 92-4.

an alleged statement that a plaintiff was legally blind is not an automatic finding of a "disability," as a plaintiff's visual acuity, with the help of eyeglasses, should be considered.

## 2.    Plaintiffs Were Not Discriminated By Reason of a Disability

Plaintiffs admit that the accommodation they sought was hernia or cataract surgery. Clearly, plaintiffs' core complaint is their underlying medical treatment, and is not a claim covered by the ADA. Even further, plaintiffs seem to argue that by issuing a duty status defendants have violated the ADA, and that the duty statuses also did not appropriately modify their work duties. The purpose of a  medical duty status is for a physician to give restrictions based on the inmate's needs, and so the classification department can assign an appropriate job. Providing a duty status is not "discrimination by reason of a disability." In fact, most plaintiffs requested these specific duty statuses.[42] Plaintiffs allege that they were prevented from participating in activities through restrictive duty statuses. However, the only "accommodation" would have been to provide surgery; a surgery that was not medically necessary. The ADA does not envision a requirement that a prison provide surgery on a reducible hernia or visually insignificant cataracts.

Further, plaintiffs argue that defendants classified individuals with disabilities (inmates with reducible hernias) and ordered that they receive different services than other inmates, i.e., that their hernia would be managed non operatively. Plaintiffs assert that defendants have applied an eligibility criteria from fully enjoying a "service;" the "service" being hernia surgery. Plaintiffs' claim is clearly not covered by the ADA.

---

[42]  R.Doc. 90-4; R.Doc. 103-4; R.Doc. 95-4; R.Doc. 92-4.

Courts routinely hold that when a plaintiff's core complaint is incompetent treatment for his underlying medical condition, such a complaint does not state a claim for relief under the ADA because "[t]he ADA does not create a remedy for medical malpractice." *Brown v. Wilson*, 2012 WL 6719464, *3 (N.D. Tex. Dec. 27, 2012). The ADA prohibits discrimination because of disability, not inadequate treatment for disability. Further, the ADA is not violated by a prison failing to attend to the medical needs of its disabled prisoners. *George v. Louisiana Dep't of Pub. Safety & Corr.*, No. CV31400338JWDEWD, 2016 WL 3568109, at *10 (M.D. La. June 23, 2016).

It is clear that plaintiffs' core complaint concerns disagreement with medical treatment, and not any discrimination by reason of an alleged disability. Plaintiffs are simply attempting to disguise a medical indifference claim in an attempt to obtain double-recovery by arguing that defendants failed to provide a "reasonable accommodation" of surgery. Such an accommodation is not covered by the ADA.

Plaintiffs cite to one case in support of their theory. In *Stillwell v. Kansas City*, plaintiff applied for an armed security guard license and was rejected based on fact that he had only one hand. He sued the Board of Police Commissioners for disability discrimination. The court found that the Board's rejection of all applicants with one hand constituted disability discrimination. Conversely, a temporary policy that placed hernia surgeries on hold for reducible hernias is clearly not "disability discrimination."

Finally, plaintiffs argue that defendants violated the ADA by denying Kevin Mathieu work release. Plaintiffs incorrectly state that Mathieu was denied work release due to his eyesight. Mathieu's medical records show that after receiving cataract surgery, the doctors were concerned

with a graft rejection.[43] The outside physicians continued to follow this complication, and the outside physician changed his level of care during that time. Therefore, plaintiffs have not shown that Mathieu was denied work release by reason of a disability; instead, there were other medical complications following his surgery that required monitoring.

## III.    Conclusion

Plaintiffs' summary judgment should be denied. Plaintiffs were continuously treated for their hernias and/or cataracts. In light of plaintiffs' medical treatment and the evidence in the record, plaintiffs cannot meet their burden under *Brauner* to show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs."  Further, plaintiffs' claims for inadequate medical treatment simply do not fall under the ADA. Because plaintiffs cannot meet their burden, not only should their motion for summary judgment be denied, but this Court should also grant the defendants' motions for summary judgment currently pending before this Court.

---

[43] See Exhibit G, Mathieu Medicals.

Respectfully submitted,

**JEFF LANDRY**
**Attorney General**

By:___ s/Andrew Blanchfield_____
       Andrew Blanchfield, T.A. (#16812)
       Email: ablanchfield@keoghcox.com
       C. Reynolds LeBlanc (#33937)
       Email: rleblanc@keoghcox.com
       Chelsea A. Payne (#35952)
       Email: cpayne@keoghcox.com
       Special Assistant Attorneys General
       701 Main Street (70802)
       Post Office Box 1151
       Baton Rouge, Louisiana  70821
       Telephone:  (225) 383-3796
       Facsimile:  (225) 343-9612

## CERTIFICATE OF SERVICE

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 20th  day of June, 2019.

_____ s/Andrew Blanchfield_____

Andrew Blanchfield