UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| EARL PETERS, IDDO BLACKWELL, KEVIN MATHIEU, LAVELLE MEYERS, DAN RILEY, RUSSELL WARE | * * * * * | CIVIL ACTION<br><br>NUMBER: 3:16-cv-00842-SDD-RLB |
| VERSUS | * * | JUDGE SHELLY D. DICK |
| RAMAN SINGH, JOHN BEL EDWARDS, JAMES M. LEBLANC, STEPHANIE LAMARTINIERE, DARRYL VANNOY, STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS | * * * * * * * * | MAGISTRATE RICHARD L. BOURGEOIS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**OPPOSITION TO STATEMENT OF MATERIAL FACTS
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

| Number | Plaintiffs' Fact | Defendants' Response |
|---|---|---|
| 1<br>Earl Peters | Plaintiff Earl Peters was diagnosed with a hernia at least as early as April 16, 2013, and on that date was referred to General Surgery for repair of Right Inguinal Hernia.[1]<br><br>On February 17, 2014, a surgery referral for Plaintiff Earl Peters was declined with the explanation that "Hold all surgeries if hernia is reducible per medical director effective 10-31-13."[2]<br><br>On May 20, 2015, Plaintiff Earl Peters' hernia was rated as a 4.5/5 on a scale of 1 to 5, and was described as a "Large (grapefruit size) herniation into scrotal sack – deviation of genitalia architecture."[3] | • An Angola physician referred Plaintiff to General Surgery on April 16, 2013, for repair of Right Inguinal Hernia. R.Doc. 94-4, Affidavit of Dr. Lavespere; Medical Records, Bates #001579.<br>• Plaintiff's April 30, 2013, visit to the Physician's Clinic was for follow up of right inguinal hernia, hypertension, eczema and constipation and was instructed to follow up in three (3) months. R.Doc. 94-4, Affidavit of Dr. Lavespere; Exhibit A-1, Medical Records, Bates #001577.<br>• On June 21, 2013, *a note from the Interim LSU Hospital* (IHL) stated that the referral placed by Angola for Earl Peters was carefully reviewed by a *clinician in the IHL general surgery clinic*, and after careful consideration, the service could not be authorized. Affidavit of Dr. Lavespere; Medical Records, Bates #001570.<br>• Plaintiff received continuous treatment for his hernia from 2013-2016. R.Doc. 94-4, Affidavit of Dr. Lavespere. |

---

[1] Ex. EE (000773541.xls); R. Doc. 79-5 at ¶ 3 (Defendants' Undisputed Facts).
[2] Ex. NNNN (Bates #017591-2); R. Doc 79-5 at ¶ 7 (Defendants' Undisputed Facts).
[3] Ex. XXX (Bates #005704); R.Doc 79-5 at ¶ 7 (Defendants' Undisputed Facts).

1

| | | |
|---|---|---|
| | On September 24, 2015, his hernia was rated as a 5 on a scale of 1 to 5, and Dr. Lavespere wrote "Very large RIH – non-reducible, scrotal involvement, needs repair."[4]<br><br>On August 3, 2016, Early Peters received hernia surgery.[5] | • Plaintiff's visit to the Physician's Clinic on May 20, 2015 was for hernia review. The physician noted that the hernia was getting larger and was now into the Plaintiff's scrotum. Last visit the hernia was 3.5/5 and today is 4.5/5. He was in no apparent distress with a grapefruit sized herniation into the scrotal sac with deviation of genitalia. The hernia was reducible with difficulty. Plaintiff was advised not to lift anything greater than 20 pounds, no sports and no rodeo for six (6) months and was advised to keep appointment and continue medication. R.Doc. 94-4, Affidavit of Dr. Lavespere; Medical Records, Bates #001563.<br>• Plaintiff was seen at the Physician's Clinic on June 22, 2015, and the physician ordered an extra-large scrotal support for hernia for the Plaintiff. R.Doc. 94-4, Affidavit of Dr. Lavespere; Medical Records, Bates #001562.<br>• On September 24, 2015, Plaintiff was seen at the Physician's Clinic for hernia review and was noted to have a very large Right Inguinal Hernia with scrotal involvement which deviated Plaintiff's penis to the left. The hernia was non-reducible and the physician planned to refer plaintiff for repair. R.Doc. 94-4, Affidavit of Dr. Lavespere; Medical Records, Bates #001559.<br>• The Eceptionist Record of October 1, 2015, was a request for general surgery appointment for Right Inguinal Hernia. The note of November 10, 2015, advised that the surgery onsite appointment would be scheduled when a date and time became available. The appointment was scheduled for March 16, 2016. R.Doc. 94-4, Affidavit of Dr. Lavespere; Medical Records, Bates #017593.<br>• Plaintiff was seen on March 16, 2016, at the General Surgery Clinic at LSP and noted to have a large Right Inguinal Hernia that was reducible, scrotal involvement and possible bladder involvement. Plaintiff was given a duty status of Regular Duty With Restrictions out of field, no lifting over 20 pounds and sports for three (3) months. The physician's plan was for hernia |

---

[4] Ex. NNNN (Bates #017593); R.Doc 79-5 at 7 (Defendants' Undisputed Facts).
[5] R. Doc. 79-5 at ¶ 30 (Defendants' Undisputed Facts).

