# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

EARL PETERS, *et al.*

versus

RAMAN SINGH, *et al.*

CIVIL ACTION

16-842-SDD-RLB

## RULING

Before the Court are the following motions:

1) The *Motion for Summary Judgment*[1] filed by Plaintiffs Earl Peters, Russell Ware, Lavelle Myers, Wallace Breaux, Herman Bella, Ronald Ailsworth, William Dickerson, Ross McCaa, Kevin Mathieu, Iddo Blackwell, and Jimmy Turner (collectively, "Plaintiffs").[2]

   a. Defendants, the State of Louisiana, Louisiana Dept. of Public Safety and Corrections, John Bel Edwards, James LeBlanc, Darryl Vannoy, Raman Singh, and Stephanie Lamartinere ("Defendants"), filed an *Opposition*[3] to this *Motion*, to which Plaintiffs filed a *Reply*.[4] Plaintiffs also filed a *Supplement in Support*,[5] to which Defendants filed an *Opposition*.[6]

2) The following *Motions for Summary Judgment* filed by Defendants:

---

[1] Rec. Doc. No. 108.
[2] Plaintiff Dan Riley does not join in the motion.
[3] Rec. Doc. No. 170.
[4] Rec. Doc. No. 178.
[5] Rec. Doc. No. 183.
[6] Rec. Doc. No. 186.
58211

a.  Eight separate *Motions for Summary Judgment*, seeking to dismiss Plaintiffs' hernia-related claims.[7] Plaintiffs filed an *Opposition* to each motion,[8] and Defendants filed one *Reply*.[9]

b.  Three separate *Motions for Summary Judgment* as to the cataract claims of Plaintiffs Ross McCaa;[10] Dan Riley;[11] and William Dickerson.[12] Plaintiffs filed *Oppositions* to the motions regarding McCaa and Dickerson.[13] Defendants filed one *Reply*.[14]

For the following reasons, Plaintiffs' *Motion for Summary Judgment* shall be DENIED, and Defendants' *Motions for Summary Judgment* shall be GRANTED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are current or former inmates who suffered from hernias or cataracts (and, in some cases, both) while incarcerated at the Louisiana State Penitentiary ("LSP").[15] Plaintiffs allege under 42 U.S.C. § 1983 that Defendants provided constitutionally deficient medical treatment for their hernias and/or cataracts. Specifically, Plaintiffs allege that Defendants implemented policies of denying and/or delaying doctor-prescribed surgeries in deliberate indifference to their serious medical needs in violation of the Eighth Amendment.[16]    Plaintiffs also bring claims under the Americans with

---

[7] Rec. Doc. No. 78 (as to Ross McCaa); Rec. Doc. No. 90 (Herman Bella); Rec. Doc. No. 91 (Ronald Ailsworth); Rec. Doc. No. 92 (Russell Ware); Rec. Doc. No. 93 (William Dickerson); Rec. Doc. No. 94 (Earl Peters); Rec. Doc. No. 95 (Lavelle Myers); Rec. Doc. No. 103 (Wallace Breaux).
[8] Rec. Doc. Nos. 143, 131, 130, 155, 141, 156, 157, and 132.
[9] Rec. Doc. No. 173.
[10] Rec. Doc. No. 98.
[11] Rec. Doc. No. 104.
[12] Rec. Doc. No. 116.
[13] Rec. Doc. Nos. 142, 134.
[14] Rec. Doc. No. 173.
[15] Rec. Doc. 56 pp. 6-15.
[16] *Id.* at p. 28.
58211

Disabilities Act of 1990, 42 USCA § 12101 *et seq* ("ADA"), and the Rehabilitation Act, 29 USCA § 701 *et seq* ("RA"),[17] alleging that they are qualified persons with disabilities as defined by the ADA, that LSP's policies constitute a facial violation of the ADA (in the case of the hernia policy), and give rise to a failure to accommodate Plaintiffs' disabilities (in the case of both the hernia and cataract policies).

Plaintiffs argue that they are entitled to summary judgment on their Eighth Amendment hernia claims because there is no genuine dispute as to whether Defendants' "If-Reducible-No-Surgery" hernia policy constitutes deliberate indifference to their serious medical needs. Plaintiffs contend that, when considered by other courts, such policies "have always, without exception, been found illegal."[18] Likewise, Plaintiffs contend that they are entitled to summary judgment on their claim that the Defendants established unconstitutional policies to delay necessary cataract surgeries. On the other hand, Defendants seek summary judgment in their favor on the deliberate indifference claims, arguing that the policies in question were not their official policy, were never applied to some of the Plaintiffs and that, in any event, the care and treatment provided was not deliberately indifferent.

As to the ADA/RA claims, Plaintiffs urge the Court to grant summary judgment in their favor, arguing that the "If-Reducible-No-Surgery" hernia policy violates the ADA on its face because it "refus[es] surgery to a specific class of individuals with disabilities."[19] With respect to both hernia and cataract-related claims, Plaintiffs argue that the evidence

---

[17] The claims of Plaintiffs Peters, Ware, Myers, Breaux, Bella, and Ailsworth arise out of complaints concerning hernias. The claims of Plaintiffs Mathieu, Blackwell, and Turner arise out of complaints concerning cataracts. Plaintiffs Dickerson and McCaa have claims pertaining to both cataracts and hernias.
[18] Rec. Doc. No. 108-1, p. 32.
[19] Rec. Doc. No. 108-1, p. 43.
58211

demonstrates that the Defendants "failed to accommodate Plaintiffs' disabilities, and excluded them from participation in programs due to their disabilities."[20] Meanwhile, Defendants argue that summary judgment should issue in their favor because Plaintiffs' claims are properly classified as arising out of deliberate medical indifference, not the ADA.

The Court will address the parties' arguments in turn.

## II.    LAW AND ANALYSIS

### A.  Motions for Summary Judgment

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[21] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[22] The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[23] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of

---

[20] Rec. Doc. No. 108-1, p. 55.
[21] Fed.R.Civ.P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996); *Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir. 1996).
[22] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008)(citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).
[23] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  *See also Gunaca v. Texas*, 65 F.3d 467, 469 (5th Cir. 1995).
58211

material fact,' but need not negate the elements of the nonmovant's case."[24]  If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[25]

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial.[26]  The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.[27]  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[28]  The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[29]  Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[30]

The Court "has no duty to search the record for material fact issues.  Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[31]  "Conclusory

---

[24] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(*en banc*)(quoting *Celotex,* 477 U.S. at 323-25, 106 S.Ct. at 2552).
[25] *Id.* at 1075.
[26] *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).
[27] *Little*, 37 F.3d at 1075; *Wallace*, 80 F.3d at 1047.
[28] *Wallace*, 80 F.3d at 1048 (quoting *Little*, 37 F.3d at 1075).  *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).
[29] *McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of rehearing*, 70 F.3d 26 (5th Cir. 1995).
[30] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
[31] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)(citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).
58211

allegations unsupported by specific facts, however, will not prevent an award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any significant probative evidence tending to support the complaint.'"[32]

### B. Deliberate Indifference – Eighth Amendment

To establish liability in connection with a claim for deliberate medical indifference, a prisoner-plaintiff must be able to show that appropriate medical care has been denied and that the denial has constituted "deliberate indifference to serious medical needs."[33] "Deliberate indifference is an extremely high standard to meet."[34]  In order to prevail, the plaintiff must show that the defendant "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[35]  Further, the plaintiff must establish that the defendant possessed a culpable state of mind.[36]

In *Mayweather v. Foti*, the Fifth Circuit emphasized that a plaintiff may be in pain, but that pain does not in and of itself establish deliberate indifference:

> [T]he record shows that [the plaintiff] received continuous treatment for his back injury despite his incarceration. The treatment may not have been the best that money could buy, and occasionally, a dose of medication may have been forgotten, but these deficiencies were minimal, they do not show an unreasonable standard of care, and they fall far short of establishing deliberate indifference by the prison authorities. Continuing back pain is unpleasant. Its existence does not, however, in and of itself demonstrate that a constitutional violation occurred.[37]

---

[32] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. 249)(citation omitted)).
[33] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Johnson v. Treen*, 759 F.2d 1236, 1237 (5th Cir. 1985).
[34] *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001).
[35] *Id.* (quoting *Johnson*, 759 F.2d at 1238).
[36] *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)(citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).
[37] *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992).