2

| | | |
|---|---|---|
| | | • repair and labs. R.Doc. 94-4, Affidavit of Dr. Lavespere; Medical Records, Bates #001550.<br>• On March 23, 2016, Plaintiff underwent a Preoperative Chest X-Ray which showed slight fullness over the hila on the lateral view that was increased from Plaintiff's prior exam. R.Doc. 94-4, Affidavit of Dr. Lavespere; Medical Records, Bates #001531.<br>• The Eceptionist Record of March 28, 2016, requested a surgery date for Right Inguinal Hernia with Bowel Repair. The surgery was requested with Lallie Kemp on March 29, 2016 and on April 7, 2016, it was advised that Plaintiff's surgery was scheduled at Lallie Kemp on August 3, 2016. R.Doc. 94-4, Affidavit of Dr. Lavespere; Medical Records, Bates #017594. |
| 2<br>Russell Ware | On October 14, 2011, Russell Ware was diagnosed with a hernia.[6]<br><br>On November 20, 2012, he was referred to LSU Health General surgery for his hernia.[7]<br><br>On February 13, 2014, a surgery referral request was denied with the explanation that "Hold all surgeries if hernia is reducible per medical director effective 10-31-13."[8]<br><br>On a spreadsheet, entitled "LSP Hernia Repair List," dated March 28, 2014, there is a notation by Mr. Ware's name: "Declined by HQ."[9]<br><br>On June 28, 2016, Plaintiff's counsel sent a letter to Director Singh that Dr. Belott was willing to perform surgery on Mr. Ware.[10]  Director Singh never responded to the letter. | • In January 2013, plaintiff was seen for his surgical consultation at the Interim LSU Hospital via Telemedicine. It was noted that the hernia was reducible, plaintiff was wearing a support, there was no sign of obstructive symptoms, and plaintiff reported some pain with prolonged standing. The plan was elective repair of the hernia "when approved." The note from LSU doctors concerning "when approved" was referring to LSU's approval process. LSU needed approval from its board to schedule any offender surgery. R.Doc. 92-4, Affidavit of Dr. Lavespere; Medical Records, Bates #002336; R.Doc. 92-5, Deposition of Dr. Singh, pp. 171-175.<br>• The February 13, 2014 Eceptionist notes indicated that the hernia was reducible, that these surgeries were on hold, and instructed physician to re-submit the request if conditions changed. R.Doc. 92-4, Affidavit of Dr. Lavespere; Medical Records, Bates #002307.<br>• Dr. Singh testified that the doctor that plaintiffs' counsel recommended did not have a contract |

---

[6] Ex. PPP (Bates #002375); R.Doc 81-5 at ¶ 4 (Defendants' Undisputed Facts).
[7] R. Doc 81-5 at ¶ 5 (Defendants' Undisputed Facts).
[8] Ex. SSS (Bates #002641); R. Doc 81-5 at ¶ 8 (Defendants' Undisputed Facts).
[9] Ex. Z at Row 67.
[10] Ex. FF.

3

|  |  |  |
|---|---|---|
|  | Mr. Ware received surgery on May 10, 2017.[11] | with DOC, and therefore DOC could not allocate funds for surgery to that doctor. R.Doc. 92-5, Deposition of Dr. Singh, p. 160-161.<br>• Once Ware's hernia became reducible with discomfort, Dr. Lavespere sent a surgical referral. R.Doc. 92-4, Affidavit of Dr. Lavespere; Medical Records, Bates #0017649.<br>• Ware was seen by general surgery in February 2017, a surgery date was requested in February 2017, the surgery was originally scheduled for April 2017, and subsequently canceled by the surgeon. It was rescheduled and performed on May 10, 2017. See. R.Doc. 92-4, Affidavit of Dr. Lavespere; Medical Records, Bates #002461, #017653. |
| 3<br>Lavelle Myers | On June 13, 2012, Lavelle Myers was referred to general surgery for evaluation of a ventral hernia.[12]<br><br>On November 5, 2012, Dr. Lavespere noted that the plan for Mr. Myers was general surgery.[13]<br><br>On August 12, 2013, Dr. Lavespere notes that Lavelle's hernia is "urgent" and asks for "GI appt ASAP" for "ventral hernia".[14]<br><br>On February 13, 2014, Dr. Lavespere's request was declined, with the "reason for declining the referral" being "Hold all surgeries if hernia is reducible per Medical Director effective 10-31-13."[15]<br><br>On a spreadsheet entitled "LSP Hernia Repair List", dated March 28, 2014, there is a notation by Lavelle's name: "Declined by HQ.[16] | • The Eceptionist record for August 12, 2013 requests a colonoscopy. He did not classify the hernia as "urgent" but requested a colonoscopy that was noted to be urgent. The colonoscopy was scheduled. See. R.Doc. 95-4, Affidavit of Dr. Lavespere; Medical Records, Bates #001295.<br>• The February 13, 2014 Eceptionist record indicates that the because the hernia reduced easily, the surgical referral would be put on hold, and advised to resubmit if condition changed. See. R.Doc. 95-4, Affidavit of Dr. Lavespere; Medical Records, Bates #017585.<br>• Meyers was continuously treated for his hernia, and was rated 2.5/5 on several occasions. On April 15, 2016, the hernia was painful with |

---

[11] Ex. PPPP (Bates #017653); Ex. AAAAA (Bates #022538-40); R.Doc 81-5 at ¶ 24 (Defendants' Undisputed Facts).
[12] Ex. OOO (Bates #001292); R. Doc. 80-5 at ¶ 3 (Defendants' Undisputed Facts).
[13] Ex. OOO (Bates #001292); R. Doc. 80-5 at ¶ 3 (Defendants' Undisputed Facts).
[14] Ex. MMMM (Bates #017584).
[15] Ex. MMMM (Bates #017586); R. Doc. 80-5 at ¶ 10 (Defendants' Undisputed Facts).
[16] Ex. Z at Row 50 .