58211

Indeed, the Fifth Circuit has held that the Eighth Amendment "proscribes only medical care so unconscionable as to fall below society's minimum standards of decency."[38]

For a prison official to be held liable, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[39]  "Mere negligence, neglect, or medical malpractice" does not constitute deliberate indifference.[40]  Even "gross negligence" does not establish deliberate indifference.[41] Rather, "subjective recklessness as used in the criminal law" is the appropriate standard for "deliberate indifference" under the Eighth Amendment.[42]  The mere delay of medical care can also constitute an Eighth Amendment violation but only "if there has been deliberate indifference [that] results in substantial harm."[43]

### 1) Deliberate Indifference Claims Based on Hernia Policy

A hernia "occurs when there is a small opening in the lining of the abdominal wall, and part of the intestine pokes through this hole."[44] A hernia is "reducible" when the protruding intestine can be pushed back into the body.[45] Plaintiffs' first deliberate indifference claim challenges LSP's alleged policy of managing reducible hernias non-operatively, a policy that Plaintiffs dub the "If-Reducible-No-Surgery-Policy."[46] Plaintiffs move for summary judgment on this claim, arguing that it is undisputed that this policy existed and that the policy resulted in DOC officials "cancelling hernia surgery referrals

---

[38] *Gibson v. Collier*, 920 F.3d 212, 216 (5th Cir. 2019), (citing *Estelle v. Gamble*).
[39] *Id.* at 837.
[40] *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).
[41] *Hernandez v. Tex. Dep't of Prot. and Reg. Servs.*, 380 F.3d 872, 882 (5th Cir. 2004).
[42] *Farmer*, 511 U.S. at 839-40.
[43] *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).
[44] *Delker v. Maass*, 843 F. Supp. 1390, 1393 (D. Or. 1994).
[45] Rec. Doc. No. 109-2, p. 2 (Declaration of Dr. Wagih Mando).
[46] Rec. Doc. No. 108-1, p. 2.
58211

made by prison doctors.'"[47]  Moreover, Plaintiffs claim that the If-Reducible-No-Surgery Policy, which the parties agree was initially implemented in response to the April 2013 closure of the Earl K. Long charity hospital that had theretofore performed surgeries for LSP inmates,[48] "became the *permanent* policy of the DOC" in 2014.[49]

Based on the parties' briefs and the evidence in the record, there appears to be no genuine dispute as to whether LSP had a policy of treating reducible hernias non-surgically during the transitional period following the closure of Earl K. Long. Semantic quibbles as to whether the surgeries were "held," "declined," or "cancelled" aside, both parties agree that it did.[50] But Plaintiffs' deliberate indifference claim goes one step further, arguing that If-Reducible-No-Surgery became the *permanent* policy at LSP. Plaintiffs support that contention by reference to a Department of Corrections document entitled "Clinical Referral Guidelines for Offender Care, 2014 Edition,"[51] which contains the following sentence: "if hernia is reducible continue to manage non-operatively."[52] Defendants deny that that document is a statement of official LSP policy, calling it an "unauthenticated purported 'policy.'"[53]

In fact, Defendants identify specific evidence in the record that the document cited by Plaintiffs was not the official LSP policy on hernia management. For example, at the deposition of Defendant Dr. Raman Singh, then the Medical Director for the Department

---

[47] Rec. Doc. No. 108-1, p. 13.
[48] See Rec. Doc. No 108-1, p. 16 ("The If-Reducible-No-Surgery policy was formalized around the time that inmate medical care was being transferred from the Charity hospital system to the DOC").
[49] Rec. Doc. No. 108-1, p. 16 (emphasis added).
[50] *See, e.g.*, Rec. Doc. No. 108-1, p. 12 ("The decision that reducible hernias would be 'managed non-operatively' is referred herein as the DOC's 'If-Reducible-No-Surgery' policy"); Rec. Doc. No. 170, p. 1 ("policy implemented in 2013, the hold hernia surgeries for reducible hernias").
[51] Rec. Doc. No. 109-18.
[52] Rec. Doc. No. 109-18, p. 15.
[53] Rec. Doc. No. 170, p. 4.
58211

of Public Safety & Corrections, Plaintiffs' counsel presented Dr. Singh with a copy of this document. Dr. Singh observed that the document contained only a cursory mention of hernias, with "hernia being addressed in one paragraph with three sentences."[54] Dr. Singh further testified regarding the cluttered and unclear nature of the document, noting that Page 15, the page containing the brief mention of hernias, also contains what appears to be an excerpt from an email or other communication about an inmate ("Hi – we have a lady from LCIW here today for urology . . . of course she says she lied when she was arrested about her DOB . . .)[55] "That's a very confidential information [sic]. That sentence does not belong to a guideline,"[56] Dr. Singh testified. "[I]f there's a contradiction between [the two alleged policy documents], Exhibit K is the document to go to,"[57] he stated.

Exhibit K is a document entitled "Referral Guidelines: Hernia,"[58] that Defendants contend was the *actual* permanent hernia policy from 2014 forward. At Dr. Singh's deposition, he testified that he convened "a work group of the providers" who were to "review any and all hernia literature, talk to surgeons, talk to hernia experts" in order to generate "consensus guidelines"[59] for the management of hernias at LSP. Counsel asked Dr. Singh, "is this the document you're talking about?"[60] and showed him the "Referral Guidelines: Hernia" document. After reviewing it, Dr. Singh stated, "[t]his is the hernia

---

[54] Rec. Doc. No. 94-5, p. 127, lines 3-5.
[55] Rec. Doc. No. 109-18, p. 15. The Court further notes that Plaintiffs' document contains multiple pages of instructions on how to use the Eceptionist software that LSP uses for managing inmates' health care. The document offers step-by-step instructions on how to enter a referral, how to close an appointment, etc. It also lists various personnel and their contact information, along with other apparently random excerpts from emails pertaining to specific inmates and their care.
[56] Rec. Doc. No. 94-5, p. 129, ll. 13-14.
[57] *Id.*, ll. 10-13.
[58] Rec. Doc. No. 170-4.
[59] Rec. Doc. No. 94-5, p. 124, ll. 13-17.
[60] *Id.*, ll. 20-21.
58211

guideline."[61] The Court also notes that Dr. Randy Lavespere, the Medical Director at LSP, was presented with a copy of the same document at his deposition and stated, "These are the hernia guidelines for the Department of Corrections."[62]

In short, Plaintiffs fail to demonstrate, as a matter of undisputed fact, that If-Reducible-No-Surgery became the permanent policy at LSP.  And, Defendants have countered with evidence to support their contention that a *different* document – "Referral Guidelines: Hernia" – was actually LSP's policy as of March 2014. That policy does not adopt an If-Reducible-No-Surgery approach. It clearly states that referrals for specialty care will be made (1) if the hernia is non-reducible, (2) if it is "very large in size failing medical management," (3) if there are "any signs/symptoms indicating incarceration or strangulation," or (4) if the hernia causes "significant pain/discomfort requiring narcotics/inpatient pain management."[63] Plaintiffs argue that If-Reducible-No Surgery is unconstitutional because it "miss[es] the category of reducible hernias where surgery is required."[64] The Court finds that this re-written policy clearly contemplates surgery for certain reducible hernias. Thus, Plaintiffs fail to establish that Defendants had a policy of no surgical intervention for reducible hernias.

Having failed to show that non-surgical management was the official "blanket policy" for reducible hernias after March 2014, Plaintiffs also fail to show a lack of dispute with respect to their contention that the If-Reducible-No-Surgery Policy became permanent on an informal or *de facto* basis after that date. Plaintiffs attempt to prove as

---

[61] Rec. Doc. No. 94-5, p. 126, line 25.
[62] Rec. Doc. No. 111-14, p. 10.
[63] Rec. Doc. No. 170-4, p. 1.
[64] Rec. Doc. No. 108-1, p. 7.
58211

much by citing the "Hernia Repair List"[65] maintained by Defendants, noting that "*forty-four out of the seventy inmates . . . were noted to have been 'Declined by HQ'*"[66] for surgical repair of their hernias. Although the list does show that forty-four inmates have a "declined" notation next to their name, there is no indication on the list when that declination took place or was entered; the list only provides the date of diagnosis and, in some cases, the date an inmate was seen in the surgery clinic. In other words, the list does not demonstrate that the blanket policy continued beyond March 2014 because it offers no indication of when the surgeries were declined.