|   |   |   |
|---|---|---|
|   | Mr. Myers had his hernia repaired on September 6, 2016. [17] | reduction, and a surgical referral was sent. Meyers was seen by Dr. Morrison on July 7, 2016, and the surgeon scheduled the surgery for September 16, 2016. See. R.Doc. 95-4, Affidavit of Dr. Lavespere; Medical Records, Bates #001258, #001252, #001244, #001230, #001228, #001227. |
| 4 Wallace Breaux | On June 12, 2008, Wallace Breaux was diagnosed with a "large" hernia.[18]<br><br>On June 30, 2011, a doctor referred Mr. Breaux to the Surgery Clinic for his hernia.[19]<br><br>Wallace's name appeared on a spreadsheet dated May 21, 2012, with the notation "Hernia surgery needed."[20]<br><br>On June 16, 2012, a doctor noted "incarceration" regarding his left hernia.[21]<br><br>On September 26, 2012, a doctor notes left inguinal hernia awaiting surgical repair.[22]<br><br>On January 11, 2013, a doctor noted "Left inguinal hernia, due for c-scope, then LIH surgery."[23]<br><br>On September 16, 2015, a doctor wrote "surgery needed."[24]<br><br>He received hernia surgery on December 6, 2017. [25] | • On January 21, 2012, Ware was seen by general surgery for an Inguinal Hernia. The plan was for Plaintiff to undergo a C-Scope (diagnostic colonoscopy) and to return to clinic after the C-Scope to schedule surgery. See R.Doc. 103-4, Affidavit of Dr. Lavespere; Medical Records, Bates #015841.<br>• Regarding the C-Scope referral, according to a note on the Eceptionist Record dated July 16, 2012, the referral was reviewed and denied by the *outside Gastroenterology Department* as Plaintiff's medical condition did not meet criteria for an appointment at that time due to Earl K. Long Clinic capacity. R.Doc. 103-4, Affidavit of Dr. Lavespere; Medical Records, Bates #015817-015818.<br>• There is no medical record dated September 16, 2015 wherein a doctor noted that surgery is needed. See Exhibit EEEE, 15736 (medical record is dated June 8, 2015, and there is no notation that hernia surgery is needed. In fact, on September 29, 2015, it was noted that the hernia was not identifiable with visual inspection, it was rated a 2.5/5 and the plan was to manage per guidelines. R.Doc. 103-4, Affidavit of Dr. Lavespere; Medical Records, #015727.<br>• On September 21, 2017, plaintiff saw Dr. Lavespere for hernia review. The notes indicate that there was no obvious hernia and no scrotal |

---

[17] Ex. MMMM (Bates #017588); R. Doc. 80-5 at ¶ 23 (Defendants' Undisputed Facts).
[18] R. Doc. 82-5 at ¶ 2 (Defendants' Undisputed Facts) .
[19] R. Doc. 82-5 at ¶ 3 (Defendants' Undisputed Facts).
[20] Ex. ZB; Ex. H.
[21] Ex. EEEE (Bates #015823).
[22] Ex. EEEE (Bates #015811).
[23] Ex. EEEE (Bates #015806).
[24] Ex. EEEE (Bates #015736).
[25] R. Doc. 82-5 at ¶ 33 (Defendants' Undisputed Facts).

| | | | |
|---|---|---|---|
| | | | edema. It was noted that there was an obvious disruption in linea alba and the protrusion was evident when raising feet off of the floor while supine. It was noted that plaintiff had rectus diastasis. Dr. Lavespere informed plaintiff that his condition did not usually warrant surgery, but because of pain he would refer plaintiff to Dr. Morrison for a surgical evaluation. R.Doc. 103-4, Affidavit of Dr. Lavespere; Medical Records, #021188. |
| 5 Herman Bella | Herman Bella was diagnosed with a hernia at least as early as June 15, 2010.[26]<br><br>On August 29, 2013, Dr. Collins requested a surgery clinic appointment for his hernia.[27]<br><br>On February 13, 2014, Dr. Lavespere's request was declined by a DOC HQ coordinator, with the "reason for declining the referral" being "Hold all surgeries if hernia is reducible per Medical Director effective 10-31-13."[28]<br><br>On September 12, 2016, he was referred to general surgery because of a "fist sized" hernia.[29]<br><br>On January 24, 2017, Mr. Bella received hernia surgery.[30] | | • The Eceptionist Record of August 29, 2013 was an appointment request for Bella to be seen at the Surgery Clinic due to history of Right Inguinal Hernia. The notes of January 8, 2014, February 13, 2014 and February 17, 2014, noted that Plaintiff's surgery was to be put on hold due to the fact that the hernia reduced easily. Bella was to be monitored by his Primary Care Physician and the request for referral was to be resubmitted if Plaintiff's condition changed. R.Doc. 90-4, Affidavit of Dr. Lavespere; Medical Records, #017470-017471.<br>• Bella was seen numerous times from 2014-2016. He did not complain of a hernia on numerous visits, and when the hernia is mentioned in the records the doctors noted it was easily reducible, small and did not cause issues with bowel movements. Once the hernia became reducible with discomfort, Bella was referred for a surgical evaluation. R.Doc. 90-4, Affidavit of Dr. Lavespere. |

---

[26] Ex. UUU (Bates #002765); R. Doc. 75-5 at ¶ 3 (Defendants' Undisputed Facts).
[27] Ex. HHHH (Bates #017470).
[28] Ex. HHHH (Bates #017471); R. Doc. 75-5 at ¶ 7 (Defendants' Undisputed Facts).
[29] Ex. UUU (Bates #002778).
[30] Ex. RRRR (Bates #019687, 019688); R. Doc. 75-5 at ¶ 18 (Defendants' Undisputed Facts).