Likewise, Plaintiffs' attempt to use email evidence to show that the If-Reducible-No-Surgery policy was "strictly enforced by DOC HQ"[67] after 2014 fails because the evidence that they cite does not actually support that contention. The argument concerns a pilot program to conduct hernia surgeries at the hospital at Lallie Kemp Regional Medical Center; Plaintiffs claim that Defendants "retained the If-Reducible-No-Surgery Policy as part of the pilot."[68] Plaintiffs cite an email from Melanie Benedict,[69] a Department of Corrections (DOC) nurse, for the proposition that "[w]hen Angola staff didn't follow the process [for hernia surgery referrals], DOC HQ would step in and send the referral back."[70] Melanie Benedict's email states: "Please make sure the [Lallie Kemp] surgery process is followed," and forwards a notation from the scheduling software that states: "LSP to follow LSP Hernia Process for Lallie Kemp OR."[71] Based on that email, it is clear

---

[65] Rec. Doc. No. 110-5.
[66] Rec. Doc. No. 108-1, p. 16 (emphasis in original).
[67] *Id.*
[68] Rec. Doc. No. 108-1, p. 17.
[69] Rec. Doc. No. 109-21, p. 1.
[70] Rec. Doc. No. 108-1, p. 16.
[71] Rec. Doc. No. 109-21, p. 1.
58211

that LSP was bound to follow a specific process for referrals to Lallie Kemp. It does not,

however, show that the process was based on an If-Reducible-No-Surgery approach. In

fact, the written process for referrals to Lallie Kemp specifies that "LSP Providers will

categorize hernia with level classification of 1-5," and that levels 1-3 "will be monitored by

LSP Primary Care Providers" while for levels 4-5, "LSP will refer to ONSITE GENERAL

SURGERY CLINIC at LSP."[72] A 2015 email from Dr. Randy Lavespere to LSP staff[73] sets

forth the definitions of Levels 1 – 5:

Randy
Lavespere/LSP/CORRECTIO
NS
01/23/2015 03:11 PM

To  Ashli OliveauxHQ/CORRECTIONS@CORRECTIONS
cc  Sherwood Poret/LSP/CORRECTIONS@CORRECTIONS
bcc
Subject  Re: hernias

History:        ↩ This message has been forwarded.

Randy Lavespere MD
LSP Medical Director
(225) 655-2272
(225) 655-2273

Cat V        ........No doubt about Repair!!!! Very Large Herniations with Scrotal involvement.......Definite
limitations in lifestyle. Not totally reducible or Chronic Pain due to size of herniation.

Cat IV        ........ Large Herniations.....Scrotal Involvement with with anatomical deviation of
penis/testicle....Reducible but with much difficulty. Moderate lifestyle limitations.

Cat III        ......... Moderate Herniations.......+/- scrotal involvement.....Reducible......No anatomical
deviations......Lifestyle minimally affected..... Manage per DOC Guidelines

Cat II        ......... Moderate to Small herniations....no scrotal involvement....easily reducible.....No affect
on lifestyle. Manage per DOC Guidelines

Cat I        ........ No significant herniation. If herniation, self reducible. No affect on lifestyle

Dr. Lavespere's description of Category 5 clearly states that "chronic pain due to size of

herniation" is an indicator for surgery, or, as he puts it, "No doubt about Repair!!!!!"

---

[72] Rec. Doc. No. 110-2, p. 1.
[73] Rec. Doc. No. 110-3, p. 1.
58211

Likewise, Category 4 hernias, described as "reducible but with much difficulty," are also indicated for surgical referral under the Lallie Kemp process. So, far from proving that If-Reducible-No-Surgery was still in place, the emails cited by Plaintiffs show that, under the Lallie Kemp process followed by DOC, for certain reducible hernias or hernias that caused chronic pain, "LSP will refer" to the surgery clinic.

Overall, the Court finds that Plaintiffs have failed to meet their summary judgment burden of demonstrating that If-Reducible-No-Surgery was the official or *de facto* policy at LSP on more than a brief, temporary basis. And, Defendants have identified reasons that summary judgment should issue in their favor on the claims related to that policy. First, Defendants argue that they are entitled to summary judgment because the record evidence shows that of the eight hernia Plaintiffs, the If-Reducible-No-Surgery Policy was not applied to four of them, namely, Wallace Breaux, Ronald Ailsworth, William Dickerson, or Ross McCaa. Dickerson and McCaa were not even diagnosed with hernias until 2015 and 2016, respectively, after the temporary policy had been replaced with the rewritten March 2014 policy.[74] Thus, the If-Reducible-No-Surgery policy could not have been the moving force of the alleged constitutional violation.

As for Wallace Breaux, the record reflects that he received surgery and that he was never subject to a categorical policy of non-surgical management. Breaux's medical records demonstrate that he initially had surgery to repair a hernia around 2004.[75] On June 12, 2008, Breaux visited the Physician's Clinic and the doctor noted that he had a

---

[74] Rec. Doc. No. 93-4, p. 6 (showing that a left inguinal hernia was noted at Dickerson's 12/21/2015 appointment); Rec. Doc. No. 114-6, p. 1 (records from a medical examination of McCaa noting the presence of a left inguinal hernia on May 9, 2016).
[75] Rec. Doc. No. 82-7, p. 8.
58211

"large" hernia, that he "has been exercising some," and indicated that Breaux should not squat, bend, or lift over 15 pounds.[76] The next hernia-related record is from June 30, 2011, when a doctor made a surgical referral for Breaux.[77] Breaux was seen at Earl K. Long, but the doctor's referral for a c-scope prior to surgery was denied by the "GI" department with the notation, "Medical condition does not meet criteria for an appointment at this time due to EKL capacity."[78] During a September 26, 2012 visit, the LSP doctor indicated that Breaux was awaiting a c-scope appointment prior to his hernia repair.[79] The same notation was made in January 2013.[80] In September 2014, Breaux complained of hernia pain when lifting;[81] in January 2015, an LSP doctor noted that his hernia was "small, reducible."[82] In May 2015, Dr. Lavespere examined Breaux and found that his hernia was a 2.5/5 on the scale used under the 2014 Policy.[83] Again in September 2015, Dr. Lavespere noted that the hernia was "small" and noted that his plan was "manage per guidelines."[84] On March 2, 2017, Breaux was referred to the surgery clinic, and he ultimately received surgery on December 6, 2017.[85]

To be sure, a significant amount of time elapsed between the initial surgical referral and the ultimate repair of Breaux's hernia; and it does not escape the Court's notice that he received surgery after this lawsuit was filed. But the record simply does not show that Breaux was subject to a categorical "If-Reducible-No-Surgery" policy; on the contrary, it

---

[76] *Id.* at p. 10.
[77] *Id.* at p. 12.
[78] *Id.* at p. 23.
[79] *Id.* at p. 25.
[80] *Id.* at p. 26.
[81] *Id.* at p. 31.
[82] *Id.* at p. 32.
[83] *Id.* at p. 34.
[84] *Id.* at p. 39.
[85] *Id.* at p. 52.
58211

demonstrates that surgery was recommended by the doctors treating him even though his hernia was reducible, and that, after issues with obtaining outside approval for the c-scope he needed before surgery, Breaux eventually did receive surgery. Moreover, the Court notes that the only action that could be characterized as a "denial" of a physician's referral came from Earl K. Long, not DOC, in 2012, before the policy challenged by Plaintiffs even existed. Establishing liability based on an unconstitutional policy under § 1983 requires a showing that the challenged policy was the moving force of a constitutional violation. Plaintiffs have not shown that the If-Reducible-No-Surgery Policy was applied to Breaux, who did receive a surgical referral that did not result in surgery because of capacity constraints at Earl K. Long, not because of any DOC "blanket policy."