| | | |
|---|---|---|
| 6 Ronald Ailsworth | On January 25, 2013, Mr. Ailsworth's doctor-assessed medical history included a right inguinal hernia.[31]<br><br>On July 11, 2013, a doctor's assessment was Right Inguinal Hernia – "await surgery."[32]<br><br>By March 22, 2017, a doctor noted that his hernia was larger than fist sized, with "superficial scrotal involv, + architect deviation" and that it was reducible with difficulty.[33]<br><br>On March 28, 2017, a doctor recommended an appointment with the surgery clinic for the hernia.[34]<br><br>On August 16, 2017, a doctor requested hernia repair for Mr. Ailsworth.[35]<br><br>On October 2, 2017, Mr. Ailsworth received hernia surgery.[36] | • From the time Ailsworth's hernia was diagnosed, until surgery was performed, Ailsworth received continuous treatment for his hernia. Further, Ailsworth refused numerous medical appoints. See R.Doc. 91-4, Affidavit of Dr. Lavespere.<br><br>• On March 22, 2017, a referral for a surgical consultation was sent. Angola requested an appointment and was notified that Ailsworth would be scheduled as soon as the surgeon had availability, but to advise if earlier appointment was needed due to change in medical condition. See R.Doc. 91-4, Affidavit of Dr. Lavespere.<br>• On July 26, 2017, Plaintiff was seen at Angola by Dr. John B. Morrison, staff surgeon at University of New Orleans. Dr. Morrison referred Plaintiff for a Right Inguinal Hernia repair. See R.Doc. 91-4, Affidavit of Dr. Lavespere.<br>• On August 16, 2017, a surgery date was requested for repair of a right inguinal hernia. After numerous days waiting for an available operating room from Lallie Kemp, Plaintiff's surgery was scheduled for October 2, 2017. See R.Doc. 91-4, Affidavit of Dr. Lavespere. |
| 7 William Dickerson | On June 22, 2011, Mr. Dickerson was diagnosed with a cataract in his left eye.[37]<br><br>On March 19, 2012, he was referred for surgery.[38] | • On March 19, 2012, Dickerson was scheduled for a trip pit to ELK for uveitis and evaluation for cataract in his left eye. Plaintiff was seen at the EKL Eye Clinic on April 3, 2012. A YAG Capsulotomy (special laser treatment used to improve vision after cataract surgery) was performed on plaintiff's right eye this date. He |

---

[31] Ex. CCCC (Bates #011201).
[32] Ex. CCCC (Bates #011186).
[33] Ex. CCCC (Bates #011109); R. Doc. 76-5 at ¶ 9 (Defendants' Undisputed Facts).
[34] Ex. GGGG (Bates #017468).
[35] Ex. SSSS (Bates #019696); Ex. TTTT (Bates #019698); R. Doc. 76-5 at ¶ 12 (Defendants' Undisputed Facts).
[36] Ex. UUUU (Bates #019784); R. Doc. 76-5 at ¶ 13 (Defendants' Undisputed Facts).
[37] Ex. VVV (Bates #003818); Ex. ZF at 2.
[38] Ex. ZF at 2; Ex. VVV (Bates #003816).

7

| | | |
|---|---|---|
| | On August 22, 2012, he was ordered for "Trip out cataract surgery."[39]<br><br>He was ordered for cataract surgery again in September 2012.[40]<br><br>Mr. Dickerson is still waiting for that cataract surgery.[41]<br><br>On December 21, 2015, Mr. Dickerson was diagnosed with a left inguinal hernia.[42]<br><br>On April 15, 2016, Dr. Lavespere noted that it was "getting larger" and causing "mid pubic pain" and "+/- difficulty" with bowel movements.[43]<br>It was greater than fist sized, in the superior aspect of Mr. Dickerson's scrotum, and "difficult to reduce but reducible" with discomfort. It was causing architectural deviation of his genitals, pushing Mr. Dickerson's penis to the right.[44] He rated it a 4.5 out of 5, and planned for a general surgery consult.[45] He wrote "please eval for repair."[46]<br><br>He received hernia surgery on November 29, 2016. [47] | was given medication and a follow-up appointment on April 10, 2012. Surgery was not recommended by the surgeon. R.Doc. 116-4, Affidavit of Dr. Lavespere, Bates #014052, #013781 & 013785.<br>- Dickerson's medical records do not indicate that he was referred for cataract surgery in September 2012.<br>- Dickerson was seen at University Medical Center on March 12, 2013, and plaintiff requested that he be referred for cataract surgery in the left eye. Plaintiff was noted to have recently been treated for uveitis in the right eye. Plaintiff had no eye pain but did have a history of recurrent iritis since 1996 which plaintiff believes began after a spider bite. Plaintiff was also noted to have had cataract surgery in the right eye in 2005. Plaintiff was assessed with uveitis of the left eye, prebyopia and suspected glaucoma which was to be followed by a physician at the jail. No surgical referral was given by the University Medical Center physician at that time.<br>- R.Doc. 116-4, Affidavit of Dr. Lavespere, Bates #008864.<br>- There have been no referrals by a surgeon for cataract extraction, despite being seen by an outside Ophthalmologist of numerous occasions. Plaintiff's last visual acuity was 20/25. See. R.Doc. 116-4, Affidavit of Dr. Lavespere.<br>Hernia<br>- Dickerson was diagnosed with a hernia in December 2015, but refused his appointment with Dr. Lavespere to assess the hernia. He was seen on April 15, 2016, and a surgical referral was made the same day. The outside surgeon scheduled his appointment for July 2016. In |

---

[39] Ex. VVV (Bates #003814).
[40] Ex. ZA at Row 44.
[41] Ex. FF at 9 (Declaration of W. Dickerson).
[42] R. Doc. 77-5 at ¶ 2 (Defendants' Undisputed Facts).
[43] Ex. ZG at 1.
[44] Ex. ZG at 2; R. Doc. 77-5 at ¶ 4 (Defendants' Undisputed Facts).
[45] Id. at 1; R. Doc. 77-5 at ¶ 4 (Defendants' Undisputed Facts).
[46] Id. at 2; R. Doc. 77-5 at ¶ 4 (Defendants' Undisputed Facts).
[47] R. Doc. 77-5 at ¶ 15 (Defendants' Undisputed Facts).