Likewise, the medical records of Ronald Ailsworth do not show that he was treated under a categorical If-Reducible-No Surgery Policy. Ailsworth first complained of a hernia in January 2013.[86] On July 11, 2013, he reported that his hernia was larger but that it did not cause pain and he was able to exercise regularly.[87] On June 24, 2016, Ailsworth was referred to Dr. Lavespere for a "possible hernia."[88] Ailsworth was seen by Dr. Lavespere on March 22, 2017, and the doctor noted that his hernia was "reducible with difficulty" and had some "scrotal involvement."[89] Dr. Lavespere referred Ailsworth for surgery, and he received surgery on October 2, 2017. The premise of Plaintiffs' policy claim is that the policy operated to intercept or cancel surgical referrals. But, Ailsworth was never referred for surgery until three years after the temporary policy was re-written, and he received

---

[86] Rec. Doc. No. 76-7, p. 10.
[87] *Id.* at p. 14.
[88] *Id.* at p. 31.
[89] *Id.* at p. 39.
58211

surgery six months after he was referred. There is simply no evidence that LSP applied a "blanket policy" of non-surgical management for reducible hernias to Ailsworth.

Plaintiffs emphasize that the heart of their case is the If-Reducible-No-Surgery policy. In fact, they reject Defendants' emphasis on assessing whether individual Plaintiffs received deliberately indifferent care, stating, "Defendants misunderstand Plaintiffs' central argument for liability . . . that is not Plaintiffs' case at all. To the contrary, Plaintiffs have come forward with a plethora of evidence that the Defendants were acting in accordance with a *blanket policy* to deny and delay surgeries."[90] Having hung their hat squarely on the alleged policy as the moving force of the alleged constitutional violations, Plaintiffs nevertheless fail to identify competent summary judgment evidence that the policy was applied at all to four of the named hernia Plaintiffs. Because the evidence in the record reflects that the challenged policy was not applied to four of the Plaintiffs, Defendants are entitled to summary judgment in their favor as to the deliberate indifference claims related to hernia treatment brought by those four Plaintiffs -- Wallace Breaux, Ronald Ailsworth, William Dickerson, and Ross McCaa.

Although Plaintiffs fail to show that the challenged policy was applied to the above Defendants, the evidence is clear that the other four hernia Plaintiffs – Earl Peters, Russell Ware, Lavelle Myers, and Herman Bella – *did* have their surgery referrals put on hold by DOC headquarters pursuant to the temporary If-Reducible-No-Surgery Policy.[91] But was the use of that policy, even on a temporary basis, unconstitutional? Defendants argue that Plaintiffs are not entitled to summary judgment on this claim because the bar for

---

[90] Rec. Doc. No. 143, pp. 2-3.
[91] *Id.*
58211

deliberate indifference is high, and the Fifth Circuit has held that it is "especially hard to show when the inmate was provided with ongoing medical treatment."[92] Defendants argue that, not only did all of the Plaintiffs receive ongoing medical treatment, the record demonstrates, via the "Hernia Repair Lists" in evidence, that "LSP doctors were steadily evaluating each inmate and creating a category system to ensure that the inmates who were most in need of a surgical referral were able to be processed first."[93] Per Defendants, that list, and the organization and attention to the inmates' care that it suggests, is "the anthesis [sic] of deliberate indifference."[94]

Defendants have identified specific evidence in the record that each of the four Plaintiffs to whom the policy was applied received ongoing medical treatment. In the case of Plaintiff Earl Peters, for example, the evidence in the record clearly demonstrates that after a doctor requested a surgical clinic appointment for Peters in September 2013,[95] a notation was entered in his medical records in February 2014 indicating that the surgical referral was "declined" pursuant to the If-Reducible-No-Surgery Policy in effect at the time.[96] However, as Defendants point out, that declined surgical referral is not the end of the story. The evidence reflects that Peters continued to have his hernia evaluated by LSP medical staff. On October 22, 2014, Peters was seen in the clinic to have his hernia checked. The doctor noted that the hernia "reduces easily"[97] and indicated that it would be managed "per DOC guidelines."[98] The hernia was evaluated again and found to reduce

---

[92] Rec. Doc. No. 170, p. 13 (quoting *Fails v. DeShields*, 349 F.App'x 973,976 (5th Cir. 2009)).
[93] Rec. Doc. No. 170, p. 14.
[94] *Id.*
[95] Rec. Doc. No. 94-4, p. 12.
[96] *Id.*
[97] *Id.* at p. 17.
[98] *Id.*

58211

easily on November 12, 2014;[99] January 16, 2015 (where the doctor noted that it was moderate to large in size but with no scrotal involvement)[100]; and March 24, 2015.[101] Then, on May 20, 2015, Peters' hernia evaluation revealed that the hernia was "reducible with difficulty," "getting larger – now into scrotum" and that the prescribed pain medicine "+/- helps."[102] A scrotal support was ordered for Peters.

At his next evaluation on September 24, 2015, the doctor found that Peters' hernia was "non reducible" and referred him for surgical repair.[103] The surgical evaluation took place on March 16, 2016,[104] and Peters received surgery on August 3, 2016.[105] Although Plaintiffs have shown that the If-Reducible-No-Surgery policy was applied to Peters, Defendants have identified evidence that Peters received ongoing treatment including pain medicine, a scrotal support, and frequent medical evaluation. Once the hernia progressed to be large and non-reducible, surgery was ordered and carried out.

Defendants identify similar evidence with respect to the other Plaintiffs to whom the policy was applied: Russell Ware, Lavelle Myers, and Herman Bella. LSP doctors noted that Ware had an umbilical hernia when he was seen at an appointment on January 4, 2010.[106] On November 20, 2012, LSP doctors noted the presence of a bilateral umbilical hernia and prescribed a scrotal support and entered a surgical referral.[107] An examination on January 7, 2013 noted that the hernia was reducible and recommended

---

[99] *Id.* at p. 18.
[100] *Id.* at p. 19.
[101] *Id.* at p. 20.
[102] *Id.* at p. 21.
[103] *Id.*, p. 25.
[104] *Id.* at p. 30.
[105] *Id.* at p. 35.
[106] *Id.* at p. 9.
[107] *Id.* at p. 12.

58211

"elective repair when approved."[108] Ware submitted a Health Care Request Form in July 2013 complaining of "severe burning pain from a hernia."[109] When he was seen by LSP doctors thereafter, they noted that the hernia "reduces easily" and noted that a surgical referral had been submitted.[110] When surgery was re-requested in August 2013, that request was put on hold with the notation "hold all surgeries if reducible per Medical Director."[111] The record evidence bears out that Ware frequently complained of pain associated with his hernia; however, it would be inaccurate to characterize Defendants' response as deliberately indifferent. The record demonstrates that Defendants prescribed pain medication and a scrotal support and arranged for bottom bunk status and for Ware's meals to be delivered so that he would not have to climb or stand for a prolonged period of time. On January 15, 2015, LSP doctors evaluated Ware's hernia and noted that it was "small → medium" with no scrotal involvement and "reduces easily."[112] The same status was noted at an appointment on June 3, 2015.[113] On October 26, 2016, Dr. Lavespere wrote that Ware's hernia was small to medium and reducible, a 2/5 on the LSP hernia guidelines. However, this time, Dr. Lavespere noted that the hernia was only reducible "with discomfort"[114] and that the scrotum was becoming involved. Lavespere entered a new surgical referral request that day. The surgical evaluation occurred in February 2017, and surgery was performed in May 2017.[115] The record does show that Ware reported pain and lifestyle limitations due to his hernia, but it does not reflect, as required to prevail

---

[108] *Id.* at p. 15.
[109] *Id.* at p. 17.
[110] *Id.* at p. 18.
[111] *Id.* at p. 20.
[112] *Id.* at p. 32.
[113] *Id.* at p. 35.
[114] *Id.* at p. 48.
[115] *Id.* at p. 54.
58211

on a deliberate indifference claim, that Defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[116]   He was examined, treated, and eventually received surgery. Although the delay was arguably significant, the Court finds, based on the uncontroverted record, a reasonable jury could not find that Ware's treatment was "so unconscionable as to fall below society's minimum standards of decency."[117]

Plaintiff Lavelle Myers was referred for surgical evaluation of a hernia on June 13, 2012.[118] He was seen by doctors twice more in 2012 (in October and November) related to his hernia.[119] Because his hernia was reducible, the surgical referral was put on hold in February 2014 pursuant to the If-Reducible-No-Surgery Policy then in place.[120] In April 15, 2016, Dr. Lavespere noted a change in Myers' condition: the hernia was now only 70% reducible "with spontaneous return," and it was "getting larger."[121] Lavespere re-entered the request for surgery, and surgery was performed in September 2016.[122] Myers was not ignored; he was recommended for surgery, and when that surgery was postponed due to the closure of Earl K. Long and the attendant crisis of resources, doctors continued to monitor and treat him. When his condition worsened, even though the hernia was still reducible, surgery was ordered and performed.