| | | | |
|---|---|---|---|
| | | | August 2016 a surgery date was requested, and was scheduled for September 2016. The surgery was cancelled due to multiple skin lesions, and was rescheduled November 2016. See R.Doc. 93-4, Affidavit of Dr. Lavespere. |
| 8<br>Iddo Blackwell | On February 24, 2012, a doctor noted Iddo Blackwell had a "bad cataract" in his right eye.[48]<br><br>On March 14, 2012, the doctor noted that "The patient needs an evaluation at LSU Eye Center in preparation for cataract surgery, both eyes."[49]<br><br>On November 28, 2012, Dr. Coullard noted that Mr Blackwell had been referred out, and was waiting on an appointment for surgery.[50]<br><br>On January 22, 2013, Mr. Blackwell was again referred for surgery.[51]<br><br>By June 5, 2013, Dr. Coullard assessed Mr. Blackwell's left eye to be 20/200 and his right eye only "light perception."[52] Mr. Blackwell was therefore legally blind.<br><br>Dr. Coullard noted that the cataract in the right eye was "hypermature" and referred him for a trip out.[53]<br><br>By January 16, 2015, Mr. Blackwell's eyes were "hand motion" in his right eye and 20/400 in his left eye.[54] A doctor wrote: "Recommend cataract extraction, right eye first."[55] | | • The surgical referral was sent to IHL. LSU IHL advised on January 22, 2013, that the referral placed for Plaintiff was carefully reviewed by a clinician and it was determined that the service could not be authorized (Bates #000089).<br>• On August 26, 2013, an Eceptionist record was filled out requesting cataract surgery for Plaintiff. A note from Diane Angelico advised that Plaintiff would not be able to be seen by an eye clinic physician until after January, 2014; however, Plaintiff was able to obtain an appointment for December 9, 2013 (Bates #017492).<br>• Defendants object to plaintiffs' statement regarding legal blindness, as there is no notation on the medical record of such.<br>• Plaintiff was seen by Dr. Yen Hoang Ngo at LSU ILH on December 9, 2013, who noted that Plaintiff was referred by an optometrist for evaluation of cataracts in both eyes and complained of blurry vision in both eyes for years which had gradually worsened. Plaintiff was noted to have diabetes, blurry vision and possible cataracts. (Bates #000070). No surgery was recommended. |

---

[48] Ex. MMM (Bates #000108).
[49] Ex. AAAA (Bates #008359); See also Ex. ZF.
[50] Ex. MMM (Bates #000221).
[51] Ex. ZF at 1.
[52] Ex. MMM (Bates #000220).
[53] Ex. MMM (Bates #000220).
[54] Ex. MMM (Bates #000062).
[55] Ex. AAAA (Bates #008376).

| | | |
|---|---|---|
| | On March 30, 2015, Mr. Blackwell received surgery on his right eye.[56] A left-eye surgery date in August 2015 was cancelled due to high glucose, and so Mr. Blackwell received surgery on his left eye on December 14, 2015.[57] | • The November 14, 2014, Eceptionist record was an Ophthalmology Referral request for Plaintiff due to blurry vision and possible cataracts. Plaintiff's appointment scheduled for December 30, 2014 was cancelled by the MD due to a family emergency and the appointment was rescheduled for January 16, 2015 (Bates #017493).<br>• Plaintiff was recommended for surgery by IHL surgeon on January 15, 2015. Bates # 000061.<br>• The Eceptionist record of January 21, 2015 was a referral for cataract surgery for Plaintiff which was scheduled for March 30, 2015 |
| 9<br>Jimmy Turner | On November 11, 2011, Mr. Turner had a trip out to be evaluated for right eye cataract surgery.[58]<br><br>On February 28, 2012, Dr. Lavespere noted that Mr. Turner was "recently back from optho appt" and "needs cataract sx R eye."[59]<br><br>By July 24, 2012, a coordinator noted that Mr. Turner was approved by "surgical Review Committee if Drs deem surgery is indicated."[60]<br><br>On August 28, 2012, his right cataract was again noted and the doctor's plan was "Trip out for cataract surgery."[61]<br><br>By November 28, 2012, a doctor noted he had a "dense cortical cataract."[62]<br><br>On June 5, 2013, he was again referred for a trip out for cataract surgery.[63] | • Plaintiff was seen by the outside UMC providers on September 5, 2012. It was noted that Plaintiff's best corrected visual acuity in the right eye was 20/25 and the plan was to observe and refract in the next exam; the pseudophakia in the left eye was stable; Plaintiff needed better control over his diabetes mellitus; Plaintiff needed better control over his blood pressure as it related to his hypertensive retinopathy; and the BRAO in the left eye versus old retinitis was discussed with additional doctors and it was noted that the IVFA performed showed partial flow through the artery. Labs were ordered and the doctors recommended that the prison team order a |

---

[56] Ex. MMM (Bates #000049).
[57] Ex. MMM (Bates #000267, 000282).
[58] Ex. ZC at page 244.
[59] Ex. DDDD (Bates #014589).
[60] Ex. DDDD (Bates #014573).
[61] Ex. ZC at page 237.
[62] Ex. DDDD (Bates #014526).
[63] Ex. ZC at page 235.