Lastly, as to Plaintiff Herman Bella: his diagnosis, treatment, and repair played out

---

[116] *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).
[117] *Gibson v. Collier*, 920 F.3d 212, 216 (5th Cir. 2019) (citing *Estelle v Gamble*, 429 U.S. 97, 102-5 (1976)).
[118] Rec. Doc. No. 112-13, p. 4.
[119] Rec. Doc. No. 95-4, p. 39-40.
[120] Rec. Doc. No. 114-13, p. 2.
[121] Rec. Doc. No. 112-13, pp. 2-3.
[122] Rec. Doc. No. 95-4, p. 71.
58211

very similarly to Lavelle Myers, detailed above. Medical records from June 15, 2010 note the presence of a "<u>small</u> umbilical hernia (easily reducible)."[123] Bella was referred for surgical evaluation on July 26, 2013, after complaining of pain and discomfort associated with his hernia.[124] In February 2014, that surgery was put on hold pursuant to the If-Reducible-No-Surgery policy then in place. Bella was regularly seen and evaluated by LSP doctors thereafter. In September 2015, Bella complained of "increased discomfort at work."[125] When Dr. Lavespere found that the hernia had become reducible with "some discomfort," he re-requested surgery for Bella.[126] The surgical referral was entered on September 12, 2016, and the surgery was performed in January 2017.[127]

The Court does not take lightly the evidence that Plaintiffs' unrepaired hernias caused them pain and inconvenience, sometimes severe, and that the reports of pain persisted, in some cases, for years before repair was ultimately provided. However, there is no dispute evident as to whether these Plaintiffs received ongoing treatment: they did. The question for purposes of this motion is whether a reasonable jury, applying the Fifth Circuit's demanding standard for deliberate indifference to the undisputed facts of these cases, could find that Defendants' treatment of Plaintiffs rises to the level of deliberate indifference. The Court concludes that it could not. All of the Plaintiffs were frequently examined by doctors; they received pain medicine, scrotal supports, modified diets, and modified bunk statuses; and, most importantly, they eventually received the exact treatment that they wanted – surgery – albeit not *when* they wanted it.

---

[123] Rec. Doc. No. 122-5, p. 1 (emphasis original).
[124] Rec. Doc. No. 90-4, p. 22.
[125] *Id.* at p. 34.
[126] Rec. Doc. No. 90-4, p. 37
[127] *Id.* at p. 43.

58211

For their part, Plaintiffs argue that "[e]very single time a department of corrections has been found to have an If-Reducible-No-Surgery hernia policy, it has been found to be illegal,"[128] citing a 1994 case out of Oregon and a 2012 case from the Northern District of Illinois.[129] It occurs to the Court that two cases provide a somewhat insubstantial basis to claim that the policy has been struck down "every single time."[130] Nevertheless, examining those two cases, it is clear that neither involved a challenge to a temporary policy that was only briefly in place. The Court does not suggest that the temporary nature of the policy has the power to transform it from unconstitutional to constitutional. However, the evidence that LSP only applied If-Reducible-No-Surgery for a brief time in response to a genuine crisis of resources stands in the way of Plaintiffs' ability to show, as required to be entitled to summary judgment on this claim, that Defendants acted with "wanton disregard" or a "culpable state of mind" when they crafted and enforced this policy. Plaintiffs have not pointed to any specific evidence that the If-Reducible-No-Surgery policy was motivated by anything other than the lack of resources occasioned by the closure of Earl K. Long. Plaintiffs admit as much in their motion, noting that "[i]t may have been that the policy was intended as a temporary response to that transition."[131] Additionally, if the medical care at LSP was characterized by "wanton disregard" such that Defendants were intent on preventing inmates with reducible hernias from receiving surgical repair, how do Plaintiffs explain the fact that all eight hernia Plaintiffs received surgical referrals in the first place? Indeed, there is legal support for the notion that "failure

---

[128] Rec. Doc. No. 108-1, p. 2 (emphasis in original).
[129] *Delker v. Maass*, 843 F. Supp. 1390 (D. Or. 1994); *Heard v. Illinois Department of Corrections,* 2012 WL 832566 (N.D. Ill. March 12, 2012).
[130] Rec. Doc. No. 108-1, p. 33.
[131] *Id.* at p. 16.
58211

to perform surgery on a reducible hernia is not deliberate indifference."[132] The district

court for the Eastern District of Texas concluded as much in *Dickerson v. Murray*:

> [T]he medical records show that Dickerson has been repeatedly evaluated
> for the hernia, but that it is reducible and so the doctors who have evaluated
> him have determined that surgery is not required. The failure to perform
> surgery on a reducible hernia is not itself deliberate indifference. *Daugherty
> v. University of Texas Medical Branch,* 2009 WL 2342753 (S.D.Tex., July
> 29, 2009), *citing Day v. Lantz*, 2009 WL 801612 (D.Conn., March 25, 2009,
> *aff'd* 360 Fed.Appx. 237, 2010 WL 95125 (2nd Cir., January 12, 2010).[133]

Plaintiffs herein were all referred for surgery, and all received it. Although there was a

regrettably long delay between referral and surgery in some cases, each Plaintiff's claim

essentially amounts to a complaint about the timing of his treatment. Given the evidence

that the Plaintiffs were repeatedly seen and treated during the pendency of the surgical

delays, and given the intervening resource crisis caused by the closure of Earl K. Long,

the Court cannot conclude, as a matter of undisputed fact, that Defendants were

deliberately indifferent.

The Fifth Circuit has clearly held that "a disagreement with his medical

treatment"[134] is insufficient for a plaintiff to state a constitutional claim. Moreover, the Fifth

Circuit has held that "delay in medical care can only constitute an Eighth Amendment

violation if there has been deliberate indifference that *results in substantial harm*."[135] In

*Easter v. Powell*, the Fifth Circuit concluded that, where the plaintiff did not show "lasting

complications"[136] from the delay, the Eight Amendment was not violated. And, this Court

in *Henderson v. Tanner* held that where there was no summary judgment evidence that

---

[132] 2012 WL 1314216 (E.D.Tex.)
[133] *Id.* (internal citations omitted).
[134] *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).
[135] *Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013).
[136] *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006).

58211

the delay caused "a life-long handicap or permanent loss," the evidence was not sufficient to constitute deliberate indifference to a serious medical need for constitutional purposes.[137] No such permanent loss resulting from delay has been alleged in this case.

This Court has previously held that these Defendants, acting pursuant to this policy, were entitled to summary judgment in their favor. In the 2018 case *Davis v. Singh*,[138] this Court granted summary judgment in favor of the defendants because it found that LSP's policy of non-surgical management for reducible hernias was not unconstitutional. This Court rejected the *Davis* plaintiff's argument that the If-Reducible-No-Surgery Policy was unconstitutional, noting that the plaintiff's medical records "reflect[] that he has routinely been seen and provided with medical attention whenever he has complained about his . . . hernia."[139] Second, this Court noted that the policy in question was "intended to be only 'temporary' and was implemented because of the closure of the Earl K. Long Hospital," and that the policy was "thereafter re-written in March 2014 to provide for the care and treatment of hernias, including surgical repair when warranted, in accordance with prevailing medical opinion."[140]

In their *Reply*, Plaintiffs suggest that *Davis* is inapposite because it did not involve "a blanket policy of denying hernia surgeries."[141] But, the *Davis* ruling explicitly states that the plaintiff "asserts that there is a wrongful policy [that] denies surgical intervention to all

---

[137] *Henderson v. Tanner*, No. CV 15-804-SDD-EWD, 2019 WL 885914, at *6 (M.D. La. Feb. 22, 2019) *See Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994) (citing *Monmouth County v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) ("Where the delay results in an inmate's suffering 'a life-long handicap or permanent loss, the medical need is serious.'")); *Wesson*, 910 F.2d at 283-84 (minor delay in escorting injured prisoner to prison infirmary for treatment of swollen wrists with some bleeding cannot be construed as deliberate indifference to serious medical needs).

[138] 2018 U.S. Dist. LEXIS 51916 (M.D. La. March 13, 2018).

[139] *Id.* at *22.