10

| | | |
|---|---|---|
| | On August 26, 2013, a doctor submitted "REQUEST CATARACT SX" in Eceptionist.[64]<br><br>On June 13, 2016, Mr. Turner received right eye surgery. | carotid ultrasound and 2-D echocardiogram. (Bates #015166).<br>• Plaintiff was seen on February 27, 2013, at the UMC Tulane Clinic for retina evaluation regarding a branch retinal vein occlusion and cataract. Plaintiff's visual acuity right eye was 20/40 and in the left eye was 20/25 -3. His left eye was noted to be PCIOL and the vessels were sclerotic arcade superiorly. Plaintiff's right eye contained a 2+ cortical senile cataract and 2+ posterior subscapular cataract. **That cataract in the right eye was to be observed** and refracted at the next exam; psuedophakia in plaintiff's left eye was stable; the doctor wanted better control of plaintiff's diabetes and blood pressure; all of plaintiff's labs were negative and it was noted that plaintiff was to follow up in six (6) months for general follow up for carotid ultrasound and echo (Bates # 015205-015209) (emphasis added).<br>• Plaintiff was seen on December 9, 2013, at the ILH Telemedicine Clinic. Plaintiff was noted to have a cataract in his right eye and the best visual acuity was noted to be 20/25. The doctor's plan was to observe plaintiff and for him to see the jail optometrist for refraction and glasses. The pseudophakia to plaintiff's left eye was noted to be stable. Plaintiff was noted to have diabetes without retinopathy as of February, 2013 and he needed to better control his diabetes and blood pressure. The carotid ultrasound was reviewed which reported minimal artherosclerotic plaque but the echo showed patent foramen oval and was a positive bubble study for intracardiac right to left shunt. Plaintiff was to follow up in six (6) months and was to be referred to Cardiology as soon as possible for evaluation of PFO (patent foramen ovale) as well as to see the jail optometrist for refraction and glasses (Bates #014484).<br>• Plaintiff was seen from 2014-2016 by outside physicians concerning his diabetes and blood pressure, and underwent numerous tests to control these issues. |

---

[64] Ex. OOOO (Bates #017623)

11

| | | |
|---|---|---|
| | | • On April 12, 2016, UMC recommended cataract extraction. (Bates #015260, #015266-015267). |
| 10 Kevin Mathieu | March 6, 2013, a doctor noted that Kevin Mathieu had declining vision and cataracts, with a bilateral visual acuity of 20/200. [65] <br><br> On June 28, 2013, the doctor recommended him for cataract surgery in both eyes.[66] That same day, Dr. Coullard wrote that Mr. Mathieu was "legally blind" (underlined in original).[67] <br><br> On October 14, 2013, a doctor creates a plan for Kevin: "cataract evaluation and surgery."[68] <br><br> On November 18, 2013, a doctor noted that Kevin had "problems reading secondary to cataracts" and noted that he had "opth f/u- surg pending."[69] <br><br> On March 6, 2014, Dr. Barron ordered cataract extraction in the right eye first.[70] DOC HQ coordinator Diane Angelico wrote "So, this surgery is approved? IF so, will ask drs for date." Jannell Mills responded "yes can you get you a date please thanks!"[71] <br><br> On June 29, 2015, Kevin had left eye cataract surgery. [72] <br><br> On November 9, 2016, Kevin was denied work release due to "medical concerns."[73] On January 12, 2017, Dr. Salisbury cleared Kevin for work | • Plaintiff was seen at the LSU Telemedicine Clinic on October 14, 2013. Plaintiff's diagnosis was a cataract and he complained of blurred vision at this visit. He was noted to have been seen by the jail optometrist and was told he had a cataract in both eyes with a visual acuity of 20/200 in both eyes. He had a questionable previous history of corneal transplant in the left eye at age 18 although Plaintiff was not certain as to the type of surgery he had. He advised he had no previous eye trauma. **The physician requested that Plaintiff be seen again in 3 months for evaluation and surgery regarding cataracts** (Bates #000635). <br> • Plaintiff was seen at the LSU Eye Clinic on March 5, 2014, with a PKP graft noted. Plaintiff was status post penetrating keratoplasty in the left eye at age 18, with corneal topography revealing 18.73 diopters of cylinder. He was also noted to have nuclear sclerotic, cortical and posterior subscapular cataracts in both eyes. Plaintiff's best corrected vision was 20/80 in the right eye and 20/100 in |

---

[65] Ex. NNN (Bates #000643); *See also* Ex. ZF.
[66] Ex. NNN (Bates #000662).
[67] Ex. ZD at page 146.
[68] Ex. NNN (Bates #000632, 000635)
[69] Ex. NNN (Bates #000634).
[70] Ex. KKKK (Bates #017536).
[71] Ex. KKKK (Bates #017536).
[72] Ex. NNN (Bates #000522, 000558, 000559).
[73] Ex. HH.

|  | release.[74] On July 31, 2017, Kevin was released without having received right eye surgery.[75] | the left eye, with a large amount of astigmatism noted to contribute to decreased vision in Plaintiff's left eye. The physician recommended cataract extraction in both eyes, with extraction in the right eye first (Bates #000611).<br>• An Eceptionist form was filled out on March 6, 2014, for Plaintiff to be referred for cataract extraction of the right eye. Due to the high volume of cases, Plaintiff's surgery was originally scheduled for September 29, 2014 (Bates #017536-017537). The physicians at ILH requested that Plaintiff be seen once more at the clinic and then he would be scheduled for surgery. Plaintiff's next appointment was scheduled for October 15, 2014.<br>• An Eceptionist form was filled out on October 27, 2014, for Plaintiff to be referred for right eye cataract extraction due to a cataract in the right eye. It was noted on October 30, 2014, that, per an email from Dr. Barron at LSU Eye Clinic, Plaintiff was "NOT to have cataract surgery at this time. He was seen recently, and a request was made to have him fitted with contact lenses to see if these will improve his vision prior to proceeding with cataract surgery" (Bates #017541).<br>• Plaintiff was seen at the Ophthalmology Clinic on November 26, 2014, for cataract. It was noted that there was no improvement in plaintiff's visual acuities with contact lenses and Plaintiff was to be evaluated for PKP and cataracts and possible cataract surgery (Bates #000593).<br>• An Eceptionist record was filled out on December 9, 2014, for Plaintiff to be seen at the Eye Clinic to be evaluated for PKP, which appointment was scheduled for January 6, 2015, at the ILH Eye Clinic (Bates #017543).<br>• Plaintiff was seen at the ILH Eye Clinic on January 6, 2015, and was noted to have a history of PKP in his left eye and cataract in his right eye. It was noted that Plaintiff had been |
|---|---|---|