[140] Rec. Doc. No. 170-3, p. 14.

[141] Rec. Doc. No. 178, p. 4 (emphasis in original).

58211

inmates with reducible hernias."[142] Plaintiffs also attempt to distinguish *Davis* by arguing that, unlike Plaintiffs herein, "the plaintiff [in *Davis*] was never referred for surgery during the period that the Court considered."[143] This is somewhat disingenuous. The plaintiff in *Davis* was referred for surgery in October 2012, and his surgery was put on hold pursuant to LSP's policy in August 2013. This Court did hold that claims arising out of events before June 3, 2015 were time-barred and therefore did not consider the 2012 surgical referral, but it is not true that Davis was never referred for surgery. The case is far from inapposite. The policy-related claim set forth in *Davis* is essentially identical to the one presented by Plaintiffs in this action. Also, the medical records in *Davis* painted a very similar picture to the records of Plaintiffs in the instant case:

> A review of Plaintiff's medical records during the relevant time period reflects that he has routinely been seen and provided with medical attention whenever he has complained about his hemorrhoids and/or hernia, and Plaintiff has not shown that this medical attention has been deficient. With the exception of a notation in October 2013 that the right inguinal hernia was not easily reducible at that time, his hernia has routinely been noted to be reducible. On numerous occasions, when Plaintiff has sought medical treatment at LSP for unrelated complaints, he has voiced no complaint regarding his hernia or hemorrhoids and has affirmatively indicated that he was experiencing no other medical problems or difficulties on those occasions.[144]

The Plaintiffs' *Motion for Summary Judgment* shall be denied because Plaintiffs have failed to identify competent summary judgment evidence (1) that the challenged policy became permanent; (2) that the challenged policy was applied at all to four of the Plaintiffs; and (3) that the care provided to Defendants pursuant to the temporary or permanent policy was deliberately indifferent. On the other hand, Defendants have put

---

[142] *Davis* at *6.
[143] Rec. Doc. No. 178, p. 4.
[144] *Davis* at *22-23.

58211

forth uncontroverted summary judgment evidence that the care and treatment provided was not so deficient as to give rise to a Constitutional violation. Thus, summary judgment shall be entered in favor of the Defendants with respect to the deliberate indifference claims related to hernias.

2)  Deliberate Indifference Claims Based on Cataract Policy

Five of the Plaintiffs – Ross McCaa, William Dickerson, Ido Blackwell, Kevin Mathieu, and Jimmy Turner -- move for summary judgment on their deliberate indifference claims related to cataracts. Defendants filed separate motions for summary judgment as to three cataract Plaintiffs – Ross McCaa,[145] William Dickerson,[146] and Dan Riley.[147]

Plaintiffs' cataract claims center around Defendants' alleged "policies that classify cataracts as an 'elective procedure.'"[148] This policy allegedly resulted in inmates waiting "for years – or more than a decade – for cataract surgery, even after being referred to a surgeon by a doctor."[149] To establish that LSP treated cataract surgeries as "elective," Plaintiffs provide a document from the Louisiana Department of Safety and Corrections dated August 27, 2010, which states: "Elective procedure: Any planned non-emergency procedure. It may be either medically necessary (e.g. cataract surgery, routinely scheduled heart surgery, etc.) or optional (e.g., cosmetic, etc.)."[150]

Defendants deny that any such policy existed; indeed, they claim that "there is no evidence that any policy operated to delay cataract surgeries."[151] Per Defendants, the

---

[145] Rec. Doc. No. 98.
[146] Rec. Doc. No. 116.
[147] Rec. Doc. No. 104.
[148] Rec. Doc. No. 108-1, p. 3.
[149] *Id.*
[150] Rec. Doc. No. 112-3, p. 1.
[151] Rec. Doc. No. 170, p. 5.
58211

delay in cataract surgery in the case of these particular Plaintiffs was caused by "either (1) the inmate had visually insignificant cataracts that did not warrant a referral; (2) the inmate was seen by the outside ophthalmologist who did not recommend surgery; or (3) the inmates had other numerous medical conditions which held up a recommendation for surgery."[152] As with the deliberate indifference claims related to LSP's alleged hernia policy, discussed *supra*, each party offers a different document that it claims is evidence of LSP's policy with respect to cataracts. Plaintiffs provide "Health Care Policy No. HC-16," a document from the Louisiana Department of Public Safety and Corrections dated August 27, 2010.[153] That document defines an elective procedure as "any planned non-emergency procedure," and identifies cataract surgery as an example of a medically necessary elective procedure.[154]

On the other hand, Defendants offer a Louisiana Department of Corrections document entitled "Referral Guidelines: Cataracts,"[155] which states that it was last reviewed in June 2013. "Referral Guidelines: Cataracts" sets forth diagnostic criteria and guidelines for the management of cataracts. Specifically, it states that "asymptomatic patients with visual acuity of 20/40 or better may be followed"[156] by the physicians at LSP. There is no mention of surgery or surgical referrals in the document.

Plaintiffs' cataract-related claims are heavily focused on the alleged policy of delaying surgeries unnecessarily. Because there is a disputed fact issue surrounding what, exactly, was LSP's policy for managing cataracts, Plaintiffs cannot prevail on

---

[152] *Id.*
[153] Rec. Doc. No. 112-3, p. 1.
[154] *Id.*
[155] Rec. Doc. No. 170-5.
[156] *Id.* at p. 1.
58211

summary judgment as to their claim that LSP's policy is unconstitutional. As to whether there was a "pattern of delay"[157] that caused excessive wait times for cataract surgeries, the Court concludes that, viewing the facts in the light most favorable to the non-movants, a reasonable jury applying the demanding deliberate medical indifference standard could not conclude that Defendants were deliberately indifferent to Plaintiffs' serious medical needs.

In the case of Plaintiff Blackwell, for example: Plaintiffs claim he was diagnosed with cataracts in 2006 (which is the date provided by Blackwell himself in a Request for Administrative Remedy that he filed in February 2016), but the earliest evidence of a diagnosis in LSP's medical records appears in a spreadsheet, filed as one of Plaintiffs' exhibits, listing his diagnosis date as October 31, 2011.[158] For their part, Defendants also state that Blackwell was diagnosed in 2011.[159] In February 2012, LSP doctors noted the presence of a "bad cataract"[160] in his file. LSP doctors subsequently examined Blackwell on March 14, 2012; May 30, 2012; June 28, 2012; and June 5, 2013.[161] The records reflect that at each of those appointments, doctors noted a need for surgery. On January 22, 2013, the LSU eye clinic returned Blackwell's surgical referral noting that after careful review, the service could not be authorized at that time.[162] A new surgical referral was entered on August 26, 2013[163] and a telemedicine appointment set for December 9, 2013.[164] Outside physician Dr. Yen Hoang Ngo recorded that Blackwell was referred for

---

[157] Rec. Doc. No. 108-1, p. 39.
[158] Rec. Doc. No. 117-6, p. 1.
[159] Rec. Doc. No. 170, p. 9.
[160] Rec. Doc. No. 112-11, p. 3.
[161] Rec. Doc. No. 114-1, p. 1; Rec. Doc. No. 111-3, p. 5.
[162] Rec. Doc. No. 170-6, p. 1.
[163] Rec. Doc. No. 114-9, p. 1.
[164] *Id.*
58211

evaluation of his cataracts and ordered a follow up face-to-face visit in 3-4 months.[165] On November 14, 2014 (admittedly more than 3-4 months later), LSP staff followed up by scheduling an appointment for December 30, 2014.[166] That appointment was canceled by the doctor due to a family emergency and rescheduled for January 16, 2015. At the January 16th appointment, Dr. Bruce Allen Barron noted "recommend cataract extraction, right eye first."[167] The right eye surgery was performed on March 30, 2015.[168] The left eye surgery was scheduled for August 10, 2015 but was canceled due to Blackwell's elevated blood glucose levels.[169] Blackwell ultimately received surgery in his left eye on December 14, 2015.[170]

And, in the case of Plaintiff Turner, the records provide ample evidence of ongoing medical treatment and show that, as Turner's visual acuity worsened, he was referred for surgery, which he received.[171] The earliest evidence of a cataract diagnosis in Turner's file is October 19, 2009, when a doctor noted a "visually significant cataract" in his right eye.[172] However,  medical records from Turner's examination by Dr. Jason P. Allemond on March 18, 2011, report a right-side cataract that is "not visually significant"[173] and states that the plan was to "monitor."[174] In July 2012, LSP staff requested a new appointment for Turner, noting that he "is app. by surgical [r]eview [c]ommittee if Drs deem