---

[74] Ex. NNN (Bates #000733).
[75] Ex. CCCCC (Bates #023100).

| | | |
|---|---|---|
| | | given a trial of contact lenses in his right eye but was found not to be beneficial and Plaintiff was advised he would be rescheduled for cataract surgery in the right eye. Cataract surgery was to schedule when available (Bates #000568-000569).<br>• Following the surgery, doctors were concerned that plaintiff was having a graft rejection and continued to follow up monthly. His "medical concerns" were not due to cataracts, but edema, graft rejection and hypertension. (Bates #000887, #000904-000907, Bates #000878, #000854, #000846, Bates #000838, #000820, #000807, #000793, #000791, #000772). |
| 11<br>Ross McCaa | On April 24, 2009, Ross McCaa was diagnosed with cataracts.[76]<br><br>On November 5, 2012, a doctor noted cataracts in both eyes, and set the plan to be cataract surgery in the right eye first.[77]<br><br>On October 19, 2016, the eye clinic noted a "dense cortical" cataract in Mr. McCaa's right eye, and a less serious cataract in his left eye.<br><br>Mr. McCaa has not yet received cataract surgery on either eye.<br><br>On May 9, 2016, a doctor noted a left inguinal hernia, and set the plan to be "surgery consult hernia."[78]<br><br>On November 14, 2016, Dr. Lavespere ordered "Please sched apt with Onsite Surg cln."[79]<br><br>On November 29, 2016, a doctor noted that the hernia was growing into Mr. McCaa's scrotum.<br><br>On July 13, 2017, it was noted that "Dr. Morrison in gen sx clinic at LSP | • McCaa's medical records indicate that he was first diagnosed with cataracts in February 2011. See R.Doc. 98-4, Affidavit of Dr. Lavespere.<br>• The November 5, 2012 appointment was at Angola Eye Clinic with an optometrist, who cannot recommend surgery. McCaa's visual acuity that day was 20/25 in both eyes. The record indicates that there was a cataract in right eye that was greater than left eye. See. Affidavit of Dr. Lavespere, Bates #021580.<br>• McCaa has never been recommended for cataract surgery as a referral was not warranted. His worst visual acuity was 20/40. See Affidavit of Dr. Lavespere,<br><br>Hernia<br>• On November 14, 2016, an Eceptionist form was filled out for plaintiff to be seen by the on-site general surgery clinic. It was noted that, due to the increased volume of referrals, plaintiff's appointment would be scheduled when an appointment became available and according to the time frame given by the on-site surgery clinic physician. The general surgery appointment was scheduled for June 14, 2017. See R.Doc. 78-4 Affidavit of Dr. Lavespere, Bates #017583. |

---

[76] Ex. ZF.
[77] Ex. WWW (Bates #005072).
[78] 005061; 017051; R. Doc. 78-2 at ¶ 2 (Defendants' Undisputed Facts).
[79] 017583; R. Doc. 78-2 at ¶ 4 (Defendants' Undisputed Facts).

14

| | | |
|---|---|---|
| | recommending hernia repair please schedule as ordered.[80]<br><br>On August 28, 2017, Mr. McCaa received hernia surgery.[81] | • Plaintiff was a no-show for the June 14, 2017 appointment, which was rescheduled. See R.Doc. 78-4 Affidavit of Dr. Lavespere, Bates #021574.<br>• Plaintiff was seen in the General Surgery Clinic at LSP by Dr. Morrison on July 12, 2017. It was noted that plaintiff had a history of swelling to the left groin, which was slowly increasing in size. Repair of the left inguinal hernia was recommended. R.Doc. 78-4, Affidavit of Dr. Lavespere, Bates #021573.<br>• An Eceptionist record was filled out on July 13, 2017, for Plaintiff to be scheduled for surgery for a left inguinal hernia repair. R.Doc. 78-4, Affidavit of Dr. Lavespere, Bates #019695; Bates #019813-019814. |
| 12 | Some reducible hernias require surgery.[82] | If a physician determines that a reducible hernia has other issues or symptoms that would indicate surgery is needed, it may require surgery. Deposition of Dr. Lavespere. |
| 13 | A list, dated May 21, 2012, was generated of Angola inmates with the notation "Hernia surgery needed."[83] | |
| 14 | An Offender Surgical Procedure Request form was created that said, in part: "Reducible Hernia – to be managed non-operatively.[84] | The form was created in the time that DOC needed to prioritize the care. Further, Dr. Singh testified that this form was used to determine the surgeries that needed to happen quickly. If the PCP looked at all of the factors with a reducible hernia. There were exceptions to the managing non-reducible hernia non-operatively, and a physician would use their medical judgment. Deposition of Dr. Singh, pp. 68-76. |
| 15 | Notes from a November 13, 2013, meeting say, in part, "If/when a surgeon documents the need for the hernia repair it is hard to overrule this decision" and "If they do not meet criteria do not send to surgeon. Reducible hernia's will be managed non-operatively by PCP at prison."[85] | Plaintiffs leave out the portion of the minutes wherein it states: "It is not about delaying care, but to prioritize the need." See Exhibit M. |

---

[80] 019695.

[81] 019813 – 019815; R. Doc. 78-2 at ¶ 8 (Defendants' Undisputed Facts).