---

[165] Rec. Doc. No. 170-6, p. 3.
[166] Rec. Doc. No. 112-11, p. 6.
[167] Rec. Doc. No. 170-6, p. 5.
[168] Rec. Doc. No. 112-11, p. 6.
[169] *Id.*
[170] *Id.*
[171] Rec. Doc. No. 170-7.
[172] Rec. Doc. No. 114-4, p. 4.
[173] Rec. Doc. No. 122-8, p. 2.
[174] *Id.*
58211

surgery is indicated."[175] The outside doctors to whom Turner was referred, however, did not appear to deem that surgery was indicated. Outside physician Dr. Stylianos A. Kandarakis examined Turner on September 5, 2012 and noted that Turner's best corrected visual acuity was 20/25. "Observe," he wrote, adding "please refract in next exam."[176] Dr. Bruce Barron also made notes on September 5, 2012: "Cataract in the right eye. Good best-corrected vision. Will re-evaluate in 6 months."[177] And, Dr. Jamie L. Hatcher made identical notes after Turner was seen on February 27, 2013. On December 9, 2013, Dr. Yen Hoang Ngo wrote that the "plan" was "Please have patient seen by jail optometrist for refraction and glasses."[178] Nevertheless, a surgical referral was entered for Turner on August 26, 2013.[179] On April 12, 2016, Dr. Barron noted that Turner's best-corrected visual acuity was now 20/60 and wrote, "recommend cataract extraction."[180] Turner received surgery on June 13, 2016.[181]

In short, the records demonstrate that Turner was diagnosed and his condition monitored by LSP doctors. When his visual acuity took at turn for the worse, he was repeatedly seen by outside specialists for surgical consults. Plaintiffs cite numerous instances where a doctor mentioned surgery or "trips out" for cataract surgery, but those stray references to surgery over the years do not alter the picture painted by the totality of the records, namely, that Turner received ongoing medical care, that doctors specifically prescribed ongoing monitoring and observation as the treatment plan, and

---

[175] Rec. Doc. No. 114-4, p. 2.
[176] Rec. Doc. No. 170-7, p. 9.
[177] Id. at p. 8.
[178] Id at p. 30.
[179] Rec. Doc. No. 114-15, p. 1.
[180] Rec. Doc. No. 170-7, p. 38.
[181] Rec. Doc. No. 108-1, p. 39; Rec. Doc. No. 170, p. 10.
58211

that Turner ultimately got surgery once his visual acuity dipped below the 20/40 threshold that Defendants contend was the level at which monitoring ceased to be the treatment guideline.

Similarly, the evidence demonstrates that on October 14, 2013, Plaintiff Mathieu was seen via telemedicine by an outside doctor who noted possible cataracts and suggested a follow-up in three months for "cataract evaluation and surgery."[182] He was seen by Dr. Couillard in the LSP eye clinic on December 4, 2013 – Plaintiffs contend that the medical record from that visit states "try out cat sx" (in other words, try out cataract surgery), but the Court finds the handwriting on that record to be completely illegible.[183] On March 5, 2014, Dr. Bruce Barron noted best-corrected visual acuities of 20/80 and 20/100 and wrote, "recommend cataract extraction in the right eye first."[184] A surgical referral was entered on March 6, 2014,[185] and LSP staff regularly communicated and made notes in their scheduling software program attempting to get a surgery date for Mathieu. On October 30, 2014, the staff noted an email from Dr. Barron, who reported that before receiving surgery, Mathieu was going to be fitted with contact lenses to see if that could improve his visual acuity.[186] After Mathieu and the doctors concluded that "contact lenses did not improve vision,"[187] he was scheduled for, and received, surgery in his right eye on June 29, 2015.[188] The records reflect that Mathieu was regularly seen by doctors and the medical records document a steady course of treatment after the right

---

[182] Rec. Doc. No. 170-8, p. 1.
[183] Rec. Doc. No. 112-12, p. 20.
[184] Rec. Doc. No. 170-8, p. 2.
[185] *Id.* at p. 6.
[186] *Id.* at p. 8.
[187] *Id.* at p. 11.
[188] Rec. Doc. No. 112-12, p. 1.
58211

eye surgery. Doctors particularly monitored various complications in Mathieu's left eye related to a history of trauma in that eye and a previous corneal graft.[189] On July 31, 2017, LSP staff noted in Mathieu's record that "this offender has been released from LSP."[190]

Viewing the facts in the light most favorable to Defendants on Plaintiffs' motion, the Court concludes that a reasonable jury could not find that Defendants' care and treatment of Mathieu was deliberately indifferent. He was diagnosed with cataracts; regularly seen by doctors; contact lenses were tried and, when those failed, surgery was ordered and performed. Complications prevented surgery from being performed in the left eye before Mathieu was released, at which point his healthcare was no longer being provided by Defendants. Although there was undoubtedly a delay between when surgery was ordered and ultimately performed, Plaintiffs have not shown that the delay rises to the level of deliberate indifference under the aforementioned legal standard.

Plaintiffs' *Motion for Summary Judgment* on their cataract claims shall be denied for the reasons stated. On the Defendants' cross-motions, the Court concludes that, based on the undisputed summary judgment evidence in the record, Defendants are entitled to summary judgment in their favor on the cataract claims of Plaintiffs Ross McCaa, Dan Riley, and William Dickerson.  As to McCaa, the evidence demonstrates that he was diagnosed with a cataract in each eye and that his visual acuity was measured at various points as 20/20 and 20/25, and 20/30. He was provided with glasses, then a new prescription for glasses. On October 4, 2017, McCaa was seen at the LSP Eye Clinic and his visual acuity was measured at 20/40 in both eyes.[191] Plaintiffs claim that a doctor "set

---

[189] Rec. Doc. No 170-8, p. 22, 25, 34, 49.
[190] Rec. Doc. No. 113-3, p. 1.
[191] Rec. Doc. No. 98-4, p. 14.
58211

the plan to be cataract surgery in the right eye first,"[192] but the record they cite for that proposition is unclear as to whether surgery was actually being ordered or recommended, or if it was simply an observation that the cataract in the right eye was more serious than in the left. There is no evidence in the provided records that McCaa was ever referred for surgery. The Court questions whether failing to provide surgery that was never ordered in the first place rises to the level of deliberate indifference.

As for Plaintiff Dickerson, Plaintiffs claim he was referred for cataract surgery multiple times and never received it; however, their evidence of those referrals is not the referral documents themselves, but rather two internal LSP spreadsheets, one indicating that a surgical referral occurred on March 19, 2012,[193] and another stating "date ordered" as "Sep-12."[194] There is a record by Dr. Coullard from the LSP Eye clinic on August 22, 2012 which states "trip out cat sx" (trip out cataract surgery), but the exact urgency or specificity of that statement is not clear. Meanwhile, Defendants produce evidence that Dickerson was regularly seen by eye doctors in connection with not only his cataracts but his recurrent uveitis (inflammation). A March 12, 2013 record by Dr. Yen Hoang Ngo notes that "patient wants to be referred for cataract surgery in left eye,"[195] but, based on the record, it does not appear that the doctor saw fit to order surgery. The record demonstrates that Dickerson frequently submitted Health Care Request Forms, but they all appear to be related to flare-ups of his uveitis, for which he was provided prescription eye drops and other treatment. Even viewing the evidence related to Dickerson in the

---

[192] Rec. Doc. No. 108-1, p. 29.
[193] Rec. Doc. No. 117-6, p. 2.
[194] Rec. Doc. No. 117-3, p. 2.
[195] Rec. Doc. No. 97-7, p. 51.
58211

light most favorable to Plaintiffs, a reasonable jury could not find that his treatment was deliberately indifferent.