[82] Johnson v. Doughty, 433 F. 3d 1001, 1014 (7th Cir. 2006) (there is a category of hernia "that is reducible yet so painful or debilitating that surgery is required").

[83] Ex. K (2012 Hernia List) at 3.

[84] Ex. L.

[85] Ex. M (Hernia 001023) at 1.

15

| 16 | Some Eceptionist entries of referrals for hernia surgery evaluation say, in part, "Reason for declining the referral: Hold all surgeries if hernia is reducible per Medical Director."[86] | |
|---|---|---|
| 17 | On January 13, 2014, an email with Dr. Singh's name was sent that said in part, "There are approximately 100 referrals for reducible hernias; can the referrals be closed and let the PCP monitor and re refer if change in condition?"[87] | Plaintiffs misrepresent this email, throughout their motion. The email was sent by Melanie Benedict, not Dr. Singh. Contrary to plaintiffs' assertion in their motion, this email does not represent that anyone cancelled referral, much less Dr. Singh, as he did not author the email. See Exhibit P. |
| 18 | The 2014 Guidelines for Offender Care regarding hernias state, in part, that "if hernia is reducible continue to manage non-operatively."[88] | Dr. Singh testified that this document is not a policy. (See R.Doc. 94-6 130-131). The 2014 Hernia Guidelines actually state that a physician should refer an inmate for surgical consultation if the hernia is not reducible, the hernia is large in size and failing medical management, there are signs of incarceration, or significant pain requiring narcotics or pain management. See. R.Doc. 94-6. |
| 19 | Per DOC Policy No. HC-16 and LSP Directive No. 13.030, cataract surgery is classified as an "elective procedure.[89] | |
| 20 | Per DOC Policy No. HC-16 and LSP Directive No. 13.030, an "elective procedure" is: "Any planned non-emergency procedure. It may be either medically necessary (e.g., cataract surgery, routinely scheduled heart surgery, etc.) or optional (e.g., cosmetic, etc.)."[90] | |
| 21 | In letter dated November 9, 2016, Kevin Mathieu was told he was "not eligible" for work release "due to medical concerns."[91] | |
| 22 | In a letter with Warden Falgout's name on it, it was written about Kevin Mathieu, "When Ophthalmology releases him, his level of care will be reviewed. If increased to level of care 3, his job opportunities will increase."[92] | Following the surgery, doctors were concerned that plaintiff was having a graft rejection and continued to follow up monthly. His "medical concerns" were not due to cataracts, but edema, graft rejection and hypertension. (Bates #000887, #000904-000907, Bates |

---

[86] E.g., Ex. PPPP (Bates #017642); R. Doc. 79-5 (Defendants' Statement of Undisputed Facts) at ¶ 7.
[87] Ex. PP.
[88] Ex. T at 5019.
[89] Exhibit EEE (Policy No. HC-16), at 1; Exhibit FFF (LSP Directive No. 13.030).
[90] *Id.*
[91] Ex. HH.
[92] Ex. LLL (December 5, 2016 Letter from Tracy Falgout).

| | | |
|---|---|---|
| | | #000878, #000854, #000846, Bates #000838, #000820, #000807, #000793, #000791, #000772). |
| 23 | Plaintiffs Blackwell, Turner, Myers, Ware, Peters, AIlsworth, Breaux, Bella, McCaa, and Dickerson, received duty statuses that said no sports, rodeo, lifting greater than 10 lbs., stooping, straining, prolonged walking, or hobbycraft.[93] | |
| 24 | Dr. Raman Singh is the person described as the "medical director" in the sentence "Hold all surgeries if hernia is reducible per medical director effective 10-31-13."[94] | |
| 25 | James LeBlanc received a letter dated December 10, 2014, with the subject line, "Medical Care at Angola."[95] | |
| 26 | James LeBlanc underlined a sentence in the December 10, 2014 letter as follows: We understand that, at present, inmates in need of acute surgical care are transported to off-site facilities for surgery only when their conditions have been deemed "life-threatening;" otherwise, surgeries are not performed at all.[96] | Defendants dispute the veracity of the unsubstantiated allegations in the letter that James Leblanc received. |
| 27 | James LeBlanc circled the word "hernias" in the following text in the December 10, 2014 letter: "We have observed men who appear to have undiagnosed major diseases; who suffer severe pain with no treatment (including medication and physical therapy); who need surgery for conditions like hernias, broken joints, and hemorrhoids, for which the prison has claimed it cannot afford to pay . . . ."[97] | Defendants dispute the veracity of the unsubstantiated allegations in the letter that James Leblanc received. |

Respectfully submitted,

---

[93] Memorandum in Support at Table 6.
[94] 94Ex. JJJJJ at Interr. No. 18 ("Dr. Raman Singh"); Ex. HHHHH at Interr. No. 9. ("Dr. Singh assumes that Ms. Young was referring to him.")
[95] Ex. JJJJJ at Interr. No. 3.
[96] Ex. JJJJJ at Interr. No. 2; Ex. IIIII at 2.
[97] Ex. JJJJJ at Interr. No. 2; Ex. IIIII at 3.

**JEFF LANDRY**
**Attorney General**

By:  s/Andrew Blanchfield
    Andrew Blanchfield, T.A. (#16812)
    Email: ablanchfield@keoghcox.com
    C. Reynolds LeBlanc (#33937)
    Email: rleblanc@keoghcox.com
    Chelsea A. Payne (#35952)
    Email: cpayne@keoghcox.com
    Special Assistant Attorneys General
    701 Main Street (70802)
    Post Office Box 1151
    Baton Rouge, Louisiana  70821
    Telephone:  (225) 383-3796
    Facsimile:  (225) 343-9612

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 20th day of June, 2019.

s/Andrew Blanchfield
Andrew Blanchfield