Lastly, as to cataract Plaintiff Dan Riley, the Court notes that Plaintiffs did not oppose Defendants' *Motion for Summary Judgment*[196] on Riley's cataract claims. Under Middle District Local Rule 7(f), the failure to oppose a motion is grounds for it to be granted; in this case, the Court also concludes that Defendants' motion has substantial merit. The voluminous records regarding Riley's treatment demonstrate that he was referred for surgery, which was delayed by significant complications related to his blood pressure and other health conditions, but which was ultimately performed – in the right eye on May 31, 2016[197] and in the left eye on July 19, 2016.[198] The evidence of ongoing medical treatment and lack of "wanton disregard" is quite clear. Because Defendants' motion as to Dan Riley is unopposed and meritorious, the Court concludes that Defendants are entitled to summary judgment in their favor on his deliberate indifference cataract claim.

Accordingly, *Plaintiffs' Motion for Summary Judgment*[199] shall be DENIED as to their deliberate indifference claims related to cataracts and Defendants' *Motions for Summary Judgment* as to Ross McCaa, Dan Riley, and William Dickerson[200] shall be GRANTED.

---

[196] Rec. Doc. No. 104.
[197] Rec. Doc. No. 104-4, p. 87.
[198] Rec. Doc. No. 104-4, p. 100.
[199] Rec. Doc. No. 108.
[200] Rec. Doc. No. 98; Rec. Doc. No. 104; Rec. Doc. No. 116.
58211

### C. Plaintiffs' Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) Claims

"The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'"[201] Title II, in particular, "focuses on disability discrimination in the provision of public services."[202] Section 504 of the RA complements Title II by "prohibit[ing] disability discrimination by recipients of federal funding."[203] These laws "are judged under the same legal standards, and the same remedies are available under both."[204] Accordingly, the Court analyzes Plaintiffs' ADA and RA claims under one rubric.

Broad as the reach of the ADA may be, Defendants argue that they are entitled to summary judgment on Plaintiffs' ADA claims because Plaintiffs' claims are "clearly not covered by the ADA."[205] Indeed, Defendants argue, "it is clear that Plaintiffs' core complaint concerns disagreement with medical treatment, and not any discrimination by reason of an alleged disability."[206] Defendants note that this Court has held as much, including in the 2016 case *George v. Louisiana Dep't of Pub. Safety & Corr.*,[207] where it stated, "[g]enerally, the ADA prohibits discrimination because of disability, not inadequate

---

[201] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)).

[202] *Frame*, 657 F.3d at 224.

[203] *Id.*

[204] *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citing *Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002)).

[205] Rec. Doc. No. 170, p. 26.

[206] *Id.* at p. 27.

[207] *George v. Louisiana Dep't of Pub. Safety & Corr.*, No. CV-3:14-00338-JWD-EWD, 2016 WL 3568109, at *10 (M.D. La. June 23, 2016).

58211

treatment for disability. Thusly interpreted by sundry courts, the ADA is not violated by a prison failing to attend to the medical needs of its disabled prisoners."[208]

Plaintiffs do not thoroughly address Defendants' argument about the applicability of the ADA. In their *Reply*, they simply state that Defendants' argument is "wrong"[209] and presented "without citation to authority." Per Plaintiffs, "[f]ederal regulations are explicit that 'medical and mental health services' in prisons are programs like any other that 'must be operated in accordance with Title II requirements.'"[210] This point is somewhat non-responsive to the argument; Defendants do not contend that prisons and their medical services are not subject to Title II requirements. In fact, the *George* case cited by Defendants begins with the premise that "[u]nder well-established precedent, prisoners may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the RA."[211]

Courts within the Fifth Circuit have held that, when a "plaintiff's core complaint [is] incompetent treatment for his underlying medical condition, [s]uch a complaint does not state a claim for relief under the ADA because '[t]he ADA does not create a remedy for medical malpractice.'"[212] Thus, if Plaintiffs' core complaint is the incompetent treatment of their underlying medical conditions, the ADA does not apply.[213] Likewise, in *Hacker v. Cain*, this Court discussed whether a claim related to allegedly delayed cataract surgeries was cognizable under the ADA:

---

[208] *Id.* (internal quotations and citations omitted).
[209] Rec. Doc. No. 178, p. 8.
[210] *Id.*, citing 28 C.F.R. Part 35, Appendix A.
[211] 2016 WL 3568109 at *8.
[212] *Brown v. Wilson*, 2012 WL 6719464, at *3 (N.D. Tex. Dec. 27, 2012) (quoting *Moore v. Prison Health Services, Inc.,* 24 F.Supp.2d 1164, 1168).
[213] *George* at *8, citing *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 209-10, 118 S. Ct. 1952, 1954-55, 141 L.Ed. 2d 215 (1998); *see also, e.g., Frame v. City of Arlington*, 657 F.3d 215, 224-25 (5th Cir. 2011).
58211

> True, Plaintiff needed and desired surgery, without which he was becoming
> disabled. But the ADA prohibits discrimination because of disability, not
> inadequate treatment for disability. So construed, neither the RA nor the
> ADA is violated by a prison's simply failing to attend to the medical needs
> of its disabled prisoners.[214]

The Court finds that Plaintiffs' argument that the If-Reducible-No-Surgery policy facially violates the ADA is, in essence, a claim related to inadequate medical treatment. Although Plaintiffs couch the argument in the language and doctrine of the ADA, their fundamental assertion is that If-Reducible-No-Surgery is an illegal policy because "such a screening criterion for hernias is not medically justified."[215] In the eyes of the Court, that duplicates their deliberate indifference argument and is cognizable under 42 U.S.C. §1983, not the ADA.

Likewise, with respect to Plaintiffs' claims that Defendants failed to accommodate inmates with hernias and cataracts in a manner consistent with the ADA, the Court finds that the claims essentially arise out of Plaintiffs' complaints about medical treatment. For example, regarding their claim that Defendants assigned "inappropriate duty status" to Plaintiffs, Plaintiffs argue that receiving "the requested and necessary surgeries would have rendered these duty statuses irrelevant and constituted an accommodation for Plaintiffs."[216] Elsewhere, Plaintiffs state that "[a] refusal to provide doctor-prescribed medical care is a failure to accommodate."[217] Indeed, Plaintiffs explain, for Defendants to provide adequate access to "existing public services" as required by the ADA, it would

---

[214] *Hacker v. Cain*, 2016 WL 3167176, at *19 (M.D. La. June 6, 2016) (internal quotations and citations omitted).
[215] Rec. Doc. No. 108-1, p. 45.
[216] *Id.* at p. 58.
[217] *Id.* at p. 55.
58211

"require very little accommodation beyond the requested surgeries."[218] If the remedy to the alleged discrimination is surgery, the Court concludes that the claims truly arise out of deliberate indifference and not under the ADA.

It is true that Plaintiffs present their claim as being broader than merely seeking accommodation in the form of surgery. For example, they argue that assigning certain duty statuses was "unnecessary or overly restrictive, even without the requested surgeries."[219] Even assuming *arguendo* that the ADA/RA applies, the Court finds that no competent summary judgment evidence has been presented to demonstrate intentional discrimination against Plaintiffs due to their alleged disabilities. In their *Reply*, Plaintiffs accuse Defendants of trying to "have it both ways"[220] by arguing that certain Plaintiffs were not impaired enough to need surgery but that they were impaired enough to merit exclusion from "sports, hobbycraft, and the rodeo."[221] However, the Court notes that the argument could be inverted to apply with equal force to Plaintiffs: if, as Plaintiffs argue, they were so critically impaired that they urgently needed surgery, how does imposing certain work and activity restrictions necessarily constitute illegal discrimination?

Overall, the Court concludes that Defendants are entitled to summary judgment in their favor because, based on the law and the competent summary judgment evidence put forth by both parties, Plaintiffs' ADA/RA claims are not properly cognizable under those statutes; their claims are fundamentally concerned with the adequacy of their

---

[218] *Id.* at p. 56.
[219] *Id.* at p. 58.
[220] Rec. Doc. No. 178, p. 9.
[221] *Id.*

58211

medical treatment, which is a matter for 42 U.S.C. § 1983 and the Eighth Amendment, not the ADA.

## III.    CONCLUSION

Accordingly, Plaintiffs' *Motion for Summary Judgment*[222] is hereby DENIED. Defendants' *Motions for Summary Judgment*[223] are hereby GRANTED and the claims against them dismissed with prejudice.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on February 20, 2020.

*Shelly D. Dick*

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[222] Rec. Doc. No. 108.
[223] Rec. Doc. Nos. 78, 90, 91, 92, 93, 94, 95, 103, 98, 104, and 116.
58211